# EXHIBIT "A"

## SUMMONS

Attorney(s) Andrew DeLaney

Office Address 6 South Street, Suite 203

Town, State, Zip Code Morristown, NJ 07960

Telephone Number 973-606-6090

Attorney(s) for Plaintiff Andrew DeLaney

Shingo Lavine, Adam Lavine,

Aiko Lavine

     Plaintiff(s)

vs.

American Academy Pediatrics Inc.

Princeton Medical Group, P.A.

     Defendant(s)

## Superior Court of New Jersey

Mercer   ☑ County

Civil      Division

Docket No: MER-L-000272-21

## CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

                      S/ Michelle Smith

              Clerk of the Superior Court

DATED: 02/16/2021

Name of Defendant to Be Served: American Academy of Pediatrics, Inc.    c/o CSC

Address of Defendant to Be Served: Princeton South Corp. Center, 100 Charles Ewing Blvd., Suite 160, Ewing, NJ

**EXHIBIT B**

Revised 11/17/2014, CN 10792-English (Appendix XII-A)



# Notice of Service of Process

**Primary Contact:** Diane Gainey
American Academy of Pediatrics
345 Park Blvd
Itasca, IL 60143-2644

**Electronic copy provided to:** Devin Henderson

| | |
|---|---|
| **Entity:** | American Academy Of Pediatrics Inc.<br>Entity ID Number  2810027 |
| **Entity Served:** | American Academy of Pediatrics, Inc |
| **Title of Action:** | Shingo Lavine vs. Princeton Medical Group, P.A. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Personal Injury |
| **Court/Agency:** | Mercer County Superior Court, NJ |
| **Case/Reference No:** | MER-L-000272-21 |
| **Jurisdiction Served:** | New Jersey |
| **Date Served on CSC:** | 02/22/2021 |
| **Answer or Appearance Due:** | 35 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Andrew Delaney<br>973-606-6090 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

**EXHIBIT B**

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY<br><br>DOCKET NO.:<br><br>Civil Action<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, Shingo Lavine, Adam Lavine, and Aiko Lavine, by way of Complaint against the above-named defendants, say:

## PARTIES

1. Plaintiff Shingo Lavine ("Shingo") is a natural person who is a citizen of the State of Rhode Island.

2. Plaintiffs Adam Lavine ("Adam") and Aiko Lavine ("Aiko") are natural persons who reside in and are citizens of the State of California. They are the natural parents of Plaintiff Shingo Lavine.

3. Defendant Princeton Medical Group, P.A. ("Princeton") is a New Jersey professional association. It is subject to the jurisdiction of this Court and may be served with process by serving its registered agent Joan Hagadron at 419 North Harrison Street, Suite 203, Princeton, NJ 08540. It is subject to the jurisdiction of this Court and venue is properly laid herein.

4. Defendant American Academy of Pediatrics, Inc. ("AAP") is an Illinois corporation registered to do business in the State of New Jersey. It is subject to the jurisdiction of this Court and may be served with process by serving its registered agent, Corporation Service Company, Princeton South Corporate Center, 100 Charles Ewing Blvd., Suite 160, Ewing, NJ 08628. It is subject to the jurisdiction of this Court and venue is properly laid herein.

## FACTS

5. In December,1997, Shingo Lavine was born to Adam and Aiko Lavine at Princeton Medical Center in Plainsboro, Mercer County, New Jersey.

6. On or about December 18, 1997, Dr. Jeffrey L. Chait, M.D., the obstetrician who delivered him, an employee and agent of Defendant Princeton Medical Group, P.A., circumcised Shingo Lavine. Defendant Princeton thereafter billed Adam and Aiko Lavine or their insurer or both for the circumcision and received money for Dr. Chait's performance of it.

7. Defendant Princeton is liable for the torts of its employees and agents, including Dr. Chait, under the doctrine of *respondeat superior.*

8. Shingo's mother, Aiko, is of Japanese heritage. Japan is not a circumcising society, and until she came to the United States and eventually married Adam, she had never heard of it. After Shingo's birth and before the circumcision, Aiko was incapacitated due to a difficult 36-hour labor on medications and a Caesarean section. Just prior to the circumcision she was being administered morphine and Percocet® (brand of oxycodone and acetaminophen) and other medications.

9. Prior to the circumcision Dr. Chait did not ask Aiko to give her permission to have her son circumcised, and she did not give permission for the circumcision.

10. After Shingo was born, Dr. Chait solicited Adam's verbal consent to have Shingo circumcised. Dr. Chait informed him that the American Academy of Pediatrics had issued guidelines about circumcision showing that circumcision reduces the incidence of urinary tract infections, penile cancer, and sexually transmitted diseases including HIV. Dr. Chait portrayed circumcision as a minor, safe, and harmless procedure and as a routine and normal part of childbirth, and he portrayed parental permission as expected and as a formality.

11. Adam does not recall signing a form giving consent to have Dr. Chait circumcise his son Shingo. If wording about consenting to circumcision was in a hospital admission form, it was not brought to his attention, and he did not see it during the rush of getting his wife Aiko admitted to the hospital to give birth. If Adam did give written permission, he did so in reliance upon the representations made, expressly, impliedly, and by omission, by Dr. Chait and the AAP, enumerated in this Complaint, which Adam had no reason to doubt and did not doubt.

12. Dr. Chait did not disclose to Adam and Aiko, and they were completely unaware, that circumcision was a highly controversial topic, nor did he convey to them any opinion other than that circumcision was good for health. He did not disclose to them that circumcision is surgery; that it is painful; that it risks many complications and can be fatal; that men may resent having been circumcised at birth without their consent and when they were unable to prevent it and that it can cause psychological problems; he did not disclose that the foreskin of the penis is highly erogenous; and he did not disclose the functions of the foreskin. He did not disclose to them the risk of any complications or the common occurrence of loss of shaft skin and consequent tight erections with hair on the shaft of the penis.

13. After the circumcision, Dr. Chait seemed distinctly less confident than he had been before. He expressed concern about the circumcision to Shingo's parents and told them that they would "have to keep an eye on it" and let him know if there were any problems with Shingo's penis. This was a surprising and concerning reaction to what had been presented as a routine and simple procedure. However, Dr. Chait did not disclose exactly what his concerns were and he did not disclose that too much shaft skin had been removed.  Adam and Aiko observed that after about one month, Shingo's penis had not healed and looked unusual to them, and they became concerned the circumcision had not been properly performed..

14. Sometime between January 10-15, 1998, Adam and Aiko took Shingo to Shingo's pediatrician, Dr. David Sharlin of Delaware Valley Pediatrics, with concerns about Shingo's penis. After examining Shingo, Dr. Sharlin told them that he believed that complications had arisen from Shingo's circumcision, namely that not enough foreskin had been removed. He recommended a follow-up with Dr. Joseph Barone, Chief of the Section of Pediatric Urology at Robert Wood Johnson University Hospital, New Brunswick, New Jersey.

15. On January 21, 1998, Adam and Aiko presented Shingo to Dr. Barone for examination.  Dr. Barone observed blood and scarring on Shingo Lavine's penis. He cleaned the penis, then diagnosed Shingo as suffering from phimosis and a buried penis.  He recommended what he called a "second circumcision." Dr. Barone presented the "second circumcision" as if it were also routine. Thereafter, Dr. Barone performed a second circumcision surgery on Shingo. He wrote a letter that day stating that, "Shingo should do very well with the circumcision." In fact, after Dr. Barone's surgery, Shingo did not "do very well" at all.  Unknown to his parents until recently, Shingo's penis had insufficient shaft skin coverage so that his erections were and are to this day too tight and pull pubic skin onto the shaft. In addition, Shingo had and has pubic hair bearing skin down to the circumcision scar line, which is unsightly, and which interferes with normal sexual functioning.

16. When Shingo reached adolescence, he suffered from physical complications caused by the circumcisions, including painful erections, meatal stenosis (narrowing of the urethral opening), scrotal webbing, and hypersensitivity of the glans.

17. By June 2020, Shingo experienced serious angst and anger that physicians had circumcised him, twice, and had caused his injuries, when he had been in perfect health at birth, did not need the operation, would not have chosen it for himself, and was powerless to prevent it. He was and is also unhappy with the unsightly appearance of his penis.

18. In June 2020, Shingo discovered that although it is a common sentiment in the United States is that circumcision is normal and good for health, and that one would have utterly no reason for experiencing the feelings that he has, he is by no means alone: many circumcised men in the U.S. share the same anger and profound sense of loss as Shingo, and many, like him, suffer from various physical and psychological complications.

19. On or about June 15, 2020, Shingo became involved with Foregen, a medical organization devoted to regenerating foreskin, specifically the specialized structures including nerve endings that are removed or destroyed during circumcision.

20. On or about June 15, 2020, Shingo began partial restoration of his foreskin, a highly intensive daily routine to attempt to recover the denuded glans by stretching the loose skin of the penile shaft, although circumcision is irreversible surgery, and the specialized erotogenic nerves are lost forever when it is performed. Upon information and belief, more than 60,000 men in the United States currently practice foreskin restoration. It requires wearing weights attached to the penis and pulling for 3-4 hours per day for 5-10 years, which is very uncomfortable and time consuming. Shingo has spent more than 700 hours over the course of almost 1,000 sessions as part of the process to partially "restore" his foreskin.

21. On July 29, 2020, Shingo began psychotherapy to try to cope with the severe emotional distress he feels about his circumcision, but to date it has not diminished his distress.


## DELAYED DISCOVERY THAT SHINGO, ADAM, AND AIKO WERE DEFRAUDED

22. Notwithstanding the physical issues that Shingo started becoming aware of in adolescence, none of the Lavines had any reason to question the circumcisions or the result, given the pervasiveness of the procedure in American culture.

23. The Lavines only became truly aware of how the physical issues Shingo was experiencing related to the circumcisions when the Lavines spoke with the law professor Peter W. Adler, an expert on circumcision and the law, on September 25, 2020. Professor Adler informed them that the foreskin is a natural body part and the most sensitive part of the penis, men value it, and physicians in most countries outside the United States leave it alone. Unnecessary surgery on a child violates the ethical and legal right of boys and the men they become to bodily integrity and self-determination. Circumcision, which began as a sacrificial religious ritual and painful rite of passage, is violence and genital mutilation, the opposite of medicine, and a fraud when performed by physicians and hospitals in the U.S., as explained in two law review articles.[1] First, physicians target newborn boys unable to refuse, mothers who are incapacitated, give fathers only minutes to decide, and badger parents who say no until they consent. This constitutes unfair, deceptive, and *fraudulent misconduct*. Second, physicians and their trade association, the American Academy of Pediatrics, make knowingly *false and fraudulent medical claims*. They portray circumcision as a normal, simple, safe, and harmless medical procedure, when they know that like any surgery it is very painful, risks many complications, can be fatal, and can cause psychological harm. They also use fear of urinary tract infections (UTIs), penile cancer, and sexually transmitted infections, including HIV, to sell circumcision to parents, when the treatment for UTIs is antibiotics, boys are not at risk of adult diseases, and those diseases can be prevented easily and more effectively without loss of the foreskin and the circumcision's attendant risks; and they use false diagnoses such as phimosis or a tight foreskin, which is normal in the newborn. Parental consent is therefore not fully informed, it is legally invalid, and the operation is a battery. Third, they and the AAP make the *false legal claims* that physicians have the right to operate on a healthy child and that parents have the right to elect circumcision, when circumcision violates the child's right to bodily integrity, and the child's rights supersede the parents' rights. Professor Adler told the Lavines that

---

[1] Matthew R. Giannetti. *Circumcision and the American Academy of Pediatrics: Should Scientific Misconduct Result in Trade Association Liability*, 85 Iowa L. Rev. 1507 (2000) at <http://www.cirp.org/library/legal/giannetti/> and Peter W. Adler, Robert Van Howe, Felix Daase, and Travis Wisdom, *Is Circumcision a Fraud?*, Cornell J. L. & Public Policy (Vol 30 No. 1 Fall 2020) at <https://www.lawschool.cornell.edu/research/JLPP/index.cfm>.

they had legal claims against the physician, medical group, and the AAP for battery, breach of fiduciary duty and hence constructive fraud (where intent to defraud is presumed, even if it is absent, to prevent unfairness).

24. The Lavines were dumbfounded to learn this, as this was the first time they had heard the normality of circumcision (which had been adopted into their worldview, as it has been for most of the American public) and the physician's right to perform it had been challenged. They realized that what Professor Adler described is exactly what had actually happened to them when Shingo was born, as detailed in this Complaint. Additionally, the Lavines were stunned to realize that the United States has one of the highest rates of circumcision in the developed world and that the AAP guidelines are opposite to the recommendations of most developed nations' medical experts.

## 1989 AAP GUIDELINES ON CIRCUMCISION

25. The AAP is an organization of physicians who specialize in pediatrics, the care of children from birth to the age of 21. The AAP is not exclusively organized for charitable or educational purposes; rather it is also organized to protect the economic welfare of its members, who practice medicine in part for a profit. The AAP actively lobbies federal and state legislatures for laws beneficial to its members. It claims to lead the pediatric medicine community in setting standards of practice and recommendations for practice. It voluntarily issues advisory reports, recommendations, and guidelines for both the medical profession as well as for the general public, including the Plaintiffs herein, upon which both the profession and the general public are expected to, and do, rely.

26. The AAP owes a duty to the general public, including the Plaintiffs herein, to tell the truth, the **whole** truth, and nothing but the truth when issuing reports, policy statements, and guidelines for medical care and procedures.

27. The AAP owes a duty to the general public, including the Plaintiffs herein, to refrain from failing to disclose all relevants facts and considerations when issuing reports, recommendations, and guidelines.

28. By words and conduct the AAP invites other medical associations such as the Ameircan College of Obstetricians and Gynecologists, obstericians and gynecologists, pediatricians, other physicians, and the general public to rely upon the AAP's reports, recommendations and guidelines.

29. In 1971 the AAP Committee on the Fetus and Newborn issued *Standards and Recommendations of Hospital Care of Newborn Infants.* In it, the AAP stated the truth that, " there are no valid indications for circumcision in the neonatal period." In 1975 an Ad Hoc Task Force of that committee found no basis for changing that statement, while stating that "there is no absolute medical indication for routine circumcison of the newborn."

30. In 1980, Springer Publishing Company, a major medical publisher in New York, published the 197 page heavily footnoted book, *Circumcision: An American Health Fallacy* by Edward Wallerstein, a medical writer. The thesis of the book is that neonatal circumcision is needless, damaging, and not medically justified. At its conclusion Wallerstein wrote: "The medical profession bears responsibility for the introduction of prophylactic circumcision without scientific basis in the past and for its continued use and rationalization without scientific basis in the present. The profession seems to accept circumcision as a 'national cultural triat' as much as do lay people. With evidence at hand to disprove the prophylactic benefits of the surgery, the medical profession has the responsibility to discourage this practice. The pretense of neutrality is a negative stance." His final paragraph stated, "**Today circumcision is a solution in search of a problem. The operation, as prophylaxis, has no place in a rational society. The final conclusion to be drawn is that routine infant health circumcision is archaic, useless, potentially dangerous, and therefore should cease.**" **(Emphasis added).**

31. In 1984 the AAP published a pamphlet for the parents of newborns entitled, "Care of the Uncircumcised Penis." It contained the following paragraph: "**The Function of the Foreskin**: The glans at birth is delicate and easily irritated by urine and feces. The foreskin shields the glans; with circumcision, this protection is lost. In such cases, the glans and especially the urinary opening (meatus) may become irritated or infected, causing ulcers, meatitis (inflammation of the meatus), and meatal stenosis (a narrowing of the urinary opening). Such problems virtually never

8

occur in uncircumcised penises. The foreskin protects the glans throughout life. " **By 1994, the AAP had removed that paragraph from the most recent edition of its pamphlet.**

32. In 1984 Trudie London on behalf of her son Adam London, to whose circumcision shortly after birth she had consented, filed a lawsuit in Marin County, California Superior Court, Docket No. 118799, against his circumciser Mark Glasser, M.D. and Kaiser Foundation Hospitals and The Permanente Medical Group, in which she claimed that the circumcision constituted common law battery, willful cruelty, unjustifiable infliction of pain, child abuse, kidnapping, false imprisonment, and mayhem. In essence, she contended that parental consent for a medically unnecessary circumcision was legally invalid and that circumcision itself constituted battery and violated several California statutes. Although the case was not successful, it received significant publicity, including an article in the then-influential Time Magazine. This suit alarmed the medical profession, including the defendant Glasser in that lawsuit, as well as his friend and acquaintance Edgar J. Schoen, M.D., a pediatric endocronolgist and member of the AAP.

33. In Volume 23, No. 3 (1984-1985) of the *Journal of Family Law*, published by the University of Louisville School of Law, there appeared an article by William E. Brigman, an Assistant Professor, entitled "Circumcision as Child Abuse: The Legal and Constitutional Issues." In it, Professor Brigman contended, "Since circumcision is not medically warranted, has no significant physiological benefits, is painful because it is performed without anesthesia and leaves a wound in which urinary salts burn, carries significant risk of surgical complications, including death, and deforms the penis, it would seem that as a nonaccidental physical injury, it is properly included in the definition of child abuse." He opined that, "Suits for damages against surgeons, hospitals, and conceivably parents are possible . . . . " He suggested that, "The most promising approach would seem to be a civil rights class action against hospitals . . . . ".

34. Growing opposition to neonatal circumcision alarmed the medical profession, which was increasingly afraid of lawsuits. The November 15-30, 1986 issue of *Ob-Gyn News* carried an article entitled, "See Expanding Liability Risks In Circumcision." It cited another California case arising from a botched circumcision that contended that, "the procedure violated the boy's constitutional right to privacy, safety,and happiness" and also claimed that the circumcision constituted a battery. Charles Bonner, the plaintiff's attorney, claimed, according to the article,

"The boy [7 weeks old at the time] did not himself consent to the procedure, and under California law parents have no ability to consent to a medically unnecessary surgery . . . . "

35. In May 1985 a pediatrician, Thomas Wiswell, M.D., published an article in the AAP's journal *Pediatrics* that suggested that circumcision might reduce the number of urinary tract infections in boys. Almost immediately, this was latched onto by circumcision proponents such as urologist Aaron Fink, M.D., whose letter to *Pediatrics* stated, "I suspect that similar studies will be repeated elsewhere and, if confirmed, become an important reference to justify a medical indication for a newborn circumcision. It presumably might even invalidate litigation based on 'removal of the natural protection afforded by the foreskin' as well as 'by reason of wrongful and malicious acts' performed by medical as well as 'mohel' (ritual) circumcisers."

36. In 1987 Edgar J. Schoen, M.D., a friend of Mark Glasser, M.D., who had been sued in the London case, published a poem in the *American Journal of Diseases of Children,* entitled "Ode to the Circumcised Male" in which he derided those opposed to circumcision. (See Exhibit A). After noting that "third-party payers are increasiningly refusing to pay for the procedure," Schoen set forth the poem that said, "If you're the son of a Berkeley professor, your genital skin will be greater, not lesser: styled the non-circumcised state as ,genital chic"; and ended with the consoling line for the circumcised, "Just hope that one day, you can say with a smile that your glans ain't passé it will rise up in style."

37. In 1988 Aaron Fink, M.D. published a book entitled *CIRCUMCISION: A Parent's Decision for Life.* In it he alleged that circumcision had potential medical benefits and he derided the idea that loss of sensation occurs because of circumcision.

38. In 1988 or 1989 Edgar J. Schoen, M.D. volunteered to chair a Task Force of the AAP on Circumcision. Dr. Schoen was a zealous proponent of circumcision whose poem suggested that he had undisclosed religious and personal motives for advocating circumcision that went beyond medicine. Dr. Schoen additionally expressed alarm that but for recent evidence that circumcision potentially decreased the rate of urinary tract infections, third party insurance payers would stop covering it, and "the anti-circumcision tide" would prevail.

39. The Task Force issued a "Report of the Task Force on Circumcision (RE9148)," which was published in the AAP's journal *Pediatrics* in August 1989 ("1989 Guidelines"). (See Exhibit B). Those were the AAP guidelines regarding circumcision in place at the time of Shingo's birth and subsequent circumcisions.

40. The 1989 Guidelines did not contain any information on the functions of the foreskin, the tissue that is removed by circumcision, even though the AAP in its 1984 pamphlet for parents had explained some of its functions and thus was aware of them.  (See Exhibit C). This section was removed in its 1994 pamphlet. (See Exhibit D).

41. The AAP issued its 1989 Guidelines specifically to protect the medical profession in general, and pediatricians in particular, from legal liability for performing unnecessary, risky, debilitating, damaging surgery, circumcision, on the penises of minor boys, and to protect the pocketbooks of AAP members, many of whom perform neonatal circumcision for money.

42. The 1989 AAP Policy Statement contained numerous intentional misrepresentations and omissions[2] as detailed in Count III of this Complaint.

43. As much of its justification for promulgating its 1989 Guidelines, the AAP claims that boys who have not been circumcised show an increased rate of urinary tract infections. The AAP itself stated that the studies may have methodologic flaws; UTIs can be treated with antibiotics; and Dr. Thomas Wiswell, the doctor responsible for the studies, has stated that there was tremendous financial incentive for doctors to continue performing circumcisions routinely on neonatal boys.

44. The 1989 Guidelines did not disclose the risk of parental anger and regret, despite the fact that the London case and the increasing opposition to circumcision as noted above had alerted the AAP to that very real risk.  Adam and Aiko are angry that defendants did not fully inform them about circumcision, in which case they would have stopped Dr. Chait and the hospital from performing the unnecessary operation. It has created tremendous hardship for Adam and Aiko Lavine to try to

---

[2] See Matthew R. Giannetti. *Circumcision and the American Academy of Pediatrics: Should Scientific Misconduct Result in Trade Association Liability*, 85 Iowa L. Rev. 1507 (2000) at <http://www.cirp.org/library/legal/giannetti/>.

come to terms with the strained relationship with their son caused by the first circumcision surgery and subsequent revision surgery.

**COUNT I**

**(Intentional Fraud)**

**Princeton Medical Group, P.A.**

45. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 44 as if set forth at length herein.

46. Dr. David Chait was acting as an employee and agent of Princeton Medical Group, P.A. and within the course and scope of his employment relationship with it when he solicited permission to circumcise Shingo and when he performed the circumcision.  At all times relevant hereto Dr. Chait, as a physician, was in a fiduciary relationship with the Plaintiffs and owed them a duty of care as a fiduciary to act with the utmost good faith in his dealings with them.

47. Dr. Chait, acting within the course and scope of his employment and agency with Princeton Medical Group, P.A., failed to act with the utmost good faith and intentionally defrauded Adam and Aiko Lavine into permitting the circumcision of their newborn son Shingo by the following unfair and deceptive misconduct, misrepresentations, and omissions; which Dr. Chait intended the Plaintiffs Adam and Aiko Lavine rely upon; which they did rely upon; and which resulted in the damages to them and to Shingo Lavine that are complained of herein.

- Fraudulent conduct in the hospital, including, without limitation: not obtaining written parental permission, or hiding the permission form in a hospital admission form; targeting a newborn baby boy, Shingo Lavine, who was unable to refuse; targeting Aiko Lavine and not giving her the opportunity to participate when she was legally incapacitated and would have refused; and giving Adam Lavine only a few minutes to make the circumcision decision, an unfair high-pressure sales tactic that constituted coercion and duress.

- Making false medical claims (express, implied, or by omission), including without limitation: not disclosing that physicians in most countries leave boys genitally

12

intact and that circumcision is controversial; falsely portraying circumcision to the Lavine parents as a normal and routine part of childbirth; not disclosing that the foreskin is a natural body part, highly erogenous, and functional, and that men value it; not disclosing that circumcision is unnecessary and not medically indicated; not disclosing that it is irreversible surgery; claiming that circumcision has potential medical benefits when it does not benefit most boys or men at all, when any benefits can be achieved without it, and when it did not benefit Shingo Lavine; mentioning urinary tract infections as a reason to circumcise when UTIs can be easily treated with antibiotics; using the scare tactic of mentioning prevention of penile cancer and STDs including HIV, when circumcision does not prevent them, boys are not at risk of those diseases, and they can be easily prevented without loss of the foreskin; not disclosing that circumcision is extremely painful, and circumcising Shingo Lavine without any pain relief or without adequate pain relief during and after the surgery; not disclosing that circumcision risks more than 50 minor and serious complications including the physical injuries that Shingo Lavine suffers from; not disclosing that circumcision can be fatal; not disclosing the risk of psychological harm that Shingo Lavine suffered and suffers from; not disclosing that circumcision could impair Aiko and Adam Lavine's relationship with their son and that the Lavine parents might come to regret the circumcision.

- Making the implied false claim that it is ethical and legal for physicians to perform irreversible unnecessary genital surgery on a healthy infant, and to solicit parental consent to do so.

48. But for the foregoing misconduct, misrepresentations, and omissions, Adam Lavine would not have given permission to have his son circumcised.  If fully informed about the pain, risks, and harms of circumcision, both Adam Lavine and Aiko Lavine would have told Dr. Chait not to perform the unnecessary operation.

49. By the foregoing misconduct, misrepresentations, and omissions, Dr. Chait intentionally defrauded the Plaintiffs Adam Lavine, Aiko Lavine, to their damage and to the damage of Shingo Lavine and Princeton Medical Group, P.A. is liable to them for said fraud pursuant to the doctrines of agency and *respondeat superior.*

**WHEREFORE**, Plaintiffs demand judgment that the defendant Princeton Medical Group, P.A., acting by and through its employee and agent Dr. Chait, intentionally defrauded the Plaintiffs, and they pray for the relief requested below.

## COUNT II
### (Constructive Fraud)
### Princeton Medical Group, P.A.

50. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 49 as if set forth at length herein.

51. When a physician violates the trust that a patient (here Shingo Lavine) and/or those representing him (here Adam and Aiko Lavine) places in the physician in the slightest way by any unfair or wrongful act—including without limitation by fraud, breach of fiduciary duty, mistake, undue influence, or the physician unjustly enriches himself—a cause of action lies for constructive fraud, where fraud is presumed even if intent to defraud is absent.

52. The misconduct, misrepresentations, and omissions described in this Complaint and in Count I constitute unfair and wrongful acts, including, without limitation, unfairness, fraudulent conduct, fraudulent medical claims, fraudulent legal claims, breach of fiduciary duty, mistake, coercion, duress, undue influence; and Dr. Chait and Princeton Medical Group, P.A. unjustly enriched themselves at the expense of their healthy "patient" Shingo Lavine. Dr. Chait thereby committed constructive fraud against the Plaintiffs, which damaged them. Princeton Medical Group, P.A. is liable to them for said constructive fraud pursuant to the doctrines of agency and *respondeat superior.*

**WHEREFORE**, Plaintiffs demand judgment that Princeton Medical Group, P.A. committed constructive fraud against them, and they pray for the relief requested below.

## COUNT III
### (Intentional Fraud)
### The American Academy of Pediatrics

53. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 52 as if set forth at length herein.

54. As set forth above, Dr. Chait referenced the AAP's circumcision policy statement then in effect (the "1989 Guidelines") when he solicited Adam Lavine's permission to circumcise Shingo Lavine and when he portrayed circumcision as routine, as medicine, and as a parental right.

55. Adam Lavine, who knew nothing about medicine or medical aspects of circumcision—and who was representing his newborn son and his incapacitated wife at the time—relied upon Dr. Chait's reference to those AAP guidelines in support of circumcision when he consented to the circumcision.

56. The AAP 1989 Guidelines contain numerous false and fraudulent representations and omissions as set forth herein; the AAP knew that they were false or made them with reckless disregard of their falsity; the AAP intended that physicians, here Dr. Chait, and parents offered circumcision representing boys, here Adam Lavine representing Shingo and Aiko Lavine, rely upon them; the Lavines did rely upon them; damages resulted from such reliance; and the AAP thereby defrauded the Plaintiffs.

57. Undisclosed Financial Bias. The 1989 AAP Guidelines fail to disclose that the AAP is not only a medical association but also a trade association representing the financial interest of its members. The AAP failed to disclose the financial bias of at least some of the committee members in perpetuating circumcision for financial reasons, and that at least some of the committee members were not neutral.

58. Undisclosed Religious Bias. Upon information and belief, one or more members of the committee that wrote the 1989 Guidelines were Jewish, including Dr. Schoen.  Circumcision is a sacred religious rite among Jews. The AAP failed to disclose the religious bias of at least one and perhaps more of its committee members in favor of perpetuating circumcision, and he or they were not neutral.

59. Undisclosed Cultural Bias. The 1989 AAP Guidelines fail to disclose that the U.S. is an outlier among physicians worldwide in circumcising healthy boys, and that its authors were culturally biased in favor of circumcision and not neutral.

60. Not Common or Routine or Medicine. The 1989 Guidelines state that most male infants born in this country are circumcised during in the newborn period, implying that it is a routine part of the practice of medicine. This fails to disclose that non-therapeutic circumcision by physicians is uncommon outside the U.S.; that it is unlike anything else in medicine worldwide as physicians do not solicit parental permission to surgically remove other healthy parts of their child's body and take orders from parents to do so; and that non-therapeutic circumcision, or circumcision that is not needed to treat a medical condition, is violence, the opposite of medicine.

61. Undisclosed Controversy. The 1989 AAP Guidelines fail to disclose that circumcision has been controversial for years, and they fail to disclose that there is widespread opposition to the practice on medical, ethics, and legal grounds inside and outside the U.S.

62. Unethical. The 1989 AAP Guidelines falsely claim by omission that circumcision is ethical when it violates numerous provisions of the AMA Code of Medical Ethics, including the prohibition against unnecessary surgery, and the general rules of medical ethics: autonomy; non-maleficence ("First, Do No Harm"); beneficence ("do good); proportionality; and justice or fairness.

63. Unlawful and a Crime. The 1989 AAP Guidelines falsely claim by omission that it is legal for physicians to circumcise or perform unnecessary genital surgery on healthy boys when it violates a child's right to bodily integrity and self-determination, constitutes a battery, which is a tort and a crime, and as William E. Brigman showed in his 1984 law review article, it is statutory criminal child abuse in every U.S. state,[3] including New Jersey.

64. Scientific Misconduct. The 1989 AAP Guidelines did not follow accepted scientific methods; its pro-circumcision conclusions were not scientifically defensible; and its authors engaged in scientific misconduct.

65. Pain Understated. The 1989 AAP Guidelines state, "Infants undergoing circumcision without anesthesia demonstrate physiologic responses suggesting that they are experiencing pain." This understates pain as circumcision is one of the most painful procedures in neonatal medicine. The AAP states that behavioral changes arising from pain are transient, not disclosing that pain continues for many days after the circumcision.

66. No Anesthetics. The AAP knew that circumcision is extremely painful and that the pain continues after the operation, but it did not even recommend that anesthesia be used to try to lessen the pain during and after the operation.

67. False Claim that Circumcision is Safe. The AAP claimed in 1989 that "[c]ircumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique." The AAP knows that circumcision is not safe. It risks many complications. The 1989 Guidelines admit that the "exact incidence of postoperative complications is unknown," while deceptively suggesting that "the rate is low." This ignores the fact that a significant part of the surgical practice of pediatric urologists is made up of treating circumcision complications or sequelae, a fact that had to be known to the prominent urologist on the committee, Frank Hinman, Jr., M.D., author of a major text on pediatric urologic surgery.

---

[3] William E. Brigman. Circumcision as Child Abuse: The Legal and Constitutional Issues, 23 J Fam Law 337 (1985).

68. Failure to Disclose Lack of Training. The AAP failed to disclose that many physicians who perform circumcisions are not well trained, even though at least one member of the committee had to have known this to be so.

69. Undisclosed and Understated Complications. (a) The AAP failed to disclose most of the complications of circumcision--there are more than 50—or the complications that Shingo Lavine suffers from including painful erections, scrotal webbing, hypersensitivity of the glans, and unsatisfactory cosmetic appearance. (b) The AAP understated the rate of complications at 0.2% and 0.6% when according to one study the rate is as high as 13%. (c) The AAP failed to take into account complications that occur later in childhood and in adulthood. (d) The AAP did not disclose severe complications such as the risk of cutting off all or part of the glans penis. (e) The AAP misrepresented the rate of severe complications, which is as high as 2-4%. (f) The AAP stated, "The exact incidence of postoperative complications is unknown." Thus, the AAP knew that it did not have enough data to conclude that circumcision is safe in 1989. (g) The most common complication following male circumcision, meatal stenosis, which is a narrowing of the urethral opening that interferes with micturition, is seen in 5% to 20% of boys following circumcision, and happened to Shingo Lavine, is only addressed in passing: "There is no evidence that meatitis leads to stenosis of the urethral meatus."

70. Risks Unknown. The 1989 Guidelines advise physicians to inform parents of the risks, but this is impossible as the Guidelines state, "The exact incidence of postoperative complications is unknown."

71. Not Harmless. The 1989 AAP guidelines imply by omission that circumcision is harmless when properly performed. The AAP did not discuss the anatomy and physiology of the foreskin of the penis, however, the body part being irreversibly amputated. The AAP did not disclose that the foreskin is highly erogenous, as has been known since ancient times; that its inner lining is a moist and mobile mucous membrane, which reduces friction during masturbation and sexual intercourse. The AAP did not disclose that men prize the foreskin and that men who have one rarely volunteer to part with it. Thus, the AAP assigned no value to the foreskin that circumcision irreversibly amputates, even though males do, and thereby impliedly told parents asked to make the circumcision decision, here the Lavines, relying on the AAP's guidelines, that the foreskin is worthless.

72. No Disclosure of the Risk of Psychological Harm. The AAP did not disclose that boys and men may be angry to have been circumcised and that circumcision can cause psychological harm.

73. No Disclosure of the Risk of Parental Regret. The AAP did not disclose that boys and men may be angry that their parents gave permission to have them circumcised, which they would not have chosen for themselves; that this may impair the relationship between parents and son; and that parents may regret having given permission.

74. Thus, the AAP 1989 Guidelines promoted circumcision by falsely portraying it as medicine, and as the simple, safe, and painless snip of a worthless piece of skin. Although the American public often refers to circumcision as a "snip," the AAP did not correct the public's false belief in the Guidelines.

75. False Claims About UTIs. The AAP promoted circumcision in its 1989 Guidelines largely based on the claim that it reduces the risk of urinary tract infections. But the AAP knew that "these studies [about UTIs] may have methodologic flaws." The AAP failed to state the simple fact that UTIs in boys can easily be treated with antibiotics, as they are in girls.  They failed to point out that girls have many times more UTIs than boys, circumcised or not.

76. False Claims About Penile Cancer. Penile cancer is a rare disease that occurs in old age. Boys are not at risk of it. The AAP also knew, as it stated in 1975, that, "optimal hygiene confers as much or nearly as much protection against penile cancer as circumcision," and a "great deal of unnecessary surgery, with attendant complications would have to be done if circumcision were to be used as prophylaxis against [penile cancer]". The possible reduction in penile cancer is not a valid medical reason to circumcise, so the Guidelines should have not discussed them as a reason to elect circumcision, in which case Dr. Chait would not have advanced penile cancer citing the AAP Guidelines as a reason to do so. The AAP deviated without valid scientific evidence from its 1975 AAP Policy Statement on circumcision, which found no solid evidence for using circumcision to prevent penile cancer. The mention of penile cancer is a scare tactic designed to sell circumcision.

77. False Claims About STDs. The AAP truthfully stated in 1975 that, "evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting." Similarly, the AAP 1989 Guidelines state, "Evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting" and that "methodologic problems render these reports about some STDs inconclusive". In any event, newborn boys and older boys are not at risk of STDs. Furthermore, males must still practice safe sex to avoid STDs and HIV. As the AMA later wrote in 1999, circumcision cannot responsibly be advanced as protection against STDs. The Guidelines should have not discussed them as a reason to elect circumcision, and Dr. Chait should not have advanced STDs and HIV, citing the AAP Guidelines, as a reason to do so. The AAP's mention of STDs is a scare tactic designed to sell circumcision.

78. The AAP did not disclose that even granting the AAP's claims, for example that it reduces the risk of UTIs by 1%, circumcision has little prospect of benefiting any boy or man, violating the ethical rule that medical procedures must do good. And insofar as circumcision is painful, risky, and causes substantial harm in every case, it violates the ethical rule, "First, Do No Harm".

79. As physicians and members of a medical organization issuing medical guidelines, the members of the 1989 task force on circumcision had an ethical and legal duty to use their independent

medical judgment to determine whether circumcision is medically indicated and hence justified or not, and, if not, as the AAP stated in 1971 and 1975, to recommend against it. The implied legal claim by the AAP in 1989 that physicians have the right to perform the operation, and to take orders from parents who know little or nothing about medicine to do so, is false and was known by the AAP to be false. The rule for physicians is: do not operate on a healthy child; only operate on a child when he or she needs the operation. The AAP Guidelines were completely fraudulent in promoting circumcision, if parents elect it, when physicians are not allowed to perform the operation unless it is medically necessary.

80. To the extent that the members of the 1989 AAP task force on circumcision did not have knowledge of the falsity of any its false claims enumerated above, they and the AAP acted recklessly in disregard of the truth or falsity or said claim or claims, and are liable for fraud.

81. The AAP thereby intentionally defrauded Adam Lavine, acting on behalf of his son Shingo Lavine and his wife Aiko Lavine, and therefore intentionally defrauded the three Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment that the American Academy of Pediatrics committed intentional fraud against them, and they pray for the relief requested below.

## COUNT IV

### (Constructive Fraud)

### The American Academy of Pediatrics

82. Plaintiffs repeat and re-allege the facts and allegations in Paragraphs 1-81 as if set forth at length herein.

83. The AAP is a medical organization, comprised of physicians licensed to practice medicine, that issues guidelines for physicians to follow in the practice of medicine and here, the practice of circumcision.

84. The AAP owes a fiduciary duty to patients and their legal representatives who learn about or are informed about and who rely upon the AAP's circumcision guidelines, here Adam Lavine's reliance on the AAP's 1989 Policy Statement.

85. When the AAP violates the trust that a physician (here Dr. Chait), a patient (here Shingo Lavine) and/or those representing him (here Adam and Aiko Lavine) places in the AAP by some wrongful or unfair act—including without limitation by unfair conduct, unethical conduct, unlawful conduct, by fraud, breach of fiduciary duty, mistake, undue influence, coercion, duress,

or unjustly enriches itself—a cause of action lies for constructive fraud, even if intent to defraud is absent.

86. The AAP's wrongful and unfair acts enumerated in this Complaint and in Count III—including without limitation undisclosed conflicts of interest, scientific misconduct, failure to use independent and neutral medical judgment, fraudulent medical claims and omissions, scare tactics, fraudulent legal claims and omissions, promotion of unethical conduct, violation of boys' rights, breach of fiduciary duty, unfairness, mistake, undue influence, coercion, duress, and unjust enrichment—constitute constructive fraud.

**WHEREFORE**, Plaintiffs demand judgment that the American Academy of Pediatrics committed constructive fraud against them, and they pray for the relief requested below.


## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Shingo Lavine, Adam Lavine, and Aiko Lavine demand judgement against defendants, Princeton Medical Group, P.A. and the American Academy of Pediatrics, Inc. and they seek the following relief:

(a) Compensation for Shingo Lavine for the pain caused by each of the two circumcisions; the pain caused by his injuries; for the emotional distress, suffering, stress, pain, and mental anguish caused by the circumcisions.

(b) Compensation for the pain and pain and suffering and emotional distress associated with attempting partial foreskin restoration to try to mitigate the damage caused by the circumcisions; and compensation for the time spent and that will be spent on foreskin restoration.

(c) Compensation for the mental anguish suffered by Adam and Aiko Lavine as a result of the two circumcisions.

(d) Attorneys' fees, pre- and post-judgment interest and costs of this lawsuit;

(e) Punitive damages; and

(f) Such other relief as the court may deem just and equitable under the circumstances.

_____
ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated: February 4, 2021

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 4:35-1(a) and (b) respectively, Plaintiffs respectfully demand a trial by jury on all issues in the within action so triable.

Dated: February 4, 2021                    BY: _____
                                                         ANDREW DELANEY, ESQ.

## DESIGNATION OF TRIAL COUNSEL

In accordance with Rule 4:25-4, Andrew DeLaney, Esq. is hereby designated as trial counsel on behalf of Plaintiffs.

Dated: February 4, 2021                    BY: _____
                                                         ANDREW DELANEY, ESQ.

## CERTIFICATION

The undersigned hereby certifies that the matter in controversy between the parties herein is not the subject of any other action pending in any Court or any arbitration proceeding, and that no other action or arbitration proceeding with respect to the matter in controversy is contemplated.

The undersigned further certifies that the names of any non-parties who should be joined in the action pursuant to Rule 4:28, or who are subject to joinder pursuant to Rule 4:29-1(b)

because of potential liability to any party on the basis of the facts set forth in the within complaint are: None.

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with <u>R.</u> 1:38-7(b).

Dated: February 4, 2021

BY: _____

ANDREW DELANEY, ESQ.

## LIST OF ATTACHED EXHIBITS

**EXHIBIT A**

"Ode to the Circumcised Male," Poem by Edgar Schoen, M.D., chair of the 1989 Task Force of the AAP on Circumcision

**EXHIBIT B**

"Report of the Task Force on Circumcision, RE9148" *Pediatrics*, 989;84(4):388-91 (August, 1989)

**EXHIBIT C**

"Care of the Uncircumcised Penis," AAP Pamphlet, 1984

**EXHIBIT D**

"Newborns: Care of the Uncircumcised Penis," AAP Pamphlet, 1994

# EXHIBIT A

mother-child resemblances as adulthood approaches, again without apparent influence of the sex of the child.[4]

STANLEY M. GARN, PhD
TIMOTHY V. SULLIVAN
The Center for Human Growth
and Development
The University of Michigan
300 North Ingalls Bldg
Ann Arbor, MI 48109

1. Ruvalcaba RHA: Familial sexual precocity. *AJDC* 1986;140:742.
2. Garn SM: Continuities and changes in maturational timing, in Brim OG, Kagan J (eds): *Constancy and Change in Human Development*. Cambridge, Mass, Harvard University Press, 1980, pp 113-162.
3. Garn SM, Bailey SM: Genetics of maturational processes, in Falkner F, Tanner JM (eds): *Human Growth*. New York, Plenum Publishing Corp, 1978, pp 307-330.
4. Garn SM, Rohmann CG: Interaction of nutrition and genetics in the timing of growth and development. *Pediatr Clin North Am* 1966;13: 353-379.

### 'Ode to the Circumcised Male'

*Sir.*—Before the mid-1970s, the American standard of care included neonatal circumcision, a minor surgical procedure that promoted genital hygiene and prevented later penile cancer as well as cervical cancer in female sexual partners. More recently, evidence has suggested that adequate hygiene is all that is needed and that circumcision is an unnecessary and traumatic procedure. In 1983, the American Academy of Pediatrics and the American College of Obstetrics and Gynecology jointly agreed that routine circumcision is not necessary,[1] and third-party payers are increasingly refusing to pay for the procedure. Whether recent evidence of a decreased incidence of urinary tract infections in circumcised male infants[2] can stem the anticircumcision tide is questionable.

The purpose of this communication is to offer some solace to the generations of circumcised males who are now being told that they have undergone an unnecessary and deforming procedure, which may also have been brutal and psychologically traumatic. To them I offer these lines:

#### Ode to the Circumcised Male

We have a new topic to heat up our passions—the foreskin is currently top of the fashions.

If you're the new son of a Berkeley professor, your genital skin will be greater, not lesser.

For if you've been circ'ed or are Moslem or Jewish, you're outside the mode; you are old-ish not new-ish.

You have broken the latest society rules; you may never get into the finest of schools.

Noncircumcised males are the "genital chic"—if your foreskin is gone, you are now up the creek.

It's a great work of art like the statue of Venus, if you're wearing a hat on the head of your penis.

When you gaze through a looking glass, don't think of Alice; don't rue that you suffered a rape of your phallus.

Just hope that one day you can say with a smile that your glans ain't passé; it will rise up in style.

EDGAR J. SCHOEN, MD
Department of Pediatrics
Kaiser Permanente
Medical Center
280 W MacArthur Blvd
Oakland, CA 94611

1. American Academy of Pediatrics and American College of Obstetrics and Gynecology: *Guidelines for Perinatal Care*. Evanston, Ill, AAP/ACOG, 1983.
2. Wiswell TE, Smith FR, Bass JW: Decreased incidence of urinary tract infections in circumcised male infants. *Pediatrics* 1985;75: 901-903.

### Gastric Acid Aspiration Possible During Flexible Endoscopy Without General Anesthesia

*Sir.*—I wish to comment on Dr Bendig's[1] recent article, "Removal of Blunt Esophageal Foreign Bodies by Flexible Endoscopy Without General Anesthesia."

I suggest that Dr Bendig has been fortunate in avoiding pulmonary aspiration of gastric contents in his patients, a life-threatening complication. Animal studies have suggested a critical gastric volume of 0.4 mL/kg and a pH of 2.5 or less as predisposing to serious pulmonary aspiration.[2] Pediatric patients are even more likely than adults to exceed this critical volume and pH.[3,4] Coté et al[5] found 50 of 51 pediatric patients to have gastric pH less than 2.5 immediately after induction of general anesthesia. Of these 51 children, 76% had gastric pH less than 2.5 and gastric volume greater than 0.4 mL/kg, placing them at risk for acid aspiration syndrome.

I suspect that many of Dr Bendig's patients were also at risk for acid aspiration both intraoperatively and postoperatively, despite the six-hour nothing-by-mouth period. Dr Bendig used chlorpromazine hydrochloride, meperidine hydrochloride, and diazepam to sedate his patients, a combination similar to "lytic cocktail," except for the substitution of diazepam for pro-

methazine. In addition, t ynx was topically anesth lidocaine or benzocaine. ability to perform esoph otherwise uncooperativ speaks for their inability t airways—the cough and were abolished. When a pa protect and control his airway, it is the responsi physician to control it to gerous aspiration. Dr Ber that "there were no comp sedation or of the endoscop Was aspiration looked for tively? Did all children h postoperative chest roent Did no child have a temper tion postoperatively?

General anesthesia wi cheal intubation provides trol and considerable prot pulmonary aspiration of tents. Recovery from an anesthetic is also much from the above-mentioned suggest that the risks fr anesthesia in this situati than that of gastric acid a

Despite Dr Bendig's c trained pediatric suppor and equipment be availabl if airway obstruction or tent regurgitation were to would not arrive in time. more prudent to have an volved at the start. I also one takes Dr Bendig's su couragement to perform dure without appropriate sonnel and equipment.

MICHAEL J. KIBEL
Department of Ane
Geisinger Medical
Danville, PA 1782

1. Bendig DW: Removal of b foreign bodies by flexible end general anesthesia. *AJDC* 1986:
2. Greenfield LJ, Singleton DR, et al: Pulmonary effects graded aspiration of hydrochlori 1969;170:74-84.
3. Teabeault JR II: Aspiration tents: An experimental study. *A* 28:51-67.
4. Salem MR, Wong AY, Ma medicant drugs and gastric juic in pediatric patients. *Anesth* 216-219.
5. Coté CJ, Goudsousian MD Assessment of risk factors relat tion syndrome in pediatric pati and residual volume. *Anesthe* 70-72.

*In Reply.*—Dr Kibelbek with the potential risk o gastric contents utilizi

The I

# EXHIBIT B

- 623 -



**Task Force on Circumcision**

# Report of the Task Force on Circumcision (RE9148)

The 1971 edition of *Standards and Recommendations of Hospital Care of Newborn Infants* by the Committee on the Fetus and Newborn of the American Academy of Pediatrics (AAP) stated that "there are no valid medical indications for circumcision in the neonatal period."[1(p110)] In 1975, an Ad Hoc Task Force of the same committee reviewed this statement and concluded that "there is no absolute medical indication for routine circumcision of the newborn."[2(p87)] The 1975 recommendation was reiterated in 1983 by both the AAP and the American College of Obstetrics and Gynecology in the jointly published *Guidelines to Perinatal Care*.[3]

Large-scale studies of US hospitals indicate that most male infants born in this country are circumcised in the newborn period,[4] although the circumcision rate recently appears to be decreasing.[5] Since the 1975 report, new evidence has suggested possible medical benefits from newborn circumcision. Preliminary data suggest the incidence of urinary tract infection in male infants may be reduced when this procedure is performed during the newborn period. There is also additional published information concerning the relationship of circumcision to sexually transmitted diseases and, in turn, the relationship of viral sexually transmitted diseases to cancer of the penis and cervix.

## DEFINITIONS, PENILE HYGIENE, AND LOCAL INFECTIONS

The penis consists of a cylindrical shaft with a rounded tip (the glans). The shaft and glans are separated by a groove called the coronal sulcus. The foreskin, or prepuce, is the fold of skin covering the glans. At birth, the prepuce is still developing histologically, and its separation from the glans is usually incomplete. Only about 4% of boys have a retractable foreskin at birth, 15% at 6 months, and 50% at 1 year; by 3 years, the foreskin can be retracted in 80% to 90% of uncircumcised boys.[6]

Phimosis is stenosis of the preputial ring with resultant inability to retract a fully differentiated foreskin. Paraphimosis is retention of the preputial ring proximal to the coronal sulcus, creating a tension greater than lymphatic pressure resulting in subsequent edema of the prepuce and glans distal to the ring. Balanitis is inflammation of the glans, and posthitis is inflammation of the prepuce; these conditions usually occur together (balanoposthitis). Meatitis is inflammation of the external urethral meatus.

Newborn circumcision consists of removal of the foreskin to near the coronal sulcus performed in early infancy (before age 2 months). The procedure prevents phimosis, paraphimosis, and balanoposthitis. Meatitis is more common in circumcised boys. There is no evidence that meatitis leads to stenosis of the urethral meatus.

It is particularly important that uncircumcised boys be taught careful penile cleansing. As the boy grows, cleansing of the distal portion of the penis is facilitated by gently, never forcibly, retracting the foreskin only to the point where resistance is met. Full retraction may not be achieved until age 3 years or older.

A small percentage of boys who are not circumcised as newborns will later require the procedure for treatment of phimosis, paraphimosis, or balanoposthitis. When performed after the newborn period, circumcision may be a more complicated procedure.[7]

## CANCER OF THE PENIS

The overall annual incidence of cancer of the penis in US men has been estimated to be 0.7 to 0.9 per 100 000 men and the mortality rate is as high as 25%.[8-11] This condition occurs almost exclusively in uncircumcised men.[12-14] In five major reported series since 1932, not one man had been circumcised neonatally.[11,15-19] The predicted lifetime risk of cancer of the penis developing in an uncircumcised man has been estimated at 1 in 600 men in the United States[20]; in Denmark, the estimate is 1 in 909 men.[21] In developed countries where

The recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed. Variations, taking into account individual circumstances, may be appropriate.
PEDIATRICS (ISSN 0031 4005). Copyright © 1989 by the American Academy of Pediatrics.

- 624 -

neonatal circumcision is not routinely performed, the incidence of penile cancer is reported to range from 0.3 to 1.1 per 100 000 men per year.[4] This low incidence is about half that found in uncircumcised US men, but greater than that in circumcised US men.

Factors other than circumcision are important in the etiology of penile cancer. The incidence of penile cancer is related to hygiene. In developing nations with low standards of hygiene, the incidence of cancer of the penis in uncircumcised men is 3 to 6 per 100 000 men per year.[22] The decision not to circumcise a male infant must be accompanied by a lifetime commitment to genital hygiene to minimize the risk of penile cancer developing. Recently, human papillomavirus types 16 and 18 DNA sequences have been found in 31 of 53 cases of penile cancer, suggesting the importance of these viruses in the development of this condition.[23] Poor hygiene, lack of circumcision, and certain sexually transmitted diseases all correlate with the incidence of penile carcinoma.

## URINARY TRACT INFECTIONS

A 1982 series of infants with urinary tract infections noted that males preponderated, contrary to female preponderance later in life, and that 95% of the infected boys were uncircumcised.[24] Beginning in 1985, studies conducted at US Army hospitals involving more than 200 000 men showed a greater than tenfold increase in urinary tract infections in uncircumcised compared with circumcised male infants; moreover, as the rate of circumcision declined throughout the years, the incidence of urinary tract infection increased.[6,25] In another army hospital study, infants were examined in the first month of life and it was concluded that the high incidence of urinary tract infection in uncircumcised boys was accompanied by a similarly increased incidence of other significant infection, including bacteremia and meningitis[26]; however, the authors of that study did not distinguish between bacteriuria secondary to septicemia and primary urinary tract infection. Still another recent army hospital study lends support to a 1986 hypothesis that circumcision prevents preputial bacterial colonization and thus protects male infants against urinary tract infection.[27,28] It should be noted that these studies in army hospitals are retrospective in design and may have methodologic flaws. For example, they do not include all boys born in any single cohort or those treated as outpatients, so the study population may have been influenced by selection bias.

## SEXUALLY TRANSMITTED DISEASES

Evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting.

Early series indicated a higher risk of gonococcal and nonspecific urethritis in uncircumcised men,[29,30] whereas one recent study shows no difference in the incidence of gonorrhea and a higher incidence of nonspecific urethritis in circumcised men.[31] Although published reports suggest that chancroid, syphilis, human papillomavirus, and herpes simplex virus type 2 infection are more frequent in uncircumcised men, methodologic problems render these reports inconclusive.[29,30,32-34]

## CERVICAL CARCINOMA

There appears to be a strong correlation between squamous cell carcinoma of the cervix and sexually transmitted diseases. Human papillomavirus types 16 and 18 are the viruses most commonly associated with cancer of the cervix[35-38]; Herpes simplex virus type 2 has also been linked with cervical cancer.[36,39] Although human papillomavirus types 16 and 18 are also associated with cancer of the penis,[23,37] evidence linking uncircumcised men to cervical carcinoma is inconclusive. The strongest predisposing factors in cervical cancer are a history of intercourse at an early age and multiple sexual partners. The disease is virtually unknown in nuns and virgins.

## PAIN AND BEHAVIORAL CHANGES

Infants undergoing circumcision without anesthesia demonstrate physiologic responses suggesting that they are experiencing pain.[40] The observed responses include behavioral, cardiovascular, and hormonal changes. Pain pathways as well as the cortical and subcortical centers necessary for pain perception are well developed by the third trimester. Responses to painful stimuli have been documented in neonates of all viable gestational ages. Behavioral changes include a cry pattern indicating distress during the circumcision procedure and changes in activity (irritability, varying sleep patterns) and in infant-maternal interaction for the first few hours after surgery.[41-43] These behavioral changes are transient and disappear within 24 hours after surgery.[43]

## SURGICAL TECHNIQUES AND LOCAL ANESTHESIA

Circumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique. The procedure should be performed only on a healthy, stable infant. Clamp techniques (eg, Gomco or Mogen clamps) or a Plastibell give equally good results.[44] Techniques that may reduce postoperative complications include (1) using a surgical marking pen to mark the location of the coronal sulcus on the shaft

MER-L-000272-21  02/05/2021 5:45:13 PM  Pg 29 of 37 Trans ID: LCV2021283509
Case 3:21-cv-17099-ZNQ-LHG  Document 1-2  Filed 09/17/21  Page 32 of 150 PageID: 44

- 625 -

skin preoperatively; (2) identifying the urethral meatus; (3) bluntly freeing the foreskin from the glans with a flexible probe; (4) completely retracting the foreskin; and (5) identifying the coronal sulcus, all before applying the clamp or Plastibell and before excising any foreskin.[45] Electrocautery should not be used in conjunction with metal clamps. At the initial health supervision visit following hospital discharge, the penis should be carefully examined and the parents given instructions concerning on-going care.

Dorsal penile nerve block using no more than 1% lidocaine (without epinephrine) in appropriate doses (3 to 4 mg/kg) may reduce the pain and stress of newborn circumcision.[41,46-49] However, reported experience with local anesthesia in newborn circumcision is limited, and the procedure is not without risk (see "Complications").

## CONTRAINDICATIONS, COMPLICATIONS, INFORMED CONSENT

Circumcision is contraindicated in an unstable or sick infant. Infants with genital anomalies, including hypospadias, should not be circumcised because the foreskin may later be needed for surgical correction of the anomalies. Appropriate laboratory studies should be performed when there is a family history of bleeding disorders. Infants who have demonstrated an uncomplicated transition to extrauterine life are considered stable. Signs of stability include normal feeding and elimination and maintenance of normal body temperature without an incubator or radiant warmer. A period of observation may allow for recognition of abnormalities or illnesses (eg, hyperbilirubinemia, infection, or manifest bleeding disorder) that should be addressed before elective surgery. It is prudent to wait until a premature infant meets criteria for discharge before performing circumcision.

The exact incidence of postoperative complications is unknown,[50] but large series indicate that the rate is low, approximately 0.2% to 0.6%.[44,46,51,52] The most common complications are local infection and bleeding. Deaths attributable to newborn circumcision are rare; there were no deaths in 500 000 circumcisions in New York City[52] or in 175 000 circumcisions in US Army hospitals.[51] A communication published in 1979 reported one death in the United States due to circumcision in 1973, and the authors' review of the literature during the previous 25 years documented two previous deaths due to this procedure.[53]

Complications due to local anesthesia are rare and consist mainly of hematomas and local skin necrosis.[41,46-49,54] However, even a small dose of lidocaine can result in blood levels high enough to produce measurable systemic responses in neonates.[55,56] Local anesthesia adds an element of risk and data regarding its use have not been reported in large numbers of cases. Circumferential anesthesia may be hazardous. It would be prudent to obtain more data from large controlled series before advocating local anesthesia as an integral part of newborn circumcision.

When considering circumcision of their infant son, parents should be fully informed of the possible benefits and potential risks of newborn circumcision, both with and without local anesthesia. In addition to the medical aspects, other factors will affect the parents' decisions, including esthetics, religion, cultural attitudes, social pressures, and tradition.

## SUMMARY

Properly performed newborn circumcision prevents phimosis, paraphimosis, and balanoposthitis and has been shown to decrease the incidence of cancer of the penis among US men. It may result in a decreased incidence of urinary tract infection. However, in the absence of well-designed prospective studies, conclusions regarding the relationship of urinary tract infection to circumcision are tentative. An increased incidence of cancer of the cervix has been found in sexual partners of uncircumcised men infected with human papillomavirus. Evidence concerning the association of sexually transmitted diseases and circumcision is conflicting.

Newborn circumcision is a rapid and generally safe procedure when performed by an experienced operator. It is an elective procedure to be performed only if an infant is stable and healthy. Infants respond to the procedure with transient behavioral and physiologic changes.

Local anesthesia (dorsal penile nerve block) may reduce the observed physiologic response to newborn circumcision. It also has its own inherent risks. However, reports of extensive experience or follow-up with the technique in newborns are lacking.

Newborn circumcision has potential medical benefits and advantages as well as disadvantages and risks. When circumcision is being considered, the benefits and risks should be explained to the parents and informed consent obtained.

AAP TASK FORCE ON CIRCUMCISION
Edgar J. Schoen, MD, Chairman
Glen Anderson, MD
Constance Bohon, MD
Frank Hinman, Jr, MD
Ronald L. Poland, MD
E. Maurice Wakeman, MD

- 626 -

### REFERENCES

1. American Academy of Pediatrics, Committee on Fetus and Newborn. *Standards and Recommendations for Hospital Care of Newborn Infants*. 5th ed. Evanston, IL: American Academy of Pediatrics; 1971

2. Thompson HC, King LR, Knox E, et al. Report of the ad hoc task force on circumcision. *Pediatrics*. 1975;56:610-611

3. American Academy of Pediatrics, Committee on Fetus and Newborn. *Guidelines for Perinatal Care*. 1st ed. Evanston, IL: American Academy of Pediatrics; 1983

4. Wallerstein E. Circumcision: the uniquely American medical enigma. *Urol Clin North Am*. 1985;12:123-132

5. Wiswell TE, Enzanauer RW, Holton ME, et al. Declining frequency of circumcision: implications for changes in the absolute incidence and male to female sex ratio of urinary tract infection in early infancy. *Pediatrics*. 1987;79:338-342

6. Gairdner D. The fate of the foreskin: a study of circumcision. *Br Med J*. 1949;2:1433-1437

7. Warner E, Strashin E. Benefits and risks of circumcision. *Can Med Assoc J*. 1981;125:967-976,992

8. Cutler SJ, Young JL, Jr. eds. *Third National Cancer Survey: Incidence Data*. National Cancer Institute Monograph 41. Bethesda, MD: US Dept of Health, Education, and Welfare; 1975.

9. Young JL, Percy CL, Asire AJ. *Surveillance, epidemiology and End Results, Incidence and Mortality Data 1973-1977*. National Cancer Institute Monograph 41. Bethesda, MD: US Dept of Health, Education, and Welfare; 1981; 17

10. Young JL. *Surveillance, Epidemiology and End Results 1978-1982*. Bethesda, MD: US Dept of Health and Human Services; YEAR;PAGE

11. Persky L, deKernion J. Carcinoma of the penis. *Cancer J Clin*. 1986;35:5:258-273

12. Leiter E, Lefkovitis AM. Circumcision and penile carcinoma. *NY State J Med*. 1975;75:1520-1522

13. Boczko S, Freed S. Penile carcinoma in young circumcised males. *NY State J Med*. 1979;79:1903-1904

14. Rogus BJ. Squamous cell carcinoma in a young circumcised man. *J Urol*. 1987;138:861-862

15. Wolbarst AL. Circumcision and penile cancer. *Lancet*. 1932;1:150-153

16. Dean AL Jr. Epithelioma of the penis. *J Urol*. 1935;33:252-283

17. Lenowitz H, Graham AP. Carcinoma of the penis. *J Urol*. 1946;56:458-484

18. Hardner GJ, Bhanalaph T, Murphy GP, et al. Carcinoma of the penis: analysis of therapy in 100 consecutive cases. *J Urol*. 1974;108:428-430

19. Dagher R, Selzer ML, Lapides J. Carcinoma of the penis and the anti-circumcision crusade. *J Urol*. 1973;110:79-80

20. Kochen M, McCurdy S. Circumcision and the risk of cancer of the penis: a life-table analysis. *Am J Dis Child*. 1980;134:484-486

21. Swafford TD. Circumcision and the risk of cancer of the penis. *Am J Dis Child*. 1985;139:112

22. Garfinkel L. Circumcision and penile cancer. *Cancer J Clin*. 1983;33:320

23. McCance DJ, Kalache A, Ashdown K, et al. Human papillomavirus types 16 and 18 in carcinomas of the penis from Brazil. *Int J Cancer*. 1986;37:55-59

24. Ginsburg CM, McCracken GH Jr. Urinary tract infections in young infants. *Pediatrics*. 1982;69:409-412

25. Wiswell TE, Smith FR, Bass JW. Decreased incidence of urinary tract infections in circumcised male infants. *Pediatrics*. 1985;75:901-903

26. Wiswell TE, Geschke DW. Risks from circumcision during the first month of life compared with those of the uncircumcised boys. *Pediatrics*. 1989;83:1011-1015

27. Roberts JA. Does circumcision prevent urinary tract infection? *J Urol*. 1986;135:991-992

28. Wiswell TE, Miller GM, Gelston HM, et al. The effect of circumcision status on periurethral bacterial flora during

the first year of life. *J Pediatr*. 1988;113:442-446

29. Wilson RA. Circumcision and venereal disease. *Can Med Assoc J*. 1947;56:54-56

30. Parker SW, Stewart AJ, Wren MN, et al. Circumcision and sexually transmissible disease. *Med J Aust*. 1983;2:288-290

31. Smith GL, Greenup R, Takafuji ET. Circumcision as a risk factor for urethritis in racial groups. *Am J Public Health*. 1987;77:452-454

32. Thirumoorthy T, Sng EH, Doraisingham S, et al. Purulent-penile ulcers of patients in Singapore: *Genitourin Med*. 1986;62:252-255

33. Oriel JD. Condyloma acuminata as a sexually transmitted disease. *Dermatol Clin*. 1983;1:93-102

34. Taylor PK, Rodin P. Herpes genitalis and circumcision. *Br J Vener Dis*. 1975;51:274-277

35. Baird PJ. The causation of cervical cancer, part II: the role of human papilloma and other viruses. In: Singer A, ed. *1985 Clinics in Obstetrics and Gynecology*. London, England: WB Saunders Co; 1985;12:19-32

36. Kaufman RH, Adam E. Herpes simplex virus and human papilloma virus in the development of cervical carcinoma. *Clin Obstet Gynecol*. 1986;29:678-692

37. McCance DJ. Human papillomaviruses and cancer. *Biochim Biophys Acta*. 1986;823:195-205

38. zur Hausen H. Genital papillomavirus infections. *Prog Med Virol*. 1985;32:15-21

39. Kessler II. Etiological concepts in cervical carcinogenesis. *Appl Pathol*. 1987;5:57-75

40. Anand KJS, Hickey PR. Pain and its effects in the human neonate and fetus. *N Engl J Med*. 1987;317:1321-1329

41. Dixon S, Snyder J, Holve R, et al. Behavioral effects of circumcision with and without anesthesia. *J Devel Behav Pediatr*. 1984;5:246-250

42. Marshall RE, Stratton WC, Moore JA, et al. Circumcision: effects upon newborn behavior. *Infant Behav Dev*. 1980;3:1-14

43. Marshall RE, Porter FL, Rogers AG, et al. Circumcision, II: Effects upon mother-infant interaction. *Early Hum Dev*. 1982;7:367-374

44. Gee WF, Ansell JS. Neonatal circumcision: a ten-year overview with comparison of the Gomco clamp and the Plastibell device. *Pediatrics*. 1976;58:824-827

45. Harkavy KL. The circumcision debate. *Pediatrics*. 1987; 79:649-650. Letter

46. Kirya C, Werthmann MW. Neonatal circumcision and penile dorsal nerve block—a painless procedure. *J Pediatr*. 1978;92:998-1000

47. Williamson PS, Williamson MI. Physiologic stress reduction by a local anesthetic during newborn circumcision. *Pediatrics*. 1983;71:36-40

48. Holve RL, Bromberger PJ, Groveman HD, et al. Regional anesthesia during newborn circumcision: effect on infant pain response. *Clin Pediatr*. 1983;22:813-818

49. Stang HJ, Gunnar MR, Snellman L, et al. Local anesthesia for neonatal circumcision; effect on distress and cortisol response. *JAMA*. 1988;259:1507-1511

50. Kaplan GW. Complications of circumcision. *Urol Clin North Am*. 1983;10:543-549

51. Wiswell TE. The circumcision debate. *Pediatrics*. 1987; 79:649-650. Letter

52. King LR. Neonatal circumcision in the United States in 1982. *J Urol*. 1982;128:1135-1136

53. Kochen M, McCurdy SA. Circumcision. *Am J Dis Child*. 1979;133:1079-1080. Letter

54. Sara CA, Lowry CJ. A complication of circumcision and dorsal nerve block of the penis. *Anaesth Intensive Care*. 1985;13:79-82

55. Dinz M, Graff M, Hiatt M, et al. Prenatal lidocaine and the auditory evoked responses in term infants. *Am J Dis Child*. 1988;142:160-161

56. Maxwell LG, Yaster M, Wetzell RC, et al. Penile nerve block for newborn circumcision. *Obstet Gynecol*. 1987;70:415-419

- 627 -

ERRATUM

Policy Statement RE9148

Report of the Task Force on Circumcision

Under the heading of "Urinary Tract Infections" (line 6, page 389), "men" should be changed to "infant boys." The complete statement should now read:

    Beginning in 1985, studies conducted at US Army hospitals involving more than 200 000 <u>infant boys</u> showed a greater than tenfold increase in urinary tract infections in uncircumcised compared with circumcised male infants; moreover, as the rate of circumcision declined throughout the years, the incidence of urinary tract infection increased.

The Task Force on Circumcision would also like to acknowledge the following for their provision of expert advice:

    David T. Mininberg, MD, FAAP, Section Liaison

        Jerome O. Klein, MD, FAAP

      Edward A. Mortimer, Jr, MD, FAAP

# EXHIBIT C

# Newborns

**Care of the Uncircumcised Penis**

American Academy of Pediatrics

NATIONAL ORGANIZATION
of
CIRCUMCISION INFORMATION
RESOURCE CENTERS
P.O. Box 369
Corte Madera, California 94925-0369

**For additional copies, contact:** American Academy of Pediatrics, Publications Department, P.O. Box 927, Elk Grove Village, IL 60007. Price: $15/100

Copyright © 1984 by the American Academy of Pediatrics

---

need for concern even after a longer period. No harm will come in leaving the foreskin alone.

**Testing Foreskin Retraction:** To test retraction occasionally, hold the penile shaft with one hand and with the other hand, push the foreskin back *gently – never forcibly –* perhaps ⅛ of an inch. Retraction may also be done with one hand pushing the shaft skin gently toward the abdomen. This will automatically retract the foreskin.

If there is any *discomfort* in your baby or if you feel resistance, stop. Try again in a few months. If the retraction is easy for both the child and the parent, further retraction may be attempted in due time. There should be no rush to retract. Eventually, the foreskin will retract completely, exposing the entire glans. This may take several years.

**Hygiene of the Fully Retracted Foreskin:**
For the first few years, an occasional retraction with cleansing beneath is sufficient.

Penile hygiene will later become a part of a child's total body hygiene, including hair shampooing, cleansing the folds of the ear and brushing teeth. At puberty, the male should be taught the importance of retracting the foreskin and cleaning beneath during his daily bath.

**Summary:**   Care of the uncircumcised boy is quite easy. "Leave it alone" is good advice. External washing and rinsing on a daily basis is all that is required. Do not retract the foreskin in an infant, as it is almost always attached to the glans. Forcing the foreskin back may harm the penis, causing pain, bleeding, and possibly adhesions. The natural separation of the foreskin from the glans may take many years. After puberty, the adult male learns to retract the foreskin and cleanse under it on a daily basis.

## Care of the Uncircumcised Penis

At birth, the penis consists of a cylindrical shaft with a rounded end called the glans. The shaft and glans are separated by a groove called the sulcus. The entire penis – shaft and glans – is covered by a continuous layer of skin. The section of the penile skin that covers the glans is called the foreskin or prepuce. The foreskin consists of two layers, the outer foreskin and an inner lining similar to a mucous membrane.

Before birth, the foreskin and glans develop as one tissue. The foreskin is firmly attached – really fused – to the glans. Over time, this fusion of the inner surface of the prepuce with the glans skin begins to separate by shedding the cells from the surface of each layer. Epithelial layers of the glans and the inner foreskin lining are regularly replaced, not only in infancy but throughout life. The discarded cells accumulate as whitish, cheesy "pearls" which gradually work their way out via the tip of the foreskin.

Eventually, sometimes as long as 5 or even 10 years after birth, full separation occurs and the foreskin may then be pushed back away from the glans toward the abdomen. This is called foreskin retraction. The foreskin may retract spontaneously with erections which occur normally from birth on and even occur in fetal life. Also, all children "discover" their genitals as they become more aware of their

bodies and may retract the foreskin themselves. If foreskin does not seem to retract easily early in life, it is important to realize that this is not abnormal and that it will eventually do so.



**Diagrammatic Representation of the Inner and Outer Foreskin Layers.**

Outer Foreskin Layer
Preputial Orifice
Inner Foreskin Layer
Urinary Meatus
Glans
Sulcus
Shaft
Frenum

Drawing reprinted with permission of Edward Wallerstein, author of Circumcision: An American Health Fallacy.

**The Function of the Foreskin:** The glans at birth is delicate and easily irritated by urine and feces. The foreskin shields the glans; with circumcision, this protection is lost. In such cases, the glans and especially the urinary opening (meatus) may become irritated or infected, causing ulcers, meatitis (inflammation of the meatus), and meatal stenosis (a narrowing of the urinary opening). Such problems virtually never occur in uncircumcised penises. The foreskin protects the glans throughout life.

**Infant Smegma:** Skin cells from the glans of the penis and the inner foreskin are shed throughout life. This is especially true in childhood; natural skin shedding serves to separate the foreskin from the glans. Since this shedding takes place in a relatively closed space – with the foreskin covering the glans – the shed skin cells cannot escape in the usual manner. They escape by working their way to the tip of the foreskin. These escaping discarded skin cells constitute infant smegma.

**Adult Smegma:** Specialized sebaceous glands – Tyson's Glands – which are located on the glans under the foreskin, are largely inactive in childhood. At puberty, Tyson's Glands produce an oily substance, which, when mixed with shed skin cells, constitute adult smegma. Adult smegma serves as a protective, lubricating function for the glans.

**Foreskin Hygiene:** The foreskin is easy to care for. The infant should be bathed or sponged frequently, and all parts should be washed including the genitals. The external penile skin is soft and pliable and easy to wash. *It is not necessary to retract any part of the skin in order to wash under it.* The uncircumcised penis is easy to keep clean. No special care is required. Leave the penis alone. The body provides its own protection of the glans area because the foreskin is fused to it. As the shed epithelial cells ooze from underneath the foreskin, clean away this infant smegma. No other manipulation is necessary. There is no need for Q-tips, irrigation or antiseptics; soap and water will suffice.

**Foreskin Retraction:** As noted, the foreskin and glans develop as one tissue. Separation will evolve over time. It should not be forced. When will separation occur? Each child is different. Separation may occur before birth; this is rare. It may take a few days, weeks, months or even years. *This is normal.* Although most foreskins are retracted by age 5, there is no

# EXHIBIT D

# Newborns: Care of the Uncircumcised Penis

## Guidelines for Parents



American Academy of Pediatrics

---



The American Academy of Pediatrics is an organization of 47,000 pediatricians dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults.

Now available: *Caring for Your Baby and Young Child: Birth to Age 5*, available at the special discount price of more than 25 percent off the $16 list price. To order your copy, send a check or money order for $11.95, plus $2.75 per copy shipping and handling, to: AAP Publications — Child Care Book, Birth to Age 5, 141 Northwest Point Blvd, PO Box 927, Elk Grove Village, IL 60009-0927.

For additional copies, contact:
American Academy of Pediatrics
Division of Publications
141 Northwest Point Blvd, PO Box 927
Elk Grove Village, IL 60009-0927

Minimum order 100
Price $23.50/100 (members)
$28.50/100 (nonmembers)
Copyright ©1990
HE0023R



American Academy of Pediatrics

1/94

---

**Summary:** Care of the uncircumcised boy is quite easy. "Leave it alone" is good advice. External washing and rinsing on a daily basis is all that is required. Do not retract the foreskin in an infant, as it is almost always attached to the glans. Forcing the foreskin back may harm the penis, causing pain, bleeding, and possibly adhesions. The natural separation of the foreskin from the glans may take many years. After puberty, the adult male learns to retract the foreskin and cleanse under it on a daily basis.

The information contained in this publication should not be used as a substitute for the medical care and advice of your pediatrician. There may be variations in treatment that your pediatrician may recommend based on individual facts and circumstances.

# Newborns: Care of the Uncircumcised Penis

At birth, the penis consists of a cylindrical shaft with a rounded end called the glans. The shaft and glans are separated by a groove called the sulcus. The entire penis — shaft and glans — is covered by a continuous layer of skin. The section of the penile skin that covers the glans is called the foreskin or prepuce. The foreskin consists of two layers, the outer foreskin and an inner lining similar to a mucous membrane.

Before birth, the foreskin and glans develop as one tissue. The foreskin is firmly attached — really fused — to the glans. Over time, this fusion of the inner surface of the prepuce with the glans skin begins to separate by shedding the cells from the surface of each layer. Epithelial layers of the glans and the inner foreskin lining are regularly replaced, not only in infancy but throughout life. The discarded cells accumulate as whitish, cheesy "pearls" which gradually work their way out via the tip of the foreskin.

Eventually, sometimes as long as 5, 10, or more years after birth, full separation occurs and the foreskin may then be pushed back away from the glans toward the abdomen. This is called foreskin retraction. The foreskin may retract spontaneously with erections which occur normally from birth on and even occur in fetal life. Also, all children "discover" their genitals as they become more aware of their bodies and may retract the foreskin themselves. If the

foreskin does not seem to retract easily early in life, it is important to realize that this is not abnormal and that it should eventually do so.

**Infant Smegma:** Skin cells from the glans of the penis and the inner foreskin are shed throughout life. This is especially true in childhood; natural skin shedding serves to separate the foreskin from the glans. Since this shedding



Diagrammatic Representation of the Inner and Outer Foreskin Layers.

Sulcus

Shaft

Urinary Meatus

Glans

Frenum

Outer Foreskin Layer

Preputial Orifice

Inner Foreskin Layer

Drawing reprinted with permission of Edward Wallerstein.

takes place in a relatively closed space — with the foreskin covering the glans — the shed skin cells cannot escape in the usual manner. They escape by working their way to the tip of the foreskin. These escaping discarded skin cells constitute infant smegma, which may appear as white "pearls" under the skin.

**Adult Smegma:** Specialized sebaceous glands — Tyson's Glands — which are located on the glans under the foreskin, are largely inactive in childhood. At puberty, Tyson's Glands produce an oily substance, which, when mixed with shed skin cells, constitute adult smegma. Adult smegma serves as a protective, lubricating function for the glans.

**Foreskin Hygiene:** The foreskin is easy to care for. The infant should be bathed or sponged frequently, and all parts should be washed including the genitals. The uncircumcised penis is easy to keep clean. No special care is required! No attempt should be made to forcefully retract the foreskin. No manipulation is necessary. There is no need for special cleansing with Q-tips, irrigation, or antiseptics; soap and water externally will suffice.

**Foreskin Retraction:** As noted, the foreskin and glans develop as one tissue. Separation will evolve over time. It should not be forced. When will separation occur? Each child is different. Separation may occur before birth; this is rare. It may take a few days, weeks, months, or even years. *This is normal.* Although many foreskins will retract by age 5, there is no need for concern even after a longer period. Some boys do not attain full retractability of the foreskin until adolescence.

**Hygiene of the Fully Retracted Foreskin:** For the first few years, an occasional retraction with cleansing beneath is sufficient.

Penile hygiene will later become a part of a child's total body hygiene, including hair shampooing, cleansing the folds of the ear, and brushing teeth. At puberty, the male should be taught the importance of retracting the foreskin and cleaning beneath during his daily bath.

# Civil Case Information Statement

**Case Details: MERCER | Civil Part Docket# L-000272-21**

**Case Caption:** LAVINE ADAM  VS AMERICAN ACADEMY
OF  PEDIATRIC

**Case Initiation Date:** 02/05/2021

**Attorney Name:** ANDREW SEAN DELANEY

**Firm Name:** ANDREW DELANEY, ATTORNEY AT LAW

**Address:** 6 SOUTH ST STE 203

MORRISTOWN NJ 07960

**Phone:** 8628126874

**Name of Party:** PLAINTIFF : Lavine, Adam

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** OTHER Fraud

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: Adam Lavine?** NO

**Are sexual abuse claims alleged by: Aiko Lavine?** NO

**Are sexual abuse claims alleged by: Shingo Lavine?** NO

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

<u>02/05/2021</u>

Dated

<u>/s/ ANDREW SEAN DELANEY</u>

Signed

MERCER COUNTY COURTHOUSE
CIVIL CASE MANAGMENT OFFICE
175 SOUTH BROAD ST P O BOX 8068
TRENTON          NJ 08650-0068
                                        TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (609) 571-4200
COURT HOURS  8:30 AM - 4:30 PM

                        DATE:   FEBRUARY 05, 2021
                        RE:     LAVINE ADAM  VS AMERICAN ACADEMY OF  PEDIATRIC
                        DOCKET: MER L -000272 21


    THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 1.

    DISCOVERY IS   150 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

    THE PRETRIAL JUDGE ASSIGNED IS:  HON DOUGLAS H. HURD

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     050
AT:  (609) 571-4200 EXT 74432.


     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
      PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                        ATTENTION:
                              ATT: ANDREW S. DELANEY
                              ANDREW DELANEY, ATTORNEY AT LA
                              6 SOUTH ST
                              STE 203
                              MORRISTOWN        NJ 07960


ECOURTS

SHINGO LAVINE, ET AL

          Plaintiff

vs

PRINCETON MEDICAL GROUP, P.A., ET AL

          Defendant

20210219172158

Superior Court Of New Jersey

MERCER Venue

Docket Number: MER L 272 21

**Person to be served** (Name and Address):
PRINCETON MEDICAL GROUP, P.A.
419 HARRISON STREET, SUITE 203
PRINCETON NJ 08540
By serving: JOAN HAGADRON, R.A.

**Attorney:** ANDREW DELANEY, ESQ.

**Papers Served:** SUMMONS AND COMPLAINT, CERTIFICATION, EXHIBITS, FIRST INTERROGATORIES

**AFFIDAVIT OF SERVICE**
(For Use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

$ _____.____

| Service Data: | [X] Served Successfully | [ ] Not Served |
|---|---|---|

Name of Person Served and relationship/title:

Date/Time:   2/22/2021 11:53 AM   _____   _____

[ ] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing therein (indicate name & relationship at right)

[X] Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc. (indicate name & official title at right)

ALANA DOURAGH

PERSON AUTHORIZED TO ACCEPT SERVICE

**Description of Person Accepting Service:**

SEX:F__  AGE:51-65  HEIGHT: 5'0"-5'3"   WEIGHT:131-160 LBS.   SKIN:OLIVE____   HAIR:BLACK___   OTHER:_____

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] Defendant is evading service
[ ] Appears vacant
[ ] No response on:       Date/Time: _____
                          Date/Time: _____
                          Date/Time: _____

Other:

**Served Data:**
Subscribed and Sworn to me this
_____23_____ day of ___Feb___, 20_21_

Notary Signature:_____

JACQUELINE GONZALEZ
NOTARY PUBLIC OF NEW JERSEY
My Name of Notary
My Commission Expires Dec. 15, 2025

Commission Expiration _____

I, DAVID FILARSKI,
was at the time of service a competent adult, over the age of 18 and not having direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.

_____   02 23 21
Signature of Process Server       Date         /20

Name of Private Server: DAVID FILARSKI  Address: 2009 Morris Avenue, UNION, NJ 07083  Phone: (800) 672-1952

SHINGO LAVINE, ET AL

**Plaintiff**

**vs**

PRINCETON MEDICAL GROUP, P.A., ET AL

**Defendant**

20210219172801

Superior Court Of New Jersey

MERCER Venue

Docket Number: MER L 272 21

**Person to be served** (Name and Address):
AMERICA ACADEMY OF PEDIATRICS
PRINCETON SOUTH CORPORATE CENTER  100 CHARLES EWING BLVD.,
SUITE 160
EWING  NJ  08638
**By serving:** CORPORATION SERVICE COMPANY, R.A.

**Attorney:** ANDREW DELANEY, ESQ.

**Papers Served:** SUMMONS AND COMPLAINT, CERTIFICATION, EXHIBITS,
FIRST INTERROGATORIES

**AFFIDAVIT OF SERVICE**
(For Use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

$ _____.____

| **Service Data:** | [X] Served Successfully | [ ] Not Served |
|---|---|---|

Date/Time:    2/22/2021 1:51 PM

[ ] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing
therein (indicate name & relationship at right)

[X] Left a copy with a person authorized to accept service, e.g. managing agent,
registered agent, etc. (indicate name & official title at right)

Name of Person Served and relationship/title:

JOHNNY MYERS

PERSON AUTHORIZED TO ACCEPT SERVICE

**Description of Person Accepting Service:**

SEX:M   AGE:21-35  HEIGHT:OVER 6'    WEIGHT: 131-160 LBS.    SKIN:BLACK    HAIR:BALD    OTHER:_____

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] Defendant is evading service
[ ] Appears vacant
[ ] No response on:          Date/Time: _____
                            Date/Time: _____
                            Date/Time: _____

Other:

**Served Data:**
Subscribed and Sworn to me this
_____ 23 day of Feb, 20 21

Notary Signature:_____

JACQUELINE GONZALEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Dec. 15, 2025

JAMES

I, JAMES NUNN,
was at the time of service a competent adult, over the age of
18 and not having direct interest in the litigation. I declare
under penalty of perjury that the foregoing is true and
correct.

Signature of Process Server        Date
027321

JACQUELINE GONZALEZ
NOTARY
PUBLIC
NEW JERSEY
Name of Notary Commission Expiration

Name of Private Server: JAMES NUNN  Address: 2009 Morris Avenue UNION, NJ 07083  Phone: (800) 672-1952

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO, AIKO AND ADAM LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A.<br>AND AMERICAN ACADEMY OF<br>PEDIATRICS, INC.<br>Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MERCER COUNTY<br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br><br><br><br>**NOTICE OF MOTION FOR ADMISSION<br>PRO HAC VICE** |

To:   Marc Silver, Esq.
      Barnes & Thornburg
      One N. Wacker Drive, Suite 4400
      Chicago, IL 60606
      *Attorney for Defendant, American Academy of Pediatrics*

      Stephanie Viola, Esq.
      Lenox Law Firm
      136 Franklin Corner Road, Unit B2
      Lawrenceville, NJ 08648
      *Attorney for Defendant, Princeton Medical Group, P.A.*

      PLEASE TAKE NOTICE, that on a date to be set by the Court, the undersigned attorneys

for Shingo Lavine, Adam Lavine and Aiko Lavine shall apply to the Superior Court of New

Jersey, Mercer County, 175 South Broad Street, Trenton, New Jersey 08650, for an Order,

pursuant to Rule 1:21-2 granting David J. Llewellyn, Esq., admission to the Bar of this Court pro

hac vice for purposes of participating as attorney in this matter for Shingo Lavine, Adam Lavine

and Aiko Lavine, and shall request that the Court enter the proposed form of Order; and

PLEASE TAKE FURTHER NOTICE that the within motion is supported by the accompanying Certifications of Andrew DeLaney, Esq. and David J. Llewellyn, Esq.; and

PLEASE TAKE FURTHER NOTICE that the within motion is accompanied by a proposed form of Order and is submitted to the Court pursuant to the provisions of Rule 1:6-2; and

PLEASE TAKE FURTHER NOTICE that oral argument is not requested unless timely opposition to this motion is filed, then oral argument is requested.

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated April 21, 2021                    BY: _____
                                        ANDREW DELANEY, ESQ.

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO, AIKO AND ADAM LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A.<br>AND AMERICAN ACADEMY OF<br>PEDIATRICS, INC.<br>Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MERCER COUNTY<br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br><br><br><br>**ORDER** |

      **THIS MATTER**, having been opened to the Court by Andrew DeLaney, Esq., attorney for Shingo Lavine, Adam Lavine, and Aiko Lavine, upon application for an Order pursuant to R. 1:21-2 granting pro hac vice admission to David J. Lllewellyn, Esq., and the court having considered the submissions of the parties and for good cause shown;

      IT IS on this ____ day of _____, 2021:

      ORDERED that the application of David J. Lllewellyn for admission to the Bar of this Court pro hac vice to represent Shingo Lavine, Adam Lavine and Aiko Lavine be and is hereby granted and that the aforesaid shall comply with the requirements of R. 1:21-2, R. 1:20-1(b) and R. 1:28-2 of the Rules Governing the State of New Jersey, and within ____ days of the entry of this Order, David Lllewellyn shall send the appropriate documentation and payment to the New Jersey Lawyers Fund for Client Protection; and

      IT IS FURTHER ORDERED that all pleadings, briefs and other papers filed with the Court shall be signed by an attorney of record authorized to practice in this State, who shall be

responsible for them and for the conduct of this case and/or counsel admitted pro hac vice by virtue of this Order; and

IT IS FURTHER ORDERED that David J. Llewellyn shall consent to the appointment of the Clerk of the New Jersey Supreme Court as agent upon whom service of process may be made for all actions against him and his firm that may arise out of participation in this matter.

_____, J.S.C.

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO, AIKO AND ADAM LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS, INC.<br>Defendant(s). | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br><br><br>**CERTIFICATION OF ANDREW DELANEY IN SUPPORT OF MOTION FOR ADMISSION PRO HAC VICE** |

I, Andrew DeLaney, of full age, certify as follows:

1. I am a licensed attorney of the State of New Jersey.

2. I make this certification in support of David J. Llewellyn's application for admission pro hac vice in the above captioned matter.

3. I am a member in good standing of the New Jersey Bar and am in compliance with R. 1:21-1 and R. 1:28-1.

4. I am not under suspension or disbarment in any jurisdiction and there are no disciplinary actions pending against me.

5. As the attorney licensed to practice in New Jersey, I will sign all pleadings, briefs and other papers filed with the Court.

I certify that the foregoing statements made by me are true, and I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated April 21, 2021                          BY: _____

                                              ANDREW DELANEY, ESQ.

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO, AIKO AND ADAM LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS, INC.<br>Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MERCER COUNTY<br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br><br><br>**MOTION FOR ADMISSION PRO HAC VICE** |

Dear Judge Hurd,

Please accept this letter brief (along with supporting certifications and proposed order) in lieu of a more formal submission in support of my Motion for Admission pro hac vice of David J. Llewellyn, who seeks admission to this court on behalf of the Plaintiffs: Shingo Lavine, Adam Lavine and Aiko Lavine.  We respectfully request the admission of David J. Lllewllyn for the good cause set forth below.

## ARGUMENT

### POINT 1
### DAVID J. LLEWELLYN IS AN EXPERT (PERHAPS THE FOREMOST EXPERT IN THE COUNTRY) IN THE UNCOMMONLY PRACTICED AREA OF LAW UNDER WHICH THIS CASE IS BROUGHT

Under the Rules Governing the Courts of the State of New Jersey, the motion for admission for pro hac vice shall be granted if one of the following grounds for good cause is shown: A). the case in which the attorney seeks admission involves a complex area of law in which the attorney is a specialist; B). there has been an attorney-client privilege with the client

for an extended period of time; C). there is a lack of local counsel with adequate expertise in the field involved; D). the cause presents questions of law involving the law of the outside jurisdiction in which the applicant is licensed; E). there is a need for extensive discovery or other proceedings in the outside jurisdiction in which the applicant is licensed; or F). such other reason similar to those set forth in this subsection as would present good cause for the pro hac vice admission. R. 1:21(b)(3). The application may only be denied after a showing of good cause if the court finds countervailing considerations to outweigh the good cause shown. Feriozzi Concrete v. Mellon Stuart, 229 N.J. Super. 366, 369 (App. Div. 1988).

Here, David J. Llewellyn's expertise and admission are indispensable to the Plaintiffs due to the unique factual and legal posture of the case (a fraud claim arising out of the American Academy of Pediatrics' policy statement on circumcision that Plaintiffs allege was the cause of their injuries from a circumcision), coupled with the experience Mr. Llewellyn has acquired over the course of the past several decades as a litigator. Mr. Llewellyn has become one of, if not the, legal experts on circumcision, and has successfully litigated scores of cases involving botched circumcisions. More importantly, in the course of litigating the aforementioned cases, Mr. Llewellyn has developed a wealth of knowledge of how various medical organizations (including the defendant American Academy of Pediatrics) have approached the subject, which includes, but is not limited to, knowledge of the medical and legal literature of the subject that dates back to 1981 (eight years preceding the policy statement at issue in this case), and a deposition of the chairman of the Task Force that promulgated the guidelines at issue in this case.

## POINT 2
### NO LOCAL ATTORNEY HAS THE KNOWLEDGE AND EXPERTISE OF MR. LLEWELLYN ON THE SUBJECT, AND FEW, IF ANY, HAVE ANY KNOWLEDGE SUFFICIENT TO ADEQUATELY REPRESENT THE PLAINTIFFS

Given the uniqueness of the subject matter, there are few, if any local counsel, with sufficient knowledge of the subject matter, let alone with knowledge of the subject matter that approaches the degree of expertise Mr. Llewellyn has on the matter. The case is unique in that it requires a depth of knowledge in a relatively obscure subject that dates back decades. We are unaware of any attorney in the State of New Jersey that has a practice specializing in circumcision litigation as Mr. Llewellyn has, let alone a practice that dates back decades. Given the complexity of this case, the novelty of the legal theory presented, the stakes involved, and the type of litigants involved, no New Jersey attorney could adequately represent the Plaintiffs, and

certainly not to the extent and quality as Mr. Llewellyn. As such, if the court were to deny this application, they would be depriving the Plaintiffs of the ability to have effective representation, and preventing a just outcome on the merits.

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court grant the Motion for Admission pro hac vice.

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated April 21, 2021          BY: _____

ANDREW DELANEY, ESQ.

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO, AIKO AND ADAM LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A.<br>AND AMERICAN ACADEMY OF<br>PEDIATRICS, INC.<br>Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MERCER COUNTY<br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br><br>**CERTIFICATE OF SERVICE** |

### CERTIFICATE OF SERVICE

I hereby assert that, consistent with R. 1:5-2, 1:5-3, and 1:32-2A(a) of the Rules of Court, service of this motion was made upon Marc Silver, attorney for defendant American Academy of Pediatrics, and Stephanie Viola, attorney for defendant Princeton Medical Group, this 23rd day of April, 2021.

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated April 23, 2021                    BY: _____
                                                    ANDREW DELANEY, ESQ.

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>    Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>    Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY<br><br>DOCKET NO.:<br><br>Civil Action<br><br>**CERTIFICATION IN SUPPORT OF NOTICE OF MOTION FOR ADMISSION OF ATTORNEY *PRO HAC VICE*** |

I, DAVID J. LLEWELLYN, declare:

1.     I am an attorney in good standing, licensed to practice law before all courts, including the Supreme Court, of the State of Georgia where I am domiciled and where I principally practice law.

2.     If the Pro Hac Vice Motion is approved, Attorney Andrew Delaney has agreed to allow me to become associated with him for the purpose of representing Shingo Lavine, Adam Lavine, and Aiko Lavine.  Andrew Delaney is an attorney licensed to practice law in the State of New Jersey, pursuant to Rule 1:21-1.

3.     Shingo Lavine, Adam Lavine, and Aiko Lavine have requested that I represent them in this matter.

4.     There are no disciplinary proceedings pending against me in any jurisdiction, and there has been no discipline previously imposed on me in any jurisdiction.

5.     The above-captioned action involves claims of fraud in regard to obtaining permission to circumcise an infant and resulting damage from that circumcision.  I have significant experience involving the surgical procedure of circumcision, having been involved in over seventy-five different cases involving that issue.  I have appeared or am appearing at present *pro hac vice* in at least 25 different states, including New Jersey.  I have significant knowledge regarding the history of the American Academy of Pediatrics, Inc.'s various positions in regard to the performance of circumcision, history that is not generally known.  Previous to this case I deposed at length the chair of the AAP Task Force that produced the guidelines that are at issue in this litigation.  I have been studying the medical literature in regard to circumcision, its alleged purposes, its effects, the controversy surrounding it, the medical politics surrounding it, and the like since about 1981.

I declare under penalty of perjury under the laws of the State of Georgia, that the foregoing is true and correct.

Dated:  April 1, 2021

_____
DAVID J. LLEWELLYN



## State Bar of Georgia

*Lawyers Serving the Public and the Justice System*

**Mr. David J. Llewellyn**
**Law Office of David J. Llewellyn**
**Two Ameris Centre**
**3500 Piedmont Road NE Suite 211**
**Atlanta, GA  30305-1559**

| | |
|---|---|
| **CURRENT STATUS:** | **Active Member-Good Standing** |
| **DATE OF ADMISSION:** | **11/13/1979** |
| **BAR NUMBER:** | **455150** |
| **TODAY'S DATE:** | **03/25/2021** |

The prerequisites for practicing law in the State of Georgia are as follows:

- **Certified by the Office of Bar Admissions, either by Exam, or on Motion (Reciprocity).**
- **Sworn in to the Superior Court in Georgia, highest court required to practice law in Georgia.**
- **Enrolled with the State Bar of Georgia, arm of the Supreme Court of Georgia.**

This member is currently in **"good standing"** as termed and defined by **State Bar Rule 1-204**.  The member is current in license fees and is not suspended or disbarred as of the date of this letter.

### STATE BAR OF GEORGIA

*Brinda Lovvorn*

**Official Representative of the State Bar of Georgia**

---

**HEADQUARTERS**
104 Marietta St. NW, Suite 100
Atlanta, GA  30303-2743
404-527-8700 • 800-334-6865
Fax 404-527-8717
www.gabar.org

**COASTAL GEORGIA OFFICE**
18 E. Bay St.
Savannah, GA  31401-1225
912-239-9910 • 877-239-9910
Fax 912-239-9970

**SOUTH GEORGIA OFFICE**
244 E. 2nd St. (31794)
P.O. Box 1390
Tifton, GA  31793-1390
229-387-0446 • 800-330-0446
Fax 229-382-7435

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO, AIKO AND ADAM LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS, INC.<br>Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MERCER COUNTY<br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br><br>**ORDER** |

     **THIS MATTER**, having been opened to the Court by Andrew DeLaney, Esq., attorney for Shingo Lavine, Adam Lavine, and Aiko Lavine, upon application for an Order pursuant to R. 1:21-2 granting pro hac vice admission to David J. Lllewellyn, Esq., and the court having considered the submissions of the parties and for good cause shown;

     IT IS on this 14th day of May, 2021:

     ORDERED that the application of David J. Lllewellyn for admission to the Bar of this Court pro hac vice to represent Shingo Lavine, Adam Lavine and Aiko Lavine be and is hereby granted and that the aforesaid shall comply with the requirements of R. 1:21-2, R. 1:20-1(b) and R. 1:28-2 of the Rules Governing the State of New Jersey, and within 20 days of the entry of this Order, David Lllewellyn shall send the appropriate documentation and payment to the New Jersey Lawyers Fund for Client Protection; and

     IT IS FURTHER ORDERED that all pleadings, briefs and other papers filed with the Court shall be signed by an attorney of record authorized to practice in this State, who shall be

responsible for them and for the conduct of this case and/or counsel admitted pro hac vice by virtue of this Order; and

IT IS FURTHER ORDERED that David J. Llewellyn shall consent to the appointment of the Clerk of the New Jersey Supreme Court as agent upon whom service of process may be made for all actions against him and his firm that may arise out of participation in this matter.

\_\_\_\_/s/ Douglas H. Hurd_____
P.J. Cv.

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No. 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY |
| Plaintiffs, | DOCKET NO.:  MER-L-000272-21 |
| v. | CIVIL ACTION |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **NOTICE OF MOTION OF DEFENDANT, AMERICAN ACADEMY OF PEDIATRICS INC. TO DISMISS PLAINTIFFS' COMPLAINT WITH PREJUDICE** |
| Defendants. | |

TO:   Andrew DeLaney, Esquire
ANDREW DELANEY, ATTORNEY AT LAW LLC
South Street, Suite 203
Morristown, NJ 07960

    **PLEASE TAKE NOTICE** that on July 9, 2021, at 9:00 am or as soon as counsel may

be heard, Defendant, American Academy of Pediatrics Inc., by and through its attorneys, White

and Williams LLP, will make application to the Superior Court of New Jersey, Law Division

Civil Part, Mercer County, New Jersey, for an Order dismissing Plaintiffs'  Complaint and any

cross-claims against it with prejudice.

27294110v.1

**PLEASE TAKE FURTHER NOTICE** Defendant American Academy of Pediatrics Inc. will rely upon the attached Certification of Counsel, Memorandum of Law and Exhibits attached thereto in support of this motion.  A proposed form of Order is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that **oral argument is requested,** if timely opposition is filed.

**PLEASE TAKE FURTHER NOTICE** that **no dates** have been fixed for pretrial conference, calendar call or trial in this matter.

**WHITE AND WILLIAMS LLP**
Attorneys for Defendant,
American Academy of Pediatrics Inc.

BY: _____

Jared K. Levy

Dated:  June 18, 2021

27294110v.1

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No. 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY |
| Plaintiffs, | DOCKET NO.:  MER-L-000272-21 |
| v. | CIVIL ACTION |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **ORDER** |
| Defendants. | |

**THIS MATTER** having become for the Court by Motion of Defendant American Academy of Pediatric Inc. by and through their attorneys, White and Williams LLP, and the Court having considered the filings, the arguments of counsel, if any, and for good cause shown:

**IT IS** on this _____ day of _____, 2021 hereby

**ORDERED** that Defendant American Academy of Pediatrics Inc.'s Motion to Dismiss is hereby **GRANTED**; and it is

**FURTHER ORDERED** that the Plaintiffs' complaint and any cross-claims against Defendant American Academy of Pediatrics Inc. are hereby dismissed with prejudice; and it is

**FURTHER ORDERED** that a copy of this Order shall be served upon all counsel of record through eCourts.

BY THE COURT:

_____
                                          J.S.C.

Motion:

Opposed: _____

Unopposed: _____

27301928v.1

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No(s). 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY |
| Plaintiffs, | DOCKET NO.:  MER-L-000272-21 |
| v. | CIVIL ACTION |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **CERTIFICATION OF COUNSEL IN SUPPORT OF DEFENDANT AMERICAN ACADEMY OF PEDIATRICS INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT WITH PREJUDICE** |
| Defendants. | |

I, Jared K. Levy, Esquire of full age, do hereby certify as follows:

1.      I am an attorney-at-law in the State of New Jersey and counsel in the law firm of White and Williams LLP located at LibertyView, 457 Haddonfield Road, Suite 400, Cherry Hill, New Jersey 08002.   My Firm represents defendant American Academy of Pediatrics Inc.  I am familiar with the file and the matters asserted herein.

2.      This personal injury matter arises from a December 18, 1997 circumcision.  See Plaintiffs' Complaint, attached hereto as Exhibit "A."

3.      Plaintiffs' counsel agreed to extend Defendant American Academy of Pediatric Inc.'s time to respond to plaintiffs' complaint by June 19, 2021.  See June 6, 2021 email, attached hereto as Exhibit "B."

4.      Neither arbitration nor trial have been scheduled.

27294110v.1

I hereby certify that the forgoing statements made by me are true to the best of my knowledge, information and belief.  I am aware that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

WHITE AND WILLIAMS LLP
Attorneys for Defendant,
American Academy of Pediatrics Inc.

BY: _____
Jared K. Levy

Dated:  June 18, 2021

-2-

27294110v.1

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No. 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY |
| Plaintiffs, | DOCKET NO.:  MER-L-000272-21 |
| v. | CIVIL ACTION |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **DEFENDANT AMERICAN ACADEMY OF PEDIATRICS INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT WITH PREJUDICE** |
| Defendants. | |

## INTRODUCTION

While the plaintiffs attempt to frame this as a fraud case, it is actually a claim for medical malpractice resulting from a botched circumcision and an unsuccessful second circumcision, both of which occurred about 23 years ago. According to the plaintiffs, complications arose after Shingo Lavine was circumcised as an infant in December 1997 because the obstetrician who performed the procedure, Dr. Chait, removed too much shaft skin. Shingo's parents, Adam and Aiko Lavine, were aware of the injury at the time; they noticed that their son was not healing and took him to a pediatrician within a month of the circumcision (i.e., in January 1998). This second doctor concluded that Dr. Chait had not removed enough foreskin and recommended a follow-up with a third doctor. The third doctor performed a second circumcision, also in 1998.

As Shingo grew up, he experienced physical complications from the botched circumcision. The Lavines did nothing about Shingo's claimed issues for over two decades until they met with a law professor in 2020 who told them that circumcision is violence, genital mutilation, and a "fraud" when performed by physicians and hospitals in the United States.

Now, 23 years after the surgery (and five years after Shingo turned 18 years old), the Lavines bring this suit for fraud and constructive fraud seeking monetary damages from Shingo's physical injuries and pain and suffering. The Lavines claim that Dr. Chait committed "fraud" when he allegedly failed to properly inform them on the risks of circumcision and therefore performed the procedure without their informed consent. In addition to suing the doctor's medical group, the Lavines are also suing the American Academy of Pediatrics, though they do not allege any relationship between them and the Academy, or between Dr. Chait (who was an obstetrician and not a pediatrician) and the Academy. Instead, the Lavines claim that the Academy should be held liable for Shingo's injuries because when Dr. Chait recommended the procedure to Shingo's father and obtained his consent, Dr. Chait supposedly told Shingo's father "that the American Academy of Pediatrics had issued guidelines about circumcision showing that the circumcision reduces the incidence of urinary tract infections, penile cancer, and sexually transmitted diseases including HIV." (Compl. ¶ 10.) That single sentence supposedly uttered 23 years ago by the doctor while advising his patient is the entirety of the Levines' claim against the Academy. Based on it, the Lavines seek to hold the Academy liable for fraud and constructive fraud for damage caused by the malpractice (Dr. Chait's removal of too much shaft skin and not enough foreskin and Dr. Barone's failed revisionary surgery). The Lavines contend that a 1989 report published in the Academy's journal, *Pediatrics*, eight years before Shingo's circumcision constitutes the "guidelines" Dr. Chait supposedly mentioned and that the 1989 report contained "numerous intentional misrepresentations and omissions." (Compl. ¶ 42.) The

27294110v.1

Lavines are trying to transform this medical-malpractice case into a fraud claim, because they need to find a way to try to hook the Academy into the lawsuit and to try to avoid the statute of limitations that bars their claims for the medical-malpractice claim that accrued back in 1998.

The Lavines' pleading machinations cannot save their purported claim. The Lavines' claim for fraud is time barred and substantively deficient, thus warranting dismissal. At the outset, the Academy as a publisher does not have any special relationship with them that would impose a duty of care to prevent any misstatements from appearing in its medical journal. And even if it did, they fail to allege the elements necessary for a fraud claim. They cannot show a misrepresentation of fact, because the 1989 report that they think Dr. Chait was referring to provides a medical *opinion* about whether newborn circumcision is a generally safe procedure; that medical judgment about safety is merely an opinion, not a statement of fact. Further, not only do they fail to allege that the Academy intended for them to rely on the report to obtain some benefit or undue advantage from them, they also could not reasonably rely on the 1989 report when it contained disclaimers directing doctors to evaluate each patient's individual circumstances. Rather, they were relying on Dr. Chait's advice as their personal physician within the context of that doctor-patient relationship. And they also cannot show causation, where their own allegations show that Dr. Chait's recommendation, the negligent treatment by Dr. Chait, and the failed second circumcision were intervening causes. The Lavines are required to plead facts to support every one of these elements to be sustained, but their complaint fails on all and should be dismissed for at least seven separate reasons.

In the end, the Lavines' real complaint is that they oppose circumcision: they allege that it is an "[u]nnecessary surgery," apparently in all instances, and that is "violence and genital mutilation, the opposite of medicine, and a fraud when performed" by doctors. (Compl. ¶ 23.) They go so far as to allege that "[t]he AAP knows that circumcision is not safe." (Compl. ¶ 67.)

27294110v.1

But while the Lavines are entitled to their opinion, it is not fraud for the Academy to publish a report by doctors about circumcision in a medical journal in 1989. The Lavines' claims against the Academy should be dismissed.

<u>**FACTS**</u>

**A.      Dr. Chait performs a circumcision on Shingo Lavine.**

In December 1997, Dr. Jeffrey Chait, an employee of Defendant Princeton Medical Group, P.A. in Princeton, New Jersey, solicited Adam's Lavine's verbal consent to perform a circumcision on his infant son, Shingo. (Compl. ¶¶ 5–10.) While explaining his recommendation that he perform a circumcision on Shingo, Dr. Chait allegedly stated that the Academy had guidelines showing that circumcision reduced incidence of urinary tract infections, penile cancer, and HIV, and opined that circumcision was a minor, routine procedure. (*Id.* ¶ 10.) The Lavines allege that Dr. Chait did not disclose the risks and complications inherent to circumcision. (*Id.* ¶ 12.)

Adam does not recall signing a consent form (and his wife Aiko was medicated at the time from the Caesarean section), but he acknowledges that he verbally consented to the procedure. (Compl. ¶ 10.) He alleges now that he did so in reliance, in part, on representations made by Dr. Chait and Dr. Chait's reference to the Academy's position. (*Id.* ¶¶ 8, 10.) The Lavines do not allege that they had any knowledge of any guidelines or other publications from the American Academy of Pediatrics. They also do not allege that Dr. Chait would not have recommended circumcision but for the purported Academy guidelines. The Lavines do not allege that the Academy was involved in the circumcision or their medical care in any way. The Lavines also fail to allege that Dr. Chait is even a member of the American Academy of Pediatrics, that he had any other relationship with it at all, or that he even read the purported "guidelines."

27294110v.1

During the circumcision, Dr. Chait removed too much shaft skin. (*Id.* ¶ 13.) After the circumcision, Dr. Chait expressed concern to the Lavines about the success of the procedure. (*Id.*)

**B.    During the next month, the Lavines were aware the circumcision was not done properly, and Shingo continued to experience related issues as he grew up.**

In the month after the circumcision, Adam and Aiko became concerned that Dr. Chait did not perform the circumcision properly, and they acted on their concern. (*Id.* ¶¶ 13–14.) Between January 10 and 15, 1998, the Lavines took Shingo to his pediatrician, who warned Plaintiffs that Dr. Chait had not removed enough foreskin. (*Id.* ¶ 14.) This second doctor recommended that the Lavines take Shingo to Dr. Barone, chief of pediatric urology at Robert Wood Johnson University Hospital in New Brunswick, New Jersey. (*Id.*) Dr. Barone diagnosed Shingo with "phimosis and a buried penis" and recommended a corrective procedure or "second circumcision." (*Id.* ¶ 15.) After the second circumcision, Shingo had insufficient shaft skin coverage and pubic hair bearing skin down into the surgery scar line. (*Id.*)

Many years later, after reaching adolescence, Shingo began suffering physical complications from the circumcision, including painful erections, meatal stenosis, scrotal webbing, and hypersensitivity of the glans. (*Id.* ¶ 16.) Shingo lived with these complications for years without remedial efforts until June 2020, when Shingo began undergoing a process to regenerate foreskin that involves wearing weights attached to the penis and pulling for three to four hours per day for five to ten years. (*Id.* ¶¶ 19–20.) In July 2020, Shingo began undergoing psychotherapy to cope with the emotional distress resulting from his circumcision. (*Id.* ¶ 21.)

**C.    The allegations relating to the Academy rest on articles or reports that were published in its journal, *Pediatrics*.**

In alleging that Dr. Chait mentioned "guidelines" issued by the Academy, the Lavines do not allege that Dr. Chait referred to any specific document. (Compl. ¶ 10.) The Lavines do not

-5-

27294110v.1

even allege that the Academy had issued "guidelines" before 1997. Instead, the Lavines base their fraud allegations on "a 'Report of the Task Force on Circumcision (RE9148),' which was published in the AAP's journal *Pediatrics* in August 1989 ('1989 Guidelines')." (Compl. ¶ 39.) To try to make their case against the Academy, the Lavines—after acknowledging that the Academy publishes a variety of different materials, including "reports, policy statements, and guidelines" (Compl. ¶ 26)—then define the 1989 Report of the Task Force as the "1989 Guidelines." (Compl. ¶ 39.) By slight of editing, the Lavines try to transform the 1989 report into "guidelines" to fit Dr. Chait's purported statement. Despite the complaint defining the 1989 report as the "1989 Guidelines" (*id.*), the 1989 report does not include any guidelines. (Compl. Exh. B.) In fact, the word "guidelines" appears in the 1989 report only twice, in both instances referring to another document (*Guidelines on Perinatal Care*). (Compl. Exh. B.)

The 1989 report, which was written by six doctors, describes their medical opinion on the safety of circumcision, concluding that it is a "generally safe procedure." (Compl. Exh. B at 390.) In the article, these doctors offered their opinion that "[n]ewborn circumcision has potential medical benefits and advantages as well as disadvantages and risks." (*Id.*) In a section entitled "Contraindications, Complications, Informed Consent," the article specifically notes risks associated with circumcision: it notes that while postoperative conditions occur at a low rate, with the most common complications being "local infection and bleeding," the procedure has resulted in three instances of death. (*Id.*) The article also notes infants who undergo circumcision without anesthesia experience pain. (*Id.* at 389 (they "demonstrate physiologic responses suggesting they are experiencing pain").)

The article states that "parents should be fully informed of the possible benefits and potential risks of newborn circumcision" and about other factors that may affect the parents decisions, "including esthetics, religion, cultural attitudes, social pressures, and tradition." (*Id.* at

-6-

27294110v.1

390.) And the article also includes a disclaimer advising doctors that they must take into account the specific circumstances of the patient. (*Id.* at 388 ("The recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed. Variations, taking into account individual characteristics, may be appropriate.").)

According to the Lavines, the 1989 report contained numerous intentional misrepresentations and omissions, including that the article touted the benefits of circumcision while omitting or underplaying the risks and pain associated with the procedure (*id.* ¶¶ 42 (referring to a "1989 AAP Policy Statement," which apparently refers to the 1989 report), 65–66). They also allege that the Task Force and the Academy maintained a religious and cultural bias toward circumcision. (*Id.* ¶¶ 58–59.) Finally, the Lavines allege that they are entitled to compensatory and punitive damages for the pain and suffering they endured arising from the negligently performed circumcisions. (*Id.* at 20.)

## **LEGAL STANDARD**

Upon considering a motion to dismiss pursuant to *Rule* 4:6-2(e), courts are required to search the complaint in depth to determine whether a cause of action could be found within its four corners. *Talalai v. Cooper Tire & Rubber Co.*, 360 N.J. Super. 547, 555-56 (Law Div. 2001). "[E]very reasonable inference is therefore accorded the plaintiff and the motion granted only in rare instances and ordinarily without prejudice." *Id.* (citing *Lieberman v. Port Auth. of N.Y. & N.J.*, 132 N.J. 76, 79 (1993). Ultimately, the analysis of the court is one of legal viability and not the actual likelihood of success. *Id.* at 556. The complaint must be searched in depth to determine if a cause of action can be gleaned, particularly if further discovery is taken. *See Printing Mart v. Sharp Elecs. Corp.*, 116 N.J. 739, 746 (1989). But if, as here, the complaint states no basis for relief and discovery would not show to the contrary, dismissal is appropriate. *Energy Rec. v. Dep't of Env. Prot*, 320 N.J. Super. 59, 64 (App. Div. 1999) *aff'd o.b.* 170 N.J.

27294110v.1

246 (2001); *see also Sickles v. Carbot Corp.*, 379 N.J. Super. 100, 106 (App. Div. 2005) ("[A] court must dismiss the plaintiff's complaint if it has failed to articulate a legal basis entitling plaintiff to relief."). On a dismissal motion pursuant to Rule 4:6-2(e), the court may also review in addition to the complaint "exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *See Banco Popular N. Am. v. Gandi,* 184 N.J. 161, 183 (2005).

A complaint sounding in fraud must on its face satisfy the requirements of *Rule* 4:5–8. The heightened fraud pleading requirements set forth in the Rule provide the "particulars of the wrong, with dates and items if necessary, shall be stated insofar as practicable. Malice, intent, knowledge, and other condition of mind of a person may be alleged generally." *R.* 4:5–8(a). A court may dismiss a complaint alleging fraud if "the allegations do not set forth with specificity, nor do they constitute as pleaded, satisfaction of the elements of legal or equitable fraud." *Levinson v. D'Alfonso & Stein,* 320 N.J. Super. 312, 315 (App. Div. 1999).

## LEGAL ARGUMENT

**I.      The Lavines may not assert a fraud claim based on a lack of informed consent.**

Only one allegation links the Academy to the circumcision at issue in this case: the allegation that Dr. Chait informed Adam Lavine "that the American Academy of Pediatrics had issued guidelines about circumcision" while he was in the process of "solicit[ing] Adam's verbal *consent* to have Shingo circumcised . . . ." (Compl. ¶ 10 (emphasis added).) This allegation reveals that the alleged "guidelines" are relevant for only one reason: for evaluating whether the Lavines had enough information to provide informed consent for the circumcision. Other allegations in the complaint confirm this. For example, the complaint alleges that "Dr. Chait did not disclose to Adam and Aiko," among other things, "that circumcision is surgery," "that it is painful," and "that it risks many complications and can be fatal." (Compl. ¶ 12.)

-8-

Indeed, the final allegation in the complaint before stating Count I is the allegation "that defendants" did not fully inform the Lavine parents about circumcision," and that if the parents had been fully informed, "they would have stopped Dr. Chait and the hospital from performing the unnecessary operation." (Compl. ¶ 44; *see also id.* ¶ 48 ("If fully informed about the pain, risks, and harms of circumcision, both Adam Lavine and Aiko Lavine would have told Dr. Chait not to perform the unnecessary procedure.").) The gravamen of the Lavines' claims is thus that they would not have consented to the circumcision had Dr. Chait fully informed them of the risks—which is the very essence of a claim for informed consent.

The fact that the gravamen of the Lavines' claim is informed consent is significant because New Jersey courts have repeatedly found that plaintiffs may not assert a fraud claim based on a lack of informed consent resulting from misrepresentations that occur pre-surgery. "[I]nformed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to evaluate knowledgeably the options available and the risks attendant upon each before subjecting that patient to a course of treatment." *Howard v. Univ. of Med. & Dentistry of New Jersey*, 172 N.J. 537, 548 (2002) (stating that an informed-consent plaintiff must "prove that a reasonably prudent patient in the plaintiff's position would have declined to undergo the treatment if informed of the risks that the defendant failed to disclose"); *see also Matthies v. Mastromonaco*, 160 N.J. 26, 33 (1999) (a "physician has a duty to disclose information that will enable a patient 'to consider and weigh knowledgeably the options available and the risk attendant to each.'").

In *Howard*, the plaintiffs brought a medical-malpractice action based on a lack of informed consent after an unsuccessful cervical surgery rendered the patient a quadriplegic. 172 N.J.. at 544, 556. Because the defendant doctor had misrepresented his credentials and experience at the time he obtained their consent to perform the surgery, the plaintiffs sought to

27294110v.1

bring a claim based on fraud, alleging that they would not have consented to surgery had they known of the defendant's true qualifications. *Id*. at 556. But the New Jersey Supreme Court held that a fraud claim was unavailable to the plaintiffs, because allowing a "fraud or deceit-based cause of action in this doctor-patient context" "would circumvent the requirements for proof of both causation and damages imposed in a traditional informed consent setting." *Id*. at 554. The court found that fraud is actionable "only when the alleged fraud occurs separately from and *subsequent to* the malpractice . . . and then only where the fraud claim gives rise to damages *separate and distinct* from those flowing from the malpractice." *Id*. (emphasis added). The Court concluded that an informed consent claim was the more appropriate analytical basis for the claim.

Here, the alleged misstatements that form the basis of Plaintiffs' fraud claims against the Academy fail both parts of *Howard*'s test. First, the allegedly fraudulent statements occurred before the negligently performed circumcisions, not after it. (Compl. ¶¶ 9–13.) Second, the damages that the Lavines claim arise from pain, suffering, and costs related to the circumcisions. (*E.g.*, Compl. ¶ 13 (alleging Dr. Chait removed "too much shaft skin"), ¶ 16 (alleging "physical complications caused by the circumcisions"), ¶ 17 (alleging "angst and anger" because "physicians had circumcised him, twice, and had caused his injuries"), ¶ 21 (alleging severe emotional distress "about his circumcision"). They do not identify any damages that are separate and distinct from the circumcision-caused damages. Therefore, the Lavines must bring their claim as medical-malpractice claim, not as a claim alleging fraud.

This is a problem for the Lavines because their claims for medical malpractice cannot be brought against the Academy. The Academy has no doctor-patient relationship with the Lavines and so owes no duty to them, including any duty to provide sufficient information for informed consent. *Ryans v. Lowell*, 484 A.2d 1253, 1257 (N.J. Super. App. Div. 1984) ("in physician-

-10-

27294110v.1

malpractice cases, the duty owed by the physician arises from the physician-patient relationship"). Further, the Academy did not perform the procedure on Shingo, so even if there was medical malpractice, the Academy is not the proper defendant for the claims that really underlie this suit—the claims for medical malpractice by Dr. Chait, the obstetrician, or by Dr. Barone, who performed the revision surgery.

## II.   The Lavines' claims are time-barred.

The likely reason that the Lavines attempt to present their medical-malpractice claim as a fraud claim is to try to avoid the statute-of-limitations problem they face in bringing this suit 23 years after the failed procedures. Shingo Lavine wants to rely on the rule that the statute of limitations for a minor starts running when he turns 18, and his parents want to rely on a discovery rule. *See N.J.S.A.* 2A:14-21; *see also N.J.S.A.* 2A:14–1 (providing a six-year statute of limitations for fraud); *D'Angelo v. Miller Yacht Sales*, 261 N.J. Super. 683, 688 (App. Div. 1993) (recognizing that the statute of limitations for fraud is six years). Under the rule for minors, because Shingo turned 18 in December 2015, he would have had until December 2021 to bring a fraud claim. But as just explained, New Jersey law does not allow a fraud claim when the alleged fraud relies on information presented before the procedure and when it fails to identify separate and distinct damages. As a result, his claim is one for medical malpractice and is barred by the relevant statutes of limitations.

### A.   The statutes of limitations for medical malpractice bar all of the Lavines claims.

Because the Lavines' claims are really malpractice claims, they are barred by the statute of limitations. Under *N.J.S.A* 2A:14-2(a), "every action at law for an injury to the person caused by the wrongful act, neglect or default of any person" must be commenced within two years, "except that an action by or on behalf of a minor that has accrued for medical malpractice for

injuries sustained at birth shall be commenced prior to the minor's 13th birthday." Therefore, if Shingo's injury is considered to be sustained at birth, then the claims had to be brought by his 13th birthday, which was in December 2010. If his injury is not considered sustained at birth, then the claims fall under the two-year limitations period, which means the claims would need to have been brought by December 1999. *N.J.S.A.* 2A:14-2(A); *N.J.S.A.* 2A:14-2.1 (giving the parent of an injured child "the same period of time as provided by law in the case of the said minor child so injured"). Either way, the claims are too late.

Further, it would be futile for the Lavines to attempt to amend their complaint, because they cannot change the fact that the faulty circumcision occurred in 1998; any attempt at amending to bring a claim based on this set of facts would still be time barred. Therefore, their claims should be dismissed with prejudice.

**B.     Even if Shingo had a real fraud claim, his parents' claims would still be time barred.**

Further, even if Shingo had a real fraud claim, instead of a malpractice claim for lack of informed consent (and he does not), his parents' claims would still need to be dismissed because they had no disability or other excuse that would have tolled the limitations period for their fraud claims. This is because a claim accrues when the plaintiff "is aware of facts that would alert a reasonable person to the possibility of an actionable claim." *Cantena v. Raytheon Co.*, 447 N.J. Super. 43, 54 (App. Div. 2016). In the fraud context, the limitations period begins when "the fraud was discovered, or through reasonable diligence should have been discovered." *Id.* at 53.

Here, Adam and Aiko Lavine were aware in 1998 of all the facts relating to the injury and alleged fraud, including the facts they now rely on in their attempt to link the circumcision to the Academy. As to the injury, they were aware that Dr. Chait performed a circumcision on Shingo and that Shingo experienced complications indicating that Dr. Chait had not performed

-12-

the circumcision properly. Specifically, they allege that Dr. Chait expressed concern immediately after the surgery about Shingo's circumcision, and that one month after Dr. Chait performed the circumcision, "they became concerned that the circumcision had not been properly performed." (Compl. ¶ 13.) The Lavines were concerned enough that in January 1998 they took Shingo to a pediatrician, and they acknowledge that this second doctor notified them that the circumcision had not been properly performed. (*Id.* ¶ 14.) Further confirming their awareness of their son's injury, the Lavines took Shingo to a third doctor (Dr. Barone), who confirmed the second doctor's diagnosis and recommended a corrective procedure, a "second circumcision." (*Id.* ¶ 15.) These allegations concede that the Lavines were on notice in January 1998 that the circumcision had not been performed properly.

As to any fraud linked to the Academy, Adam and Aiko Lavine were aware in 1998 that Dr. Chait allegedly referred to unspecified guidelines from the Academy when explaining why he recommended circumcision. They thus could have discovered, through reasonable diligence, the 1989 report that they now assume and claim is what Dr. Chait meant when he supposedly referenced Academy "guidelines." (*Id.* ¶ 39.) Indeed, every article that the complaint mentions predates the 1998 injury (*id.* ¶¶ 29–44), and so the Lavines could have discovered any misrepresentations in those articles in 1998. Put simply, the Lavines either had discovered or could have discovered all of the factual bases for their claims in 1998, and they thus had sufficient information to alert them "to the possibility of an actionable claim." *Cantena*, 447 N.J. at 53.

While the Lavines assert that they were not truly aware of their claim until they met with a law professor in September 2020 who told them that circumcision is violence and genital mutilation and a "fraud" (Compl. ¶ 23), that is not the proper standard for accrual under New Jersey law. For example, in *Burd v. New Jersey Tel. Co.*, 76 N.J. 284 (1978), the New Jersey

-13-

Supreme Court specifically corrected a lower court for concluding that "the applicable limitations period does not begin running until [a claimant] learns from a lawyer that those facts equate with a legal cause of action against the producer or originator of the injurious source or cause." *Id.* at 291; *see also Catena*, 447 N.J. at 54 (explaining that the "discovery rule does not toll the statute until the plaintiff has 'legal certainty' of an actionable claim, or until the full extent of the damage becomes apparent") (internal citations omitted). Because the Lavines' claims accrued in January 1998, the statute of limitations for fraud claims ran in 2004, and their claims are thus time-barred.

In any event, as explained at the outset, in substance all three of the Lavines are bringing medical malpractice claims, not fraud claims. *See New Jersey Educ. Ass'n v. New Jersey*, Civ. No. 11-5024, 2012 WL 715284, *4 (D.N.J. Mar. 5, 2012) ("a court should look to substance over form and be mindful of the fact that "the line between permitted and prohibited suits will often be indistinct" (quoting *Papasan v. Allain,* 478 U.S. 265, 278–79 (1986)); *see also Thomas v. Adams*, 55 F. Supp. 3d 552, 563 (D.N.J. 2014) (courts analyzing a complaint for entitlement to relief must look to "substance-over-form"). Accordingly, their claims are time barred.

### III. The Lavines cannot establish the Academy's liability for the author's opinions in the 1989 report as the report's publisher.

The Academy did not author the 1989 report. Six task force members authored it and rendered the opinions in it. The Academy later published it in its journal *Pediatrics*. The Lavines cannot meet their burden to establish liability against the Academy as a mere publisher of the 1989 report. The gravamen of their allegations is that the Academy, the publisher of the *Pediatrics* journal, should be held liable for the alleged misstatements and omissions *by the authors* of the 1989 report because their report appeared in the *Pediatrics* journal.

But courts across jurisdictions have been reluctant to hold publishers liable for articles or books they publish. As one court put it, outside of the defamation context "[a] review of the

-14-

applicable law reveals no cases that have directly held publishers liable based on the content of a publication," and "[t]he cases contrary to holding publishers liable are legion." *Smith v. Linn*, 48 Pa. D. & C.3d 339, 342 (Pa. Com. Pl. 1988) (citing cases); *see also id.* at 346 ("The court found no duty existed on a publisher with respect to the content of its publication outside the area of defamation."). For example, when a plaintiff "sued the publisher of the 'Merck Index,' which contained information about drugs, chemicals and biologicals including their toxicity," the suit based on negligence and willful misrepresentation was dismissed, because a court found "no duty owed to plaintiff by Merck." *Id.* at 346–47 (discussing *Demuth Dev. Co. v. Merck & Co.*, 432 F. Supp. 990 (E.D. N.Y. 1977)). As another example, in a negligence case against the publisher of a "how to" book, a court "reasoned that the publisher owed no duty to the reading public as to the contents of a publication authored by another." *Id.* at 347 (discussing *Alm v. Van Nostrand Reinhold Co.*, 134 Ill. App. 3d 716, 720–21 (1985)). The Pennsylvania court also examined numerous sections of Restatement (Second) of Torts and concluded that none of them suggest the sections were meant to be applied to publishers. *Id.* at 354 (analyzing "sections 302(a), 303, 307, 308, 310, 311, 321, 388, 390 and 402B").

Numerous other courts have taken the same view. As the Ninth Circuit has explained, a publisher has "no duty to investigate the accuracy of the contents of the books it publishes." *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1037 (9th Cir. 1991). "[T]here is nothing inherent in the role of publisher or the surrounding legal doctrines to suggest that such a duty should be imposed on publishers," and "[i]ndeed the cases uniformly refuse to impose such a duty." *Id.* at 1037 & n.8 (listing cases); *see also First Equity Corp. of Florida v. Standard & Poor's Corp.*, 869 F.2d 175, 179–80 (2d Cir. 1989) (concluding that a publisher of securities information publication has no duty to verify information) (citing cases). The Ninth Circuit also noted the First Amendment concerns with imposing liability on publishers: "Were we tempted to create

this duty, the gentle tug of the First Amendment and the values embodied therein would remind us of the social costs." *Winter*, 938 F.2d at 1037. Similarly, in *Tumminello v. Bergen Evening Record, Inc*., 454 F. Supp. 1156 (D.N.J. 1978), when concluding that "under traditional tort principles" publishers of a news story did not owe "any particular duty of care" to a member of the public mentioned in an article, the court noted that "the chilling effect of imposing a high duty of care on those in the business of news dissemination and making that duty run to a wide range of readers or TV viewers would have a chilling effect which is unacceptable under our Constitution." *Id*. at 1159–60; *see also Gutter v. Dow Jones, Inc.*, 22 Ohio St. 3d 286, 288 (1986) ("The general view is that '[n]o action for damages lies against a newspaper for merely inaccurate reporting when the publication does not constitute libel.'") (citing cases and treatises); *Pistilli-Leopardi v. MediaNews Grp., Inc.*, No. A-0086-18T1, 2020 WL 3967992, at *4 (N.J. Super. Ct. App. Div. July 14, 2020) (discussing the heightened standard of known falsity or reckless disregard for the truth applicable for "a defamation claim against a media defendant in a matter of public interest and concern").

Based on the foregoing, and despite Plaintiffs' conclusory allegations, no duty exists between the Lavines and the Academy. The Lavines do not allege any special relationship with the Academy. The Lavines were not members of the Academy nor subscribers to the *Pediatrics* journal. In fact, the Lavines do not allege that they ever reviewed the *Pediatrics* journal or the 1989 report—or even that Dr. Chait reviewed the 1989 report. Thus, permitting the Lavines to recover for the alleged misstatements or omissions by the authors in a scientific journal article would create a new duty outside the defamation context, would significantly expand publisher liability, and would chill future medical publications. But under the case law, without a special relationship or duty there can be no recovery for any misstatements by the Academy. As a

27294110v.1

result, the Academy should not be held liable to the Lavines for fraud based on its publication of an article.

## IV. The Lavines' complaint fails to state a claim for fraud or constructive fraud.

Even if this Court determines that the Academy may be liable as a publisher, it should still dismiss Lavines' fraud and constructive-fraud claims with prejudice because the Lavines have not adequately pled any of the elements required for a fraud or constructive-fraud claim.

### A. The Lavines fail to allege an actionable fraud claim.

The elements of common-law fraud are "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate New Jersey Ins. Co. v. Lajara*, 222 N.J. 129, 147 (N.J. 2015). "Misrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them." *Banco Popular*, 184 N.J. at 261.

### 1. The Lavines have not alleged a misstatement of fact.

The Lavines' fraud claim fails on the first element, because statements of *opinion*, rather than statements of *fact*, are not actionable for fraud. *See Alexander v. CIGNA*, 991 F. Supp. 427, 435 (D.N.J. 1998) ("A statement's content must be susceptible of 'exact knowledge' at the time it is made" to be a statement of fact that is actionable for fraud.). "The distinction between fact and opinion is broadly indicated by the generalization that what was susceptible of exact knowledge when the statement is made is usually considered to be a matter of fact." *Joseph J. Murphy Realty, Inc. v. Shervan*, 159 N.J. Super. 546, 551 (App. Div. 1978). Courts have admonished that representations pertaining to "matters not susceptible of personal knowledge are generally to be regarded as mere expressions of opinion, and that is held to be so even though they are made positively and as though they are based upon the maker's own

-17-

knowledge." *Id.*; *see also Paul v. Mayo Clinic*, No. 3:15-CV-1244-J-20MCR, 2017 WL 9937984, at *7 (M.D. Fla. June 6, 2017) (explaining that "a difference of opinion will not support a claim for fraud or negligent misrepresentation" and so holding that a "difference in medical opinion" did not establish a misrepresentation).

Here, the alleged misrepresentations set forth in the complaint are not facts; they are the medical opinions of the 1989 report's authors. For example, the 1989 report provides the authors' medical opinion that newborn circumcision is a "general safe procedure." (Compl. Exh. B. at 390.) Determining whether a medical procedure is safe necessarily requires a judgment call about the competing risks and benefits of the procedure made between the treating physician and the patient, as the 1989 report indicates.  That doctor/patient judgment call is the medical opinion the Lavines now disagree with, decades later, after talking to a law professor. Put simply, the Lavines base their entire suit on *their* current medical opinion "that circumcision is not safe" (Compl. ¶ 67). Apparently, the Lavines now would weigh the risks of complications from the procedure differently (as is perhaps inevitable, given the effects of hindsight bias). For example, many of the Lavines' allegations are that the author-physicians overstated the benefits while understating the risks of undergoing circumcision—in other words, that the doctors should have weighed those factors differently and concluded it was *not* generally safe. (*See* Compl. ¶¶ 42–44, 60, 65–67, 69–70.) The Lavines allege that "[t]he AAP knows that circumcision is not safe" (Compl. ¶ 67), but that allegation is simply the medical (and philosophical) opinion that the Lavines hold. The medical opinions of the doctors who wrote the 1989 report are precisely the type of statements that are not "susceptible" of exact knowledge, and therefore not actionable as fraud.

Further, the first page of the 1989 report provides a disclaimer highlighting that the report is providing a general opinion about safety, not one specifically tailored to a particular

27294110v.1

patient: "[t]he recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed." (Compl. Ex. B, 1989 Rept. at 388.) It further states that "[v]ariations, taking into account individual circumstances, may be appropriate." (*Id.*) The article mentions that "[n]ewborn circumcision has potential medical benefits and advantages as well as disadvantages and risks," and specifically mentions the risk of "postoperative complications" (including three deaths). (*Id.* at 390.) And in providing their opinions about the general safety of circumcision, the author-physicians state that parents should consult with a medical professional before proceeding with any course of treatment, so that they can be "fully informed of the possible benefits and potential risks" of newborn circumcision in their particular context. (*Id.*) Here, the Lavines acted in accord with that recommendation and consulted with Dr. Chait, but they claim they were not fully informed as the risks of circumcision by Dr. Chait, which would be solely the fault of Dr. Chait and not the Academy. Dr. Chait was the learned intermediary with a duty to the Lavines as their treating physician to advise them, not the Academy.

As shown in the products-liability context under the "learned intermediary doctrine," such warnings and disclaimers are sufficient to discharge a defendant of liability. *See Niemiera v. Schneider*, 114 N.J. 550, 559 (1989) ("a pharmaceutical manufacturer generally discharges its duty to warn the ultimate user of prescription drugs by supplying physicians with information about the drug's dangerous propensities"); *see also Grobelny v. Baxter Healthcare Corp.*, 341 F. App'x. 803, 806 (3d Cir. 2009) (explaining that, "[t]he crucial question [under the doctrine] is whether the warning was adequate to apprise a physician, not a consumer, of the risks."). In the products-liability context, a defendant will not be held accountable because of the failure to warn, if a sufficient warning would not have altered the physician's decision to prescribe the drug in dispute. *Strumph v. Schering Corp.*, 256 N.J. Super. 309, 323 (App. Div. 1992). The

-19-

27294110v.1

same reasoning applies here: Dr. Chait's duty to exercise his independent medical judgment and his failure to perform a circumcision properly are intervening causes here.

Plaintiffs also contend that the 1989 report contains a number of omissions that are actionable as fraud; for example, they contend that it was fraudulent for the Academy to not disclose it is a trade association, that some of the report authors had religious affiliations, and that the report authors had a cultural bias toward circumcision. (Compl. ¶¶ 56–59, 61, 68–69, 72–73.) The Lavines are in effect challenging the merits of the physician-authors' opinions on the ground that the authors allegedly failed to acknowledge additional counter arguments. But the fact that the Lavines disagree with the authors about which arguments to focus on does not mean there was any actionable fraud. Where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a "special relationship." *Berman v. Gurwicz*, 189 N.J. Super. 89, 458 A.2d 1311, 1313 (Ch. Div. 1981).

Here, as addressed earlier, no "special relationship" exists between the Lavines and the Academy such that a duty to inform arose between the two. Indeed, no relationships at all exists between the parties. Restatement (Second) of Torts § 551 (requiring disclosure only where defendant knows information whose nondisclosure will make earlier partial or ambiguous statement of facts to become misleading or where defendant is in a fiduciary or special relationship with plaintiff). Accordingly, any alleged omissions in the 1989 report are not actionable for fraud.

### 2. The Lavines have not alleged the Academy's knowledge of falsity.

The Lavines' fraud claim also fails because they have failed to allege that the Academy knew that the authors' opinions in the 1989 report were allegedly false. To establish that a defendant knowingly made a false misrepresentation, a plaintiff must show: (1) defendant

27294110v.1

knows or believes that the matter is not as he represents it to be, (b) defendant does not have the confidence in the accuracy of his representation that he states or implies, or (c) defendant knows that he does not have the basis for his representation that he states or implies. *Island Insteel Sys. Inc. v. Waters,* 296 F.3d 200, 212 (3d Cir. 2002) (citing Restatement (Second) Torts § 526).

Although Plaintiffs assert that the Academy knew the alleged false representations and omissions set forth in the 1989 report were false (Compl. ¶ 56), the report itself belies this assertion. First, as the report's 56 footnotes demonstrate, the report rests on a well-documented body of the medical studies that the report's authors drew on when reaching their medical opinions. The report's authors carefully identified the source of the information included in the report, refuting any contention that the Academy knew that the facts the physician-authors relied on in forming their medical opinions were false. Secondly, as discussed earlier, the disclaimer puts readers on notice that statements in the article need to be evaluated with the guidance of a physician and are based on individual circumstances. (Compl. Ex. B at 388.) The Lavines take the medical opinions in the 1989 report out of context to support their fraud claim. For example, they allege that the report's statements about urinary tract infections are false because the Academy knew that the studies cited in the report "may have methodological flaws." (Compl. ¶ 75.) But the report does not say that the studies *are* flawed; rather, it advises the reader of a possible issue with the studies—a step that *increases* the amount of information informing any decisions based on the report—while noting that five separate studies all suggested a relationship between circumcision and urinary tract infections. (Comp. Exh. B at 389 & nn.24–28). The Lavines characterize the statements as false, but the document speaks for itself and controls over the allegations. *Myska v. New Jersey Mfrs. Ins. Co.*, 440 N.J. Super. 458, 482 (App. Div. 2015) ("[W]hen allegations contained in a complaint are contradicted by the document it cites, the document controls.") (alteration in original). The controlling document

-21-

shows that the 1989 physicians candidly noted limitations on how certain they could be about this circumcision-UTI relationship, and this acknowledgement of limitations contradicts the allegation the Academy knew that the statements about the circumcision-UTI relationship were somehow false. Indeed, it highlights that the report's statements are medical opinions about possible risks, not statements of fact that the Academy could know were false.

> **3.**   **The Lavines cannot establish that the Academy intended for them to rely on the alleged misstatements in the report.**

The Lavines' fraud claim suffers from additional fatal flaws. New Jersey courts have held that "actual receipt and consideration of any misstatement remains central to the case of any plaintiff seeking to prove that he or she was deceived by the misstatement or omission." *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109 (2000). Further, plaintiffs must demonstrate "an intention to obtain an undue advantage therefrom." *Farris v. Cty. of Camden*, 61 F. Supp. 2d 307, 345 (D.N.J. 1999) (quoting *Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599, 609 (1989)). "Every fraud in its most general and fundamental conception consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith." *Jewish Ctr. of Sussex Cnty. v. Whale,* 86 N.J. 619, 624 (1981). Here, the Lavines do not even allege that they received and actually considered the medical opinions proffered in the 1989 report or that the Academy intended to obtain some benefit from Shingo's procedure. As a result, the Lavines cannot show that the Academy intended for them to rely on any of the 1989 report's statements.

In fact, the Lavines do not even allege that Dr. Chait actually reviewed the 1989 report or communicated to them the medical opinions it contained, nor have they alleged that they reviewed article; instead, they simply allege that Dr. Chait mentioned some undefined "guidelines." (Compl. ¶ 10.) Thus, the Lavines were never in "receipt" of any alleged misstatement in the 1989 report and so cannot establish that the Academy ever intended them to

27294110v.1

rely on the misstatements. As noted earlier, the only "statements" that the Lavines received were from Dr. Chait referring to supposed "guidelines."  The Lavines cannot try to make the 1989 report actionable as the "guidelines" just by referring to it as such.  A fraud claim has to be based on an actual misrepresentation and cannot be grammatically fashioned by a lawyer to try to link a vague statement to a document that is a report, not guidelines, all in service of a crusade against a medical procedure.

Further, they fail to allege that the Academy ever intended or derived any benefit or undue advantage from the procedure. *Farris*, 61 F. Supp. 2d at 346 ("a plaintiff must show that the defendant had an intention to obtain an undue advantage from the alleged false representation"). The Academy neither sought nor did it receive any discernable benefit from Dr. Chait performing the circumcision—the Academy was not even aware of Shingo's procedure until the instigation of this lawsuit. *See United States v. Czubinski*, 106 F.3d 1069, 1077 (1st Cir. 1997) (overturning conviction for honest-services fraud because the accused "did not receive, nor can it be found that he intended to receive, any tangible benefit"). Thus, the Lavines have failed to establish that the Academy intended for them to rely on any alleged misstatements.

### 4.      The Lavines do not allege reasonable reliance.

In addition to their failure to show that the Academy intended for them to rely on the statement, the Lavines' allegations also fail because they have not alleged sufficient facts to show they actually and reasonably relied on any misstatements. New Jersey courts have consistently held that "[w]ithout reasonable reliance on a material misrepresentation, an action in fraud must fail." *Triffin v. Automatic Data Processing, Inc.*, 397 N.J. Super. 237, 249 (App. Div. 2007) ("Reliance is an essential element of common law fraud.") (citing *Byrne v. Weichert Realtors*, 290 N.J. Super. 126, 137 (App. Div. 1996)). The Restatement (Second) of Torts § 537

(1977) requires that there be justifiable reliance if one is to recover on a fraudulent misrepresentation. Section 537(a) requires a recipient of a fraudulent misrepresentation to rely on the misrepresentation "in acting or refraining from action." *Triffin*, 397 N.J. Super. at 249.

In the instant case, the Lavines' allegations show that their decision to proceed with the procedure was based upon Dr. Chait's recommendation as the treating physician for the procedure. Although they assert that Dr. Chait based his recommendation on "guidelines" from the Academy (Compl. ¶¶ 10–11), the Lavines are simply assuming that the 1989 report (which they label the 1989 Guidelines) is the document Dr. Chait was referencing, apparently on the theory that the 1989 report was "the AAP's circumcision policy then in effect" at the time of Shingo's circumcision. (Compl. ¶ 54.) This assumption is inconsistent with the complaint's own allegations, as it recognizes repeatedly that the Academy publishes several different categories of documents: "advisory reports, recommendations, and guidelines," as well as "policy statements." (Compl. ¶¶ 25–28.) And the vagueness of this allegation is further exacerbated by the fact that the complaint itself references another document issued by the Academy, *Standards and Recommendations for Hospital Care of Newborn Infants*, without explaining why that document might not be the "guidelines" Dr. Chait meant. (*Id*. ¶¶ 29, 38–39.)

This is significant because when making fraud allegations, a plaintiff must plead with specificity the "particulars of the wrong, with dates and items if necessary," R. 4:5-8(a), yet here the Lavines simply plead that Dr. Chait in 1998 referenced "guidelines about circumcision" (Compl. ¶ 10) and then assume that he must have been referencing the nine-year-old 1989 report. Assuming a vague reference to "guidelines" is actually a reference to a task force report is not consistent with the requirement of pleading with specificity the statement alleged to contain fraud. In this context, where it is unclear which document Dr. Chait was referencing, the

-24-

27294110v.1

Lavines have not sufficiently alleged that either they or Dr. Chait relied upon the 1989 report when deciding whether to have the circumcision performed.

Moreover, the Lavines appear to be relying on a theory of indirect reliance, which is equally impermissible under the facts of this case. Section 533 of the Restatement of Torts states:

> The maker of a fraudulent misrepresentation in a business transaction is subject to liability to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person for the purpose of having him repeat its terms or communicate its substance to the other in order *to influence his conduct* in a particular transaction or type of transaction.

(emphasis added). And if a plaintiff does not hear the misrepresentation directly, "a plaintiff must prove that he or she was an intended recipient of the defendant's misrepresentations." *Port Liberte Homeowner's Ass'n, Inc. v. Sordoni Const. Co.*, 393 N.J. Super. 492, 508 (App. Div. 2007); *see, e.g.*, *Judson v. Peoples Bank & Trust Co.*, 25 N.J. 17 (1957) (defendant made false representation to members of a family with the intention that those family members communicate it to other family members to induce them into selling shares of closely held corporation at a lower price).

Here, the Lavines have not alleged that any of the medical opinions contained in the 1989 report were proffered to persuade them to elect having the circumcision performed. Indeed, the disclaimer makes it clear that the report counseled readers—who would largely be doctors, not patients—that doctors would need to aid patients in deciding whether to elect a course of treatment. *See Eli Lilly Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 493 (D.N.J. 1998) (plaintiff pharmaceutical company could not assert common law fraud claims against another pharmaceutical company for alleged misrepresentations to the Federal Drug Administration because plaintiff was not the intended recipient of those misrepresentations). Accordingly, Plaintiffs have failed to establish reasonable reliance, the death knell for any fraud claim.

-25-

5.      **The Lavines have also failed to plead that the Academy's alleged misstatements proximately caused their damages.**

The Lavines' fraud allegations lack another fundamental ingredient—they have not alleged that the Academy's alleged fraudulent conduct is the source of their damages. Indeed, the allegations make clear that the compensation Plaintiffs seek is "for the pain caused by each of the two circumcisions." (Compl. at 20.) The only portion of the complaint that addresses the basis of Plaintiffs' claim for damages is the prayer for relief, in which Plaintiffs request "[c]ompensation for the pain and pain [sic] and suffering and emotional distress associated with attempting partial foreskin restoration to try to mitigate the damage caused by the circumcisions," as well as "[c]ompensation for the time spent and that will be spent on foreskin restoration." (*Id.*) Additionally, they seek "[c]ompensation for the mental anguish suffered by [Plaintiff-parents] as a result of the two circumcisions." (*Id.*) These are all damages based on the failed medical procedures that Shingo endured, *not* on the Academy's alleged misstatements.

The complaint contains multiple allegations that constitute an intervening, superseding event that would relieve the Academy of any liability for the failed circumcisions. The New Jersey Supreme Court has explained that "if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm." *Lynch v. Scheininger*, 162 N.J. 209, 226 (2000) (quoting Restatement (Second) of Torts § 440 cmt. b (1965)). Courts have resolved questions of superseding cause by focusing on whether the intervening cause is so closely connected with the defendant's conduct that responsibility should not be terminated. *Id.* Courts consider numerous factors in addressing this issue, including (1) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation; (2) the fact that the operation of the intervening force is

due to a third person's act or to his failure to act; (3) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; and (4) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion. *Id.* (quoting Restatement (Second) of Torts § 442 (1965)).

All these factors militate against finding the Academy liable for the Lavines' damages. The Lavines consented to the circumcision based on the consultation with Dr. Chait, their treating physician, which is an event that occurred independently of the Academy or its issuance of the 1989 report. (Compl. ¶¶ 10–11.) And the intervening force of Dr. Chait's recommendation to operate and his eventual negligent handling of the circumcision is precisely the conduct that resulted in Shingo's injuries. These injuries were compounded by yet another intervening, superseding force—Dr. Barone's second circumcision surgery that was also apparently negligently performed. (Compl. ¶ 15.) Both physicians are responsible for the negligently performed circumcisions that resulted in the damages claims Plaintiffs now seek. As a result, Dr. Chait's recommendation, Dr. Chait's performance of the surgery, and Dr. Barone's performance of the second surgery constitute intervening, superseding forces that absolve the Academy of any liability for alleged misstatements.

**B.      The Lavines fail to allege an actionable equitable-fraud claim.**

The Lavines' constructive-fraud claim fares no better than their fraud claim. To advance a constructive-fraud claim, plaintiffs "need not demonstrate scienter, but must establish the other elements of fraud by clear and convincing evidence." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1182-83 (3d Cir. 1993); *see also Daibo v. Kirsch*, 316 N.J. Super. 580, 588 (App. Div. 1999) ("[T]o recover based on equitable fraud the plaintiff must prove his or her reasonable reliance on a material misrepresentation of fact."). But as already explained, the Lavines' fraud claim fails to establish the other elements of fraud, as they fail to allege a misrepresentation of

27294110v.1

fact, fail to show reasonable reliance on any misstatements, and allege facts showing that intervening causes, not the Academy, are responsible for any damages. These pleading deficiencies defeat the Lavines' constructive-fraud claim. *See, e.g.*, *id.* at 590 (dismissing plaintiff's equitable-fraud claim because a plaintiff's allegation reflected an opinion rather than a misrepresentation of fact). And while the Lavines cite a string of affirmative *defenses* (including mistake, coercion, duress, and undue influences) as bases for their equitable-fraud claim (Compl. ¶ 85), none of these defenses is a basis for asserting equitable fraud.

In addition, New Jersey law is clear that "[i]n an action for equitable fraud, the only relief that may be obtained is equitable relief, such as rescission or reformation of an agreement *and not monetary damages*." *Daibo*, 316 N.J. Super at 592 (emphasis added and citations omitted). Here, the Lavines unambiguously seek compensatory and punitive damages and do not seek any form of equitable relief (other than the catch-all request for "[s]uch other relief as the court may deem just and equitable"). (Compl. at 20.) The law is clear that "money damages cannot be awarded for an equitable fraud." *Daibo*, 316 N.J. Super at 592. Accordingly, Plaintiffs' equitable fraud claim should also be dismissed.

## **CONCLUSION**

In the end, no valid, timely cause of action can be found within the complaint. Accordingly, the Academy respectfully requests that this Court dismiss with prejudice the Lavines' complaint for failure to state a claim against the Academy.

27294110v.1

Respectfully Submitted,

**WHITE AND WILLIAMS LLP**
Attorneys for Defendant,
American Academy of Pediatrics Inc.

BY: _____
Jared K. Levy

Dated:  June 18, 2021

27294110v.1

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No(s). 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>Plaintiffs,<br><br>v.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY<br><br>DOCKET NO.:  MER-L-000272-21<br><br>CIVIL ACTION<br><br>**CERTIFICATE OF SERVICE** |

The undersigned hereby certifies that a true and correct copy of the within Motion to

Dismiss was served via electronic filing upon the following parties:

Andrew DeLaney, Esquire
ANDREW DELANEY, ATTORNEY AT LAW LLC
South Street, Suite 203
Morristown, NJ 07960
*Counsel for Plaintiffs*

**WHITE AND WILLIAMS LLP**
Attorneys for Defendant,
American Academy of Pediatrics Inc.

BY: _____
Jared K. Levy

Dated:  June 18, 2021

27294110v.1

# EXHIBIT "A"

## SUMMONS

Attorney(s) Andrew DeLaney

Office Address  6 South Street, Suite 203

Town, State, Zip Code  Morristown, NJ 07960

Telephone Number  973-606-6090

Attorney(s) for Plaintiff  Andrew DeLaney

Shingo Lavine, Adam Lavine,

Aiko Lavine
       Plaintiff(s)

vs.

American Academy Pediatrics Inc.

Princeton Medical Group, P.A.
       Defendant(s)

## Superior Court of New Jersey

Mercer    County

Civil      Division

Docket No: MER-L-000272-21

## CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

S/ Michelle Smith
Clerk of the Superior Court

DATED:  02/16/2021

Name of Defendant to Be Served:  American Academy of Pediatrics, Inc.  S/o CSC

Address of Defendant to Be Served:  Princeton South Corp. Center, 100 Charles Ewing Blvd., Suite 160, Ewing, NJ

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>      Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>      Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY<br><br>DOCKET NO.:<br><br>Civil Action<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, Shingo Lavine, Adam Lavine, and Aiko Lavine, by way of Complaint against the above-named defendants, say:

1

## PARTIES

1. Plaintiff Shingo Lavine ("Shingo") is a natural person who is a citizen of the State of Rhode Island.

2. Plaintiffs Adam Lavine ("Adam") and Aiko Lavine ("Aiko") are natural persons who reside in and are citizens of the State of California. They are the natural parents of Plaintiff Shingo Lavine.

3. Defendant Princeton Medical Group, P.A. ("Princeton") is a New Jersey professional association. It is subject to the jurisdiction of this Court and may be served with process by serving its registered agent Joan Hagadron at 419 North Harrison Street, Suite 203, Princeton, NJ 08540. It is subject to the jurisdiction of this Court and venue is properly laid herein.

4. Defendant American Academy of Pediatrics, Inc. ("AAP") is an Illinois corporation registered to do business in the State of New Jersey. It is subject to the jurisdiction of this Court and may be served with process by serving its registered agent, Corporation Service Company, Princeton South Corporate Center, 100 Charles Ewing Blvd., Suite 160, Ewing, NJ 08628. It is subject to the jurisdiction of this Court and venue is properly laid herein.

## FACTS

5. In December,1997, Shingo Lavine was born to Adam and Aiko Lavine at Princeton Medical Center in Plainsboro, Mercer County, New Jersey.

6. On or about December 18, 1997, Dr. Jeffrey L. Chait, M.D., the obstetrician who delivered him, an employee and agent of Defendant Princeton Medical Group, P.A., circumcised Shingo Lavine. Defendant Princeton thereafter billed Adam and Aiko Lavine or their insurer or both for the circumcision and received money for Dr. Chait's performance of it.

7. Defendant Princeton is liable for the torts of its employees and agents, including Dr. Chait, under the doctrine of *respondeat superior*.

2

8. Shingo's mother, Aiko, is of Japanese heritage.  Japan is not a circumcising society, and until she came to the United States and eventually married Adam, she had never heard of it. After Shingo's birth and before the circumcision, Aiko was incapacitated due to a difficult 36-hour labor on medications and a Caesarean section. Just prior to the circumcision she was being administered morphine and Percocet® (brand of oxycodone and acetaminophen) and other medications.

9. Prior to the circumcision Dr. Chait did not ask Aiko to give her permission to have her son circumcised, and she did not give permission for the circumcision.

10. After Shingo was born, Dr. Chait solicited Adam's verbal consent to have Shingo circumcised. Dr. Chait informed him that the American Academy of Pediatrics had issued guidelines about circumcision showing that circumcision reduces the incidence of urinary tract infections, penile cancer, and sexually transmitted diseases including HIV.  Dr. Chait portrayed circumcision as a minor, safe, and harmless procedure and as a routine and normal part of childbirth, and he portrayed parental permission as expected and as a formality.

11. Adam does not recall signing a form giving consent to have Dr. Chait circumcise his son Shingo. If wording about consenting to circumcision was in a hospital admission form, it was not brought to his attention, and he did not see it during the rush of getting his wife Aiko admitted to the hospital to give birth. If Adam did give written permission, he did so in reliance upon the representations made, expressly, impliedly, and by omission, by Dr. Chait and the AAP, enumerated in this Complaint, which Adam had no reason to doubt and did not doubt.

12. Dr. Chait did not disclose to Adam and Aiko, and they were completely unaware, that circumcision was a highly controversial topic, nor did he convey to them any opinion other than that circumcision was good for health.  He did not disclose to them that circumcision is surgery; that it is painful; that it risks many complications and can be fatal; that men may resent having been circumcised at birth without their consent and when they were unable to prevent it and that it can cause psychological problems; he did not disclose that the foreskin of the penis is highly erogenous; and he did not disclose the functions of the foreskin. He did not disclose to them the risk of any complications or the common occurrence of loss of shaft skin and consequent tight erections with hair on the shaft of the penis.

13. After the circumcision, Dr. Chait seemed distinctly less confident than he had been before. He expressed concern about the circumcision to Shingo's parents and told them that they would "have to keep an eye on it" and let him know if there were any problems with Shingo's penis. This was a surprising and concerning reaction to what had been presented as a routine and simple procedure. However, Dr. Chait did not disclose exactly what his concerns were and he did not disclose that too much shaft skin had been removed.  Adam and Aiko observed that after about one month, Shingo's penis had not healed and looked unusual to them, and they became concerned the circumcision had not been properly performed..

14. Sometime between January 10-15, 1998, Adam and Aiko took Shingo to Shingo's pediatrician, Dr. David Sharlin of Delaware Valley Pediatrics, with concerns about Shingo's penis. After examining Shingo, Dr. Sharlin told them that he believed that complications had arisen from Shingo's circumcision, namely that not enough foreskin had been removed. He recommended a follow-up with Dr. Joseph Barone, Chief of the Section of Pediatric Urology at Robert Wood Johnson University Hospital, New Brunswick, New Jersey.

15. On January 21, 1998, Adam and Aiko presented Shingo to Dr. Barone for examination. Dr. Barone observed blood and scarring on Shingo Lavine's penis. He cleaned the penis, then diagnosed Shingo as suffering from phimosis and a buried penis. He recommended what he called a "second circumcision." Dr. Barone presented the "second circumcision" as if it were also routine. Thereafter, Dr. Barone performed a second circumcision surgery on Shingo. He wrote a letter that day stating that, "Shingo should do very well with the circumcision." In fact, after Dr. Barone's surgery, Shingo did not "do very well" at all.  Unknown to his parents until recently, Shingo's penis had insufficient shaft skin coverage so that his erections were and are to this day too tight and pull pubic skin onto the shaft. In addition, Shingo had and has pubic hair bearing skin down to the circumcision scar line, which is unsightly, and which interferes with normal sexual functioning.

16. When Shingo reached adolescence, he suffered from physical complications caused by the circumcisions, including painful erections, meatal stenosis (narrowing of the urethral opening), scrotal webbing, and hypersensitivity of the glans.

4

17. By June 2020, Shingo experienced serious angst and anger that physicians had circumcised him, twice, and had caused his injuries, when he had been in perfect health at birth, did not need the operation, would not have chosen it for himself, and was powerless to prevent it.  He was and is also unhappy with the unsightly appearance of his penis.

18. In June 2020, Shingo discovered that although it is a common sentiment in the United States is that circumcision is normal and good for health, and that one would have utterly no reason for experiencing the feelings that he has, he is by no means alone: many circumcised men in the U.S. share the same anger and profound sense of loss as Shingo, and many, like him, suffer from various physical and psychological complications.

19. On or about June 15, 2020, Shingo became involved with Foregen, a medical organization devoted to regenerating foreskin, specifically the specialized structures including nerve endings that are removed or destroyed during circumcision.

20. On or about June 15, 2020, Shingo began partial restoration of his foreskin, a highly intensive daily routine to attempt to recover the denuded glans by stretching the loose skin of the penile shaft, although circumcision is irreversible surgery, and the specialized erotogenic nerves are lost forever when it is performed. Upon information and belief, more than 60,000 men in the United States currently practice foreskin restoration. It requires wearing weights attached to the penis and pulling for 3-4 hours per day for 5-10 years, which is very uncomfortable and time consuming. Shingo has spent more than 700 hours over the course of almost 1,000 sessions as part of the process to partially "restore" his foreskin.

21. On July 29, 2020, Shingo began psychotherapy to try to cope with the severe emotional distress he feels about his circumcision, but to date it has not diminished his distress.


## DELAYED DISCOVERY THAT SHINGO, ADAM, AND AIKO WERE DEFRAUDED

22. Notwithstanding the physical issues that Shingo started becoming aware of in adolescence, none of the Lavines had any reason to question the circumcisions or the result, given the pervasiveness of the procedure in American culture.

23. The Lavines only became truly aware of how the physical issues Shingo was experiencing related to the circumcisions when the Lavines spoke with the law professor Peter W. Adler, an expert on circumcision and the law, on September 25, 2020. Professor Adler informed them that the foreskin is a natural body part and the most sensitive part of the penis, men value it, and physicians in most countries outside the United States leave it alone. Unnecessary surgery on a child violates the ethical and legal right of boys and the men they become to bodily integrity and self-determination. Circumcision, which began as a sacrificial religious ritual and painful rite of passage, is violence and genital mutilation, the opposite of medicine, and a fraud when performed by physicians and hospitals in the U.S., as explained in two law review articles.[1] First, physicians target newborn boys unable to refuse, mothers who are incapacitated, give fathers only minutes to decide, and badger parents who say no until they consent. This constitutes unfair, deceptive, and *fraudulent misconduct*. Second, physicians and their trade association, the American Academy of Pediatrics, make knowingly *false and fraudulent medical claims*. They portray circumcision as a normal, simple, safe, and harmless medical procedure, when they know that like any surgery it is very painful, risks many complications, can be fatal, and can cause psychological harm. They also use fear of urinary tract infections (UTIs), penile cancer, and sexually transmitted infections, including HIV, to sell circumcision to parents, when the treatment for UTIs is antibiotics, boys are not at risk of adult diseases, and those diseases can be prevented easily and more effectively without loss of the foreskin and the circumcision's attendant risks; and they use false diagnoses such as phimosis or a tight foreskin, which is normal in the newborn. Parental consent is therefore not fully informed, it is legally invalid, and the operation is a battery. Third, they and the AAP make the *false legal claims* that physicians have the right to operate on a healthy child and that parents have the right to elect circumcision, when circumcision violates the child's right to bodily integrity, and the child's rights supersede the parents' rights. Professor Adler told the Lavines that

---

[1] Matthew R. Giannetti. *Circumcision and the American Academy of Pediatrics: Should Scientific Misconduct Result in Trade Association Liability*, 85 Iowa L. Rev. 1507 (2000) at <http://www.cirp.org/library/legal/giannetti/> and Peter W. Adler, Robert Van Howe, Felix Daase, and Travis Wisdom, *Is Circumcision a Fraud?*, Cornell J. L. & Public Policy (Vol 30 No. 1 Fall 2020) at <https://www.lawschool.cornell.edu/research/JLPP/index.cfm>.

they had legal claims against the physician, medical group, and the AAP for battery, breach of fiduciary duty and hence constructive fraud (where intent to defraud is presumed, even if it is absent, to prevent unfairness).

24. The Lavines were dumbfounded to learn this, as this was the first time they had heard the normality of circumcision (which had been adopted into their worldview, as it has been for most of the American public) and the physician's right to perform it had been challenged. They realized that what Professor Adler described is exactly what had actually happened to them when Shingo was born, as detailed in this Complaint. Additionally, the Lavines were stunned to realize that the United States has one of the highest rates of circumcision in the developed world and that the AAP guidelines are opposite to the recommendations of most developed nations' medical experts.

## 1989 AAP GUIDELINES ON CIRCUMCISION

25. The AAP is an organization of physicians who specialize in pediatrics, the care of children from birth to the age of 21.  The AAP is not exclusively organized for charitable or educational purposes; rather it is also organized to protect the economic welfare of its members, who practice medicine in part for a profit. The AAP actively lobbies federal and state legislatures for laws beneficial to its members.  It claims to lead the pediatric medicine community in setting standards of practice and recommendations for practice.   It voluntarily issues advisory reports, recommendations, and guidelines for both the medical profession as well as for the general public, including the Plaintiffs herein, upon which both the profession and the general public are expected to, and do, rely.

26. The AAP owes a duty to the general public, including the Plaintiffs herein, to tell the truth, the **whole** truth, and nothing but the truth when issuing reports, policy statements, and guidelines for medical care and procedures.

27. The AAP owes a duty to the general public, including the Plaintiffs herein, to refrain from failing to disclose all relevants facts and considerations when issuing reports, recommendations, and guidelines.

7

28. By words and conduct the AAP invites other medical associations such as the Ameircan College of Obstetricians and Gynecologists, obstericians and gynecologists, pediatricians, other physicians, and the general public to rely upon the AAP's reports, recommendations and guidelines.

29. In 1971 the AAP Committee on the Fetus and Newborn issued *Standards and Recommendations of Hospital Care of Newborn Infants.* In it, the AAP stated the truth that, " there are no valid indications for circumcision in the neonatal period." In 1975 an Ad Hoc Task Force of that committee found no basis for changing that statement, while stating that "there is no absolute medical indication for routine circumcison of the newborn."

30. In 1980, Springer Publishing Company, a major medical publisher in New York, published the 197 page heavily footnoted book, *Circumcision: An American Health Fallacy* by Edward Wallerstein, a medical writer. The thesis of the book is that neonatal circumcision is needless, damaging, and not medically justified. At its conclusion Wallerstein wrote: "The medical profession bears responsibility for the introduction of prophylactic circumcision without scientific basis in the past and for its continued use and rationalization without scientific basis in the present. The profession seems to accept circumcision as a 'national cultural triat' as much as do lay people. With evidence at hand to disprove the prophylactic benefits of the surgery, the medical profession has the responsibility to discourage this practice. The pretense of neutrality is a negative stance." His final paragraph stated, **"Today circumcision is a solution in search of a problem. The operation, as prophylaxis, has no place in a rational society. The final conclusion to be drawn is that routine infant health circumcision is archaic, useless, potentially dangerous, and therefore should cease."** (Emphasis added).

31. In 1984 the AAP published a pamphlet for the parents of newborns entitled, "Care of the Uncircumcised Penis." It contained the following paragraph: **"The Function of the Foreskin:** The glans at birth is delicate and easily irritated by urine and feces. The foreskin shields the glans; with circumcision, this protection is lost. In such cases, the glans and especially the urinary opening (meatus) may become irritated or infected, causing ulcers, meatitis (inflammation of the meatus), and meatal stenosis (a narrowing of the urinary opening). Such problems virtually never

occur in uncircumcised penises. The foreskin protects the glans throughout life. " **By 1994, the AAP had removed that paragraph from the most recent edition of its pamphlet.**

32. In 1984 Trudie London on behalf of her son Adam London, to whose circumcision shortly after birth she had consented, filed a lawsuit in Marin County, California Superior Court, Docket No. 118799, against his circumciser Mark Glasser, M.D. and Kaiser Foundation Hospitals and The Permanente Medical Group, in which she claimed that the circumcision constituted common law battery, willful cruelty, unjustifiable infliction of pain, child abuse, kidnapping, false imprisonment, and mayhem. In essence, she contended that parental consent for a medically unnecessary circumcision was legally invalid and that circumcision itself constituted battery and violated several California statutes. Although the case was not successful, it received significant publicity, including an article in the then-influential <u>Time</u> <u>Magazine</u>. This suit alarmed the medical profession, including the defendant Glasser in that lawsuit, as well as his friend and acquaintance Edgar J. Schoen, M.D., a pediatric endocronolgist and member of the AAP.

33. In Volume 23, No. 3 (1984-1985) of the *Journal of Family Law*, published by the University of Louisville School of Law, there appeared an article by William E. Brigman, an Assistant Professor, entitled "Circumcision as Child Abuse: The Legal and Constitutional Issues." In it, Professor Brigman contended, "Since circumcision is not medically warranted, has no significant physiological benefits, is painful because it is performed without anesthesia and leaves a wound in which urinary salts burn, carries significant risk of surgical complications, including death, and deforms the penis, it would seem that as a nonaccidental physical injury, it is properly included in the definition of child abuse." He opined that, "Suits for damages against surgeons, hospitals, and conceivably parents are possible . . . . " He suggested that, "The most promising approach would seem to be a civil rights class action against hospitals . . . . ".

34. Growing opposition to neonatal circumcision alarmed the medical profession, which was increasingly afraid of lawsuits. The November 15-30, 1986 issue of *Ob-Gyn News* carried an article entitled, "See Expanding Liability Risks In Circumcision." It cited another California case arising from a botched circumcision that contended that, "the procedure violated the boy's constitutional right to privacy, safety,and happiness" and also claimed that the circumcision constituted a battery. Charles Bonner, the plaintiff's attorney, claimed, according to the article,

"The boy [7 weeks old at the time] did not himself consent to the procedure, and under California law parents have no ability to consent to a medically unnecessary surgery . . . . "

35. In May 1985 a pediatrician, Thomas Wiswell, M.D., published an article in the AAP's journal *Pediatrics* that suggested that circumcision might reduce the number of urinary tract infections in boys. Almost immediately, this was latched onto by circumcision proponents such as urologist Aaron Fink, M.D., whose letter to *Pediatrics* stated, "I suspect that similar studies will be repeated elsewhere and, if confirmed, become an important reference to justify a medical indication for a newborn circumcision. It presumably might even invalidate litigation based on removal of the natural protection afforded by the foreskin as well as 'by reason of wrongful and malicious acts' performed by medical as well as 'mohel' (ritual) circumcisers."

36. In 1987 Edgar J. Schoen, M.D., a friend of Mark Glasser, M.D., who had been sued in the London case, published a poem in the *American Journal of Diseases of Children,* entitled "Ode to the Circumcised Male" in which he derided those opposed to circumcision. (See Exhibit A). After noting that "third-party payers are increasiningly refusing to pay for the procedure," Schoen set forth the poem that said, "If you're the son of a Berkeley professor, your genital skin will be greater, not lesser: styled the non-circumcised state as ,genital chic"; and ended with the consoling line for the circumcised, "Just hope that one day, you can say with a smile that your glans ain't passé it will rise up in style."

37. In 1988 Aaron Fink, M.D. published a book entitled *CIRCUMCISION: A Parent's Decision for Life.* In it he alleged that circumcision had potential medical benefits and he derided the idea that loss of sensation occurs because of circumcision.

38. In 1988 or 1989 Edgar J. Schoen, M.D. volunteered to chair a Task Force of the AAP on Circumcision. Dr. Schoen was a zealous proponent of circumcision whose poem suggested that he had undisclosed religious and personal motives for advocating circumcision that went beyond medicine. Dr. Schoen additionally expressed alarm that but for recent evidence that circumcision potentially decreased the rate of urinary tract infections, third party insurance payers would stop covering it, and "the anti-circumcision tide" would prevail.

39. The Task Force issued a "Report of the Task Force on Circumcision (RE9148)," which was published in the AAP's journal *Pediatrics* in August 1989 ("1989 Guidelines"). (See Exhibit B). Those were the AAP guidelines regarding circumcision in place at the time of Shingo's birth and subsequent circumcisions.

40. The 1989 Guidelines did not contain any information on the functions of the foreskin, the tissue that is removed by circumcision, even though the AAP in its 1984 pamphlet for parents had explained some of its functions and thus was aware of them. (See Exhibit C). This section was removed in its 1994 pamphlet. (See Exhibit D).

41. The AAP issued its 1989 Guidelines specifically to protect the medical profession in general, and pediatricians in particular, from legal liability for performing unnecessary, risky, debilitating, damaging surgery, circumcision, on the penises of minor boys, and to protect the pocketbooks of AAP members, many of whom perform neonatal circumcision for money.

42. The 1989 AAP Policy Statement contained numerous intentional misrepresentations and omissions[2] as detailed in Count III of this Complaint.

43. As much of its justification for promulgating its 1989 Guidelines, the AAP claims that boys who have not been circumcised show an increased rate of urinary tract infections. The AAP itself stated that the studies may have methodologic flaws; UTIs can be treated with antibiotics; and Dr. Thomas Wiswell, the doctor responsible for the studies, has stated that there was tremendous financial incentive for doctors to continue performing circumcisions routinely on neonatal boys.

44. The 1989 Guidelines did not disclose the risk of parental anger and regret, despite the fact that the London case and the increasing opposition to circumcision as noted above had alerted the AAP to that very real risk. Adam and Aiko are angry that defendants did not fully inform them about circumcision, in which case they would have stopped Dr. Chait and the hospital from performing the unnecessary operation. It has created tremendous hardship for Adam and Aiko Lavine to try to

---

[2] See Matthew R. Giannetti. *Circumcision and the American Academy of Pediatrics: Should Scientific Misconduct Result in Trade Association Liability*, 85 Iowa L. Rev. 1507 (2000) at <http://www.cirp.org/library/legal/giannetti/>.

come to terms with the strained relationship with their son caused by the first circumcision surgery and subsequent revision surgery.

## COUNT I

### (Intentional Fraud)

### Princeton Medical Group, P.A.

45. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 44 as if set forth at length herein.

46. Dr. David Chait was acting as an employee and agent of Princeton Medical Group, P.A. and within the course and scope of his employment relationship with it when he solicited permission to circumcise Shingo and when he performed the circumcision. At all times relevant hereto Dr. Chait, as a physician, was in a fiduciary relationship with the Plaintiffs and owed them a duty of care as a fiduciary to act with the utmost good faith in his dealings with them.

47. Dr. Chait, acting within the course and scope of his employment and agency with Princeton Medical Group, P.A., failed to act with the utmost good faith and intentionally defrauded Adam and Aiko Lavine into permitting the circumcision of their newborn son Shingo by the following unfair and deceptive misconduct, misrepresentations, and omissions; which Dr. Chait intended the Plaintiffs Adam and Aiko Lavine rely upon; which they did rely upon; and which resulted in the damages to them and to Shingo Lavine that are complained of herein.

- Fraudulent conduct in the hospital, including, without limitation: not obtaining written parental permission, or hiding the permission form in a hospital admission form; targeting a newborn baby boy, Shingo Lavine, who was unable to refuse; targeting Aiko Lavine and not giving her the opportunity to participate when she was legally incapacitated and would have refused; and giving Adam Lavine only a few minutes to make the circumcision decision, an unfair high-pressure sales tactic that constituted coercion and duress.

- Making false medical claims (express, implied, or by omission), including without limitation: not disclosing that physicians in most countries leave boys genitally

12

intact and that circumcision is controversial; falsely portraying circumcision to the Lavine parents as a normal and routine part of childbirth; not disclosing that the foreskin is a natural body part, highly erogenous, and functional, and that men value it; not disclosing that circumcision is unnecessary and not medically indicated; not disclosing that it is irreversible surgery; claiming that circumcision has potential medical benefits when it does not benefit most boys or men at all, when any benefits can be achieved without it, and when it did not benefit Shingo Lavine; mentioning urinary tract infections as a reason to circumcise when UTIs can be easily treated with antibiotics; using the scare tactic of mentioning prevention of penile cancer and STDs including HIV, when circumcision does not prevent them, boys are not at risk of those diseases, and they can be easily prevented without loss of the foreskin; not disclosing that circumcision is extremely painful, and circumcising Shingo Lavine without any pain relief or without adequate pain relief during and after the surgery; not disclosing that circumcision risks more than 50 minor and serious complications including the physical injuries that Shingo Lavine suffers from; not disclosing that circumcision can be fatal; not disclosing the risk of psychological harm that Shingo Lavine suffered and suffers from; not disclosing that circumcision could impair Aiko and Adam Lavine's relationship with their son and that the Lavine parents might come to regret the circumcision.

- Making the implied false claim that it is ethical and legal for physicians to perform irreversible unnecessary genital surgery on a healthy infant, and to solicit parental consent to do so.

48. But for the foregoing misconduct, misrepresentations, and omissions, Adam Lavine would not have given permission to have his son circumcised.  If fully informed about the pain, risks, and harms of circumcision, both Adam Lavine and Aiko Lavine would have told Dr. Chait not to perform the unnecessary operation.

49. By the foregoing misconduct, misrepresentations, and omissions, Dr. Chait intentionally defrauded the Plaintiffs Adam Lavine, Aiko Lavine, to their damage and to the damage of Shingo Lavine and Princeton Medical Group, P.A. is liable to them for said fraud pursuant to the doctrines of agency and *respondeat superior.*

13

**WHEREFORE**, Plaintiffs demand judgment that the defendant Princeton Medical Group, P.A., acting by and through its employee and agent Dr. Chait, intentionally defrauded the Plaintiffs, and they pray for the relief requested below.

## COUNT II

### (Constructive Fraud)

### Princeton Medical Group, P.A.

50. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 49 as if set forth at length herein.

51. When a physician violates the trust that a patient (here Shingo Lavine) and/or those representing him (here Adam and Aiko Lavine) places in the physician in the slightest way by any unfair or wrongful act—including without limitation by fraud, breach of fiduciary duty, mistake, undue influence, or the physician unjustly enriches himself—a cause of action lies for constructive fraud, where fraud is presumed even if intent to defraud is absent.

52. The misconduct, misrepresentations, and omissions described in this Complaint and in Count I constitute unfair and wrongful acts, including, without limitation, unfairness, fraudulent conduct, fraudulent medical claims, fraudulent legal claims, breach of fiduciary duty, mistake, coercion, duress, undue influence; and Dr. Chait and Princeton Medical Group, P.A. unjustly enriched themselves at the expense of their healthy "patient" Shingo Lavine. Dr. Chait thereby committed constructive fraud against the Plaintiffs, which damaged them. Princeton Medical Group, P.A. is liable to them for said constructive fraud pursuant to the doctrines of agency and *respondeat superior*.

**WHEREFORE**, Plaintiffs demand judgment that Princeton Medical Group, P.A. committed constructive fraud against them, and they pray for the relief requested below.

## COUNT III

### (Intentional Fraud)

### The American Academy of Pediatrics

14

53. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 52 as if set forth at length herein.

54. As set forth above, Dr. Chait referenced the AAP's circumcision policy statement then in effect (the "1989 Guidelines") when he solicited Adam Lavine's permission to circumcise Shingo Lavine and when he portrayed circumcision as routine, as medicine, and as a parental right.

55. Adam Lavine, who knew nothing about medicine or medical aspects of circumcision—and who was representing his newborn son and his incapacitated wife at the time—relied upon Dr. Chait's reference to those AAP guidelines in support of circumcision when he consented to the circumcision.

56. The AAP 1989 Guidelines contain numerous false and fraudulent representations and omissions as set forth herein; the AAP knew that they were false or made them with reckless disregard of their falsity; the AAP intended that physicians, here Dr. Chait, and parents offered circumcision representing boys, here Adam Lavine representing Shingo and Aiko Lavine, rely upon them; the Lavines did rely upon them; damages resulted from such reliance; and the AAP thereby defrauded the Plaintiffs.

57. Undisclosed Financial Bias. The 1989 AAP Guidelines fail to disclose that the AAP is not only a medical association but also a trade association representing the financial interest of its members. The AAP failed to disclose the financial bias of at least some of the committee members in perpetuating circumcision for financial reasons, and that at least some of the committee members were not neutral.

58. Undisclosed Religious Bias. Upon information and belief, one or more members of the committee that wrote the 1989 Guidelines were Jewish, including Dr. Schoen. Circumcision is a sacred religious rite among Jews. The AAP failed to disclose the religious bias of at least one and perhaps more of its committee members in favor of perpetuating circumcision, and he or they were not neutral.

59. Undisclosed Cultural Bias. The 1989 AAP Guidelines fail to disclose that the U.S. is an outlier among physicians worldwide in circumcising healthy boys, and that its authors were culturally biased in favor of circumcision and not neutral.

60. Not Common or Routine or Medicine. The 1989 Guidelines state that most male infants born in this country are circumcised during in the newborn period, implying that it is a routine part of the practice of medicine. This fails to disclose that non-therapeutic circumcision by physicians is uncommon outside the U.S.; that it is unlike anything else in medicine worldwide as physicians do not solicit parental permission to surgically remove other healthy parts of their child's body and take orders from parents to do so; and that non-therapeutic circumcision, or circumcision that is not needed to treat a medical condition, is violence, the opposite of medicine.

61. Undisclosed Controversy. The 1989 AAP Guidelines fail to disclose that circumcision has been controversial for years, and they fail to disclose that there is widespread opposition to the practice on medical, ethics, and legal grounds inside and outside the U.S.

62. Unethical. The 1989 AAP Guidelines falsely claim by omission that circumcision is ethical when it violates numerous provisions of the AMA Code of Medical Ethics, including the prohibition against unnecessary surgery, and the general rules of medical ethics: autonomy; non-maleficence ("First, Do No Harm"); beneficence ("do good); proportionality; and justice or fairness.

63. Unlawful and a Crime. The 1989 AAP Guidelines falsely claim by omission that it is legal for physicians to circumcise or perform unnecessary genital surgery on healthy boys when it violates a child's right to bodily integrity and self-determination, constitutes a battery, which is a tort and a crime, and as William E. Brigman showed in his 1984 law review article, it is statutory criminal child abuse in every U.S. state,[3] including New Jersey.

64. Scientific Misconduct. The 1989 AAP Guidelines did not follow accepted scientific methods; its pro-circumcision conclusions were not scientifically defensible; and its authors engaged in scientific misconduct.

65. Pain Understated. The 1989 AAP Guidelines state, "Infants undergoing circumcision without anesthesia demonstrate physiologic responses suggesting that they are experiencing pain." This understates pain as circumcision is one of the most painful procedures in neonatal medicine. The AAP states that behavioral changes arising from pain are transient, not disclosing that pain continues for many days after the circumcision.

66. No Anesthetics. The AAP knew that circumcision is extremely painful and that the pain continues after the operation, but it did not even recommend that anesthesia be used to try to lessen the pain during and after the operation.

67. False Claim that Circumcision is Safe. The AAP claimed in 1989 that "[c]ircumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique." The AAP knows that circumcision is not safe. It risks many complications. The 1989 Guidelines admit that the "exact incidence of postoperative complications is unknown," while deceptively suggesting that "the rate is low." This ignores the fact that a significant part of the surgical practice of pediatric urologists is made up of treating circumcision complications or sequelae, a fact that had to be known to the prominent urologist on the committee, Frank Hinman, Jr., M.D., author of a major text on pediatric urologic surgery.

---

[3] William E. Brigman. Circumcision as Child Abuse: The Legal and Constitutional Issues, 23 J Fam Law 337 (1985).

68. Failure to Disclose Lack of Training. The AAP failed to disclose that many physicians who perform circumcisions are not well trained, even though at least one member of the committee had to have known this to be so.

69. Undisclosed and Understated Complications. (a) The AAP failed to disclose most of the complications of circumcision--there are more than 50—or the complications that Shingo Lavine suffers from including painful erections, scrotal webbing, hypersensitivity of the glans, and unsatisfactory cosmetic appearance. (b) The AAP understated the rate of complications at 0.2% and 0.6% when according to one study the rate is as high as 13%. (c) The AAP failed to take into account complications that occur later in childhood and in adulthood. (d) The AAP did not disclose severe complications such as the risk of cutting off all or part of the glans penis. (e) The AAP misrepresented the rate of severe complications, which is as high as 2-4%. (f) The AAP stated, "The exact incidence of postoperative complications is unknown." Thus, the AAP knew that it did not have enough data to conclude that circumcision is safe in 1989. (g) The most common complication following male circumcision, meatal stenosis, which is a narrowing of the urethral opening that interferes with micturition, is seen in 5% to 20% of boys following circumcision, and happened to Shingo Lavine, is only addressed in passing: "There is no evidence that meatitis leads to stenosis of the urethral meatus."

70. Risks Unknown. The 1989 Guidelines advise physicians to inform parents of the risks, but this is impossible as the Guidelines state, "The exact incidence of postoperative complications is unknown."

71. Not Harmless. The 1989 AAP guidelines imply by omission that circumcision is harmless when properly performed. The AAP did not discuss the anatomy and physiology of the foreskin of the penis, however, the body part being irreversibly amputated. The AAP did not disclose that the foreskin is highly erogenous, as has been known since ancient times; that its inner lining is a moist and mobile mucous membrane, which reduces friction during masturbation and sexual intercourse. The AAP did not disclose that men prize the foreskin and that men who have one rarely volunteer to part with it. Thus, the AAP assigned no value to the foreskin that circumcision irreversibly amputates, even though males do, and thereby impliedly told parents asked to make the circumcision decision, here the Lavines, relying on the AAP's guidelines, that the foreskin is worthless.

72. No Disclosure of the Risk of Psychological Harm. The AAP did not disclose that boys and men may be angry to have been circumcised and that circumcision can cause psychological harm.

73. No Disclosure of the Risk of Parental Regret. The AAP did not disclose that boys and men may be angry that their parents gave permission to have them circumcised, which they would not have chosen for themselves; that this may impair the relationship between parents and son; and that parents may regret having given permission.

74. Thus, the AAP 1989 Guidelines promoted circumcision by falsely portraying it as medicine, and as the simple, safe, and painless snip of a worthless piece of skin. Although the American public often refers to circumcision as a "snip," the AAP did not correct the public's false belief in the Guidelines.

75. False Claims About UTIs. The AAP promoted circumcision in its 1989 Guidelines largely based on the claim that it reduces the risk of urinary tract infections. But the AAP knew that "these studies [about UTIs] may have methodologic flaws." The AAP failed to state the simple fact that UTIs in boys can easily be treated with antibiotics, as they are in girls.  They failed to point out that girls have many times more UTIs than boys, circumcised or not.

76. False Claims About Penile Cancer. Penile cancer is a rare disease that occurs in old age. Boys are not at risk of it. The AAP also knew, as it stated in 1975, that, "optimal hygiene confers as much or nearly as much protection against penile cancer as circumcision," and a "great deal of unnecessary surgery, with attendant complications would have to be done if circumcision were to be used as prophylaxis against [penile cancer]". The possible reduction in penile cancer is not a valid medical reason to circumcise, so the Guidelines should have not discussed them as a reason to elect circumcision, in which case Dr. Chait would not have advanced penile cancer citing the AAP Guidelines as a reason to do so. The AAP deviated without valid scientific evidence from its 1975 AAP Policy Statement on circumcision, which found no solid evidence for using circumcision to prevent penile cancer. The mention of penile cancer is a scare tactic designed to sell circumcision.

77. False Claims About STDs. The AAP truthfully stated in 1975 that, "evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting." Similarly, the AAP 1989 Guidelines state, "Evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting" and that "methodologic problems render these reports about some STDs inconclusive". In any event, newborn boys and older boys are not at risk of STDs. Furthermore, males must still practice safe sex to avoid STDs and HIV. As the AMA later wrote in 1999, circumcision cannot responsibly be advanced as protection against STDs. The Guidelines should have not discussed them as a reason to elect circumcision, and Dr. Chait should not have advanced STDs and HIV, citing the AAP Guidelines, as a reason to do so. The AAP's mention of STDs is a scare tactic designed to sell circumcision.

78. The AAP did not disclose that even granting the AAP's claims, for example that it reduces the risk of UTIs by 1%, circumcision has little prospect of benefiting any boy or man, violating the ethical rule that medical procedures must do good. And insofar as circumcision is painful, risky, and causes substantial harm in every case, it violates the ethical rule, "First, Do No Harm".

79. As physicians and members of a medical organization issuing medical guidelines, the members of the 1989 task force on circumcision had an ethical and legal duty to use their independent

medical judgment to determine whether circumcision is medically indicated and hence justified or not, and, if not, as the AAP stated in 1971 and 1975, to recommend against it. The implied legal claim by the AAP in 1989 that physicians have the right to perform the operation, and to take orders from parents who know little or nothing about medicine to do so, is false and was known by the AAP to be false. The rule for physicians is: do not operate on a healthy child; only operate on a child when he or she needs the operation. The AAP Guidelines were completely fraudulent in promoting circumcision, if parents elect it, when physicians are not allowed to perform the operation unless it is medically necessary.

80. To the extent that the members of the 1989 AAP task force on circumcision did not have knowledge of the falsity of any its false claims enumerated above, they and the AAP acted recklessly in disregard of the truth or falsity or said claim or claims, and are liable for fraud.

81. The AAP thereby intentionally defrauded Adam Lavine, acting on behalf of his son Shingo Lavine and his wife Aiko Lavine, and therefore intentionally defrauded the three Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment that the American Academy of Pediatrics committed intentional fraud against them, and they pray for the relief requested below.

## COUNT IV

### (Constructive Fraud)

### The American Academy of Pediatrics

82. Plaintiffs repeat and re-allege the facts and allegations in Paragraphs 1-81 as if set forth at length herein.

83. The AAP is a medical organization, comprised of physicians licensed to practice medicine, that issues guidelines for physicians to follow in the practice of medicine and here, the practice of circumcision.

84. The AAP owes a fiduciary duty to patients and their legal representatives who learn about or are informed about and who rely upon the AAP's circumcision guidelines, here Adam Lavine's reliance on the AAP's 1989 Policy Statement.

85. When the AAP violates the trust that a physician (here Dr. Chait), a patient (here Shingo Lavine) and/or those representing him (here Adam and Aiko Lavine) places in the AAP by some wrongful or unfair act—including without limitation by unfair conduct, unethical conduct, unlawful conduct, by fraud, breach of fiduciary duty, mistake, undue influence, coercion, duress,

19

or unjustly enriches itself—a cause of action lies for constructive fraud, even if intent to defraud is absent.

86. The AAP's wrongful and unfair acts enumerated in this Complaint and in Count III—including without limitation undisclosed conflicts of interest, scientific misconduct, failure to use independent and neutral medical judgment, fraudulent medical claims and omissions, scare tactics, fraudulent legal claims and omissions, promotion of unethical conduct, violation of boys' rights, breach of fiduciary duty, unfairness, mistake, undue influence, coercion, duress, and unjust enrichment—constitute constructive fraud.

**WHEREFORE,** Plaintiffs demand judgment that the American Academy of Pediatrics committed constructive fraud against them, and they pray for the relief requested below.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs Shingo Lavine, Adam Lavine, and Aiko Lavine demand judgement against defendants, Princeton Medical Group, P.A. and the American Academy of Pediatrics, Inc. and they seek the following relief:

(a) Compensation for Shingo Lavine for the pain caused by each of the two circumcisions; the pain caused by his injuries; for the emotional distress, suffering, stress, pain, and mental anguish caused by the circumcisions.

(b) Compensation for the pain and pain and suffering and emotional distress associated with attempting partial foreskin restoration to try to mitigate the damage caused by the circumcisions; and compensation for the time spent and that will be spent on foreskin restoration.

(c) Compensation for the mental anguish suffered by Adam and Aiko Lavine as a result of the two circumcisions.

(d) Attorneys' fees, pre- and post-judgment interest and costs of this lawsuit;

(e) Punitive damages; and

(f) Such other relief as the court may deem just and equitable under the circumstances.

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated: February 4, 2021

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 4:35-1(a) and (b) respectively, Plaintiffs respectfully demand a trial by jury on all issues in the within action so triable.

Dated: February 4, 2021                      BY: _____
                                                      ANDREW DELANEY, ESQ.

## DESIGNATION OF TRIAL COUNSEL

In accordance with Rule 4:25-4, Andrew DeLaney, Esq. is hereby designated as trial counsel on behalf of Plaintiffs.

Dated: February 4, 2021                      BY: _____
                                                      ANDREW DELANEY, ESQ.

## CERTIFICATION

The undersigned hereby certifies that the matter in controversy between the parties herein is not the subject of any other action pending in any Court or any arbitration proceeding, and that no other action or arbitration proceeding with respect to the matter in controversy is contemplated.

The undersigned further certifies that the names of any non-parties who should be joined in the action pursuant to Rule 4:28, or who are subject to joinder pursuant to Rule 4:29-1(b)

because of potential liability to any party on the basis of the facts set forth in the within complaint are: None.

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

Dated: February 4, 2021                          BY: _____
                                                 ANDREW DELANEY, ESQ.

## LIST OF ATTACHED EXHIBITS

**EXHIBIT A**

"Ode to the Circumcised Male," Poem by Edgar Schoen, M.D., chair of the 1989 Task Force of the AAP on Circumcision

**EXHIBIT B**

"Report of the Task Force on Circumcision, RE9148" *Pediatrics*, 989;84(4):388-91 (August, 1989)

**EXHIBIT C**

"Care of the Uncircumcised Penis," AAP Pamphlet, 1984

**EXHIBIT D**

"Newborns: Care of the Uncircumcised Penis," AAP Pamphlet, 1994

# EXHIBIT A

mother-child resemblances as adulthood approaches, again without apparent influence of the sex of the child.[4]

STANLEY M. GARN, PhD
TIMOTHY V. SULLIVAN
The Center for Human Growth
and Development
The University of Michigan
300 North Ingalls Bldg
Ann Arbor, MI 48109

1. Ruvalcaba RHA: Familial sexual precocity. AJDC 1986;140:742.
2. Garn SM: Continuities and changes in maturational timing, in Brim OG, Kagan J (eds): Constancy and Change in Human Development. Cambridge, Mass, Harvard University Press, 1980, pp 113-162.
3. Garn SM, Bailey SM: Genetics of maturational processes, in Falkner F, Tanner JM (eds): Human Growth. New York, Plenum Publishing Corp, 1978, pp 307-330.
4. Garn SM, Rohmann CG: Interaction of nutrition and genetics in the timing of growth and development. Pediatr Clin North Am 1966;13: 353-379.

### 'Ode to the Circumcised Male'

Sir.—Before the mid-1970s, the American standard of care included neonatal circumcision, a minor surgical procedure that promoted genital hygiene and prevented later penile cancer as well as cervical cancer in female sexual partners. More recently, evidence has suggested that adequate hygiene is all that is needed and that circumcision is an unnecessary and traumatic procedure. In 1983, the American Academy of Pediatrics and the American College of Obstetrics and Gynecology jointly agreed that routine circumcision is not necessary,[1] and third-party payers are increasingly refusing to pay for the procedure. Whether recent evidence of a decreased incidence of urinary tract infections in circumcised male infants[2] can stem the anticircumcision tide is questionable.

The purpose of this communication is to offer some solace to the generations of circumcised males who are now being told that they have undergone an unnecessary and deforming procedure, which may also have been brutal and psychologically traumatic. To them I offer these lines:

#### Ode to the Circumcised Male

We have a new topic to heat up our passions—the foreskin is currently top of the fashions.

If you're the new son of a Berkeley professor, your genital skin will be greater, not lesser.

For if you've been circ'ed or are Moslem or Jewish, you're outside the mode; you are old-ish not new-ish.

You have broken the latest society rules; you may never get into the finest of schools.

Noncircumcised males are the "genital chic"—if your foreskin is gone, you are now up the creek.

It's a great work of art like the statue of Venus, if you're wearing a hat on the head of your penis.

When you gaze through a looking glass, don't think of Alice; don't rue that you suffered a rape of your phallus.

Just hope that one day you can say with a smile that your glans ain't passé; it will rise up in style.

EDGAR J. SCHOEN, MD
Department of Pediatrics
Kaiser Permanente
Medical Center
280 W MacArthur Blvd
Oakland, CA 94611

1. American Academy of Pediatrics and American College of Obstetrics and Gynecology: Guidelines for Perinatal Care. Evanston, Ill, AAP/ACOG, 1983.
2. Wiswell TE, Smith FR, Bass JW: Decreased incidence of urinary tract infections in circumcised male infants. Pediatrics 1985;75: 901-903.

### Gastric Acid Aspiration Possible During Flexible Endoscopy Without General Anesthesia

Sir.—I wish to comment on Dr Bendig's recent article, "Removal of Blunt Esophageal Foreign Bodies by Flexible Endoscopy Without General Anesthesia."

I suggest that Dr Bendig has been fortunate in avoiding pulmonary aspiration of gastric contents in his patients, a life-threatening complication. Animal studies have suggested a critical gastric volume of 0.4 mL/kg and a pH of 2.5 or less as predisposing to serious pulmonary aspiration.[2] Pediatric patients are even more likely than adults to exceed this critical volume and pH.[3,4] Coté et al[5] found 50 of 51 pediatric patients to have gastric pH less than 2.5 immediately after induction of general anesthesia. Of these 51 children, 76% had gastric pH less than 2.5 and gastric volume greater than 0.4 mL/kg, placing them at risk for acid aspiration syndrome.

I suspect that many of Dr Bendig's patients were also at risk for acid aspiration both intraoperatively and postoperatively, despite the six-hour nothing-by-mouth period. Dr Bendig used chlorpromazine hydrochloride, meperidine hydrochloride, and diazepam to sedate his patients, a combination similar to "lytic cocktail," except for the substitution of diazepam for pro-

methazine. In addition, the larynx was topically anesthetized with lidocaine or benzocaine. The ability to perform esophagoscopy otherwise ... uncooperative ... speaks for their inability to ... airways—the cough and gag ... were abolished. When a patient ... protect and control his own ... airway, it is the responsibility ... physician to control it to prevent ... gerous aspiration. Dr Bendig ... that "there were no compli... sedation or of the endoscopy." ... Was aspiration looked for ... tively? Did all children have ... postoperative chest roent... Did no child have a temperature ... tion postoperatively?

General anesthesia with ... cheal intubation provides ... trol and considerable prot... pulmonary aspiration of gastric ... tents. Recovery from an ... anesthetic is also much ... from the above-mentioned ... suggest that the risks from ... anesthesia in this situation ... than that of gastric acid as...

Despite Dr Bendig's c... trained pediatric support ... and equipment be available ... if airway obstruction or ... tent regurgitation were to ... would not arrive in time. ... more prudent to have an ... volved at the start. I also ... one takes Dr Bendig's su... couragement to perform ... dure without appropriate ... sonnel and equipment.

MICHAEL J. KIBEL...
Department of An...
Geisinger Medical ...
Danville, PA 1782...

1. Bendig DW: Removal of b... foreign bodies by flexible end... general anesthesia. AJDC 1986:...
2. Greenfield LJ, Singleton ... DR, et al: Pulmonary effects ... graded aspiration of hydrochloric... 1969;170:74-84.
3. Teabeault JR II: Aspiratio... tents: An experimental study. A... 28:51-67.
4. Salem MR, Wong AY, Ma... medicant drugs and gastric juic... in pediatric patients. Anesth... 216-219.
5. Coté CJ, Goudsouzian MD ... Assessment of risk factors rela... tion syndrome in pediatric pati... and residual volume. Anesth... 70-72.

In Reply.—Dr Kibelbek ... with the potential risk of ... gastric contents utilizi...

The ...

# EXHIBIT B

- ·623 -



Task Force on Circumcision

# Report of the Task Force on Circumcision (RE9148)

The 1971 edition of *Standards and Recommendations of Hospital Care of Newborn Infants* by the Committee on the Fetus and Newborn of the American Academy of Pediatrics (AAP) stated that "there are no valid medical indications for circumcision in the neonatal period."[1(p110)] In 1975, an Ad Hoc Task Force of the same committee reviewed this statement and concluded that "there is no absolute medical indication for routine circumcision of the newborn."[2(p87)] The 1975 recommendation was reiterated in 1983 by both the AAP and the American College of Obstetrics and Gynecology in the jointly published *Guidelines to Perinatal Care.*[3]

Large-scale studies of US hospitals indicate that most male infants born in this country are circumcised in the newborn period,[4] although the circumcision rate recently appears to be decreasing.[5] Since the 1975 report, new evidence has suggested possible medical benefits from newborn circumcision. Preliminary data suggest the incidence of urinary tract infection in male infants may be reduced when this procedure is performed during the newborn period. There is also additional published information concerning the relationship of circumcision to sexually transmitted diseases and, in turn, the relationship of viral sexually transmitted diseases to cancer of the penis and cervix.

## DEFINITIONS, PENILE HYGIENE, AND LOCAL INFECTIONS

The penis consists of a cylindrical shaft with a rounded tip (the glans). The shaft and glans are separated by a groove called the coronal sulcus. The foreskin, or prepuce, is the fold of skin covering the glans. At birth, the prepuce is still developing histologically, and its separation from the glans is usually incomplete. Only about 4% of boys have a retractable foreskin at birth, 15% at 6 months, and 50% at 1 year; by 3 years, the foreskin can be retracted in 80% to 90% of uncircumcised boys.[6]

Phimosis is stenosis of the preputial ring with resultant inability to retract a fully differentiated foreskin. Paraphimosis is retention of the preputial ring proximal to the coronal sulcus, creating a tension greater than lymphatic pressure resulting in subsequent edema of the prepuce and glans distal to the ring. Balanitis is inflammation of the glans, and posthitis is inflammation of the prepuce; these conditions usually occur together (balanoposthitis). Meatitis is inflammation of the external urethral meatus.

Newborn circumcision consists of removal of the foreskin to near the coronal sulcus performed in early infancy (before age 2 months). The procedure prevents phimosis, paraphimosis, and balanoposthitis. Meatitis is more common in circumcised boys. There is no evidence that meatitis leads to stenosis of the urethral meatus.

It is particularly important that uncircumcised boys be taught careful penile cleansing. As the boy grows, cleansing of the distal portion of the penis is facilitated by gently, never forcibly, retracting the foreskin only to the point where resistance is met. Full retraction may not be achieved until age 3 years or older.

A small percentage of boys who are not circumcised as newborns will later require the procedure for treatment of phimosis, paraphimosis, or balanoposthitis. When performed after the newborn period, circumcision may be a more complicated procedure.[7]

## CANCER OF THE PENIS

The overall annual incidence of cancer of the penis in US men has been estimated to be 0.7 to 0.9 per 100 000 men and the mortality rate is as high as 25%.[8–11] This condition occurs almost exclusively in uncircumcised men.[12–14] In five major reported series since 1932, not one man had been circumcised neonatally.[11,15–19] The predicted lifetime risk of cancer of the penis developing in an uncircumcised man has been estimated at 1 in 600 men in the United States[20]; in Denmark, the estimate is 1 in 909 men.[21] In developed countries where

The recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed. Variations, taking into account individual circumstances, may be appropriate.
PEDIATRICS (ISSN 0031 4005). Copyright © 1989 by the American Academy of Pediatrics.

- 624 -

neonatal circumcision is not routinely performed, the incidence of penile cancer is reported to range from 0.3 to 1.1 per 100 000 men per year.[4] This low incidence is about half that found in uncircumcised US men, but greater than that in circumcised US men.

Factors other than circumcision are important in the etiology of penile cancer. The incidence of penile cancer is related to hygiene. In developing nations with low standards of hygiene, the incidence of cancer of the penis in uncircumcised men is 3 to 6 per 100 000 men per year.[22] The decision not to circumcise a male infant must be accompanied by a lifetime commitment to genital hygiene to minimize the risk of penile cancer developing. Recently, human papillomavirus types 16 and 18 DNA sequences have been found in 31 of 53 cases of penile cancer, suggesting the importance of these viruses in the development of this condition.[23] Poor hygiene, lack of circumcision, and certain sexually transmitted diseases all correlate with the incidence of penile carcinoma.

### URINARY TRACT INFECTIONS

A 1982 series of infants with urinary tract infections noted that males preponderated, contrary to female preponderance later in life, and that 95% of the infected boys were uncircumcised.[24] Beginning in 1985, studies conducted at US Army hospitals involving more than 200 000 men showed a greater than tenfold increase in urinary tract infections in uncircumcised compared with circumcised male infants; moreover, as the rate of circumcision declined throughout the years, the incidence of urinary tract infection increased.[5,25] In another army hospital study, infants were examined in the first month of life and it was concluded that the high incidence of urinary tract infection in uncircumcised boys was accompanied by a similarly increased incidence of other significant infection, including bacteremia and meningitis[26]; however, the authors of that study did not distinguish between bacteriuria secondary to septicemia and primary urinary tract infection. Still another recent army hospital study lends support to a 1986 hypothesis that circumcision prevents preputial bacterial colonization and thus protects male infants against urinary tract infection.[27,28] It should be noted that these studies in army hospitals are retrospective in design and may have methodologic flaws. For example, they do not include all boys born in any single cohort or those treated as outpatients, so the study population may have been influenced by selection bias.

### SEXUALLY TRANSMITTED DISEASES

Evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting.

Early series indicated a higher risk of gonococcal and nonspecific urethritis in uncircumcised men,[29,30] whereas one recent study shows no difference in the incidence of gonorrhea and a higher incidence of nonspecific urethritis in circumcised men.[31] Although published reports suggest that chancroid, syphilis, human papillomavirus, and herpes simplex virus type 2 infection are more frequent in uncircumcised men, methodologic problems render these reports inconclusive.[29,30,32-34]

### CERVICAL CARCINOMA

There appears to be a strong correlation between squamous cell carcinoma of the cervix and sexually transmitted diseases. Human papillomavirus types 16 and 18 are the viruses most commonly associated with cancer of the cervix[35-38]; Herpes simplex virus type 2 has also been linked with cervical cancer.[36,39] Although human papillomavirus types 16 and 18 are also associated with cancer of the penis,[23,37] evidence linking uncircumcised men to cervical carcinoma is inconclusive. The strongest predisposing factors in cervical cancer are a history of intercourse at an early age and multiple sexual partners. The disease is virtually unknown in nuns and virgins.

### PAIN AND BEHAVIORAL CHANGES

Infants undergoing circumcision without anesthesia demonstrate physiologic responses suggesting that they are experiencing pain.[40] The observed responses include behavioral, cardiovascular, and hormonal changes. Pain pathways as well as the cortical and subcortical centers necessary for pain perception are well developed by the third trimester. Responses to painful stimuli have been documented in neonates of all viable gestational ages. Behavioral changes include a cry pattern indicating distress during the circumcision procedure and changes in activity (irritability, varying sleep patterns) and in infant-maternal interaction for the first few hours after circumcision.[41-43] These behavioral changes are transient and disappear within 24 hours after surgery.[43]

### SURGICAL TECHNIQUES AND LOCAL ANESTHESIA

Circumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique. The procedure should be performed only on a healthy, stable infant. Clamp techniques (eg, Gomco or Mogen clamps) or a Plastibell give equally good results.[44] Techniques that may reduce postoperative complications include (1) using a surgical marking pen to mark the location of the coronal sulcus on the shaft

MER-L-000272-21  06/18/2021 3:53:49 PM  Pg 31 of 48 Trans ID: LCV20211469872
Case 3:21-cv-17099-ZNQ-LHG   Document 1-2   Filed 09/17/21   Page 128 of 150 PageID: 140

- 625 -

skin preoperatively; (2) identifying the urethral meatus; (3) bluntly freeing the foreskin from the glans with a flexible probe; (4) completely retracting the foreskin; and (5) identifying the coronal sulcus, all before applying the clamp or Plastibell and before excising any foreskin.[45] Electrocautery should not be used in conjunction with metal clamps. At the initial health supervision visit following hospital discharge, the penis should be carefully examined and the parents given instructions concerning on-going care.

Dorsal penile nerve block using no more than 1% lidocaine (without epinephrine) in appropriate doses (3 to 4 mg/kg) may reduce the pain and stress of newborn circumcision.[41,46-49] However, reported experience with local anesthesia in newborn circumcision is limited, and the procedure is not without risk (see "Complications").

## CONTRAINDICATIONS, COMPLICATIONS, INFORMED CONSENT

Circumcision is contraindicated in an unstable or sick infant. Infants with genital anomalies, including hypospadias, should not be circumcised because the foreskin may later be needed for surgical correction of the anomalies. Appropriate laboratory studies should be performed when there is a family history of bleeding disorders. Infants who have demonstrated an uncomplicated transition to extrauterine life are considered stable. Signs of stability include normal feeding and elimination and maintenance of normal body temperature without an incubator or radiant warmer. A period of observation may allow for recognition of abnormalities or illnesses (eg, hyperbilirubinemia, infection, or manifest bleeding disorder) that should be addressed before elective surgery. It is prudent to wait until a premature infant meets criteria for discharge before performing circumcision.

The exact incidence of postoperative complications is unknown,[50] but large series indicate that the rate is low, approximately 0.2% to 0.6%.[44,45,51,52] The most common complications are local infection and bleeding. Deaths attributable to newborn circumcision are rare; there were no deaths in 500 000 circumcisions in New York City[52] or in 175 000 circumcisions in US Army hospitals.[51] A communication published in 1979 reported one death in the United States due to circumcision in 1973, and the authors' review of the literature during the previous 25 years documented two previous deaths due to this procedure.[53]

Complications due to local anesthesia are rare and consist mainly of hematomas and local skin necrosis.[41,46-49,54] However, even a small dose of lidocaine can result in blood levels high enough to produce measurable systemic responses in neonates.[55,56] Local anesthesia adds an element of risk and data regarding its use have not been reported in large numbers of cases. Circumferential anesthesia may be hazardous. It would be prudent to obtain more data from large controlled series before advocating local anesthesia as an integral part of newborn circumcision.

When considering circumcision of their infant son, parents should be fully informed of the possible benefits and potential risks of newborn circumcision, both with and without local anesthesia. In addition to the medical aspects, other factors will affect the parents' decisions, including esthetics, religion, cultural attitudes, social pressures, and tradition.

## SUMMARY

Properly performed newborn circumcision prevents phimosis, paraphimosis, and balanoposthitis and has been shown to decrease the incidence of cancer of the penis among US men. It may result in a decreased incidence of urinary tract infection. However, in the absence of well-designed prospective studies, conclusions regarding the relationship of urinary tract infection to circumcision are tentative. An increased incidence of cancer of the cervix has been found in sexual partners of uncircumcised men infected with human papillomavirus. Evidence concerning the association of sexually transmitted diseases and circumcision is conflicting.

Newborn circumcision is a rapid and generally safe procedure when performed by an experienced operator. It is an elective procedure to be performed only if an infant is stable and healthy. Infants respond to the procedure with transient behavioral and physiologic changes.

Local anesthesia (dorsal penile nerve block) may reduce the observed physiologic response to newborn circumcision. It also has its own inherent risks. However, reports of extensive experience or follow-up with the technique in newborns are lacking.

Newborn circumcision has potential medical benefits and advantages as well as disadvantages and risks. When circumcision is being considered, the benefits and risks should be explained to the parents and informed consent obtained.

AAP TASK FORCE ON CIRCUMCISION
Edgar J. Schoen, MD, Chairman
Glen Anderson, MD
Constance Bohon, MD
Frank Hinman, Jr, MD
Ronald L. Poland, MD
E. Maurice Wakeman, MD

## REFERENCES

1. American Academy of Pediatrics, Committee on Fetus and Newborn. *Standards and Recommendations for Hospital Care of Newborn Infants.* 5th ed. Evanston, IL: American Academy of Pediatrics; 1971
2. Thompson HC, King LR, Knox E, et al. Report of the ad hoc task force on circumcision. *Pediatrics.* 1975;56:610-611
3. American Academy of Pediatrics, Committee on Fetus and Newborn. *Guidelines for Perinatal Care.* 1st ed. Evanston, IL: American Academy of Pediatrics; 1983
4. Wallerstein E. Circumcision: the uniquely American medical enigma. *Urol Clin North Am.* 1985;12:123-132
5. Wiswell TE, Enzenauer RW, Holton ME, et al. Declining frequency of circumcision: implications for changes in the absolute incidence and male to female sex ratio of urinary tract infection in early infancy. *Pediatrics.* 1987;79:338-342
6. Gairdner D. The fate of the foreskin: a study of circumcision. *Br Med J.* 1949;2:1433-1437
7. Warner E, Strashin E. Benefits and risks of circumcision. *Can Med Assoc J.* 1981;125:967-976,992
8. Cutler SJ, Young JL, Jr. eds. *Third National Cancer Survey: Incidence Data.* National Cancer Institute Monograph 41. Bethesda, MD: US Dept of Health, Education, and Welfare; 1975.
9. Young JL, Percy CL, Asire AJ. *Surveillance, epidemiology and End Results, Incidence and Mortality Data 1973-1977.* National Cancer Institute Monograph 41. Bethesda, MD: US Dept of Health, Education, and Welfare; 1981; 14
10. Young JL. *Surveillance, Epidemiology and End Results 1978- 1982.* Bethesda, MD: US Dept of Health and Human Services; YEAR;PAGE
11. Persky L, deKernion J. Carcinoma of the penis. *Cancer J Clin.* 1986;35:5:258-273
12. Leiter E, Lefkovitis AM. Circumcision and penile carcinoma. *NY State J Med.* 1975;75:1520-1522
13. Boczko S, Freed S. Penile carcinoma in young circumcised males. *NY State J Med.* 1979;79:1903-1904
14. Rogus BJ. Squamous cell carcinoma in a young circumcised man, *J Urol.* 1987;138:861-862
15. Wolbarst AL. Circumcision and penile cancer. *Lancet.* 1932;1:150-153
16. Dean AL Jr. Epithelioma of the penis *J Urol.* 1935;33:252-283
17. Lenowitz H, Graham AP. Carcinoma of the penis. *J Urol.* 1946;56:458-484
18. Hardner GJ, Bhanalaph T, Murphy GP, et al. Carcinoma of the penis: analysis of therapy in 100 consecutive cases, *J Urol.* 1974;108:428-430
19. Dagher R, Selzer ML, Lapides J. Carcinoma of the penis and the anti-circumcision crusade. *J Urol.* 1973;110:79-80
20. Kochen M, McCurdy S. Circumcision and the risk of cancer of the penis: a life-table analysis. *Am J Dis Child.* 1980;134:484-486
21. Swafford TD. Circumcision and the risk of cancer of the penis. *Am J Dis Child.* 1985;139:112
22. Garfinkel L. Circumcision and penile cancer. *Cancer J Clin.* 1983;33:320
23. McCance DJ, Kalache A, Ashdown K, et al. Human papillomavirus types 16 and 18 in carcinomas of the penis from Brazil. *Int J Cancer.* 1986;37:55-59
24. Ginsburg CM, McCracken GH Jr. Urinary tract infections in young infants. *Pediatrics.* 1982;69:409-412
25. Wiswell TE, Smith FR, Bass JW. Decreased incidence of urinary tract infections in circumcised male infants. *Pediatrics.* 1985;75:901-903
26. Wiswell TE, Geschke DW. Risks from circumcision during the first month of life compared with those of the uncircumcised boys. *Pediatrics.* 1989;83:1011-1015
27. Roberts JA. Does circumcision prevent urinary tract infection? *J Urol.* 1986;135:991-992
28. Wiswell TE, Miller GM, Gelston HM, et al. The effect of circumcision status on periurethral bacterial flora during the first year of life. *J Pediatr.* 1988;113:442-446
29. Wilson RA. Circumcision and venereal disease. *Can Med Assoc J.* 1947;56:54-56
30. Parker SW, Stewart AJ, Wren MN, et al. Circumcision and sexually transmissible disease. *Med J Aust.* 1983;2:288-290
31. Smith GL, Greenup R, Takafuji ET. Circumcision as a risk factor for urethritis in racial groups. *Am J Public Health.* 1987;77:452-454
32. Thirumoorthy T, Sng EH, Doraisingham S, et al. Purulent-penile ulcers of patients in Singapore: *Genitourin Med.* 1986;62:252-255
33. Oriel JD. Condyloma acuminata as a sexually transmitted disease. *Dermatol Clin.* 1983;1:93-102
34. Taylor PK, Rodin P. Herpes genitalis and circumcision. *Br J Vener Dis.* 1975;51:274-277
35. Baird PJ. The causation of cervical cancer, part II: the role of human papilloma and other viruses. In: Singer A, ed. *1985 Clinics in Obstetrics and Gynecology.* London, England: WB Saunders Co; 1985;12:19-32
36. Kaufman RH, Adam E. Herpes simplex virus and human papilloma virus in the development of cervical carcinoma. *Clin Obstet Gynecol.* 1986;29:678-692
37. McCance DJ. Human papillomaviruses and cancer. *Biochim Biophys Acta.* 1986;823:195-205
38. zur Hausen H. Genital papillomavirus infections. *Prog Med Virol.* 1985;32:15-21
39. Kessler II. Etiological concepts in cervical carcinogenesis. *Appl Pathol.* 1987;5:57-76
40. Anand KJS, Hickey PR. Pain and its effects in the human neonate and fetus. *N Engl J Med.* 1987;317:1321-1329
41. Dixon S, Snyder J, Holve R, et al. Behavioral effects of circumcision with and without anesthesia. *J Devel Behav Pediatr.* 1984;5:246-250
42. Marshall RE, Stratton WC, Moore JA, et al. Circumcision: effects upon newborn behavior. *Infant Behav Dev.* 1980;3:1-14
43. Marshall RE, Porter FL, Rogers AG, et al. Circumcision, II: Effects upon mother-infant interaction. *Early Hum Dev.* 1982;7:367-374
44. Gee WF, Ansell JS. Neonatal circumcision: a ten-year overview with comparison of the Gomco clamp and the Plastibell device. *Pediatrics.* 1976;58:824-827
45. Harkavy KL. The circumcision debate. *Pediatrics.* 1987; 79:649-650. Letter
46. Kirya C, Werthmann MW. Neonatal circumcision and penile dorsal nerve block—a painless procedure. *J Pediatr.* 1978;92:998-1000
47. Williamson PS, Williamson MI. Physiologic stress reduction by a local anesthetic during newborn circumcision. *Pediatrics.* 1983;71:36-40
48. Holve RL, Bromberger PJ, Groveman HD, et al. Regional anesthesia during newborn circumcision: effect on infant pain response. *Clin Pediatr.* 1983;22:813-818
49. Stang HJ, Cunnar MR, Snellman L, et al. Local anesthesia for neonatal circumcision; effect on distress and cortisol response. *JAMA.* 1988;259:1507-1511
50. Kaplan GW. Complications of circumcision. *Urol Clin North Am.* 1983;10:543-549
51. Wiswell TE. The circumcision debate. *Pediatrics.* 1987; 79:649-650. Letter
52. King LR. Neonatal circumcision in the United States in 1982. *J Urol.* 1982;128:1135-1136
53. Kochen M, McCurdy SA. Circumcision. *Am J Dis Child.* 1979;133:1079-1080. Letter
54. Sara CA, Lowry CJ. A complication of circumcision and dorsal nerve block of the penis. *Anaesth Intensive Care.* 1985;13:79-82
55. Diaz M, Graff M, Hiatt M, et al. Prenatal lidocaine and the auditory evoked responses in term infants. *Am J Dis Child.* 1988;142:160-161
56. Maxwell LG, Yaster M, Wetzell RC, et al. Penile nerve block for newborn circumcision. *Obstet Gynecol.* 1987;70:415-419

MER-L-000272-21  06/18/2021 3:53:49 PM  Pg 33 of 48 Trans ID: LCV20211469872
Case 3:21-cv-17099-ZNQ-LHG  Document 1-2  Filed 09/17/21  Page 130 of 150 PageID: 142

- 627 -

ERRATUM

Policy Statement RE9148

Report of the Task Force on Circumcision

Under the heading of "Urinary Tract Infections" (line 6, page
389), "men" should be changed to "infant boys." The
complete statement should now read:
    Beginning in 1985, studies conducted at US Army
    hospitals involving more than 200 000 infant boys showed
    a greater than tenfold increase in urinary tract
    infections in uncircumcised compared with circumcised
    male infants; moreover, as the rate of circumcision
    declined throughout the years, the incidence of urinary
    tract infection increased.


The Task Force on Circumcision would also like to acknowledge
the following for their provision of expert advice:
    David T. Mininberg, MD, FAAP, Section Liaison
        Jerome O. Klein, MD, FAAP
    Edward A. Mortimer, Jr, MD, FAAP

# EXHIBIT C

MER-L-000272-21  06/18/2021 3:53:49 PM  Pg 35 of 48 Trans ID: LCV20211469872
Case 2:21-cv-17090-ZNQ-LHG  Document 12  Filed 09/17/21  Page 132 of 150 PageID: 144



# Newborns

## Care of the Uncircumcised Penis

American Academy of Pediatrics

NATIONAL ORGANIZATION
of
CIRCUMCISION INFORMATION
RESOURCE CENTERS
P.O. Box 369
Corte Madera, California 94925-0369

For additional copies contact:  American
Academy of Pediatrics, Publications
Department, PO Box 927, Elk Grove Village,
IL 60007  Price: $15.100

Copyright © 1984 by the American Academy of Pediatrics

---

**Testing Foreskin Retraction:** To test retraction occasionally, hold the penile shaft with one hand and with the other hand, push the foreskin back *gently – never forcibly* – perhaps ⅛ of an inch. Retraction may also be done with one hand pushing the shaft skin gently toward the abdomen. This will automatically retract the foreskin.

If there is any *discomfort* in your baby or if you feel resistance, stop. Try again in a few months. If the retraction is easy for both the child and the parent, further retraction may be attempted in due time. There should be no rush to retract. Eventually, the foreskin will retract completely, exposing the entire glans. This may take several years.

**Hygiene of the Fully Retracted Foreskin:** For the first few years, an occasional retraction with cleansing beneath is sufficient.

Penile hygiene will later become a part of a child's total body hygiene, including hair shampooing, cleansing the folds of the ear and brushing teeth. At puberty, the male should be taught the importance of retracting the foreskin and cleaning beneath during his daily bath.

**Summary:**  Care of the uncircumcised boy is quite easy. "Leave it alone" is good advice. External washing and rinsing on a daily basis is all that is required. Do not retract the foreskin in an infant, as it is almost always attached to the glans. Forcing the foreskin back may harm the penis, causing pain, bleeding, and possibly adhesions. The natural separation of the foreskin from the glans may take many years. After puberty, the adult male learns to retract the foreskin and cleanse under it on a daily basis.

---

need for concern even after a longer period. No harm will come in leaving the foreskin alone.

## Care of the Uncircumcised Penis

At birth, the penis consists of a cylindrical shaft with a rounded end called the glans. The shaft and glans are separated by a groove called the sulcus. The entire penis – shaft and glans – is covered by a continuous layer of skin. The section of the penile skin that covers the glans is called the foreskin or prepuce. The foreskin consists of two layers, the outer foreskin and an inner lining similar to a mucous membrane.

Before birth, the foreskin and glans develop as one tissue. The foreskin is firmly attached – really fused – to the glans. Over time, this fusion of the inner surface of the prepuce with the glans skin begins to separate by shedding the cells from the surface of each layer. Epithelial layers of the glans and the inner foreskin lining are regularly replaced, not only in infancy but throughout life. The discarded cells accumulate as whitish, cheesy "pearls" which gradually work their way out via the tip of the foreskin.

Eventually, sometimes as long as 5 or even 10 years after birth, full separation occurs and the foreskin may then be pushed back away from the glans toward the abdomen. This is called foreskin retraction. The foreskin may retract spontaneously with erections which occur normally from birth on and even occur in fetal life. Also, all children "discover" their genitals as they become more aware of their bodies and may retract the foreskin themselves. If foreskin does not seem to retract easily early in life, it is important to realize that this is not abnormal and that it will eventually do so.



**Diagrammatic Representation of the Inner and Outer Foreskin Layers**

Sulcus

Shaft

Urinary Meatus

Glans

Frenum

Outer Foreskin Layer

Preputial Orifice

Inner Foreskin Layer

Drawing reprinted with permission of Edward Wallerstein, author of *Circumcision: An American Health Fallacy*.

**The Function of the Foreskin:** The glans at birth is delicate and easily irritated by urine and feces. The foreskin shields the glans, with circumcision, this protection is lost. In such cases, the glans and especially the urinary opening (meatus) may become irritated or infected, causing ulcers, meatitis (inflammation of the urinary opening), and meatal stenosis (a narrowing of the urinary opening). Such problems virtually never occur in uncircumcised penises. The foreskin protects the glans throughout life.

**Infant Smegma:** Skin cells from the glans of the penis and the inner foreskin are shed throughout life. This is especially true in childhood, natural skin shedding serves to separate the foreskin from the glans. Since this shedding takes place in a relatively closed space – with the foreskin covering the glans – the shed skin cells cannot escape in the usual manner. They escape by working their way to the tip of the foreskin. These escaping discarded skin cells constitute infant smegma.

**Adult Smegma:** Specialized sebaceous glands – Tyson's Glands – which are located on the glans under the foreskin, are largely inactive in childhood. At puberty, Tyson's Glands produce an oily substance, which, when mixed with shed skin cells, constitute adult smegma. Adult smegma serves as a protective, lubricating function for the glans.

**Foreskin Hygiene:** The foreskin is easy to care for. The infant should be bathed or sponged frequently, and all parts should be washed including the genitals. The external penile skin is soft and pliable and easy to wash. *It is not necessary to retract any part of the skin in order to wash under it.* The uncircumcised penis is easy to keep clean. No special care is required! Leave the penis alone. The body provides its own protection of the glans area because the foreskin is fused to it. As the shed epithelial cells ooze from underneath the foreskin, clean away this infant smegma. No other manipulation is necessary. There is no need for Q-tips, irrigation or antiseptics; soap and water will suffice.

**Foreskin Retraction:** As noted, the foreskin and glans develop as one tissue. Separation will evolve over time. It should not be forced. When will separation occur? Each child is different. Separation may occur before birth; this is rare. It may take a few days, weeks, months or even years. *This is normal.* Although most foreskins are retracted by age 5, there is no

# EXHIBIT D

# Newborns: Care of the Uncircumcised Penis

## Guidelines for Parents

American Academy of Pediatrics





The American Academy of Pediatrics is an organization of 47,000 pediatricians dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults.

Now available: *Caring for Your Baby and Young Child: Birth to Age 5*, available at the special discount price of more than 25 percent off the $16 list price. To order your copy, send a check or money order for $11.95, plus $2.75 per copy shipping and handling, to:
AAP Publications — Child Care Book, Birth to Age 5,
141 Northwest Point Blvd, PO Box 927, Elk Grove Village, IL 60009-0927.

For additional copies, contact:
American Academy of Pediatrics
Division of Publications
141 Northwest Point Blvd., PO Box 927
Elk Grove Village, IL 60009-0927

Minimum order 100
Price $23.50/100 (members)
$28.50/100 (nonmembers)
Copyright ©1990
HE0023R



American Academy of Pediatrics

1/94

**Summary:** Care of the uncircumcised boy is quite easy. "Leave it alone" is good advice. External washing and rinsing on a daily basis is all that is required. Do not retract the foreskin in an infant, as it is almost always attached to the glans. Forcing the foreskin back may harm the penis, causing pain, bleeding, and possibly adhesions. The natural separation of the foreskin from the glans may take many years. After puberty, the adult male learns to retract the foreskin and cleanse under it on a daily basis.

The information contained in this publication should not be used as a substitute for the medical care and advice of your pediatrician. There may be variations in treatment that your pediatrician may recommend based on individual facts and circumstances.

# Newborns: Care of the Uncircumcised Penis

At birth, the penis consists of a cylindrical shaft with a rounded end called the glans. The shaft and glans are separated by a groove called the sulcus. The entire penis — shaft and glans — is covered by a continuous layer of skin. The section of the penile skin that covers the glans is called the foreskin or prepuce. The foreskin consists of two layers, the outer foreskin and an inner lining similar to a mucous membrane.

Before birth, the foreskin and glans develop as one tissue. The foreskin is firmly attached — really fused — to the glans. Over time, this fusion of the inner surface of the prepuce with the glans skin begins to separate by shedding the cells from the surface of each layer. Epithelial layers of the glans and the inner foreskin lining are regularly replaced, not only in infancy but throughout life. The discarded cells accumulate as whitish, cheesy "pearls" which gradually work their way out via the tip of the foreskin.

Eventually, sometimes as long as 5, 10, or more years after birth, full separation occurs and the foreskin may then be pushed back away from the glans toward the abdomen. This is called foreskin retraction. The foreskin may retract spontaneously with erections which occur normally from birth on and even occur in fetal life. Also, all children "discover" their genitals as they become more aware of their bodies and may retract the foreskin themselves. If the foreskin does not seem to retract easily early in life, it is important to realize that this is not abnormal and that it should eventually do so.

**Infant Smegma:** Skin cells from the glans of the penis and the inner foreskin are shed throughout life. This is especially true in childhood; natural skin shedding serves to separate the foreskin from the glans. Since this shedding



Diagrammatic Representation of the Inner and Outer Foreskin Layers

Sulcus — Shaft — Urinary Meatus — Glans — Frenum — Outer Foreskin Layer — Preputial Orifice — Inner Foreskin Layer

Drawing reprinted with permission of Edward Wallerstein

takes place in a relatively closed space — with the foreskin covering the glans — the shed skin cells cannot escape in the usual manner. They escape by working their way to the tip of the foreskin. These escaping discarded skin cells constitute infant smegma, which may appear as white "pearls" under the skin.

**Adult Smegma:** Specialized sebaceous glands — Tyson's Glands — which are located on the glans under the foreskin, are largely inactive in childhood. At puberty, Tyson's Glands produce an oily substance, which, when mixed with shed skin cells, constitute adult smegma. Adult smegma serves as a protective, lubricating function for the glans.

**Foreskin Hygiene:** The foreskin is easy to care for. The infant should be bathed or sponged frequently, and all parts should be washed including the genitals. The uncircumcised penis is easy to keep clean. No special care is required! No attempt should be made to forcibly retract the foreskin. No manipulation is necessary. There is no need for special cleansing with Q-tips, irrigation, or antiseptics; soap and water externally will suffice.

**Foreskin Retraction:** As noted, the foreskin and glans develop as one tissue. Separation will evolve over time. It should not be forced. When will separation occur? Each child is different. Separation may occur before birth; this is rare. It may take a few days, weeks, months, or even years. *This is normal.* Although many foreskins will retract by age 5, there is no need for concern even after a longer period. Some boys do not attain full retractability of the foreskin until adolescence.

**Hygiene of the Fully Retracted Foreskin:** For the first few years, an occasional retraction with cleansing beneath is sufficient.

Penile hygiene will later become a part of a child's total body hygiene, including hair shampooing, cleansing the folds of the ear, and brushing teeth. At puberty, the male should be taught the importance of retracting the foreskin and cleaning beneath during his daily bath.

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>    Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>    Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY<br><br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br>**PLAINTIFF SHINGO LAVINE'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANT AMERICAN ACADEMNY OF PEDIATRICS, INC.** |

COMES NOW Plaintiff Shingo Lavine and requests that Defendant American Academy

of Pediatrics, Inc. (hereinafter the "AAP") produce the following books, documents, or other

tangible things, within 45 days of the service of these Requests upon it, at the offices of Andrew Delaney, Attorney at Law LLC, 6 South Street, Suite 203, Morristown, New Jersey 07960.

No request shall be interpreted as requiring the production of attorney work product or materials protected by the attorney-client privilege.

## REQUESTS

1.    Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, oral communications that were recorded in some physical form, journal articles, research articles, texts, opinions, graphs, charts, newspaper or magazine articles or opinion pieces, surveys, compilations of data, or the like, that were submitted to the AAP Task Force on Circumcision (hereinafter the "Task Force") whose report (hereinafter "the Report") was published in *Pediatrics* 1989;84;388-391 and a copy of which is attached to the Complaint in this case.

2.    Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, oral communications that were recorded in some physical form, journal articles, research articles, texts, opinions, graphs, charts, newspaper or magazine articles or opinion pieces, surveys, compilations of data, or the like, that were considered by the Task Force before the approval and publication of the Report.

3.    Any and all books, documents, and other tangible things, including but not limited to minutes, notes, or sound or video recordings, that record any of the deliberations of the Task Force

or the approval of the Report by any other body or person within or acting upon the behalf of the AAP.

4.      Any and all drafts of the Report or a suggested report that were submitted to, formulated by, or considered by the Task Force or any member thereof before the approval and issuance of the final version of the Report.

5.      Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, and oral communications that were recorded in some physical form, that suggested or led to the formation of the Task Force.

6.      Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, and oral communications that were recorded in some physical form, that dealt with the selection of the members of the Task Force, including but not limited to requests for appointment thereto, invitations to participate as a member of the Task Force, letters of acceptance, letters declining to participate, and the like.

7.      Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, and oral communications that were recorded in some physical form, that dealt with the selection of the Chairman of the Task Force, including but not limited to requests for appointment as such, invitations to participate as Chairman of the Task Force, letters of acceptance, letters declining to participate, and the like.

3

8.      Any and all books, documents, and other tangible things reflecting communications between members of the Task Force themselves in regard to the subject of the Task Force or its operations, deliberations, or report.

9.      Any and all books, documents, and other tangible things reflecting communications between members of the Task Force and any other member of the AAP in regard to the subject of the Task Force or its operations, deliberations, or report.

10.     Any and all books, documents, and other tangible things reflecting communications between members of the Task Force and any member of any other professional association or organization, including but not limited to the American College of Obstetricians and Gynecologists, the American Academy of Family Physicians, the American Cancer Society, or the American Urological Association, in regard to the subject of the Task Force or its operations, deliberations, or report.

11.     Any and all books, documents, and other tangible things reflecting communications between members of the Task Force and any person associated with any governmental agency, including but not limited to the National Institutes of Health or the Centers for Disease Control, in regard to the subject of the Task Force or its operations, deliberations, or report.

12.     Any and all books, documents, and other tangible things reflecting the formulation of, drafting of, content of, or production of the AAP's 1984 pamphlets "NEWBORNS:  Care of the Uncircumcised Penis."

4

13.    Any and all books, documents, and other tangible things reflecting the formulation of, drafting of, content of, or production of the AAP's 1994 pamphlet "NEWBORNS: Care of the Uncircumcised Penis," including without limitation those items reflecting or concerning the modification of the language therein whereby the section in the 1984 pamphlets entitled "The Function of the Foreskin:" was eliminated and the reference in the "Diagrammatic Representation of the Inner and Outer Foreskin Layers" was modified to eliminate the reference to "author of Circumcision: An American Health Fallacy." This request includes, specifically, any documentation that evidences the reason(s) for the elimination of the referenced portions and the identity of the persons who suggested and/or authorized such changes.

14.    Any and all letters or comments, whether or not published, received by the editors of *Pediatrics* in regard to the Report as published.

15.    Any and all books, documents, and other tangible things reflecting any dissent from the Report by any member of the Task Force.

16.    Any and all versions of the pamphlet "Newborns: Care of the Uncircumcised Penis" from 1984 up to and through 1997.

_____
ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated: February 9, 2021

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>           Plaintiffs,<br><br>vs.<br><br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>           Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY<br><br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br>**PLAINTIFF SHINGO LAVINE'S FIRST INTERROGATORIES TO DEFENDANT AMERICAN ACADEMNY OF PEDIATRICS, INC.** |

COMES NOW Plaintiff Shingo Lavine and requests that Defendant American Academy

of Pediatrics, Inc. (hereinafter the "AAP") answer the following interrogatories within the time

1

No interrogatory shall be interpreted as requiring the revelation of attorney work product or matters or materials protected by the attorney-client privilege.

## INTERROGATORIES

1.      Please state the names and last known physical addresses, email addresses, and telephone numbers of the members of the AAP Task Force on Circumcision (hereinafter the "Task Force") whose report (hereinafter "the Report") was published in *Pediatrics* 1989;84;388-391 and a copy of which is attached to the Complaint in this case.

2.      Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of the person or persons who selected the members of the Task Force.

3.      Please state name(s) and last known physical address(es), email address(es), and telephone number(s) of the person or persons who selected the Chairman of the Task Force.

4.      Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of the person or persons who decided to convene and appoint the Task Force.

5.      Who requested that the Task Force be convened and why was the Task Force convened?

6.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any employees or agents of the AAP who assisted the Task Force, consulted with the Task Force, kept the records of the Task Force, received information to convey to the Task Force, or attended any of its meetings.

7.    How many times did the Task Force meet, how did it meet (in person, by telephone, etc.), where did it meet, how were its proceedings recorded, and who kept the minutes of its proceedings?

8.    Did any member of the Task Force ever leave a meeting because of a disagreement with any other member or members of the Task Force?  If so, give complete details, including who left the meeting, when the incident occurred, the reasons given for the person(s) leaving the meeting, and the like.

9.    Did any member of the Task Force draft or present a dissenting report?  If so, give complete details, including who drafted or presented a dissenting report, the contents thereof, the reason(s) for it, and the disposition of such.

10.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any person(s) who authored, drafted, approved or had anything to do with the content of the AAP's 1984 pamphlets "NEWBORNS:  Care of the Uncircumcised Penis."

11.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any person(s) who authored, drafted, approved or had anything to do with the content of the AAP's 1994 pamphlet "NEWBORNS:  Care of the Uncircumcised Penis."

12.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any person(s) who had anything to do with the modifications of the language in the AAP pamphlet "NEWBORNS:  Care of the Uncircumcised Penis" whereby the section in the 1984 pamphlets entitled "The Function of the Foreskin:" was eliminated in the 1994 edition and the reference in the "Diagrammatic Representation of the Inner and Outer Foreskin Layers" was modified in the 1994 edition to eliminate the reference to "author of Circumcision: An American Health Fallacy" and state ALL of the reason(s) for those modifications.

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated: February 9, 2021

4

# EXHIBIT "B"

**From:** Andrew DeLaney <andrew.delaney21@gmail.com>
**Sent:** Sunday, June 6, 2021 10:00 PM
**To:** Silver, Marc <Marc.Silver@btlaw.com>
**Cc:** Stephanie Viola <sviola@lenoxlaw.com>; Bridges, Brandon <Brandon.Bridges@btlaw.com>
**Subject:** Re: [EXTERNAL]Re: Levine v. Princeton Medical Group and AAP

Marc,

Confirmed that you have until June 19. We'll talk

Andrew DeLaney
Attorney at Law
6 South Street, Suite 203
Morristown, NJ 07960
Work. 973-606-6090
Cell. 862-812-6874

On Thu, Jun 3, 2021 at 1:48 PM Silver, Marc <Marc.Silver@btlaw.com> wrote:

Andrew:  To confirm our conversation just now, plaintiffs have agreed to allow the AAP an additional week to and including June 18, 2021 to respond to the Complaint. Accordingly, plaintiffs will not move for default prior to June 19, 2021, Thank you for your professional courtesy.

Marc


**Marc Silver** | Partner
Direct: (312) 214-8321 | Mobile: (773) 415-8257
Chicago, IL



Gregory J. Giordano, Esq., ID# 026481984
Stephanie J. Viola, Esq., ID# 246342017
*LENOX, SOCEY, FORMIDONI,*
 *GIORDANO, LANG, CARRIGG & CASEY, LLC*
136 Franklin Corner Road, Unit B2
Lawrenceville, New Jersey 08648
(609) 896-2000
Attorney(s) for Defendant, **Princeton Medical Group, P.A.**

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, <br><br> Plaintiffs, <br><br> v. <br><br> PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – MERCER COUNTY **DOCKET NO.:  MER-L-272-21** <br><br> CIVIL ACTION <br><br> **NOTICE OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |

TO:  **Andrew Delaney**
     **6 South Street, Suite 203**
     **Morristown, NJ 07960**
     Attorneys for Plaintiff

   **PLEASE TAKE NOTICE** on July 9, 2021 at 9:00 A.M. in the forenoon or soon thereafter as counsel may be heard, the undersigned, attorneys for the Defendant, **Princeton Medical Group, P.A.**, shall apply to the Superior Court of New Jersey, Law Division, at the Mercer Civil County Courthouse, Trenton, New Jersey, for an Order dismissing Plaintiff's Complaint, and any and all cross-claims, against Defendant, Princeton Medical Group, with prejudice, failure to state a claim upon which relief can be granted, pursuant to R. 4:6-2(e).

**PLEASE TAKE FURTHER NOTICE** that Defendant shall rely on the attached Certification of Counsel and Legal Brief in support of the within motion.

**PLEASE TAKE FURTHER NOTICE** that a proposed form of order is submitted herewith.

**PLEASE TAKE FURTHER NOTICE** that oral argument is specifically requested.

LENOX, SOCEY, FORMIDONI, GIORDANO, LANG, CARRIGG & CASEY, LLC.

*Stephanie J. Viola*

_____
Stephanie J. Viola, Esquire
Attorneys for Defendant,
**Princeton Medical Group, P.A.**

DATED:  June 18, 2021

Gregory J. Giordano, Esq., ID# 026481984
Stephanie J. Viola, Esq., ID# 246342017
*LENOX, SOCEY, FORMIDONI,*
 *GIORDANO, LANG, CARRIGG & CASEY, LLC*
136 Franklin Corner Road, Unit B2
Lawrenceville, New Jersey 08648
(609) 896-2000
Attorney(s) for Defendant, **Princeton Medical Group, P.A.**

---

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>                Plaintiffs,<br><br>v.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>                Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – MERCER COUNTY<br>**DOCKET NO.:  MER-L-272-21**<br><br>        CIVIL ACTION<br><br>**ORDER DISMISSING PLAINTIFF'S AMENDED COMPLAINT** |

---

    **THIS MATTER HAVING** been opened to the Court by LENOX, SOCEY, FORMIDONI, GIORDANO, LANG, CARRIGG & CASEY, ESQUIRES, attorneys for Defendant, **Princeton Medical Group, P.A.,** for an Order dismissing Plaintiffs' Complaint, and any and all cross-claims, with prejudice, for failure to state claim for which relief can be granted; and the Court having reviewed the moving papers, and any timely opposition filed thereto, and for good cause shown;

    **IT IS ON THIS**       day of          , 2021;

    **ORDERED** that Defendant, Princeton Medical Group, P.A.'s Motion to Dismiss Plaintiffs' Complaint is hereby **GRANTED**; and it is further