**ORDERED** that Plaintiffs' Complaint asserted against Defendant, Princeton Medical Group, P.A., is hereby **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that any and all cross-claims asserted against Defendant, Princeton Medical Group, P.A., are hereby dismissed with prejudice;

**FURTHER ORDERED** that a copy of this Order shall be served upon all counsel of records within seven (7) days of receipt.

_____
                                                    J.S.C.

Opposed     _____

Unopposed _____

Gregory J. Giordano, Esq., ID# 026481984
Stephanie J. Viola, Esq., ID# 246342017
*LENOX, SOCEY, FORMIDONI,*
 *GIORDANO, LANG, CARRIGG & CASEY, LLC*
136 Franklin Corner Road, Unit B2
Lawrenceville, New Jersey 08648
(609) 896-2000
Attorney(s) for Defendant, **Princeton Medical Group, P.A.**

---

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – MERCER COUNTY **DOCKET NO.: MER-L-272-21** |
| Plaintiffs, | CIVIL ACTION |
| v. | |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **CERTIFICATION OF COUNSEL IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |
| Defendants. | |

---

I, Stephanie J. Viola, Esquire, of full age, having been duly sworn upon my oath, do hereby certify and state:

1. I am an attorney at law in the State of New Jersey and an associate of the law firm of Lenox, Socey, Formidoni, Giordano, Lang, Carrigg & Casey, LLC, attorneys for Defendant, Princeton Medical Group, P.A., in the above-captioned matter.

2. As such, I am familiar with the facts set forth herein and make this Certification in support of Defendant's Motion to Dismiss Plaintiff's Complaint, with prejudice, for failure to state a claim upon which relief can be granted.

3. Plaintiff's Complaint alleges that on or about December 18, 1997, Plaintiffs, Adam and Aiko Lavine, were fraudulently induced by the now-deceased Jeffrey L. Chait, M.D., to consent to the circumcision of their son, Plaintiff, Shingo Lavine. A true and accurate copy of Plaintiff's Complaint is attached hereto as "**Exhibit A**".

4. In December 1997, Dr. Chait was an employee of Defendant, Princeton Medical Group, P.A. Exhibit A.

5. Plaintiffs' allege that Dr. Chait portrayed circumcision as a "routine and normal part of childbirth" in order to obtain their consent to circumcise Shingo. Exhibit A.

6. Plaintiffs verbally consented to the procedure. Exhibit A.

7. Plaintiff, Adam Lavine, alleges that Dr. Chait informed him that the American Academy of Pediatrics issued guidelines about circumcision which included health benefits, and Dr. Chait presented same as a harmless procedure. Exhibit A.

8. Approximately one month after the circumcision, Plaintiffs became concerned that the circumcision had not been performed properly. Exhibit A.

9. On or about January 1998, Plaintiffs presented to David Sharlin, M.D. with concerns about Shingo's penis, who informed Plaintiff he believed there complications from the procedure. Exhibit A.

10.     On or about January 21, 1998, Plaintiffs presented to Joseph Barone, M.D. for evaluation, after which Shingo underwent a second circumcision. <u>Exhibit A</u>.

11.     Plaintiff, Shingo Lavine alleges he has suffered injuries to his foreskin as a result of the two circumcisions. <u>Exhibit A</u>.

12.     Despite meeting with additional doctors about Shingo's circumcisions and resulting complications, Plaintiffs allege they "only became truly aware" of Shingo's issues until speaking with law professor Peter W. Adler, who is an expert on circumcision and the law. <u>Exhibit A</u>.

13.     In 1989, Defendant, American Academy of Pediatrics, Inc. ("Academy") issued a "Report of the Task Force on Circumcision", which Plaintiffs allege operate as circumcision guidelines, which Dr. Chait relief upon when requesting consent to circumcise Shingo. <u>Exhibit A</u>.

14.     Plaintiffs allege that the Academy's report contained numerous intentional misrepresentations and omissions, and did not properly disclose all risks associated with circumcision. <u>Exhibit A</u>.

15.     Plaintiffs bring one count against this Defendant for intentional fraud, based on Dr. Chait eliciting Plaintiffs' consent to circumcise Shingo. <u>Exhibit A</u>.

16.     Plaintiffs bring a second claim against this Defendant for constructive fraud based on Dr. Chait violating the trust of Plaintiffs in offering to circumcise Shingo. Exhibit A.

17.     Pursuant to N.J.S.A. 2A:14-1, causes of action for fraud "shall be commenced within 6 years next after the cause of any such action shall have accrued". N.J.S.A. 2A:14-1.

18.     Plaintiffs' alleged causes of action arose in 1997, which is well beyond the statutory limitations period, and therefore same are time barred.

19.     For these reasons, Defendant now moves to dismiss Plaintiff's Complaint with prejudice.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

LENOX, SOCEY, FORMIDONI, GIORDANO, LANG, CARRIGG & CASEY, LLC.

*Stephanie J. Viola*

_____
Stephanie J. Viola, Esquire
Attorneys for Defendant,
**Princeton Medical Group, P.A.**

DATED:  June 18, 2021

Gregory J. Giordano, Esq., ID# 026481984
Stephanie J. Viola, Esq., ID# 246342017
*LENOX, SOCEY, FORMIDONI,*
 *GIORDANO, LANG, CARRIGG & CASEY, LLC*
136 Franklin Corner Road, Unit B2
Lawrenceville, New Jersey 08648
(609) 896-2000
Attorney(s) for Defendant, **Princeton Medical Group, P.A.**

_____

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>                  Plaintiffs,<br><br>v.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>                Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION – MERCER COUNTY<br>**DOCKET NO.:  MER-L-272-21**<br><br>        CIVIL ACTION |

_____

### BRIEF IN SUPPORT OF DEFENDANT, PRINCETON MEDICAL GROUP, P.A.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

_____


GREGORY J. GIORDANO, ESQUIRE, OF COUNSEL
STEPHANIE J. VIOLA, ESQUIRE, ON THE BRIEF

## PRELIMINARY STATEMENT

Defendant, Princeton Medical Group, P.A. ("Defendant"), by and through its undersigned attorneys and pursuant to New Jersey Rule 4:6-2(e), moves this Court to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted. Plaintiffs' Complaint alleges intentional and constructive fraud against this Defendant, however Plaintiffs' claims are actually grounded in medical malpractice, as opposed to tort. Further, the statute of limitations to bring a cause of action for fraud in New Jersey is six years, and the alleged actions giving rise to Plaintiffs' claims occurred more than twenty-three years ago. N.J.S.A. 2A:14-1. As set forth more fully herein, the Plaintiffs' claims are time barred by the state of limitations, and further barred as New Jersey case law makes clear that causes of action based upon alleged malpractice cannot be re-packaged as a fraud claim. Accordingly, Plaintiffs have failed to carry their burden to set forth a valid cause of action for which relief can be granted as to Defendant, Princeton Medical Group, P.A., and their claims should be dismissed.

## STATEMENT OF FACTS

Plaintiff's Complaint alleges that on or about December 18, 1997, Plaintiffs, Adam and Aiko Lavine, were fraudulently induced by the now-deceased Jeffrey L. Chait, M.D., to consent to the circumcision of their son, Plaintiff, Shingo Lavine.

Exhibit A. In December 1997, Dr. Chait was an employee of Defendant, Princeton Medical Group, P.A. Id. Plaintiffs' allege that Dr. Chait portrayed circumcision as a "routine and normal part of childbirth" in order to obtain their consent to circumcise Shingo. Id. Plaintiffs verbally consented to the procedure. Id. Plaintiff, Adam Lavine, alleges that Dr. Chait informed him that the American Academy of Pediatrics issued guidelines about circumcision which included health benefits, and Dr. Chait presented same as a harmless procedure. Id.

Approximately one month after the circumcision, Plaintiffs became concerned that the circumcision had not been performed properly. Id. On or about January 1998, Plaintiffs presented to David Sharlin, M.D. with concerns about Shingo's penis, who informed Plaintiff he believed there complications from the procedure. Id. On or about January 21, 1998, Plaintiffs presented to Joseph Barone, M.D. for evaluation, after which Shingo underwent a second circumcision. Id. Plaintiff, Shingo Lavine alleges he has suffered injuries to his foreskin as a result of the two circumcisions. Id.

Despite meeting with additional doctors about Shingo's circumcisions and resulting complications, Plaintiffs allege they "only became truly aware" of Shingo's issues until speaking with law professor Peter W. Adler, who is an expert on circumcision and the law. Id. Plaintiffs allege that Dr. Chait

relied upon the "Report of the Task Force on Circumcision", issued by the American Academy of Pediatrics, Inc. in 1998, and same contained numerous intentional misrepresentations and omissions, and did not properly disclose all risks associated with circumcision. Id. Plaintiffs claim that by allegedly referencing the 1998 Report, Dr. Chait fraudulently induced Plaintiffs to consent to the circumcision. Id.

Since Plaintiffs fail to allege legally cognizable fraud claims, and same would further be time barred, there is no basis for liability against Defendant, Princeton Medical Group, P.A. and therefore Plaintiffs' Complaint must be dismissed.

## LEGAL ARGUMENT

### STANDARD OF REVIEW

This application is made pursuant to R. 4:6-2(e). When deciding a motion to dismiss for failure to state a claim, a reviewing court "searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746 (1989) (quoting Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 252 (App. Div. 1957)). However, this inquiry is limited to examining the legal sufficiency of the facts alleged

on the face of the complaint. <u>Printing Mart-Morristown</u>, 116 N.J. at 746.

For a claim to survive, Plaintiffs must allege sufficient facts, and not only conclusory allegations, to support a cause of action. <u>Scheidt v. DRS Technologies, Inc.</u>, 424 N.J. Super. 188, 193 (App. Div. 2012). Although "[t]he examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach," if the complaint states no basis for relief and discovery would not provide one, dismissal is appropriate. <u>Id</u>. See also, <u>Camden County Energy Recovery Assoc., L.P. v. N.J. Dep't of Envtl. Prot.</u>, 320 N.J. Super. 59, 64 (<u>App. Div.</u> 1999), *aff'd*, 170 N.J. 246 (2001).

## I. **COUNTS I AND II OF PLAINTIFFS' COMPLAINT MUST BE DISMISSED BECAUSE A FRAUD CLAIM CANNOT BE MAINTAINED WHEN THE DAMAGES ALLEGED FLOW FROM MALPRACTICE.**

Counts One and Two and Plaintiffs' Complaint allege intentional and constructive fraud based on the alleged misrepresentations of Dr. Chait, resulting in the alleged injuries to Plaintiff Shingo Lavine as a result of the circumcision. <u>Exhibit A</u>. Plaintiffs allege that their lack of informed consent about circumcisions resulted in Plaintiff Adam Lavine consenting to Shingo's circumcision, which ultimately had complications. <u>Id</u>. After careful review of situations where

plaintiffs bring claims against physicians based on a lack of informed consent, as opposed to a complete lack of consent (battery), the New Jersey Supreme Court opined,

> we are not convinced that our common law should be extended to allow a novel fraud or deceit-based cause of action in this doctor-patient context that regularly would admit of the possibility of punitive damages, and that would circumvent the requirements for proof of both causation and damages imposed in a traditional informed consent setting. We are especially reluctant to do so when plaintiff's damages from this alleged "fraud" arise exclusively from the doctor-patient relationship involving plaintiff's corpectomy procedure.

Howard v. University of Medicine and Dentistry of New Jersey, 172 N.J. 537, 553-54 (2002). The Howard court distinctively held that in circumstances where a plaintiff alleges some form of lack of informed consent from a physician, "a fraud or deceit-based claim is unavailable". Id. The rationale being that "deviation from the standard of care and failure to obtain informed consent are simply sub-groups of a broad claim of medical negligence". Id. 545. The Howard court ultimately declined to permit the plaintiff to maintain a separate cause of action for fraud. Id. 560.

Since Howard, New Jersey courts have consistently held that lack of informed consent cases must appropriately be brought as medical negligence claims and cannot be re-packed as fraud claims. In Liguori v. Elmann, the New Jersey Supreme Court again considered whether a cause of action for fraud can be maintained

based on an underlying allegation of medical negligence. In Ligouri, the claims brought against the physicians were based on a lack of informed consent and deviation from the applicable standard of care, though pled as fraud claims. Liguori v. Elmann, 191 N.J. 527, 548 (2007). The Ligouri court held that because the harms suffered as a result of the alleged fraud cannot be separated from the act of medical negligence, in this matter, the circumcision performed by Dr. Chait, the court saw no reason to "deviate from our careful analysis in Howard", and therefore the fraud claims were precluded. Id. The analysis and reasoning in Ligouri applies to this matter.

Here, Plaintiffs allege that the fraud is based on a lack of informed consent about circumcisions, including health risks and the overall acceptance of circumcision worldwide, and as a result, Plaintiff Shingo Lavine suffered complications from the procedure. Exhibit A. Similar to Ligouri, the complications from the circumcision and the alleged misrepresentations that induced Plaintiff Adam Lavine to consent to the circumcision cannot be separated, and therefore "the claim is indeed one arising out of an asserted lack of informed consent". Liguori, supra, 191 N.J. at 549 (2007).

"[I]nformed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him [or her] to evaluate knowledgeably the

options available and the risks attendant upon each before subjecting that patient to a course of treatment". Starozytnyk v. Reich, 377 N.J. Super. 111, 125 (App. Div. 2005); citing Howard, supra, 172 N.J. 548. The case law unequivocally makes clear that allegations of lack of informed consent in the physician-patient setting are to be brought as negligence claims, and re-packaging same as a cause of action for fraud cannot be maintained. Plaintiffs specifically allege that Dr. Chait's misrepresentations caused them to not be fully informed about the potential risks associated with circumcision, and subsequent to this misrepresentation, Plaintiff Shingo Lavine suffered personal injuries as a result of the circumcision. Exhibit A. Plaintiffs' allegations are not rooted in fraud, but rather medical negligence, and significantly, even a valid medical negligence claim is time barred.

Pursuant to N.J.S.A. 2A:14-2(a), "[e]xcept as otherwise provided by law, every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within two years next after the cause of any such action shall have accrued". N.J.S.A. 2A:14-2(a). Subsection (b) further provides that for injuries to a minor, the period will extend two years after the individual's eighteenth birthday. N.J.S.A. 2A:14-2(b). Even this extended time has expired. As such, Plaintiffs have failed to state a

cause of action for which relief can be granted. Accordingly, Plaintiffs' Complaint against Defendant, Princeton Medical Group, P.A. must be dismissed with prejudice.

## II. **Even if Plaintiffs were able to maintain causes of action for fraud, same are time barred by the statute of limitations.**

Pursuant to N.J.S.A. 2A:14-1,

> Every action at law for trespass to real property, for any tortious injury to real or personal property, for taking, detaining, or converting personal property, for replevin of goods or chattels, for any tortious injury to the rights of another not stated in sections 2A:14-2 and 2A:14-3 of this Title, or for recovery upon a contractual claim or liability, express or implied, not under seal, or upon an account other than one which concerns the trade or merchandise between merchant and merchant, their factors, agents and servants, shall be commenced within 6 years next after the cause of any such action shall have accrued. N.J.S.A. 2A:14-1.

"The statutory language and well-established case law, make clear that the six year statute of limitations period is to be measured from the date a plaintiff's cause of action accrues". Homlin v. TRW, Inc., 330 N.J. Super. 30, 35 (App. Div. 2000). "It is also clear that the date when a cause of action is deemed to have accrued is the date upon which the right to institute and maintain a suit first arises". Id. (internal quotations omitted).

The elements for a prima facie case for the tort of fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its

falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages". Id. Accordingly, until a plaintiff has suffered damages, he cannot maintain a suit for damages based on fraud. Therefore, the cause of action will accrue only when damage is inflicted. Id. 36. "[T]he limitation period will not commence until sometime thereafter if the wronged party either knew nor had reason to know that he or she had been wronged". Id. at 48.

Here, the damages alleged by Plaintiffs are the physical complications that resulted from Plaintiff Shingo Lavine's first circumcision. Exhibit A. By Plaintiffs' own admissions, they personally became concerned that the circumcision was not performed properly only about a month after the December 1997 circumcision. Id. As a result of their suspicions, Plaintiffs saw Dr. Sharlin in January 1998, who told Plaintiffs he believed that complications had arisen from the circumcision. Id. Later in January 1998, Plaintiffs presented to Dr. Barone for further examination. Id. As a result of this examination, Dr. Barone diagnosed Plaintiff Shingo Lavine with phimosis and a buried penis. Id. Shingo then underwent a second circumcision. Id. By virtue of Dr. Barone's medical diagnosis and corrective procedure, Plaintiffs were expressly made aware that Dr. Chait's initial circumcision had complications which resulted in

physical damage to Shingo, and necessitated a second, corrective procedure.

Plaintiffs must only "be aware of an injury and a causal relationship between the injury and an actor, but need not know that the conduct is tortious or legally wrongful". <u>Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.</u>, 181 F.3d 410, 425 (3d Cir. 1999). Plaintiffs were not only aware through their personal observations that there was an injury to Shingo and a causal relationship to Dr. Chait's circumcision, but they were expressly informed of same by Drs. Sharlin and Barone. Whether or not Plaintiffs understood this conduct to be tortious or legally wrongful is irrelevant to the when the accrual of the cause of action begins. <u>Id</u>.

Plaintiffs allege that they "only became truly aware" of Shingo's physical issues after speaking with a law professor who is an expert on circumcision and speaks to ethical arguments made about the topic. <u>Exhibit A</u>. While this conversation may have informed Plaintiffs about controversy surrounding the topic of circumcision, and various debates that have occurred, this is not the legal standard required for tolling the statute of limitations. The standard only requires Plaintiffs to be aware of a causal relationship between Dr. Chait's circumcision and Shingo's injury, which Plaintiffs' Complaint concedes by virtue of the conversations with Drs. Sharlin and Barone, as well as

the second, corrective circumcision. Plaintiffs becoming aware that circumcision is controversial has no bearing on the legal standard.

Plaintiffs were made aware of the causal relationship between the injury and the actor in January 1998, which therefore gave them until January 2004 to file the pending fraud claims. As such, even if this Court determined that Plaintiffs alleged legally cognizable claims for fraud against Defendant, Princeton Medical Group, P.A., same are time barred by the statute of limitations, and therefore, dismissal of Plaintiffs' Complaint is appropriate.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that Defendant's motion be granted and Plaintiffs' Complaint against Defendant, Princeton Medical Group, P.A., be dismissed with prejudice.

LENOX, SOCEY, FORMIDONI, GIORDANO,
LANG, CARRIGG & CASEY, LLC.

*Stephanie J. Viola*

_____
Stephanie J. Viola, Esquire
Attorneys for Defendant, **Princeton
Medical Group, P.A.**

DATED: June 18, 2021

Gregory J. Giordano, Esq., ID# 026481984
Stephanie J. Viola, Esq., ID# 246342017
*LENOX, SOCEY, FORMIDONI,*
 *GIORDANO, LANG, CARRIGG & CASEY, LLC*
136 Franklin Corner Road, Unit B2
Lawrenceville, New Jersey 08648
(609) 896-2000
Attorney(s) for Defendant, **Princeton Medical Group, P.A.**

_____

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>                Plaintiffs,<br><br>v.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>                Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – MERCER COUNTY<br>**DOCKET NO.:  MER-L-272-21**<br><br>CIVIL ACTION<br><br><br>**PROOF OF SERVICE** |

_____

1. I am employed by the law firm of LENOX, SOCEY, FORMIDONI, GIORDANO, LANG, CARRIGG & CASEY, attorneys for Defendant, **Princeton Medical Group, P.A.**, in the above-captioned action.

2. On June 18, 2021, copies of the Notice of Motion to Dismiss, Certification of Counsel, Proposed Order, and Legal Brief, were served upon the following via e-courts:

> **Andrew Delaney**
> **6 South Street, Suite 203**
> **Morristown, NJ 07960**

3. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

*Stephanie J. Viola*

_____
Stephanie J. Viola

DATED:   June 18, 2021

# EXHIBIT A

## SUMMONS

Attorney(s) Andrew DeLaney

Office Address 6 South Street, Suite 203

Town, State, Zip Code Morristown, NJ 07960

Telephone Number 973-606-6090

Attorney(s) for Plaintiff Andrew DeLaney

Shingo Lavine, Adam Lavine,

Aiko Lavine — 236553

      Plaintiff(s)

vs.

American Academy of Pediatrics,

Princeton Medical Group, P.A.
      Defendant(s)

## Superior Court of New Jersey

Mercer ▼ County

Civil      Division

Docket No: MER-L-000272-21

## CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

    The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

    If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

    If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

S/ Michelle Smith

Clerk of the Superior Court

DATED: 02/16/2021

Name of Defendant to Be Served: Princeton Medical Group, P.A.

Address of Defendant to Be Served: 419 Harrison Street, Suite 203, Princeton, NJ

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, <br><br> Plaintiffs, <br><br> vs. <br><br> PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., <br><br> Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY <br><br> DOCKET NO.: <br><br> Civil Action <br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiffs, Shingo Lavine, Adam Lavine, and Aiko Lavine, by way of Complaint against the above-named defendants, say:

1

## PARTIES

1. Plaintiff Shingo Lavine ("Shingo") is a natural person who is a citizen of the State of Rhode Island.

2. Plaintiffs Adam Lavine ("Adam") and Aiko Lavine ("Aiko") are natural persons who reside in and are citizens of the State of California. They are the natural parents of Plaintiff Shingo Lavine.

3. Defendant Princeton Medical Group, P.A. ("Princeton") is a New Jersey professional association. It is subject to the jurisdiction of this Court and may be served with process by serving its registered agent Joan Hagadron at 419 North Harrison Street, Suite 203, Princeton, NJ 08540. It is subject to the jurisdiction of this Court and venue is properly laid herein.

4. Defendant American Academy of Pediatrics, Inc. ("AAP") is an Illinois corporation registered to do business in the State of New Jersey. It is subject to the jurisdiction of this Court and may be served with process by serving its registered agent, Corporation Service Company, Princeton South Corporate Center, 100 Charles Ewing Blvd., Suite 160, Ewing, NJ 08628. It is subject to the jurisdiction of this Court and venue is properly laid herein.

## FACTS

5. In December,1997, Shingo Lavine was born to Adam and Aiko Lavine at Princeton Medical Center in Plainsboro, Mercer County, New Jersey.

6. On or about December 18, 1997, Dr. Jeffrey L. Chait, M.D., the obstetrician who delivered him, an employee and agent of Defendant Princeton Medical Group, P.A., circumcised Shingo Lavine. Defendant Princeton thereafter billed Adam and Aiko Lavine or their insurer or both for the circumcision and received money for Dr. Chait's performance of it.

7. Defendant Princeton is liable for the torts of its employees and agents, including Dr. Chait, under the doctrine of *respondeat superior*.

2

8. Shingo's mother, Aiko, is of Japanese heritage. Japan is not a circumcising society, and until she came to the United States and eventually married Adam, she had never heard of it. After Shingo's birth and before the circumcision, Aiko was incapacitated due to a difficult 36-hour labor on medications and a Caesarean section. Just prior to the circumcision she was being administered morphine and Percocet® (brand of oxycodone and acetaminophen) and other medications.

9. Prior to the circumcision Dr. Chait did not ask Aiko to give her permission to have her son circumcised, and she did not give permission for the circumcision.

10. After Shingo was born, Dr. Chait solicited Adam's verbal consent to have Shingo circumcised. Dr. Chait informed him that the American Academy of Pediatrics had issued guidelines about circumcision showing that circumcision reduces the incidence of urinary tract infections, penile cancer, and sexually transmitted diseases including HIV. Dr. Chait portrayed circumcision as a minor, safe, and harmless procedure and as a routine and normal part of childbirth, and he portrayed parental permission as expected and as a formality.

11. Adam does not recall signing a form giving consent to have Dr. Chait circumcise his son Shingo. If wording about consenting to circumcision was in a hospital admission form, it was not brought to his attention, and he did not see it during the rush of getting his wife Aiko admitted to the hospital to give birth. If Adam did give written permission, he did so in reliance upon the representations made, expressly, impliedly, and by omission, by Dr. Chait and the AAP, enumerated in this Complaint, which Adam had no reason to doubt and did not doubt.

12. Dr. Chait did not disclose to Adam and Aiko, and they were completely unaware, that circumcision was a highly controversial topic, nor did he convey to them any opinion other than that circumcision was good for health. He did not disclose to them that circumcision is surgery; that it is painful; that it risks many complications and can be fatal; that men may resent having been circumcised at birth without their consent and when they were unable to prevent it and that it can cause psychological problems; he did not disclose that the foreskin of the penis is highly erogenous; and he did not disclose the functions of the foreskin. He did not disclose to them the risk of any complications or the common occurrence of loss of shaft skin and consequent tight erections with hair on the shaft of the penis.

3

13. After the circumcision, Dr. Chait seemed distinctly less confident than he had been before. He expressed concern about the circumcision to Shingo's parents and told them that they would "have to keep an eye on it" and let him know if there were any problems with Shingo's penis. This was a surprising and concerning reaction to what had been presented as a routine and simple procedure. However, Dr. Chait did not disclose exactly what his concerns were and he did not disclose that too much shaft skin had been removed. Adam and Aiko observed that after about one month, Shingo's penis had not healed and looked unusual to them, and they became concerned the circumcision had not been properly performed..

14. Sometime between January 10-15, 1998, Adam and Aiko took Shingo to Shingo's pediatrician, Dr. David Sharlin of Delaware Valley Pediatrics, with concerns about Shingo's penis. After examining Shingo, Dr. Sharlin told them that he believed that complications had arisen from Shingo's circumcision, namely that not enough foreskin had been removed. He recommended a follow-up with Dr. Joseph Barone, Chief of the Section of Pediatric Urology at Robert Wood Johnson University Hospital, New Brunswick, New Jersey.

15. On January 21, 1998, Adam and Aiko presented Shingo to Dr. Barone for examination. Dr. Barone observed blood and scarring on Shingo Lavine's penis. He cleaned the penis, then diagnosed Shingo as suffering from phimosis and a buried penis. He recommended what he called a "second circumcision." Dr. Barone presented the "second circumcision" as if it were also routine. Thereafter, Dr. Barone performed a second circumcision surgery on Shingo. He wrote a letter that day stating that, "Shingo should do very well with the circumcision." In fact, after Dr. Barone's surgery, Shingo did not "do very well" at all. Unknown to his parents until recently, Shingo's penis had insufficient shaft skin coverage so that his erections were and are to this day too tight and pull pubic skin onto the shaft. In addition, Shingo had and has pubic hair bearing skin down to the circumcision scar line, which is unsightly, and which interferes with normal sexual functioning.

16. When Shingo reached adolescence, he suffered from physical complications caused by the circumcisions, including painful erections, meatal stenosis (narrowing of the urethral opening), scrotal webbing, and hypersensitivity of the glans.

4

17. By June 2020, Shingo experienced serious angst and anger that physicians had circumcised him, twice, and had caused his injuries, when he had been in perfect health at birth, did not need the operation, would not have chosen it for himself, and was powerless to prevent it. He was and is also unhappy with the unsightly appearance of his penis.

18. In June 2020, Shingo discovered that although it is a common sentiment in the United States is that circumcision is normal and good for health, and that one would have utterly no reason for experiencing the feelings that he has, he is by no means alone: many circumcised men in the U.S. share the same anger and profound sense of loss as Shingo, and many, like him, suffer from various physical and psychological complications.

19. On or about June 15, 2020, Shingo became involved with Foregen, a medical organization devoted to regenerating foreskin, specifically the specialized structures including nerve endings that are removed or destroyed during circumcision.

20. On or about June 15, 2020, Shingo began partial restoration of his foreskin, a highly intensive daily routine to attempt to recover the denuded glans by stretching the loose skin of the penile shaft, although circumcision is irreversible surgery, and the specialized erotogenic nerves are lost forever when it is performed. Upon information and belief, more than 60,000 men in the United States currently practice foreskin restoration. It requires wearing weights attached to the penis and pulling for 3-4 hours per day for 5-10 years, which is very uncomfortable and time consuming. Shingo has spent more than 700 hours over the course of almost 1,000 sessions as part of the process to partially "restore" his foreskin.

21. On July 29, 2020, Shingo began psychotherapy to try to cope with the severe emotional distress he feels about his circumcision, but to date it has not diminished his distress.

## DELAYED DISCOVERY THAT SHINGO, ADAM, AND AIKO WERE DEFRAUDED

22. Notwithstanding the physical issues that Shingo started becoming aware of in adolescence, none of the Lavines had any reason to question the circumcisions or the result, given the pervasiveness of the procedure in American culture.

23. The Lavines only became truly aware of how the physical issues Shingo was experiencing related to the circumcisions when the Lavines spoke with the law professor Peter W. Adler, an expert on circumcision and the law, on September 25, 2020. Professor Adler informed them that the foreskin is a natural body part and the most sensitive part of the penis, men value it, and physicians in most countries outside the United States leave it alone. Unnecessary surgery on a child violates the ethical and legal right of boys and the men they become to bodily integrity and self-determination. Circumcision, which began as a sacrificial religious ritual and painful rite of passage, is violence and genital mutilation, the opposite of medicine, and a fraud when performed by physicians and hospitals in the U.S., as explained in two law review articles.[1] First, physicians target newborn boys unable to refuse, mothers who are incapacitated, give fathers only minutes to decide, and badger parents who say no until they consent. This constitutes unfair, deceptive, and *fraudulent misconduct*. Second, physicians and their trade association, the American Academy of Pediatrics, make knowingly *false and fraudulent medical claims*. They portray circumcision as a normal, simple, safe, and harmless medical procedure, when they know that like any surgery it is very painful, risks many complications, can be fatal, and can cause psychological harm. They also use fear of urinary tract infections (UTIs), penile cancer, and sexually transmitted infections, including HIV, to sell circumcision to parents, when the treatment for UTIs is antibiotics, boys are not at risk of adult diseases, and those diseases can be prevented easily and more effectively without loss of the foreskin and the circumcision's attendant risks; and they use false diagnoses such as phimosis or a tight foreskin, which is normal in the newborn. Parental consent is therefore not fully informed, it is legally invalid, and the operation is a battery. Third, they and the AAP make the *false legal claims* that physicians have the right to operate on a healthy child and that parents have the right to elect circumcision, when circumcision violates the child's right to bodily integrity, and the child's rights supersede the parents' rights. Professor Adler told the Lavines that

[1] Matthew R. Giannetti, *Circumcision and the American Academy of Pediatrics: Should Scientific Misconduct Result in Trade Association Liability*, 85 Iowa L. Rev. 1507 (2000) at <http://www.cirp.org/library/legal/giannetti/> and Peter W. Adler, Robert Van Howe, Felix Daase, and Travis Wisdom, *Is Circumcision a Fraud?*, Cornell J. L. & Public Policy (Vol 30 No. 1 Fall 2020) at <https://www.lawschool.cornell.edu/research/JLPP/index.cfm>.

they had legal claims against the physician, medical group, and the AAP for battery, breach of fiduciary duty and hence constructive fraud (where intent to defraud is presumed, even if it is absent, to prevent unfairness).

24. The Lavines were dumbfounded to learn this, as this was the first time they had heard the normality of circumcision (which had been adopted into their worldview, as it has been for most of the American public) and the physician's right to perform it had been challenged. They realized that what Professor Adler described is exactly what had actually happened to them when Shingo was born, as detailed in this Complaint. Additionally, the Lavines were stunned to realize that the United States has one of the highest rates of circumcision in the developed world and that the AAP guidelines are opposite to the recommendations of most developed nations' medical experts.

## 1989 AAP GUIDELINES ON CIRCUMCISION

25. The AAP is an organization of physicians who specialize in pediatrics, the care of children from birth to the age of 21. The AAP is not exclusively organized for charitable or educational purposes; rather it is also organized to protect the economic welfare of its members, who practice medicine in part for a profit. The AAP actively lobbies federal and state legislatures for laws beneficial to its members. It claims to lead the pediatric medicine community in setting standards of practice and recommendations for practice. It voluntarily issues advisory reports, recommendations, and guidelines for both the medical profession as well as for the general public, including the Plaintiffs herein, upon which both the profession and the general public are expected to, and do, rely.

26. The AAP owes a duty to the general public, including the Plaintiffs herein, to tell the truth, the whole truth, and nothing but the truth when issuing reports, policy statements, and guidelines for medical care and procedures.

27. The AAP owes a duty to the general public, including the Plaintiffs herein, to refrain from failing to disclose all relevants facts and considerations when issuing reports, recommendations, and guidelines.

7

28. By words and conduct the AAP invites other medical associations such as the Ameircan College of Obstetricians and Gynecologists, obstericians and gynecologists, pediatricians, other physicians, and the general public to rely upon the AAP's reports, recommendations and guidelines.

29. In 1971 the AAP Committee on the Fetus and Newborn issued *Standards and Recommendations of Hospital Care of Newborn Infants.* In it, the AAP stated the truth that, " there are no valid indications for circumcision in the neonatal period." In 1975 an Ad Hoc Task Force of that committee found no basis for changing that statement, while stating that "there is no absolute medical indication for routine circumcison of the newborn."

30. In 1980, Springer Publishing Company, a major medical publisher in New York, published the 197 page heavily footnoted book, *Circumcision: An American Health Fallacy* by Edward Wallerstein, a medical writer. The thesis of the book is that neonatal circumcision is needless, damaging, and not medically justified. At its conclusion Wallerstein wrote: "The medical profession bears responsibility for the introduction of prophylactic circumcision without scientific basis in the past and for its continued use and rationalization without scientific basis in the present. The profession seems to accept circumcision as a 'national cultural triat' as much as do lay people. With evidence at hand to disprove the prophylactic benefits of the surgery, the medical profession has the responsibility to discourage this practice. The pretense of neutrality is a negative stance." His final paragraph stated, "**Today circumcision is a solution in search of a problem. The operation, as prophylaxis, has no place in a rational society. The final conclusion to be drawn is that routine infant health circumcision is archaic, useless, potentially dangerous, and therefore should cease.**" (Emphasis added).

31. In 1984 the AAP published a pamphlet for the parents of newborns entitled, "Care of the Uncircumcised Penis." It contained the following paragraph: **The Function of the Foreskin:** The glans at birth is delicate and easily irritated by urine and feces. The foreskin shields the glans; with circumcision, this protection is lost. In such cases, the glans and especially the urinary opening (meatus) may become irritated or infected, causing ulcers, meatitis (inflammation of the meatus), and meatal stenosis (a narrowing of the urinary opening). Such problems virtually never

8

occur in uncircumcised penises. The foreskin protects the glans throughout life. " **By 1994, the AAP had removed that paragraph from the most recent edition of its pamphlet.**

32. In 1984 Trudie London on behalf of her son Adam London, to whose circumcision shortly after birth she had consented, filed a lawsuit in Marin County, California Superior Court, Docket No. 118799, against his circumciser Mark Glasser, M.D. and Kaiser Foundation Hospitals and The Permanente Medical Group, in which she claimed that the circumcision constituted common law battery, willful cruelty, unjustifiable infliction of pain, child abuse, kidnapping, false imprisonment, and mayhem. In essence, she contended that parental consent for a medically unnecessary circumcision was legally invalid and that circumcision itself constituted battery and violated several California statutes. Although the case was not successful, it received significant publicity, including an article in the then-influential Time Magazine. This suit alarmed the medical profession, including the defendant Glasser in that lawsuit, as well as his friend and acquaintance Edgar J. Schoen, M.D., a pediatric endocronolgist and member of the AAP.

33. In Volume 23, No. 3 (1984-1985) of the *Journal of Family Law*, published by the University of Louisville School of Law, there appeared an article by William E. Brigman, an Assistant Professor, entitled "Circumcision as Child Abuse: The Legal and Constitutional Issues." In it, Professor Brigman contended, "Since circumcision is not medically warranted, has no significant physiological benefits, is painful because it is performed without anesthesia and leaves a wound in which urinary salts burn, carries significant risk of surgical complications, including death, and deforms the penis, it would seem that as a nonaccidental physical injury, it is properly included in the definition of child abuse." He opined that, "Suits for damages against surgeons, hospitals, and conceivably parents are possible . . . . " He suggested that, "The most promising approach would seem to be a civil rights class action against hospitals . . . . ".

34. Growing opposition to neonatal circumcision alarmed the medical profession, which was increasingly afraid of lawsuits. The November 15-30, 1986 issue of *Ob-Gyn News* carried an article entitled, "See Expanding Liability Risks In Circumcision." It cited another California case arising from a botched circumcision that contended that, "the procedure violated the boy's constitutional right to privacy, safety,and happiness" and also claimed that the circumcision constituted a battery. Charles Bonner, the plaintiff's attorney, claimed, according to the article,

"The boy [7 weeks old at the time] did not himself consent to the procedure, and under California law parents have no ability to consent to a medically unnecessary surgery . . . . "

35. In May 1985 a pediatrician, Thomas Wiswell, M.D., published an article in the AAP's journal *Pediatrics* that suggested that circumcision might reduce the number of urinary tract infections in boys. Almost immediately, this was latched onto by circumcision proponents such as urologist Aaron Fink, M.D., whose letter to *Pediatrics* stated, "I suspect that similar studies will be repeated elsewhere and, if confirmed, become an important reference to justify a medical indication for a newborn circumcision. It presumably might even invalidate litigation based on 'removal of the natural protection afforded by the foreskin' as well as 'by reason of wrongful and malicious acts' performed by medical as well as 'mohel' (ritual) circumcisers."

36. In 1987 Edgar J. Schoen, M.D., a friend of Mark Glasser, M.D., who had been sued in the London case, published a poem in the *American Journal of Diseases of Children,* entitled "Ode to the Circumcised Male" in which he derided those opposed to circumcision. (See Exhibit A). After noting that "third-party payers are increasiningly refusing to pay for the procedure," Schoen set forth the poem that said, "If you're the son of a Berkeley professor, your genital skin will be greater, not lesser: styled the non-circumcised state as ,genital chic"; and ended with the consoling line for the circumcised, "Just hope that one day, you can say with a smile that your glans ain't passé it will rise up in style."

37. In 1988 Aaron Fink, M.D. published a book entitled *CIRCUMCISION: A Parent's Decision for Life.* In it he alleged that circumcision had potential medical benefits and he derided the idea that loss of sensation occurs because of circumcision.

38. In 1988 or 1989 Edgar J. Schoen, M.D. volunteered to chair a Task Force of the AAP on Circumcision. Dr. Schoen was a zealous proponent of circumcision whose poem suggested that he had undisclosed religious and personal motives for advocating circumcision that went beyond medicine. Dr. Schoen additionally expressed alarm that but for recent evidence that circumcision potentially decreased the rate of urinary tract infections, third party insurance payers would stop covering it, and "the anti-circumcision tide" would prevail.

39. The Task Force issued a "Report of the Task Force on Circumcision (RE9148)," which was published in the AAP's journal *Pediatrics* in August 1989 ("1989 Guidelines"). (See Exhibit B). Those were the AAP guidelines regarding circumcision in place at the time of Shingo's birth and subsequent circumcisions.

40. The 1989 Guidelines did not contain any information on the functions of the foreskin, the tissue that is removed by circumcision, even though the AAP in its 1984 pamphlet for parents had explained some of its functions and thus was aware of them. (See Exhibit C). This section was removed in its 1994 pamphlet. (See Exhibit D).

41. The AAP issued its 1989 Guidelines specifically to protect the medical profession in general, and pediatricians in particular, from legal liability for performing unnecessary, risky, debilitating, damaging surgery, circumcision, on the penises of minor boys, and to protect the pocketbooks of AAP members, many of whom perform neonatal circumcision for money.

42. The 1989 AAP Policy Statement contained numerous intentional misrepresentations and omissions[2] as detailed in Count III of this Complaint.

43. As much of its justification for promulgating its 1989 Guidelines, the AAP claims that boys who have not been circumcised show an increased rate of urinary tract infections. The AAP itself stated that the studies may have methodologic flaws; UTIs can be treated with antibiotics; and Dr. Thomas Wiswell, the doctor responsible for the studies, has stated that there was tremendous financial incentive for doctors to continue performing circumcisions routinely on neonatal boys.

44. The 1989 Guidelines did not disclose the risk of parental anger and regret, despite the fact that the London case and the increasing opposition to circumcision as noted above had alerted the AAP to that very real risk. Adam and Aiko are angry that defendants did not fully inform them about circumcision, in which case they would have stopped Dr. Chait and the hospital from performing the unnecessary operation. It has created tremendous hardship for Adam and Aiko Lavine to try to

---

[2] See Matthew R. Giannetti. *Circumcision and the American Academy of Pediatrics: Should Scientific Misconduct Result in Trade Association Liability*, 85 Iowa L. Rev. 1507 (2000) at <http://www.cirp.org/library/legal/giannetti/>.

come to terms with the strained relationship with their son caused by the first circumcision surgery and subsequent revision surgery.

## COUNT I
### (Intentional Fraud)
### Princeton Medical Group, P.A.

45. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 44 as if set forth at length herein.

46. Dr. David Chait was acting as an employee and agent of Princeton Medical Group, P.A. and within the course and scope of his employment relationship with it when he solicited permission to circumcise Shingo and when he performed the circumcision. At all times relevant hereto Dr. Chait, as a physician, was in a fiduciary relationship with the Plaintiffs and owed them a duty of care as a fiduciary to act with the utmost good faith in his dealings with them.

47. Dr. Chait, acting within the course and scope of his employment and agency with Princeton Medical Group, P.A., failed to act with the utmost good faith and intentionally defrauded Adam and Aiko Lavine into permitting the circumcision of their newborn son Shingo by the following unfair and deceptive misconduct, misrepresentations, and omissions; which Dr. Chait intended the Plaintiffs Adam and Aiko Lavine rely upon; which they did rely upon; and which resulted in the damages to them and to Shingo Lavine that are complained of herein.

- Fraudulent conduct in the hospital, including, without limitation: not obtaining written parental permission, or hiding the permission form in a hospital admission form; targeting a newborn baby boy, Shingo Lavine, who was unable to refuse; targeting Aiko Lavine and not giving her the opportunity to participate when she was legally incapacitated and would have refused; and giving Adam Lavine only a few minutes to make the circumcision decision, an unfair high-pressure sales tactic that constituted coercion and duress.

- Making false medical claims (express, implied, or by omission), including without limitation: not disclosing that physicians in most countries leave boys genitally

intact and that circumcision is controversial; falsely portraying circumcision to the Lavine parents as a normal and routine part of childbirth; not disclosing that the foreskin is a natural body part, highly erogenous, and functional, and that men value it; not disclosing that circumcision is unnecessary and not medically indicated; not disclosing that it is irreversible surgery; claiming that circumcision has potential medical benefits when it does not benefit most boys or men at all, when any benefits can be achieved without it, and when it did not benefit Shingo Lavine; mentioning urinary tract infections as a reason to circumcise when UTIs can be easily treated with antibiotics; using the scare tactic of mentioning prevention of penile cancer and STDs including HIV, when circumcision does not prevent them, boys are not at risk of those diseases, and they can be easily prevented without loss of the foreskin; not disclosing that circumcision is extremely painful, and circumcising Shingo Lavine without any pain relief or without adequate pain relief during and after the surgery; not disclosing that circumcision risks more than 50 minor and serious complications including the physical injuries that Shingo Lavine suffers from; not disclosing that circumcision can be fatal; not disclosing the risk of psychological harm that Shingo Lavine suffered and suffers from; not disclosing that circumcision could impair Aiko and Adam Lavine's relationship with their son and that the Lavine parents might come to regret the circumcision.

- Making the implied false claim that it is ethical and legal for physicians to perform irreversible unnecessary genital surgery on a healthy infant, and to solicit parental consent to do so.

48. But for the foregoing misconduct, misrepresentations, and omissions, Adam Lavine would not have given permission to have his son circumcised. If fully informed about the pain, risks, and harms of circumcision, both Adam Lavine and Aiko Lavine would have told Dr. Chait not to perform the unnecessary operation.

49. By the foregoing misconduct, misrepresentations, and omissions, Dr. Chait intentionally defrauded the Plaintiffs Adam Lavine, Aiko Lavine, to their damage and to the damage of Shingo Lavine and Princeton Medical Group, P.A. is liable to them for said fraud pursuant to the doctrines of agency and *respondeat superior.*

WHEREFORE, Plaintiffs demand judgment that the defendant Princeton Medical Group, P.A., acting by and through its employee and agent Dr. Chait, intentionally defrauded the Plaintiffs, and they pray for the relief requested below.

### COUNT II

#### (Constructive Fraud)

#### Princeton Medical Group, P.A.

50. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 49 as if set forth at length herein.

51. When a physician violates the trust that a patient (here Shingo Lavine) and/or those representing him (here Adam and Aiko Lavine) places in the physician in the slightest way by any unfair or wrongful act—including without limitation by fraud, breach of fiduciary duty, mistake, undue influence, or the physician unjustly enriches himself—a cause of action lies for constructive fraud, where fraud is presumed even if intent to defraud is absent.

52. The misconduct, misrepresentations, and omissions described in this Complaint and in Count I constitute unfair and wrongful acts, including, without limitation, unfairness, fraudulent conduct, fraudulent medical claims, fraudulent legal claims, breach of fiduciary duty, mistake, coercion, duress, undue influence; and Dr. Chait and Princeton Medical Group, P.A. unjustly enriched themselves at the expense of their healthy "patient" Shingo Lavine. Dr. Chait thereby committed constructive fraud against the Plaintiffs, which damaged them. Princeton Medical Group, P.A. is liable to them for said constructive fraud pursuant to the doctrines of agency and *respondeat superior*.

WHEREFORE, Plaintiffs demand judgment that Princeton Medical Group, P.A. committed constructive fraud against them, and they pray for the relief requested below.

### COUNT III

#### (Intentional Fraud)

#### The American Academy of Pediatrics

53. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 52 as if set forth at length herein.

54. As set forth above, Dr. Chait referenced the AAP's circumcision policy statement then in effect (the "1989 Guidelines") when he solicited Adam Lavine's permission to circumcise Shingo Lavine and when he portrayed circumcision as routine, as medicine, and as a parental right.

55. Adam Lavine, who knew nothing about medicine or medical aspects of circumcision—and who was representing his newborn son and his incapacitated wife at the time—relied upon Dr. Chait's reference to those AAP guidelines in support of circumcision when he consented to the circumcision.

56. The AAP 1989 Guidelines contain numerous false and fraudulent representations and omissions as set forth herein; the AAP knew that they were false or made them with reckless disregard of their falsity; the AAP intended that physicians, here Dr. Chait, and parents offered circumcision representing boys, here Adam Lavine representing Shingo and Aiko Lavine, rely upon them; the Lavines did rely upon them; damages resulted from such reliance; and the AAP thereby defrauded the Plaintiffs.

57. Undisclosed Financial Bias. The 1989 AAP Guidelines fail to disclose that the AAP is not only a medical association but also a trade association representing the financial interest of its members. The AAP failed to disclose the financial bias of at least some of the committee members in perpetuating circumcision for financial reasons, and that at least some of the committee members were not neutral.

58. Undisclosed Religious Bias. Upon information and belief, one or more members of the committee that wrote the 1989 Guidelines were Jewish, including Dr. Schoen. Circumcision is a sacred religious rite among Jews. The AAP failed to disclose the religious bias of at least one and perhaps more of its committee members in favor of perpetuating circumcision, and he or they were not neutral.

59. Undisclosed Cultural Bias. The 1989 AAP Guidelines fail to disclose that the U.S. is an outlier among physicians worldwide in circumcising healthy boys, and that its authors were culturally biased in favor of circumcision and not neutral.

60. Not Common or Routine or Medicine. The 1989 Guidelines state that most male infants born in this country are circumcised during in the newborn period, implying that it is a routine part of the practice of medicine. This fails to disclose that non-therapeutic circumcision by physicians is uncommon outside the U.S.; that it is unlike anything else in medicine worldwide as physicians do not solicit parental permission to surgically remove other healthy parts of their child's body and take orders from parents to do so; and that non-therapeutic circumcision, or circumcision that is not needed to treat a medical condition, is violence, the opposite of medicine.

61. Undisclosed Controversy. The 1989 AAP Guidelines fail to disclose that circumcision has been controversial for years, and they fail to disclose that there is widespread opposition to the practice on medical, ethics, and legal grounds inside and outside the U.S.

62. Unethical. The 1989 AAP Guidelines falsely claim by omission that circumcision is ethical when it violates numerous provisions of the AMA Code of Medical Ethics, including the prohibition against unnecessary surgery, and the general rules of medical ethics: autonomy; non-maleficence ("First, Do No Harm"); beneficence ("do good); proportionality; and justice or fairness.

63. Unlawful and a Crime. The 1989 AAP Guidelines falsely claim by omission that it is legal for physicians to circumcise or perform unnecessary genital surgery on healthy boys when it violates a child's right to bodily integrity and self-determination, constitutes a battery, which is a tort and a crime, and as William E. Brigman showed in his 1984 law review article, it is statutory criminal child abuse in every U.S. state,[3] including New Jersey.

64. Scientific Misconduct. The 1989 AAP Guidelines did not follow accepted scientific methods; its pro-circumcision conclusions were not scientifically defensible; and its authors engaged in scientific misconduct.

65. Pain Understated. The 1989 AAP Guidelines state, "Infants undergoing circumcision without anesthesia demonstrate physiologic responses suggesting that they are experiencing pain." This understates pain as circumcision is one of the most painful procedures in neonatal medicine. The AAP states that behavioral changes arising from pain are transient, not disclosing that pain continues for many days after the circumcision.

66. No Anesthetics. The AAP knew that circumcision is extremely painful and that the pain continues after the operation, but it did not even recommend that anesthesia be used to try to lessen the pain during and after the operation.

67. False Claim that Circumcision is Safe. The AAP claimed in 1989 that "[c]ircumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique." The AAP knows that circumcision is not safe. It risks many complications. The 1989 Guidelines admit that the "exact incidence of postoperative complications is unknown," while deceptively suggesting that "the rate is low." This ignores the fact that a significant part of the surgical practice of pediatric urologists is made up of treating circumcision complications or sequelae, a fact that had to be known to the prominent urologist on the committee, Frank Hinman, Jr., M.D., author of a major text on pediatric urologic surgery.

---

[3] William E. Brigman. Circumcision as Child Abuse: The Legal and Constitutional Issues, 23 J Fam Law 337 (1985).

68. Failure to Disclose Lack of Training. The AAP failed to disclose that many physicians who perform circumcisions are not well trained, even though at least one member of the committee had to have known this to be so.

69. Undisclosed and Understated Complications. (a) The AAP failed to disclose most of the complications of circumcision--there are more than 50—or the complications that Shingo Lavine suffers from including painful erections, scrotal webbing, hypersensitivity of the glans, and unsatisfactory cosmetic appearance. (b) The AAP understated the rate of complications at 0.2% and 0.6% when according to one study the rate is as high as 13%. (c) The AAP failed to take into account complications that occur later in childhood and in adulthood. (d) The AAP did not disclose severe complications such as the risk of cutting off all or part of the glans penis. (e) The AAP misrepresented the rate of severe complications, which is as high as 2-4%. (f) The AAP stated, "The exact incidence of postoperative complications is unknown." Thus, the AAP knew that it did not have enough data to conclude that circumcision is safe in 1989. (g) The most common complication following male circumcision, meatal stenosis, which is a narrowing of the urethral opening that interferes with micturition, is seen in 5% to 20% of boys following circumcision, and happened to Shingo Lavine, is only addressed in passing: "There is no evidence that meatitis leads to stenosis of the urethral meatus."

70. Risks Unknown. The 1989 Guidelines advise physicians to inform parents of the risks, but this is impossible as the Guidelines state, "The exact incidence of postoperative complications is unknown."

71. Not Harmless. The 1989 AAP guidelines imply by omission that circumcision is harmless when properly performed. The AAP did not discuss the anatomy and physiology of the foreskin of the penis, however, the body part being irreversibly amputated. The AAP did not disclose that the foreskin is highly erogenous, as has been known since ancient times; that its inner lining is a moist and mobile mucous membrane, which reduces friction during masturbation and sexual intercourse. The AAP did not disclose that men prize the foreskin and that men who have one rarely volunteer to part with it. Thus, the AAP assigned no value to the foreskin that circumcision irreversibly amputates, even though males do, and thereby impliedly told parents asked to make the circumcision decision, here the Lavines, relying on the AAP's guidelines, that the foreskin is worthless.

72. No Disclosure of the Risk of Psychological Harm. The AAP did not disclose that boys and men may be angry to have been circumcised and that circumcision can cause psychological harm.

73. No Disclosure of the Risk of Parental Regret. The AAP did not disclose that boys and men may be angry that their parents gave permission to have them circumcised, which they would not have chosen for themselves; that this may impair the relationship between parents and son; and that parents may regret having given permission.

74. Thus, the AAP 1989 Guidelines promoted circumcision by falsely portraying it as medicine, and as the simple, safe, and painless snip of a worthless piece of skin. Although the American public often refers to circumcision as a "snip," the AAP did not correct the public's false belief in the Guidelines.

75. False Claims About UTIs. The AAP promoted circumcision in its 1989 Guidelines largely based on the claim that it reduces the risk of urinary tract infections. But the AAP knew that "these studies [about UTIs] may have methodologic flaws." The AAP failed to state the simple fact that UTIs in boys can easily be treated with antibiotics, as they are in girls. They failed to point out that girls have many times more UTIs than boys, circumcised or not.

76. False Claims About Penile Cancer. Penile cancer is a rare disease that occurs in old age. Boys are not at risk of it. The AAP also knew, as it stated in 1975, that, "optimal hygiene confers as much or nearly as much protection against penile cancer as circumcision," and a "great deal of unnecessary surgery, with attendant complications would have to be done if circumcision were to be used as prophylaxis against [penile cancer]". The possible reduction in penile cancer is not a valid medical reason to circumcise, so the Guidelines should have not discussed them as a reason to elect circumcision, in which case Dr. Chait would not have advanced penile cancer citing the AAP Guidelines as a reason to do so. The AAP deviated without valid scientific evidence from its 1975 AAP Policy Statement on circumcision, which found no solid evidence for using circumcision to prevent penile cancer. The mention of penile cancer is a scare tactic designed to sell circumcision.

77. False Claims About STDs. The AAP truthfully stated in 1975 that, "evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting." Similarly, the AAP 1989 Guidelines state, "Evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting" and that "methodologic problems render these reports about some STDs inconclusive". In any event, newborn boys and older boys are not at risk of STDs. Furthermore, males must still practice safe sex to avoid STDs and HIV. As the AMA later wrote in 1999, circumcision cannot responsibly be advanced as protection against STDs. The Guidelines should have not discussed them as a reason to elect circumcision, and Dr. Chait should not have advanced STDs and HIV, citing the AAP Guidelines, as a reason to do so. The AAP's mention of STDs is a scare tactic designed to sell circumcision.

78. The AAP did not disclose that even granting the AAP's claims, for example that it reduces the risk of UTIs by 1%, circumcision has little prospect of benefiting any boy or man, violating the ethical rule that medical procedures must do good. And insofar as circumcision is painful, risky, and causes substantial harm in every case, it violates the ethical rule, "First, Do No Harm".

79. As physicians and members of a medical organization issuing medical guidelines, the members of the 1989 task force on circumcision had an ethical and legal duty to use their independent

medical judgment to determine whether circumcision is medically indicated and hence justified or not, and, if not, as the AAP stated in 1971 and 1975, to recommend against it. The implied legal claim by the AAP in 1989 that physicians have the right to perform the operation, and to take orders from parents who know little or nothing about medicine to do so, is false and was known by the AAP to be false. The rule for physicians is: do not operate on a healthy child; only operate on a child when he or she needs the operation. The AAP Guidelines were completely fraudulent in promoting circumcision, if parents elect it, when physicians are not allowed to perform the operation unless it is medically necessary.

80. To the extent that the members of the 1989 AAP task force on circumcision did not have knowledge of the falsity of any its false claims enumerated above, they and the AAP acted recklessly in disregard of the truth or falsity or said claim or claims, and are liable for fraud.

81. The AAP thereby intentionally defrauded Adam Lavine, acting on behalf of his son Shingo Lavine and his wife Aiko Lavine, and therefore intentionally defrauded the three Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment that the American Academy of Pediatrics committed intentional fraud against them, and they pray for the relief requested below.

## COUNT IV

### (Constructive Fraud)

### The American Academy of Pediatrics

82. Plaintiffs repeat and re-allege the facts and allegations in Paragraphs 1-81 as if set forth at length herein.

83. The AAP is a medical organization, comprised of physicians licensed to practice medicine, that issues guidelines for physicians to follow in the practice of medicine and here, the practice of circumcision.

84. The AAP owes a fiduciary duty to patients and their legal representatives who learn about or are informed about and who rely upon the AAP's circumcision guidelines, here Adam Lavine's reliance on the AAP's 1989 Policy Statement.

85. When the AAP violates the trust that a physician (here Dr. Chait), a patient (here Shingo Lavine) and/or those representing him (here Adam and Aiko Lavine) places in the AAP by some wrongful or unfair act—including without limitation by unfair conduct, unethical conduct, unlawful conduct, by fraud, breach of fiduciary duty, mistake, undue influence, coercion, duress,

19

or unjustly enriches itself—a cause of action lies for constructive fraud, even if intent to defraud is absent.

86. The AAP's wrongful and unfair acts enumerated in this Complaint and in Count III—including without limitation undisclosed conflicts of interest, scientific misconduct, failure to use independent and neutral medical judgment, fraudulent medical claims and omissions, scare tactics, fraudulent legal claims and omissions, promotion of unethical conduct, violation of boys' rights, breach of fiduciary duty, unfairness, mistake, undue influence, coercion, duress, and unjust enrichment—constitute constructive fraud.

**WHEREFORE**, Plaintiffs demand judgment that the American Academy of Pediatrics committed constructive fraud against them, and they pray for the relief requested below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Shingo Lavine, Adam Lavine, and Aiko Lavine demand judgement against defendants, Princeton Medical Group, P.A. and the American Academy of Pediatrics, Inc. and they seek the following relief:

(a) Compensation for Shingo Lavine for the pain caused by each of the two circumcisions; the pain caused by his injuries; for the emotional distress, suffering, stress, pain, and mental anguish caused by the circumcisions.

(b) Compensation for the pain and pain and suffering and emotional distress associated with attempting partial foreskin restoration to try to mitigate the damage caused by the circumcisions; and compensation for the time spent and that will be spent on foreskin restoration.

(c) Compensation for the mental anguish suffered by Adam and Aiko Lavine as a result of the two circumcisions.

(d) Attorneys' fees, pre- and post-judgment interest and costs of this lawsuit;

(e) Punitive damages; and

(f) Such other relief as the court may deem just and equitable under the circumstances.

_____

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated: February 4, 2021

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 4:35-1(a) and (b) respectively, Plaintiffs respectfully demand a trial by jury on all issues in the within action so triable.

Dated: February 4, 2021                    BY: _____

ANDREW DELANEY, ESQ.

## DESIGNATION OF TRIAL COUNSEL

In accordance with Rule 4:25-4, Andrew DeLaney, Esq. is hereby designated as trial counsel on behalf of Plaintiffs.

Dated: February 4, 2021                    BY: _____

ANDREW DELANEY, ESQ.

## CERTIFICATION

The undersigned hereby certifies that the matter in controversy between the parties herein is not the subject of any other action pending in any Court or any arbitration proceeding, and that no other action or arbitration proceeding with respect to the matter in controversy is contemplated.

The undersigned further certifies that the names of any non-parties who should be joined in the action pursuant to Rule 4:28, or who are subject to joinder pursuant to Rule 4:29-1(b)

because of potential liability to any party on the basis of the facts set forth in the within complaint are: None.

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

Dated: February 4, 2021                     BY: _____
                                            ANDREW DELANEY, ESQ.

## LIST OF ATTACHED EXHIBITS

### EXHIBIT A

"Ode to the Circumcised Male," Poem by Edgar Schoen, M.D., chair of the 1989 Task Force of the AAP on Circumcision

### EXHIBIT B

"Report of the Task Force on Circumcision, RE9148" *Pediatrics*, 989;84(4):388-91 (August, 1989)

### EXHIBIT C

"Care of the Uncircumcised Penis," AAP Pamphlet, 1984

### EXHIBIT D

"Newborns: Care of the Uncircumcised Penis," AAP Pamphlet, 1994

# EXHIBIT A


mother-child resemblances as adult-hood approaches, again without apparent influence of the sex of the child.[4]

STANLEY M. GARN, PhD
TIMOTHY V. SULLIVAN
The Center for Human Growth
and Development
The University of Michigan
300 North Ingalls Bldg
Ann Arbor, MI 48109

1. Ruvalcaba RHA: Familial sexual precocity. *AJDC* 1986;140:742.
2. Garn SM: Continuities and changes in maturational timing, in Brim OG, Kagan J (eds): *Constancy and Change in Human Development.* Cambridge, Mass, Harvard University Press, 1980, pp 113-162.
3. Garn SM, Bailey SM: Genetics of maturational processes, in Falkner F, Tanner JM (eds): *Human Growth.* New York, Plenum Publishing Corp, 1978, pp 307-330.
4. Garn SM, Rohmann CG: Interaction of nutrition and genetics in the timing of growth and development. *Pediatr Clin North Am* 1966;13: 353-379.

### 'Ode to the Circumcised Male'

*Sir.*—Before the mid-1970s, the American standard of care included neonatal circumcision, a minor surgical procedure that promoted genital hygiene and prevented later penile cancer as well as cervical cancer in female sexual partners. More recently, evidence has suggested that adequate hygiene is all that is needed and that circumcision is an unnecessary and traumatic procedure. In 1983, the American Academy of Pediatrics and the American College of Obstetrics and Gynecology jointly agreed that routine circumcision is not necessary,[1] and third-party payers are increasingly refusing to pay for the procedure. Whether recent evidence of a decreased incidence of urinary tract infections in circumcised male infants[2] can stem the anticircumcision tide is questionable.

The purpose of this communication is to offer some solace to the generations of circumcised males who are now being told that they have undergone an unnecessary and deforming procedure, which may also have been brutal and psychologically traumatic. To them I offer these lines:

Ode to the Circumcised Male
We have a new topic to heat up our passions—the foreskin is currently top of the fashions.
If you're the new son of a Berkeley professor, your genital skin will be greater, not lesser.
For if you've been circ'ed or are Moslem or Jewish, you're outside the mode; you are old-ish not new-ish.

You have broken the latest society rules; you may never get into the finest of schools.
Noncircumcised males are the "genital chic"—if your foreskin is gone, you are now up the creek.
Its a great work of art like the statue of Venus, if you're wearing a hat on the head of your penis.
When you gaze through a looking glass, don't think of Alice; don't rue that you suffered a rape of your phallus.
Just hope that one day you can say with a smile that your glans ain't passé; it will rise up in style.

EDGAR J. SCHOEN, MD
Department of Pediatrics
Kaiser Permanente
Medical Center
280 W MacArthur Blvd
Oakland, CA 94611

1. American Academy of Pediatrics and American College of Obstetrics and Gynecology: *Guidelines for Perinatal Care.* Evanston, Ill, AAP/ACOG, 1983.
2. Wiswell TE, Smith FR, Bass JW: Decreased incidence of urinary tract infections in circumcised male infants. *Pediatrics* 1985;75: 901-903.

### Gastric Acid Aspiration Possible During Flexible Endoscopy Without General Anesthesia

*Sir.*—I wish to comment on Dr Bendig's recent article, "Removal of Blunt Esophageal Foreign Bodies by Flexible Endoscopy Without General Anesthesia."

I suggest that Dr Bendig has been fortunate in avoiding pulmonary aspiration of gastric contents in his patients, a life-threatening complication. Animal studies have suggested a critical gastric volume of 0.4 mL/kg and a pH of 2.5 or less as predisposing to serious pulmonary aspiration.[2] Pediatric patients are even more likely than adults to exceed this critical volume and pH.[3,4] Coté et al[5] found 50 of 51 pediatric patients to have gastric pH less than 2.5 immediately after induction of general anesthesia. Of these 51 children, 76% had gastric pH less than 2.5 and gastric volume greater than 0.4 mL/kg, placing them at risk for acid aspiration syndrome.

I suspect that many of Dr Bendig's patients were also at risk for acid aspiration both intraoperatively and postoperatively, despite the six-hour nothing-by-mouth period. Dr Bendig used chlorpromazine hydrochloride, meperidine hydrochloride, and diazepam to sedate his patients, a combination similar to "lytic cocktail," except for the substitution of diazepam for pro-

methazine. In addition, t ynx was topically anesth lidocaine or benzocaine. ability to perform esophi otherwise uncooperativ speaks for their inability to airways—the cough and p were abolished. When a pa protect and control his airway, it is the responsi physician to control it to p gerous aspiration. Dr Ben that "there were no com sedation or of the endoscop Was aspiration looked fos tively? Did all children h postoperative chest roent Did no child have a temper tion postoperatively?

General anesthesia wi cheal intubation provides trol and considerable prot pulmonary aspiration of tents. Recovery from an anesthetic is also much from the above-mentioned suggest that the risks fr anesthesia in this situati than that of gastric acid a

Despite Dr Bendig's c trained pediatric suppor and equipment be available if airway obstruction or tent regurgitation were t would not arrive in time. more prudent to have an volved at the start. I also one takes Dr Bendig's su couragement to perform dure without appropriate s sonnel and equipment.

MICHAEL J. KISEI
Department of Anⁱ
Geisinger Medical
Danville, PA 1782:

1. Bendig DW: Removal of b foreign bodies by flexible and general anesthesia. *AJDC* 1986:
2. Greenfield LJ, Singleton DR, et al: Pulmonary effects graded aspiration of hydrochlorit 1969;170:74-84.
3. Tessbeault JR II: Aspiration tents: An experimental study. *A* 28:51-87.
4. Salem MR, Wong AY, Ma medicant drugs and gastric juic in pediatric patients. *Anesth.* 216-219.
5. Coté CJ, Goudsouzian MD Assessment of risk factors relat tion syndrome in pediatric pati and residual volume. *Anesth.* 70:72.

*In Reply.*—Dr Kibelbek with the potential risk of gastric contents utilizi

# EXHIBIT B

- 623 -



Task Force on Circumcision

# Report of the Task Force on Circumcision (RE9148)

The 1971 edition of *Standards and Recommendations of Hospital Care of Newborn Infants* by the Committee on the Fetus and Newborn of the American Academy of Pediatrics (AAP) stated that "there are no valid medical indications for circumcision in the neonatal period."[1(p110)] In 1975, an Ad Hoc Task Force of the same committee reviewed this statement and concluded that "there is no absolute medical indication for routine circumcision of the newborn."[2(p87)] The 1975 recommendation was reiterated in 1983 by both the AAP and the American College of Obstetrics and Gynecology in the jointly published *Guidelines to Perinatal Care.*[3]

Large-scale studies of US hospitals indicate that most male infants born in this country are circumcised in the newborn period,[4] although the circumcision rate recently appears to be decreasing.[5] Since the 1975 report, new evidence has suggested possible medical benefits from newborn circumcision. Preliminary data suggest the incidence of urinary tract infection in male infants may be reduced when this procedure is performed during the newborn period. There is also additional published information concerning the relationship of circumcision to sexually transmitted diseases and, in turn, the relationship of viral sexually transmitted diseases to cancer of the penis and cervix.

## DEFINITIONS, PENILE HYGIENE, AND LOCAL INFECTIONS

The penis consists of a cylindrical shaft with a rounded tip (the glans). The shaft and glans are separated by a groove called the coronal sulcus. The foreskin, or prepuce, is the fold of skin covering the glans. At birth, the prepuce is still developing histologically, and its separation from the glans is usually incomplete. Only about 4% of boys have a retractable foreskin at birth, 15% at 6 months, and

The recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed. Variations, taking into account individual circumstances, may be appropriate.

PEDIATRICS (ISSN 0031 4005). Copyright © 1989 by the American Academy of Pediatrics.

50% at 1 year; by 3 years, the foreskin can be retracted in 80% to 90% of uncircumcised boys.[6]

Phimosis is stenosis of the preputial ring with resultant inability to retract a fully differentiated foreskin. Paraphimosis is retention of the preputial ring proximal to the coronal sulcus, creating a tension greater than lymphatic pressure resulting in subsequent edema of the prepuce and glans distal to the ring. Balanitis is inflammation of the glans, and posthitis is inflammation of the prepuce; these conditions usually occur together (balanoposthitis). Meatitis is inflammation of the external urethral meatus.

Newborn circumcision consists of removal of the foreskin to near the coronal sulcus performed in early infancy (before age 2 months). The procedure prevents phimosis, paraphimosis, and balanoposthitis. Meatitis is more common in circumcised boys. There is no evidence that meatitis leads to stenosis of the urethral meatus.

It is particularly important that uncircumcised boys be taught careful penile cleansing. As the boy grows, cleansing of the distal portion of the penis is facilitated by gently, never forcibly, retracting the foreskin only to the point where resistance is met. Full retraction may not be achieved until age 3 years or older.

A small percentage of boys who are not circumcised as newborns will later require the procedure for treatment of phimosis, paraphimosis, or balanoposthitis. When performed after the newborn period, circumcision may be a more complicated procedure.[7]

## CANCER OF THE PENIS

The overall annual incidence of cancer of the penis in US men has been estimated to be 0.7 to 0.9 per 100 000 men and the mortality rate is as high as 25%.[8-11] This condition occurs almost exclusively in uncircumcised men.[12-14] In five major reported series since 1932, not one man had been circumcised neonatally.[11,15-19] The predicted lifetime risk of cancer of the penis developing in an uncircumcised man has been estimated at 1 in 600 men in the United States[20]; in Denmark, the estimate is 1 in 909 men.[21] In developed countries where

- 624 -

neonatal circumcision is not routinely performed, the incidence of penile cancer is reported to range from 0.3 to 1.1 per 100 000 men per year.[4] This low incidence is about half that found in uncircumcised US men, but greater than that in circumcised US men.

Factors other than circumcision are important in the etiology of penile cancer. The incidence of penile cancer is related to hygiene. In developing nations with low standards of hygiene, the incidence of cancer of the penis in uncircumcised men is 3 to 6 per 100 000 men per year.[22] The decision not to circumcise a male infant must be accompanied by a lifetime commitment to genital hygiene to minimize the risk of penile cancer developing. Recently, human papillomavirus types 16 and 18 DNA sequences have been found in 31 of 53 cases of penile cancer, suggesting the importance of these viruses in the development of this condition.[23] Poor hygiene, lack of circumcision, and certain sexually transmitted diseases all correlate with the incidence of penile carcinoma.

## URINARY TRACT INFECTIONS

A 1982 series of infants with urinary tract infections noted that males preponderated, contrary to female preponderance later in life, and that 95% of the infected boys were uncircumcised.[24] Beginning in 1985, studies conducted at US Army hospitals involving more than 200 000 men showed a greater than tenfold increase in urinary tract infections in uncircumcised compared with circumcised male infants; moreover, as the rate of circumcision declined throughout the years, the incidence of urinary tract infection increased.[5,25] In another army hospital study, infants were examined in the first month of life and it was concluded that the high incidence of urinary tract infection in uncircumcised boys was accompanied by a similarly increased incidence of other significant infection, including bacteremia and meningitis[26]; however, the authors of that study did not distinguish between bacteriuria secondary to septicemia and primary urinary tract infection. Still another recent army hospital study lends support to a 1986 hypothesis that circumcision prevents preputial bacterial colonization and thus protects male infants against urinary tract infection.[27,28] It should be noted that these studies in army hospitals are retrospective in design and may have methodologic flaws. For example, they do not include all boys born in any single cohort or those treated as outpatients, so the study population may have been influenced by selection bias.

## SEXUALLY TRANSMITTED DISEASES

Evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting.

Early series indicated a higher risk of gonococcal and nonspecific urethritis in uncircumcised men,[29,30] whereas one recent study shows no difference in the incidence of gonorrhea and a higher incidence of nonspecific urethritis in circumcised men.[31] Although published reports suggest that chancroid, syphilis, human papillomavirus, and herpes simplex virus type 2 infection are more frequent in uncircumcised men, methodologic problems render these reports inconclusive.[29,30,31-34]

## CERVICAL CARCINOMA

There appears to be a strong correlation between squamous cell carcinoma of the cervix and sexually transmitted diseases. Human papillomavirus types 16 and 18 are the viruses most commonly associated with cancer of the cervix[35-38]; Herpes simplex virus type 2 has also been linked with cervical cancer.[38,39] Although human papillomavirus types 16 and 18 are also associated with cancer of the penis,[22,23] evidence linking uncircumcised men to cervical carcinoma is inconclusive. The strongest predisposing factors in cervical cancer are a history of intercourse at an early age and multiple sexual partners. The disease is virtually unknown in nuns and virgins.

## PAIN AND BEHAVIORAL CHANGES

Infants undergoing circumcision without anesthesia demonstrate physiologic responses suggesting that they are experiencing pain.[40] The observed responses include behavioral, cardiovascular, and hormonal changes. Pain pathways as well as the cortical and subcortical centers necessary for pain perception are well developed by the third trimester. Responses to painful stimuli have been documented in neonates of all viable gestational ages. Behavioral changes include a cry pattern indicating distress during the circumcision procedure and changes in activity (irritability, varying sleep patterns) and in infant-maternal interaction for the first few hours after circumcision.[41-43] These behavioral changes are transient and disappear within 24 hours after surgery.[43]

## SURGICAL TECHNIQUES AND LOCAL ANESTHESIA

Circumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique. The procedure should be performed only on a healthy, stable infant. Clamp techniques (eg, Gomco or Mogan clamps) or a Plastibell give equally good results.[44] Techniques that may reduce postoperative complications include (1) using a surgical marking pen to mark the location of the coronal sulcus on the shaft

MER-L-000272-21   06/18/2021 4:58:02 PM   Pg 31 of 48 Trans ID: LCV20211470242
Case 3:21-cv-17099-ZNQ-LHG   Document 1-3   Filed 09/17/21   Page 50 of 122 PageID: 212

- 625 -

skin preoperatively; (2) identifying the urethral meatus; (3) bluntly freeing the foreskin from the glans with a flexible probe; (4) completely retracting the foreskin; and (5) identifying the coronal sulcus, all before applying the clamp or Plastibell and before excising any foreskin.[45] Electrocautery should not be used in conjunction with metal clamps. At the initial health supervision visit following hospital discharge, the penis should be carefully examined and the parents given instructions concerning on-going care.

Dorsal penile nerve block using no more than 1% lidocaine (without epinephrine) in appropriate doses (3 to 4 mg/kg) may reduce the pain and stress of newborn circumcision.[41,46-49] However, reported experience with local anesthesia in newborn circumcision is limited, and the procedure is not without risk (see "Complications").

## CONTRAINDICATIONS, COMPLICATIONS, INFORMED CONSENT

Circumcision is contraindicated in an unstable or sick infant. Infants with genital anomalies, including hypospadias, should not be circumcised because the foreskin may later be needed for surgical correction of the anomalies. Appropriate laboratory studies should be performed when there is a family history of bleeding disorders. Infants who have demonstrated an uncomplicated transition to extrauterine life are considered stable. Signs of stability include normal feeding and elimination and maintenance of normal body temperature without an incubator or radiant warmer. A period of observation may allow for recognition of abnormalities or illnesses (eg, hyperbilirubinemia, infection, or manifest bleeding disorder) that should be addressed before elective surgery. It is prudent to wait until a premature infant meets criteria for discharge before performing circumcision.

The exact incidence of postoperative complications is unknown,[60] but large series indicate that the rate is low, approximately 0.2% to 0.6%.[44,46,61,62] The most common complications are local infection and bleeding. Deaths attributable to newborn circumcision are rare; there were no deaths in 500 000 circumcisions in New York City[62] or in 175 000 circumcisions in US Army hospitals.[61] A communication published in 1979 reported one death in the United States due to circumcision in 1973, and the authors' review of the literature during the previous 25 years documented two previous deaths due to this procedure.[63]

Complications due to local anesthesia are rare and consist mainly of hematomas and local skin necrosis.[41,46-49,64] However, even a small dose of lidocaine can result in blood levels high enough to produce measurable systemic responses in neonates.[65,46] Local anesthesia adds an element of risk and data regarding its use have not been reported in large numbers of cases. Circumferential anesthesia may be hazardous. It would be prudent to obtain more data from large controlled series before advocating local anesthesia as an integral part of newborn circumcision.

When considering circumcision of their infant son, parents should be fully informed of the possible benefits and potential risks of newborn circumcision, both with and without local anesthesia. In addition to the medical aspects, other factors will affect the parents' decisions, including esthetics, religion, cultural attitudes, social pressures, and tradition.

## SUMMARY

Properly performed newborn circumcision prevents phimosis, paraphimosis, and balanoposthitis and has been shown to decrease the incidence of cancer of the penis among US men. It may result in a decreased incidence of urinary tract infection. However, in the absence of well-designed prospective studies, conclusions regarding the relationship of urinary tract infection to circumcision are tentative. An increased incidence of cancer of the cervix has been found in sexual partners of uncircumcised men infected with human papillomavirus. Evidence concerning the association of sexually transmitted diseases and circumcision is conflicting.

Newborn circumcision is a rapid and generally safe procedure when performed by an experienced operator. It is an elective procedure to be performed only if an infant is stable and healthy. Infants respond to the procedure with transient behavioral and physiologic changes.

Local anesthesia (dorsal penile nerve block) may reduce the observed physiologic response to newborn circumcision. It also has its own inherent risks. However, reports of extensive experience or follow-up with the technique in newborns are lacking.

Newborn circumcision has potential medical benefits and advantages as well as disadvantages and risks. When circumcision is being considered, the benefits and risks should be explained to the parents and informed consent obtained.

AAP TASK FORCE ON CIRCUMCISION
Edgar J. Schoen, MD, Chairman
Glen Anderson, MD
Constance Bohon, MD
Frank Hinman, Jr, MD
Ronald L. Poland, MD
E. Maurice Wakeman, MD

REFERENCES

1. American Academy of Pediatrics, Committee on Fetus and Newborn. *Standards and Recommendations for Hospital Care of Newborn Infants.* 5th ed. Evanston, IL: American Academy of Pediatrics; 1971

2. Thompson HC, King LR, Knox E, et al. Report of the ad hoc task force on circumcision. *Pediatrics.* 1975;56:610–611

3. American Academy of Pediatrics, Committee on Fetus and Newborn. *Guidelines for Perinatal Care.* 1st ed. Evanston, IL: American Academy of Pediatrics; 1983

4. Wallerstein E. Circumcision: the uniquely American medical enigma. *Urol Clin North Am.* 1985;12:123–132

5. Wiswell TE, Enzenauer RW, Holton ME, et al. Declining frequency of circumcision: implications for changes in the absolute incidence and male to female sex ratio of urinary tract infection in early infancy. *Pediatrics.* 1987;79:338–342

6. Gairdner D. The fate of the foreskin: a study of circumcision. *Br Med J.* 1949;2:1433–1437

7. Warner E, Strashin E. Benefits and risks of circumcision. *Can Med Assoc J.* 1981;125:967–976,992

8. Cutler SJ, Young JL, Jr. eds. *Third National Cancer Survey: Incidence Data.* National Cancer Institute Monograph 41. Bethesda, MD: US Dept of Health, Education, and Welfare; 1975.

9. Young JL, Percy CL, Asire AJ. *Surveillance, epidemiology and End Results, Incidence and Mortality Data 1973–1977.* National Cancer Institute Monograph 41. Bethesda, MD: US Dept of Health, Education, and Welfare; 1981; 17

10. Young JL. *Surveillance, Epidemiology and End Results 1978–1982.* Bethesda, MD: US Dept of Health and Human Services; YEAR;PAGE

11. Persky L, deKernion J. Carcinoma of the penis. *Cancer J Clin.* 1986;36:5:258–273

12. Leiter E, Lefkovitis AM. Circumcision and penile carcinoma. *NY State J Med.* 1975;75:1520–1822

13. Boczko S, Freed S. Penile carcinoma in young circumcised males. *NY State J Med.* 1979;79:1903–1904

14. Rogus BJ. Squamous cell carcinoma in a young circumcised man. *J Urol.* 1987;138:861–862

15. Wolbarst AL. Circumcision and penile cancer. *Lancet.* 1932;1:150–153

16. Dean AL Jr. Epithelioma of the penis. *J Urol.* 1935;33:252–283

17. Lenowitz H, Graham AP. Carcinoma of the penis. *J Urol.* 1946;56:458–484

18. Hardner GJ, Bhanalaph T, Murphy GP, et al. Carcinoma of the penis: analysis of therapy in 100 consecutive cases. *J Urol.* 1974;108:428–430

19. Dagher R, Selzer ML, Lapides J. Carcinoma of the penis and the anti-circumcision crusade. *J Urol.* 1973;110:79–80

20. Kochen M, McCurdy S. Circumcision and the risk of cancer of the penis: a life-table analysis. *Am J Dis Child.* 1980;134:484–486

21. Swafford TD. Circumcision and the risk of cancer of the penis. *Am J Dis Child.* 1985;139:112

22. Garfinkel L. Circumcision and penile cancer. *Cancer J Clin.* 1983;33:320

23. McCance DJ, Kalache A, Ashdown K, et al. Human papillomavirus types 16 and 18 in carcinomas of the penis from Brazil. *Int J Cancer.* 1986;37:55–59

24. Ginsburg CM, McCracken GH Jr. Urinary tract infections in young infants. *Pediatrics.* 1982;69:409–412

25. Wiswell TE, Smith FR, Bass JW. Decreased incidence of urinary tract infections in circumcised male infants. *Pediatrics.* 1985;75:901–903

26. Wiswell TE, Geschke DW. Risks from circumcision during the first month of life compared with those of the uncircumcised boys. *Pediatrics.* 1989;83:1011–1015

27. Roberts JA. Does circumcision prevent urinary tract infection? *J Urol.* 1986;135:991–992

28. Wiswell TE, Miller GM, Gelston HM, et al. The effect of circumcision status on periurethral bacterial flora during

the first year of life. *J Pediatr.* 1988;113:442–446

29. Wilson RA. Circumcision and venereal disease. *Can Med Assoc J.* 1947;56:54–56

30. Parker SW, Stewart AJ, Wren MN, et al. Circumcision and sexually transmissible disease. *Med J Aust.* 1983;2:288–290

31. Smith GL, Greenup R, Takafuji ET. Circumcision as a risk factor for urethritis in racial groups. *Am J Public Health.* 1987;77:452–454

32. Thirumoorthy T, Sng EH, Doraisingham S, et al. Purulent penile ulcers of patients in Singapore: *Genitourin Med.* 1986;62:253–256

33. Oriel JD. Condyloma acuminata as a sexually transmitted disease. *Dermatol Clin.* 1983;1:93–102

34. Taylor PK, Rodin P. Herpes genitalis and circumcision. *Br J Vener Dis.* 1975;51:274–277

35. Beird PJ. The causation of cervical cancer, part II: the role of human papilloma and other viruses. In: Singer A, ed. *1985 Clinics in Obstetrics and Gynecology.* London, England: WB Saunders Co; 1985;12:19–32

36. Kaufman RH, Adam E. Herpes simplex virus and human papilloma virus in the development of cervical carcinoma. *Clin Obstet Gynecol.* 1986;29:678–692

37. McCance DJ. Human papillomaviruses and cancer. *Biochim Biophys Acta.* 1986;823:195–205

38. zur Hausen H. Genital papillomavirus infections. *Prog Med Virol.* 1985;32:15–21

39. Kessler II. Etiological concepts in cervical carcinogenesis. *Appl Pathol.* 1987;5:57–75

40. Anand KJS, Hickey PR. Pain and its effects in the human neonate and fetus. *N Engl J Med.* 1987;317:1321–1329

41. Dixon S, Snyder J, Holve R, et al. Behavioral effects of circumcision with and without anesthesia. *J Devel Behav Pediatr.* 1984;5:246–250

42. Marshall RE, Stratton WC, Moore JA, et al. Circumcision: effects upon newborn behavior. *Infant Behav Dev.* 1980;3:1–14

43. Marshall RE, Porter FL, Rogers AG, et al. Circumcision, II: Effects upon mother-infant interaction. *Early Hum Dev.* 1982;7:367–374

44. Gee WF, Ansell JS. Neonatal circumcision: a ten-year overview with comparison of the Gomco clamp and the Plastibell device. *Pediatrics.* 1976;58:824–827

45. Harkavy KL. The circumcision debate. *Pediatrics.* 1987; 79:649–650. Letter

46. Kirya C, Werthmann MW. Neonatal circumcision and penile dorsal nerve block—a painless procedure. *J Pediatr.* 1978;92:998–1000

47. Williamson PS, Williamson ML. Physiologic stress reduction by a local anesthetic during newborn circumcision. *Pediatrics.* 1983;71:36–40

48. Holve RL, Bromberger PJ, Groveman HD, et al. Regional anesthesia during newborn circumcision: effect on infant pain response. *Clin Pediatr.* 1983;22:813–818

49. Stang HJ, Gunnar MR, Snellman L, et al. Local anesthesia for neonatal circumcision; effect on distress and cortisol response. *JAMA.* 1988;259:1507–1511

50. Kaplan GW. Complications of circumcision. *Urol Clin North Am.* 1983;10:543–549

51. Wiswell TE. The circumcision debate. *Pediatrics.* 1987; 70:649–650. Letter

52. King LR. Neonatal circumcision in the United States in 1982. *J Urol.* 1982;128:1135–1136

53. Kochen M, McCurdy SA. Circumcision. *Am J Dis Child.* 1979;133:1079–1080. Letter

54. Sara CA, Lowry CJ. A complication of circumcision and dorsal nerve block of the penis. *Anaesth Intensive Care.* 1985;13:79–82

55. Diaz M, Graff M, Hiatt M, et al. Prenatal lidocaine and the auditory evoked responses in term infants. *Am J Dis Child.* 1988;142:160–161

56. Maxwell LG, Yaster M, Wetzell RC, et al. Penile nerve block for newborn circumcision. *Obstet Gynecol.* 1987;70:415–419

MER-L-000272-21   06/18/2021 4:58:02 PM   Pg 33 of 48 Trans ID: LCV20211470242
Case 3:21-cv-17099-ZNQ-LHG   Document 1-3   Filed 09/17/21   Page 52 of 122 PageID: 214

- 627 -

### ERRATUM

### Policy Statement RE9148

### Report of the Task Force on Circumcision

Under the heading of "Urinary Tract Infections" (line 6, page 389), "men" should be changed to "infant boys." The complete statement should now read:

> Beginning in 1985, studies conducted at US Army hospitals involving more than 200 000 <u>infant boys</u> showed a greater than tenfold increase in urinary tract infections in uncircumcised compared with circumcised male infants; moreover, as the rate of circumcision declined throughout the years, the incidence of urinary tract infection increased.

The Task Force on Circumcision would also like to acknowledge the following for their provision of expert advice:

David T. Mininberg, MD, FAAP, Section Liaison
Jerome O. Klein, MD, FAAP
Edward A. Mortimer, Jr, MD, FAAP

# EXHIBIT C

# Newborns

## Care of the Uncircumcised Penis

## American Academy of Pediatrics

NATIONAL ORGANIZATION
of
CIRCUMCISION INFORMATION
RESOURCE CENTERS
P.O. Box 369
Corte Madera, California 94925-0369

**For additional copies, contact:** American Academy of Pediatrics, Publications Department, P.O. Box 927, Elk Grove Village, IL 60007. Price: $15/100.

Copyright © 1984 by the American Academy of Pediatrics

need for concern even after a longer period. No harm will come in leaving the foreskin alone.

**Testing Foreskin Retraction:** To test retraction occasionally, hold the penile shaft with one hand and with the other hand, push the foreskin back *gently – never forcibly* – perhaps ⅛ of an inch. Retraction may also be done with one hand pushing the shaft skin gently toward the abdomen. This will automatically retract the foreskin.

If there is any *discomfort* in your baby or if you feel resistance, stop. Try again in a few months. If the retraction is easy for both the child and the parent, further retraction may be attempted in due time. There should be no rush to retract. Eventually, the foreskin will retract completely, exposing the entire glans. This may take several years.

**Hygiene of the Fully Retracted Foreskin:**
For the first few years, an occasional retraction with cleansing beneath is sufficient.

Penile hygiene will later become a part of a child's total body hygiene, including hair shampooing, cleansing the folds of the ear and brushing teeth. At puberty, the male should be taught the importance of retracting the foreskin and cleaning beneath during his daily bath.

**Summary:** Care of the uncircumcised boy is quite easy. "Leave it alone" is good advice. External washing and rinsing on a daily basis is all that is required. Do not retract the foreskin in an infant, as it is almost always attached to the glans. Forcing the foreskin back may harm the penis, causing pain, bleeding, and possibly adhesions. The natural separation of the foreskin from the glans may take many years. After puberty, the adult male learns to retract the foreskin and cleanse under it on a daily basis.

# Care of the Uncircumcised Penis

At birth, the penis consists of a cylindrical shaft with a rounded end called the glans. The shaft and glans are separated by a groove called the sulcus. The entire penis – shaft and glans – is covered by a continuous layer of skin. The section of the penile skin that covers the glans is called the foreskin or prepuce. The foreskin consists of two layers, the outer foreskin and an inner lining similar to a mucous membrane.

Before birth, the foreskin and glans develop as one tissue. The foreskin is firmly attached – really fused – to the glans. Over time, this fusion of the inner surface of the prepuce with the glans skin begins to separate by shedding the cells from the surface of each layer. Epithelial layers of the glans and the inner foreskin lining are regularly replaced, not only in infancy but throughout life. The discarded cells accumulate as whitish, cheesy "pearls" which gradually work their way out via the tip of the foreskin.

Eventually, sometimes as long as 5 or even 10 years after birth, full separation occurs and the foreskin may then be pushed back away from the glans toward the abdomen. This is called foreskin retraction. The foreskin may retract spontaneously with erections which occur normally from birth on and even occur in fetal life. Also, all children "discover" their genitals as they become more aware of their

bodies and may retract the foreskin themselves. If foreskin does not seem to retract easily early in life, it is important to realize that this is not abnormal and that it will eventually do so.

Diagrammatic Representation of the Inner and Outer Foreskin Layers.



Drawing reprinted with permission of Edward Wallerstein, author of Circumcision: An American Health Fallacy

**The Function of the Foreskin:** The glans at birth is delicate and easily irritated by urine and feces. The foreskin shields the glans; with circumcision, this protection is lost. In such cases, the glans and especially the urinary opening (meatus) may become irritated or infected, causing ulcers, meatitis (inflammation of the meatus), and meatal stenosis (a narrowing of the urinary opening). Such problems virtually never occur in uncircumcised penises. The foreskin protects the glans throughout life.

**Infant Smegma:** Skin cells from the glans of the penis and the inner foreskin are shed throughout life. This is especially true in childhood; natural skin shedding serves to separate the foreskin from the glans. Since this shedding takes place in a relatively closed space – with the foreskin covering the glans – the shed skin cells cannot escape in the usual manner. They escape by working their way to the tip of the foreskin. These escaping discarded skin cells constitute infant smegma.

**Adult Smegma:** Specialized sebaceous glands – Tyson's Glands – which are located on the glans under the foreskin, are largely inactive in childhood. At puberty, Tyson's Glands produce an oily substance, which, when mixed with shed skin cells, constitute adult smegma. Adult smegma serves as a protective, lubricating function for the glans.

**Foreskin Hygiene:** The foreskin is easy to care for. The infant should be bathed or sponged for. The external penile skin is soft and pliable and easy to wash. *It is not necessary to retract any part of the skin in order to wash under it.* The uncircumcised penis is easy to keep clean. No special care is required! Leave the penis alone. The body provides its own protection of the glans area because the foreskin is fused to it. As the shed epithelial cells ooze from underneath the foreskin, clean away this infant smegma. No other manipulation is necessary. There is no need for Q-tips, irrigation or antiseptics; soap and water will suffice.

**Foreskin Retraction:** As noted, the foreskin and glans develop as one tissue. Separation will evolve over time. It should not be forced. When will separation occur? Each child is different. Separation may occur before birth; this is rare. It may take a few days, weeks, months or even years. *This is normal.* Although most foreskins are retracted by age 5, there is no

# EXHIBIT D

# Newborns: Care of the Uncircumcised Penis

## Guidelines for Parents



American Academy
of Pediatrics

---

The American Academy of Pediatrics is an organization of 47,000 pediatricians dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults.

Now available: *Caring for Your Baby and Young Child: Birth to Age 5*, available at the special discount price of more than 25 percent off the $16 list price. To order your copy, send a check or money order for $11.95, plus $2.75 per copy shipping and handling, to: AAP Publications — Child Care Book, Birth to Age 5, 141 Northwest Point Blvd, PO Box 927, Elk Grove Village, IL 60009-0927.

For additional copies, contact:
American Academy of Pediatrics
Division of Publications
141 Northwest Point Blvd, PO Box 927
Elk Grove Village, IL 60009-0927

Minimum order: 100
Price $23.50/100 (members)
$28.50/100 (nonmembers)
Copyright ©1990
HE0023R

American Academy
of Pediatrics

1/94

---

**Summary:** Care of the uncircumcised boy is quite easy. "Leave it alone" is good advice. External washing and rinsing on a daily basis is all that is required. Do not retract the foreskin in an infant, as it is almost always attached to the glans. Forcing the foreskin back may harm the penis, causing pain, bleeding, and possibly adhesions. The natural separation of the foreskin from the glans may take many years. After puberty, the adult male learns to retract the foreskin and cleanse under it on a daily basis.

The information contained in this publication should not be used as a substitute for the medical care and advice of your pediatrician. There may be variations in treatment that your pediatrician may recommend based on individual facts and circumstances.

# Newborns: Care of the Uncircumcised Penis

**A** t birth, the penis consists of a cylindrical shaft with a rounded end called the glans. The shaft and glans are separated by a groove called the sulcus. The entire penis — shaft and glans — is covered by a continuous layer of skin. The section of the penile skin that covers the glans is called the foreskin or prepuce. The foreskin consists of two layers, the outer foreskin and an inner lining similar to a mucous membrane.

Before birth, the foreskin and glans develop as one tissue. The foreskin is firmly attached — really fused — to the glans. Over time, this fusion of the inner surface of the prepuce with the glans skin begins to separate by shedding the cells from the surface of each layer. Epithelial layers of the glans and the inner foreskin lining are regularly replaced, not only in infancy but throughout life. The discarded cells accumulate as whitish, cheesy 'pearls' which gradually work their way out via the tip of the foreskin.

Eventually, sometimes as long as 5, 10, or more years after birth, full separation occurs and the foreskin may then be pushed back away from the glans toward the abdomen. This is called foreskin retraction. The foreskin may retract spontaneously with erections which occur normally from birth on and even occur in fetal life. Also, all children "discover" their genitals as they become more aware of their bodies and may retract the foreskin themselves. If the

foreskin does not seem to retract easily early in life, it is important to realize that this is not abnormal and that it should eventually do so.

**Infant Smegma:** Skin cells from the glans of the penis and the inner foreskin are shed throughout life. This is especially true in childhood; natural skin shedding serves to separate the foreskin from the glans. Since this shedding



Diagrammatic Representation of the inner and Outer Foreskin Layers.

Urinary Meatus — Sulcus — Outer Foreskin Layer — Glans — Shaft — Preputial Orifice — Inner Foreskin Layer — Frenum

Drawing reprinted with permission of Edward Wallerstein.

takes place in a relatively closed space — with the foreskin covering the glans — the shed skin cells cannot escape in the usual manner. They escape by working their way to the tip of the foreskin. These escaping discarded skin cells constitute infant smegma, which may appear as white 'pearls' under the skin.

**Adult Smegma:** Specialized sebaceous glands — Tyson's Glands — which are located on the glans under the foreskin, are largely inactive in childhood. At puberty, Tyson's Glands produce an oily substance, which, when mixed with shed skin cells, constitute adult smegma. Adult smegma serves as a protective, lubricating function for the glans.

**Foreskin Hygiene:** The foreskin is easy to care for. The infant should be bathed or sponged frequently, and all parts should be washed including the genitals. The uncircumcised penis is easy to keep clean. No special care is required! No attempt should be made to forceably retract the foreskin. No manipulation is necessary. There is no need for special cleansing with Q-tips, irrigation, or antiseptics; soap and water externally will suffice.

**Foreskin Retraction:** As noted, the foreskin and glans develop as one tissue. Separation will evolve over time. It should not be forced. When will separation occur? Each child is different. Separation may occur before birth; this is rare. It may take a few days, weeks, months, or even years. *This is normal.* Although many foreskins will retract by age 5, there is no need for concern even after a longer period. Some boys do not attain full retractability of the foreskin until adolescence.

**Hygiene of the Fully Retracted Foreskin:** For the first few years, an occasional retraction with cleansing beneath is sufficient.

Penile hygiene will later become a part of a child's total body hygiene, including hair shampooing, cleansing the folds of the ear, and brushing teeth. At puberty, the male should be taught the importance of retracting the foreskin and cleaning beneath during his daily bath.

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY |
| Plaintiffs, | DOCKET NO.: MER-L-000272-21 |
| | Civil Action |
| vs. | |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **PLAINTIFF SHINGO LAVINE'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANT AMERICAN ACADEMNY OF PEDIATRICS, INC.** |
| Defendants | |

COMES NOW Plaintiff Shingo Lavine and requests that Defendant American Academy

of Pediatrics, Inc. (hereinafter the "AAP") produce the following books, documents, or other

tangible things, within 45 days of the service of these Requests upon it, at the offices of Andrew Delaney, Attorney at Law LLC, 6 South Street, Suite 203, Morristown, New Jersey 07960.

No request shall be interpreted as requiring the production of attorney work product or materials protected by the attorney-client privilege.

## REQUESTS

1.     Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, oral communications that were recorded in some physical form, journal articles, research articles, texts, opinions, graphs, charts, newspaper or magazine articles or opinion pieces, surveys, compilations of data, or the like, that were submitted to the AAP Task Force on Circumcision (hereinafter the "Task Force") whose report (hereinafter "the Report") was published in *Pediatrics* 1989;84;388-391 and a copy of which is attached to the Complaint in this case.

2.     Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, oral communications that were recorded in some physical form, journal articles, research articles, texts, opinions, graphs, charts, newspaper or magazine articles or opinion pieces, surveys, compilations of data, or the like, that were considered by the Task Force before the approval and publication of the Report.

3.     Any and all books, documents, and other tangible things, including but not limited to minutes, notes, or sound or video recordings, that record any of the deliberations of the Task Force

2

or the approval of the Report by any other body or person within or acting upon the behalf of the AAP.

4.      Any and all drafts of the Report or a suggested report that were submitted to, formulated by, or considered by the Task Force or any member thereof before the approval and issuance of the final version of the Report.

5.      Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, and oral communications that were recorded in some physical form, that suggested or led to the formation of the Task Force.

6.      Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, and oral communications that were recorded in some physical form, that dealt with the selection of the members of the Task Force, including but not limited to requests for appointment thereto, invitations to participate as a member of the Task Force, letters of acceptance, letters declining to participate, and the like.

7.      Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, and oral communications that were recorded in some physical form, that dealt with the selection of the Chairman of the Task Force, including but not limited to requests for appointment as such, invitations to participate as Chairman of the Task Force, letters of acceptance, letters declining to participate, and the like.

8.      Any and all books, documents, and other tangible things reflecting communications between members of the Task Force themselves in regard to the subject of the Task Force or its operations, deliberations, or report.

9.      Any and all books, documents, and other tangible things reflecting communications between members of the Task Force and any other member of the AAP in regard to the subject of the Task Force or its operations, deliberations, or report.

10.     Any and all books, documents, and other tangible things reflecting communications between members of the Task Force and any member of any other professional association or organization, including but not limited to the American College of Obstetricians and Gynecologists, the American Academy of Family Physicians, the American Cancer Society, or the American Urological Association, in regard to the subject of the Task Force or its operations, deliberations, or report.

11.     Any and all books, documents, and other tangible things reflecting communications between members of the Task Force and any person associated with any governmental agency, including but not limited to the National Institutes of Health or the Centers for Disease Control, in regard to the subject of the Task Force or its operations, deliberations, or report.

12.     Any and all books, documents, and other tangible things reflecting the formulation of, drafting of, content of, or production of the AAP's 1984 pamphlets "NEWBORNS: Care of the Uncircumcised Penis."

4

13.     Any and all books, documents, and other tangible things reflecting the formulation of, drafting of, content of, or production of the AAP's 1994 pamphlet "NEWBORNS: Care of the Uncircumcised Penis," including without limitation those items reflecting or concerning the modification of the language therein whereby the section in the 1984 pamphlets entitled "The Function of the Foreskin:" was eliminated and the reference in the "Diagrammatic Representation of the Inner and Outer Foreskin Layers" was modified to eliminate the reference to "author of Circumcision:  An American Health Fallacy."    This request includes, specifically, any documentation that evidences the reason(s) for the elimination of the referenced portions and the identity of the persons who suggested and/or authorized such changes.

14.     Any and all letters or comments, whether or not published, received by the editors of *Pediatrics* in regard to the Report as published.

15.     Any and all books, documents, and other tangible things reflecting any dissent from the Report by any member of the Task Force.

16.     Any and all versions of the pamphlet "Newborns: Care of the Uncircumcised Penis" from 1984 up to and through 1997.

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated: February 9, 2021

5

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY<br><br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br>**PLAINTIFF SHINGO LAVINE'S FIRST INTERROGATORIES TO DEFENDANT AMERICAN ACADEMNY OF PEDIATRICS, INC.** |

COMES NOW Plaintiff Shingo Lavine and requests that Defendant American Academy

of Pediatrics, Inc. (hereinafter the "AAP") answer the following interrogatories within the time

No interrogatory shall be interpreted as requiring the revelation of attorney work product or matters or materials protected by the attorney-client privilege.

## INTERROGATORIES

1.     Please state the names and last known physical addresses, email addresses, and telephone numbers of the members of the AAP Task Force on Circumcision (hereinafter the "Task Force") whose report (hereinafter "the Report") was published in *Pediatrics* 1989;84;388-391 and a copy of which is attached to the Complaint in this case.

2.     Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of the person or persons who selected the members of the Task Force.

3.     Please state name(s) and last known physical address(es), email address(es), and telephone number(s) of the person or persons who selected the Chairman of the Task Force.

4.     Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of the person or persons who decided to convene and appoint the Task Force.

5.     Who requested that the Task Force be convened and why was the Task Force convened?

6.     Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any employees or agents of the AAP who assisted the Task Force, consulted with the Task Force, kept the records of the Task Force, received information to convey to the Task Force, or attended any of its meetings.

7.     How many times did the Task Force meet, how did it meet (in person, by telephone, etc.), where did it meet, how were its proceedings recorded, and who kept the minutes of its proceedings?

8.     Did any member of the Task Force ever leave a meeting because of a disagreement with any other member or members of the Task Force? If so, give complete details, including who left the meeting, when the incident occurred, the reasons given for the person(s) leaving the meeting, and the like.

9.     Did any member of the Task Force draft or present a dissenting report? If so, give complete details, including who drafted or presented a dissenting report, the contents thereof, the reason(s) for it, and the disposition of such.

10.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any person(s) who authored, drafted, approved or had anything to do with the content of the AAP's 1984 pamphlets "NEWBORNS:  Care of the Uncircumcised Penis."

3

11.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any person(s) who authored, drafted, approved or had anything to do with the content of the AAP's 1994 pamphlet "NEWBORNS:  Care of the Uncircumcised Penis."

12.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any person(s) who had anything to do with the modifications of the language in the AAP pamphlet "NEWBORNS:  Care of the Uncircumcised Penis" whereby the section in the 1984 pamphlets entitled "The Function of the Foreskin:" was eliminated in the 1994 edition and the reference in the "Diagrammatic Representation of the Inner and Outer Foreskin Layers" was modified in the 1994 edition to eliminate the reference to "author of Circumcision: An American Health Fallacy" and state ALL of the reason(s) for those modifications.

_____
ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated: February 9, 2021

4

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No. 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY |
| Plaintiffs, | DOCKET NO.:  MER-L-000272-21 |
| v. | CIVIL ACTION |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **NOTICE OF MOTION FOR *PRO HAC VICE* ADMISSION OF MARC S. SILVER** |
| Defendants. | |

TO:   Andrew DeLaney, Esquire
       ANDREW DELANEY, ATTORNEY AT LAW LLC
       South Street, Suite 203
       Morristown, NJ 07960

  **PLEASE TAKE NOTICE** that on July 9, 2021, at 9:00 am or as soon as counsel may

be heard, Defendant, American Academy of Pediatrics Inc., by and through its attorneys, White

and Williams LLP, will make application to the Superior Court of New Jersey, Law Division

Civil Part, Mercer County, New Jersey, for an Order granting admission of Marc S. Silver,

Esquire as counsel for defendant, American Academy of Pediatrics Inc., *pro hac vice*, pursuant

to R. 1:21-2.

  **PLEASE TAKE FURTHER NOTICE** that counsel shall rely in support of this motion

upon the attached Certifications of Jared K. Levy, Esquire and Marc S. Silver, Esquire.

27305123v.1

PLEASE TAKE FURTHER NOTICE that **oral argument is requested,** if timely opposition is filed.

PLEASE TAKE FURTHER NOTICE that **no dates** have been fixed for pretrial conference, calendar call or trial in this matter.

**WHITE AND WILLIAMS LLP**
Attorneys for Defendant,
American Academy of Pediatrics Inc.

BY: _____
Jared K. Levy

Dated:  June 23, 2021

-2-

27305123v.1

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No. 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY |
| Plaintiffs, | DOCKET NO.:  MER-L-000272-21 |
| v. | CIVIL ACTION |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **ORDER GRANTING *PRO HAC VICE* ADMISSION OF MARC S. SILVER** |
| Defendants. | |

      This matter having been opened to the court by White and Williams LLP, attorneys for defendant American Academy of Pediatrics Inc., upon application for an order granting the *pro hac vice* admission of Marc S. Silver, Esquire and the Court having considered the pleadings filed, argument of counsel, if any, and for good cause shown, it is on this _____ day of _____, 2021, hereby

      **ORDERED** that Marc S. Silver, Esquire be admitted *pro hac vice* to appear as counsel for defendant American Academy of Pediatrics Inc. in this matter pursuant to R. 1:21-2, provided the following requirements are met:

      (1)    Marc S. Silver, Esquire shall abide by the Rules governing the Courts of the State of New Jersey, including all disciplinary rules;

27318328v.1

(2)     Marc S. Silver, Esquire shall consent to the appointment of the Clerk of the Supreme Court as an agent upon whom service of process may be made for all actions against him or his firm that may arise out of his participation in this matter;

(3)     Marc S. Silver, Esquire shall notify the court immediately of any matter affecting his standing in the bar of any other court; and

(4)     Marc S. Silver, Esquire shall have all pleadings, briefs, and other papers filed with the court signed by an attorney of record authorized to practice within the State of New Jersey, specifically Jared K. Levy, Esquire, of the law firm of White and Williams LLP, LibertyView, 475 Haddonfield Road, Suite 400, Cherry Hill, New Jersey, who shall be held responsible for him and for his conduct; and it is

**FURTHER ORDERED** that non-compliance with any of the above requirements shall constitute grounds for removal; and it is

**FURTHER ORDERED** that $212.00 be paid to the New Jersey Lawyers Fund, for each attorney admitted, within ____ days pursuant to Rule 1:21-2(a); and it is

**FURTHER ORDERED** that a copy of this order be served upon all counsel within seven (7) days of receipt.

_____

-2-

27318328v.1

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No. 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY |
| Plaintiffs, | DOCKET NO.:  MER-L-000272-21 |
| v. | CIVIL ACTION |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **CERTIFICATION OF JARED K. LEVY IN SUPPORT OF MOTION FOR *PRO HAC VICE* ADMISSION OF MARC S. SILVER** |
| Defendants. | |

I, Jared K. Levy, Esquire, of full age, do hereby certify as follows:

1.      I am an attorney at law in the State of New Jersey and counsel with the law firm of White and Williams LLP, local counsel for defendant, American Academy of Pediatrics, Inc. in the above entitled action.

2.      White and Williams LLP maintains bona fide offices for the practice of law in the State of New Jersey at Liberty View, 457 Haddonfield Road, Suite 400, Cherry Hill, New Jersey (and also in Newark, New Jersey).

3.      I am authorized to practice law in the State in accordance with <u>Rule</u> 1:21-1(a).

4.      I am fully familiar with the facts and circumstances of the matter herein and make this certification in support of the *pro hac vice* admission of Marc S. Silver, Esquire.

27305123v.1

5.      Mr. Silver maintains an attorney-client relationship with American Academy of Pediatrics Inc. and is familiar with its business operations and the facts and legal issues relating to this litigation.

6.      Mr. Silver is in good standing of the Bar of the State of Illinois and has held such standing since 1996.

7.      The undersigned counsel will remain associated with Mr. Silver and shall sign all pleadings and other filings with the Court pursuant to Rule 1:21-2(b)(4).

8.      Based upon the aforementioned, I respectfully request that Marc S. Silver, Esquire be specially admitted to the Bar of the State of New Jersey for purposes of participation in this action.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**WHITE AND WILLIAMS LLP**
Attorneys for Defendant,
American Academy of Pediatrics Inc.

BY: _____
Jared K. Levy

Dated:  June 23, 2021

-2-

27305123v.1

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No. 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>                                Plaintiffs,<br><br>                v.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>                                Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY<br><br>DOCKET NO.:  MER-L-000272-21<br><br>CIVIL ACTION<br><br>**CERTIFICATION OF MARC S. SLIVER IN SUPPORT OF MOTION FOR *PRO HAC VICE* ADMISSION** |

I, Marc S. Silver, Esquire, of full age, hereby certify as follows:

1.      I am an attorney and member of good standing of the Bar of the State of Illinois.

2.      I am a partner with the law firm of Barnes & Thornburg LLP and practice primarily out of its offices located at One North Wacker Drive, Suite 4400, Chicago, Illinois 60606.

3.      I have been retained to represent American Academy of Pediatrics Inc, in the above-captioned matter.

4.      I am associated in this matter with New Jersey counsel of record, Jared K. Levy, Esquire, who is qualified to practice pursuant to <u>R</u>. 1:21-1.

5.      There is good cause for my admission *pro hac vice*, including:

27305123v.1

(a)     I have developed a working relationship with American Academy of Pediatrics Inc., and I have become familiar with the facts and legal issues relating to this particular type of litigation;

(b)     American Academy of Pediatrics Inc., an Illinois corporation, has requested my continued representation in this matter;

(c)     My participation in this lawsuit will further the interest of convenience and judicial economy and minimize the expense of this litigation;

(d)     I have been admitted to practice in the State of Illinois since 1996; and

(e)     No disciplinary proceedings are pending against me in any jurisdiction and no discipline has previously been imposed on my in any jurisdiction.

6.     Based upon the foregoing showing of good cause, I respectfully request to be admitted *pro hac vice* to represent the interests of American Academy of Pediatrics Inc. in this action.

I certify that the foregoing statements made by me are true, I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**BARNES & THORNBURG LLP**
Attorneys for Defendant, American
Academy of Pediatrics Inc.

BY: _____
Marc S. Silver

Dated:  June 23, 2021

-2-

27305123v.1

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No. 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY |
| Plaintiffs, | DOCKET NO.:  MER-L-000272-21 |
| v. | CIVIL ACTION |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **CERTIFICATE OF SERVICE** |
| Defendants. | |

I hereby certify that a true and accurate copy of defendant's Notice of Motion for *Pro Hac Vice* Admission of Marc S. Silver, Esquire was served this day via the Court's e-notification system upon the following counsel of record:

Andrew DeLaney, Esquire
ANDREW DELANEY, ATTORNEY AT LAW LLC
South Street, Suite 203
Morristown, NJ 07960

Gregory J. Giordano, Esquire
Stephanie J. Viola, Esquire
LENOX, SOCEY, FORMIDONI,
GIORDANO, LANG, CARRIGG & CASEY, LLC
136 Franklin Corner Road, Unit B2
Lawrenceville, NJ 08648

27305123v.1

Jared K. Levy, Esquire

Dated:    June 23, 2021

27305123v.1

JARED K LEVY
019132003
457 HADDONFIELD RD
CHERRY HILL NJ 08002

**Superior Court of New Jersey**
**Civil Division, Civil Part**
MERCER County

SHINGO  LAVINE, AIKO  LAVINE, ADAM
LAVINE
        vs.
PRINCETON MEDICAL GROUP, P.A.,
AMERICAN ACADEMY OF PEDIATRICS

Docket No. MER-L-000272-21

**Civil Action**

**Adjournment Request**

I certify that my adversary has consented and request that the MOTION DISMISSAL
HEARING scheduled on 07/09/2021 before DOUGLAS H HURD be adjourned.

| | | |
|---|---|---|
| Original DED: | Current DED: | # of DED Extension: 0 |
| Original Arb Date: | Current Arb Date: | # of Arb Adjournments: 0 |
| Original Trial Date: | Current Trial Date: | # of Trial Adjournments: 0 |

/S/ JARED K LEVY

1



**Jared K. Levy** | Counsel

LibertyView | 457 Haddonfield Road, Suite 400 | Cherry Hill, NJ 08002-2220
Direct 856.317.3642 | Fax 856.317.3604
levyj@whiteandwilliams.com | whiteandwilliams.com

June 29, 2021

Via E-Filing

The Honorable Douglas H. Hurd, J.S.C.
Superior Court of Mercer County
Civil Courthouse
175 South Broad Street, 3rd Floor
Trenton, NJ 08650

RE:  Lavine v. Princeton Medical Group, P.A., et al.
     Docket No:  MER-L-000272-21

Dear Judge Hurd:

This Firm represents defendant American Academy of Pediatrics, Inc. in the above matter.
Pending before Your Honor on July 9, 2021 is American Academy of Pediatrics Inc.'s Motion to
Dismiss Plaintiffs' Complaint (LCV20211469872) and Motion for Pro Hac Vice Admission
(LCV20211502347).  At plaintiffs' counsel's request, we have agreed to carry Defendant's
Motion to Dismiss two cycles to August 6, 2021.  Accordingly, it is respectfully requested that
defendants Motion to Dismiss (LCV20211469872) be carried to August 6, 2021.  The motion for
Pro Hac Vice Admission (LCV20211502347) can remain on July 9, 2021 unless Your Honor
requires oral argument in which case we would respectfully request that the motion be carried to
August 6, 2021 as well.

Thank you for your courtesies.

Very truly yours,

WHITE AND WILLIAMS LLP

Jared K. Levy
JKL:hch
Cc (via e-filing):   Marc Silver, Esquire
                     Andrew Delaney, Esquire
                     Stephanie J. Viola, Esquire

Delaware | Massachusetts | New Jersey | New York | Pennsylvania | Rhode Island

27358387v.1

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO, AIKO AND ADAM LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A.<br>AND AMERICAN ACADEMY OF<br>PEDIATRICS, INC.<br>Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MERCER COUNTY<br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br><br>**ADJOURNMENT REQUEST** |

    I certify that my adversary (Princeton Medical Group) has consented and request that the
MOTION DISMISSAL HEARING scheduled on 07/07/2021 before DOUGLAS H HURD be
adjourned.


                              ANDREW DELANEY, ATTORNEY AT LAW, LLC
                              *Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*


Dated July 6, 2021               BY: _____
                                      ANDREW DELANEY, ESQ.

# ANDREW DELANEY
## Attorney at Law

6 South Street Suite 203
Morristown, New Jersey 07960

Dir (973)606-6090
Cell (862)812-6874
andrew.delaney21@gmail.com

July 6, 2021

The Honorable Douglas H. Hurd
Superior Court of Mercer County
Civil Courthouse
175 South Broad Street, 3rd Floor
Trenton, NJ 08650
(via efiling)

Re: Lavine v. Princeton Medical Group P.A. & American Academy of Pediatrics
    Docket No.: MER-L-000272-21

Dear Judge Hurd,

Please be advised that I represent Adam, Shingo and Aiko Lavine in the above-captioned matter. Pending before Your Honor on July 9, 2021 is American Academy of Pediatrics Inc's Motion to Dismiss Plaintiffs' Complaint (LCV202111469872) and Princeton Medical Group P.A.'s Motion to Dismiss Plaintiffs' Complaint. On the consent of both parties, the American Academy of Pediatrics, Inc's Motion has been carried to August 6, 2021. We respectfully request that the Motion to Dismiss Plaintiffs' Complaint filed by Princeton Medical Group, P.A. be carried to the same day, and Princeton Medical Group, P.A. has consented to same. Thank you for your courtesies.

Best Regards,

DocuSigned by:

Andrew DeLaney, Attorney for Plaintiffs

**WHITE AND WILLIAMS LLP**
BY:   Jared K. Levy
Identification No. 019132003
LibertyView | 457 Haddonfield Road, Suite 400 |
Cherry Hill, NJ 08002-2220
856.317.3600
Attorneys for Defendant,
American Academy of Pediatrics Inc.

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MERCER COUNTY |
| Plaintiffs, | DOCKET NO.:  MER-L-000272-21 |
| v. | CIVIL ACTION |
| PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC., | **ORDER GRANTING *PRO HAC VICE* ADMISSION OF MARC S. SILVER** |
| Defendants. | |

This matter having been opened to the court by White and Williams LLP, attorneys for defendant American Academy of Pediatrics Inc., upon application for an order granting the *pro hac vice* admission of Marc S. Silver, Esquire and the Court having considered the pleadings filed, argument of counsel, if any, and for good cause shown, it is on this 9th day of July, 2021

**ORDERED** that Marc S. Silver, Esquire be admitted *pro hac vice* to appear as counsel for defendant American Academy of Pediatrics Inc. in this matter pursuant to R. 1:21-2, provided the following requirements are met:

(1)     Marc S. Silver, Esquire shall abide by the Rules governing the Courts of the State of New Jersey, including all disciplinary rules;

(2)     Marc S. Silver, Esquire shall consent to the appointment of the Clerk of the Supreme Court as an agent upon whom service of process may be made for all actions against him or his firm that may arise out of his participation in this matter;

27318328v.1

(3)     Marc S. Silver, Esquire shall notify the court immediately of any matter affecting his standing in the bar of any other court; and

(4)     Marc S. Silver, Esquire shall have all pleadings, briefs, and other papers filed with the court signed by an attorney of record authorized to practice within the State of New Jersey, specifically Jared K. Levy, Esquire, of the law firm of White and Williams LLP, LibertyView, 475 Haddonfield Road, Suite 400, Cherry Hill, New Jersey, who shall be held responsible for him and for his conduct; and it is

**FURTHER ORDERED** that non-compliance with any of the above requirements shall constitute grounds for removal; and it is

**FURTHER ORDERED** that $212.00 be paid to the New Jersey Lawyers Fund, for each attorney admitted, within 30 days pursuant to Rule 1:21-2(a); and it is

**FURTHER ORDERED** that a copy of this order be served upon all counsel within seven (7) days of receipt.

_____/s/ Douglas H. Hurd
P.J. Cv.

27318328v.1

-2-

JARED K LEVY
019132003
457 HADDONFIELD RD
CHERRY HILL NJ 08002

**Superior Court of New Jersey**
**Civil Division, Civil Part**
MERCER County

SHINGO  LAVINE, AIKO  LAVINE, ADAM
LAVINE
      vs.
PRINCETON MEDICAL GROUP, P.A.,
AMERICAN ACADEMY OF PEDIATRICS

Docket No. MER-L-000272-21

**Civil Action**

**Adjournment Request**

I certify that my adversary has consented and request that the MOTION HEARING scheduled on
08/06/2021 before DOUGLAS H HURD be adjourned.

| | | |
|---|---|---|
| Original DED: | Current DED: | # of DED Extension: 0 |
| Original Arb Date: | Current Arb Date: | # of Arb Adjournments: 0 |
| Original Trial Date: | Current Trial Date: | # of Trial Adjournments: 0 |

/S/ JARED K LEVY

1



**Jared K. Levy** | Counsel

LibertyView | 457 Haddonfield Road, Suite 400 | Cherry Hill, NJ 08002-2220
Direct 856.317.3642 | Fax 856.317.3604
levyj@whiteandwilliams.com | whiteandwilliams.com

July 26, 2021

Via E-Filing

The Honorable Douglas H. Hurd, J.S.C.
Superior Court of Mercer County
Civil Courthouse
175 South Broad Street, 3rd Floor
Trenton, NJ 08650

RE:  Lavine v. Princeton Medical Group, P.A., et al.
     Docket No:  MER-L-000272-21

Dear Judge Hurd:

This Firm represents defendant American Academy of Pediatrics, Inc. in the above matter.
Pending before Your Honor on August 6, 2021 is American Academy of Pediatrics Inc.'s Motion
to Dismiss Plaintiffs' Complaint (LCV20211469872).   At plaintiffs' counsel's request, we have
agreed to carry Defendant's Motion to Dismiss two cycles to September 10, 2021.   Accordingly,
it is respectfully requested that defendants Motion to Dismiss (LCV20211469872) be carried to
September 10, 2021.

Thank you for your courtesies.

Very truly yours,

WHITE AND WILLIAMS LLP

Jared K. Levy
JKL:hch
Cc (via e-filing):   Marc Silver, Esquire
                     Andrew Delaney, Esquire
                     Stephanie J. Viola, Esquire

Delaware | Massachusetts | New Jersey | New York | Pennsylvania | Rhode Island

STEPHANIE J VIOLA
246342017
136 FRANKLIN CORNER ROAD B2
LAWRENCEVILLE NJ 08648

**Superior Court of New Jersey**
**Civil Division, Civil Part**
MERCER County

SHINGO  LAVINE, AIKO  LAVINE, ADAM
LAVINE
      vs.
PRINCETON MEDICAL GROUP, P.A.,
AMERICAN ACADEMY OF PEDIATRICS

Docket No. MER-L-000272-21

**Civil Action**

**Adjournment Request**

I certify that my adversary has consented and request that the MOTION HEARING scheduled on
08/06/2021 before DOUGLAS H HURD be adjourned.

| | | |
|---|---|---|
| Original DED: | Current DED: | # of DED Extension: 0 |
| Original Arb Date: | Current Arb Date: | # of Arb Adjournments: 0 |
| Original Trial Date: | Current Trial Date: | # of Trial Adjournments: 0 |

/S/ STEPHANIE J VIOLA

1

# LENOX, SOCEY, FORMIDONI, GIORDANO, LANG, CARRIGG & CASEY

### A LIMITED LIABILITY COMPANY
### COUNSELORS AT LAW
136 FRANKLIN CORNER ROAD, UNIT B2
LAWRENCEVILLE, NEW JERSEY 08648

TEL: (609) 896-2000

FAX: (609) 895-1693

RUDOLPH A. SOCEY, JR., P.C.
ROLAND R. FORMIDONI
ROBERT P. CASEY, P.C.
GREGORY J. GIORDANO†
JOSEPH R. LANG ⧾
ROBERT F. CASEY, P.C.
PATRICK F. CARRIGG**

*MEMBER OF NJ & PA BAR
**MEMBER OF NJ & NY BAR
***MEMBER OF NJ, NY & MA BAR
† CERTIFIED AS A CIVIL TRIAL ATTORNEY

ANDREW M. SALMON*‡
NICHOLAS J. REPICI*
CASEY R. LANGEL*
MICHAEL A. PATTANITE, JR.*
CASEY P. ACKER***
STEPHANIE J. VIOLA

OF COUNSEL
THOMAS M. BROWN, JSC (RET.) *

SAMUEL D. LENOX
1922–1975

July 26, 2021

**VIA ECOURTS**

The Honorable Douglas H. Hurd, P.J.Cv.
Mercer County Civil Courthouse
175 South Broad Street, 3rd Floor
Trenton, NJ 08650

> Re:   **Adam Lavine v. Princeton Medical Group, et al.**
> **MER-L-272-21**

Dear Judge Hurd:

This office represents the Defendant, Princeton Medical Group, in the above-referenced matter. Presently before Your Honor is our client's Motion to Dismiss, which is returnable on August 6, 2021. Plaintiff's counsel has requested that we carry our motion two cycles until September 10, 2021, and we have consented to that request. Accordingly, it is respectfully requested that Defendant's motion be carried to September 10, 2021.

Your attention and consideration to the foregoing are greatly appreciated.

Very truly yours,

*s/ Stephanie J. Viola*

For the Firm

MERCER COUNTY COURTHOUSE
CIVIL CASE MANAGMENT OFFICE
175 SOUTH BROAD ST P O BOX 8068
TRENTON          NJ 08650-0068

                    DISMISSAL NOTICE

TELEPHONE - (609) 571-4200 EXT. 74432,NANCY NOCELLA      TEAM 050
COURT HOURS:  8:30 AM - 4:30 PM

                DATE: JULY 30, 2021
                RE: LAVINE ADAM  VS AMERICAN ACADEMY OF  PEDIATRIC
            DOCKET: MER L -000272 21
            PARTY:   PRINCETON MEDICAL GR


        PLEASE TAKE NOTICE THAT ON SEPTEMBER 28, 2021 (60 DAYS FROM DATE OF
THIS NOTICE), THE COURT WILL DISMISS THE ABOVE PARTY OR PARTIES FOR LACK OF
PROSECUTION WITHOUT PREJUDICE, PURSUANT TO RULE 1:13-7 OR RULE 4:43-2 UNLESS ACTION
REQUIRED UNDER THE ABOVE RULES IS TAKEN.


    HON DOUGLAS H. HURD                          ATT: ANDREW S. DELANEY
    _____              ANDREW DELANEY, ATTORNEY
AT LA
        JUDGE                                    6 SOUTH ST
                                                 STE 203
                                                 MORRISTOWN      NJ 07960

JARED K LEVY
019132003
457 HADDONFIELD RD
CHERRY HILL NJ 08002

**Superior Court of New Jersey**
**Civil Division, Civil Part**
MERCER County

SHINGO  LAVINE, AIKO  LAVINE, ADAM
LAVINE
      vs.
PRINCETON MEDICAL GROUP, P.A.,
AMERICAN ACADEMY OF PEDIATRICS

Docket No. MER-L-000272-21

**Civil Action**

**Adjournment Request**

I certify that my adversary has consented and request that the MOTION HEARING scheduled on
09/10/2021 before DOUGLAS H HURD be adjourned.

| | | |
|---|---|---|
| Original DED: | Current DED: | # of DED Extension: 0 |
| Original Arb Date: | Current Arb Date: | # of Arb Adjournments: 0 |
| Original Trial Date: | Current Trial Date: | # of Trial Adjournments: 0 |

/S/ JARED K LEVY

1



**Jared K. Levy** | Counsel

LibertyView | 457 Haddonfield Road, Suite 400 | Cherry Hill, NJ 08002-2220
Direct 856.317.3642 | Fax 856.317.3604
levyj@whiteandwilliams.com | whiteandwilliams.com

August 18, 2021

Via E-Filing

The Honorable Douglas H. Hurd, J.S.C.
Superior Court of Mercer County
Civil Courthouse
175 South Broad Street, 3rd Floor
Trenton, NJ 08650

RE:  Lavine v. Princeton Medical Group, P.A., et al.
        Docket No:  MER-L-000272-21

Dear Judge Hurd:

This Firm represents defendant American Academy of Pediatrics, Inc. ("AAP") in the above
matter.  Pending before Your Honor on September 10, 2021 is American Academy of Pediatrics
Inc.'s Motion to Dismiss Plaintiffs' Complaint (LCV20211469872).   The purpose of this letter
is to respectfully request that the motion be carried to September 24, 2021 in order to allow AAP
additional time to file their reply brief in light of Labor Day and the upcoming Jewish holidays.
I have conferred with plaintiffs' counsel and we respectfully request the motion be carried with
plaintiff's counsel's  opposition still due by **September 2, 2021** and defendant AAP's reply brief
due by **September 20, 2021.**

Thank you for your courtesies.

Respectfully submitted,

WHITE AND WILLIAMS LLP

Jared K. Levy
JKL:hch
Cc (via e-filing):   Marc Silver, Esquire
                    Andrew Delaney, Esquire
                    Stephanie J. Viola, Esquire

Delaware | Massachusetts | New Jersey | New York | Pennsylvania | Rhode Island

27637705v.1

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO, AIKO AND ADAM LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS, INC.<br>Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MERCER COUNTY<br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br><br><br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT AMERICAN ACADEMY OF PEDIATRICS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT WITH PREJUDICE** |

## **INTRODUCTION**

Defendant the American Academy of Pediatrics, Inc. ("AAP") misapprehends the gravamen of the Plaintiffs' claims against it. It portrays the Complaint as being a medical negligence/malpractice claim for two circumcisions that Plaintiff Shingo Lavine ("Shingo") underwent as an infant, the results of which have left him with a litany of physical and psychological problems. In doing so, they erroneously invoke a number of defenses that would apply only if this case were actually a medical malpractice/negligence case, and ignore or

1

downplay the fraud that the AAP itself actually engaged in. Plaintiffs do not claim medical

negligence against the AAP (nor against any other party for that matter). The AAP, being a trade

organization, does not perform circumcisions,[1] so it cannot negligently perform them. Nor do

Plaintiffs claim that the AAP was directly involved in the "informed consent" counseling prior to

either of Shingo's circumcisions, as the AAP itself does not provide "informed consent"

counselling directly to its patients. Rather, the AAP, as the leading organization of pediatricians

in the United States and a trade association dedicated to its members and their financial interests,

has voluntarily taken upon itself the responsibility of providing what it alleges to be authoritative

medical advice, guidance, recommendations for treatment to the medical profession and general

public.

Plaintiffs' claims are based upon fraud perpetrated by the AAP when it promulgated

guidelines on circumcision in 1989, encapsulated in a "Report of the Task Force on Circumcision

(RE9148)" ("Guidelines")[2], upon which the AAP expected the medical profession and the

general public to rely in considering whether or not to recommend or agree to the circumcision

of an infant (notwithstanding a legally unenforceable "waiver" the AAP tries to invoke to

exculpate itself from the wrongdoing it committed in promulgating the guidelines). These

guidelines were promulgated with the express goal of protecting the medical profession from

lawsuits that were beginning to spring up in the 1980's (on the basis that circumcision was

medically unnecessary and therefore constituted a battery when done on non-consenting minors).

Additionally, at least one member of the committee (the chairman Dr. Edgar Schoen, M.D.) was

so driven in his zealotry for circumcision that he authored a poem ("The Ode to the Circumcised

---

[1] Many of its members perform them, however.

[2] See Exhibit B.

2

Male")[3] in which he waxed philosophically on his own predilection for circumcised penises and a desire for an increasing universality of circumcision.[4] The guidelines that the Dr. Schoen-chaired AAP Task Force promulgated were a direct product of his zealotry toward the subject and the desire of the AAP and the medical community writ large to make circumcision-related lawsuits more difficult moving forward, as they intentionally included numerous false and fraudulent representations and omissions.

When Shingo was born in December 1997, the obstetrician who delivered him (Dr. Jeffrey L. Chait M.D.) referenced the AAP guidelines[5] in recommending circumcision to Shingo's father, Plaintiff Adam Lavine ("Adam"), and Adam relief upon Dr. Chait's reference to those guidelines in agreeing to the circumcision of Shingo. (Shingo's mother, Plaintiff Aiko Lavine, was incapacitated from a difficult labor at the time). If the AAP guidelines had not been the product of a Task Force (and Chairman specifically) with fraudulent intent, and Adam had not had them transmitted to him through Dr. Chait, he would not have given permission for the circumcision. Shingo would not have been circumcised, and would not have suffered the damage that he ultimately did from the two circumcisions. In fact, underscoring the fact that medical malpractice/negligence (and the legal principles governing it that the AAP tries to pigeonhole into this case) has little relevance to this case or the AAP's liability to Shingo (except insofar as it would heighten the damages), Shingo still would have suffered damages and his legal claims would have remained unchanged even if the circumcision procedure had not been botched in any

---

[3] See Exhibit A.

[4] The AAP apparently sees no conflict of interest or ethical issue in appointing such a man as Chairman to a supposedly objective task force, nor does it feel like it should bear any responsibility for the outcome them having done so.

[5] No subsequent task force on circumcision had been convened since 1989, so those guidelines were the most recent at the time Shingo was born.

way. He still would have lost his foreskin, and the tissue contained therein, the very loss of which (irrespective of whether the procedures themselves were improperly done or not, which they were in this case) is central to many of the issues Shingo is now experiencing. Accordingly, it is the AAP's fraud in promulgating the 1989 guidelines, and the damage that ultimately stemmed from Adam's reliance on those guidelines in making the decision to get Shingo circumcised that is at issue in the case. Accordingly, all of the AAP's attempts to get the case dismissed on the basis that this is a mispleaded malpractice/negligence case against a malfeasant doctor are misplaced. They utterly fail to account for the AAP's own fraudulent conduct. Because the facts alleged in this case support claims for intentional fraud and constructive fraud under New Jersey law, the AAP's Motion to Dismiss must be denied in its entirety.

## **STATEMENT OF FACTS**

### **A.  BACKGROUND ABOUT THE AAP AND CIRCUMCISION**

The AAP is an organization of physicians who specialize in pediatrics. (Compl. para. 25) It was created in part for the purpose of leading the pediatric community in setting standards of practice and recommendations for practice. (Compl. para. 25) It does this by voluntarily issuing advisory reports, recommendations, and guidelines for both the medical profession as well as for the general public. (Compl. para. 25) Additionally, it is organized to protect the economic welfare of its members, which it does by actively lobbying federal and state legislatures for laws beneficial to its members. (Compl. para. 25) One of the issues the AAP has dealt with as part of its operation is circumcision.

While neonatal male circumcision (the removal of the foreskin from the penis) is so largely accepted as a normal and routine part of neonatal medicine in the United States that its

4

existence and practice is rarely questioned, its controversial and nuanced history belies the seeming banality with which it exists within American culture. It began thousands of years ago for a variety of reasons having nothing to do with medicine. Despite entering American medicine in the early part of the 20th century when it soon became entrenched as a cultural practice, it is unnecessary, and in fact is extremely uncommon outside of American medicine.[6] (Compl. para. 23-24) The AAP actually reflected this view when its Committee on the Fetus and Newborn issued *Standards and Recommendations of Hospital Care of Newborn Infants* in 1971. (Compl. para. 29). It stated that there are no valid medical indications for circumcision in the neonatal period. (Compl. para. 29). Its ad hoc task force of that committee found no basis for changing that statement in 1975, stating that there is no absolute medical indication for routine circumcision of the newborn. (Compl. para. 29) The AAP also noted the value of the foreskin (the part removed during circumcision) in 1984. It published a pamphlet for the parents of newborns entitled "Care of the Uncircumcised Penis." (Compl. para. 31). The pamphlet noted some of the functions of the foreskin: shielding the glans from the irritation from feces and urine it otherwise would have, protecting it from irritation and the resultant meatal stenosis that can occur, which is a narrowing of the urinary opening.[7] (Compl. para. 31). The AAP's position on circumcision took a dramatic turn in the 1980's, however.

## B. FRAUD BY THE AAP

---

[6] Shingo Lavine's mother, Aiko, is of Japanese heritage, where circumcision is so uncommon that she had never heard of the procedure until immigrating to the United States. This is similar to Europe, where the procedure is virtually unheard of as a routine part of neonatal medicine.

[7] When the AAP published a similar pamphlet in 1994, it removed any references to the function of the foreskin, without any rationale for doing so.

During the 1980's a series of legal arguments against circumcision began springing up, spurred in part by the fact that the medical profession was on record as saying there was no legitimate medical basis for circumcision, yet it was still being widely practiced by them (largely for cultural/aesthetic reasons). These arguments suggested that the American medical profession could be held liable for soliciting consent for unnecessary genital surgery that had no valid medical purpose (and thus making parental consent invalid), arising in several notable lawsuits and law review articles.[8] One was the 1984 case of Adam London, a California boy whose mother, Trudie London, filed a lawsuit on his behalf against the physician who performed his circumcision, his medical group, and the hospital where it was done. (Compl. para. 32) The lawsuit claimed that Trudie London's consent to her son's circumcision was invalid since circumcision itself constituted battery and violated several California statutes (the state where it was brought), and therefore parental consent would be invalid. (Compl. para. 32) While the case was ultimately unsuccessful, it received widespread publicity (including a feature in Time Magazine). (Compl. para. 32).

The publicity that the *London* case received had the effect of widely alarming the medical profession. They recognized the threat that looming litigation posed to their profession, and reacted to it accordingly. The November 15-30, 1986 issue of *Ob-Gyn News* carried an article entitled, "See Expanding Liability Risks in Circumcision," which cited another California case that contended the procedure violated the boy's Constitutional right to privacy, safety and happiness and also constituted a battery since the boy's parents had no valid right to consent to the unnecessary and unlawful procedure. (Compl. para. 34).

---

[8] See William Brigman, "Circumcision as Child Abuse: The Legal and Constitutional Issues," 23 *Journal of Family Law* 3, University of Louisville School of Law, 1984-85.

Perhaps no member of the medical profession was more alarmed and more defensive than Edgar Schoen, M.D. Schoen was a friend of the defendant in the *London* case and displayed a fervor for defending circumcision that was so strident, it went beyond the expression of a policy or medical preference and veered into a personal zealous fanaticism. Schoen, in addition to lamenting the fact that "the anti-circumcision tide" might prevail, authored a poem whereby he expressed a personal predilection of the circumcised penis, extolling its virtues and the fact that the circumcised penis would become increasingly universalized.[9] (Compl. para. 36). Titled the "Ode to the Circumcised Male" and published in the *American Journal of Diseases of Children*, Schoen viciously derided those opposed to circumcision and stated that the circumcised "ain't passe it will rise up in style." (Compl. para. 36).

In 1988 or 1989, Schoen volunteered to chair the Task Force of the AAP on Circumcision, and the AAP in fact appointed Schoen as chairman of the Task Force. (Compl. para. 38). This AAP Task Force issued a "Report of the Task Force on Circumcision (RE9148)," ("guidelines") which was published in the AAP's journal *Pediatrics* in August 1989.[10] (Compl. para. 39). The guidelines were a reflection of the chair's, Edgar Schoen's, passionate personal predilection for seeing circumcision as universalized along with his professional fear and opposition to the kind of litigation that was arising in part as a result of the AAP's then current position on circumcision. Accordingly, the guidelines contained numerous misrepresentations and omissions meant to portray circumcision in a more positive light (with the ultimate ostensible goal of making circumcision more universalized while mitigating against the risk of potential lawsuits then arising). These included, but were not limited to: 1). Failure to disclose

---

[9] See Exhibit A of Plaintiffs' Complaint.

[10] See Exhibit B of Plaintiffs' Complaint.

that circumcision is not routine neonatal medicine anywhere else in the world (Compl. para. Para. 60), 2). failure to disclose the controversy around circumcision (Compl. para. 61), 3). failure to disclose lack of training by many of the practitioners of circumcision (Compl. para. 68), 4). failure to disclose numerous complications from circumcision (including painful erections, scrotal webbing, hypersensitivity of the glans many of those suffered by the Plaintiff in this case) (Compl. para. 69), 5). failure to disclose the true complication rate of circumcision (which is closer to 13%, with a severe complication rate as high as 2-4%), 6). failure to disclose the function/value of the foreskin (Compl. para. 69), 7). failure to disclose the risk of psychological harm that can result (Compl. para. 72), 8). failure to disclose that parents may feel regret over the procedure (Compl. para. 44, 73), and 9). misrepresenting the efficacy of the procedure in preventing UTI's, penile cancer, and STD's (Compl. para. 75-77).

## C.  THE BOTCHED CIRCUMCISION PROCEDURE

Into this medical climate was born Shingo Lavine in 1997, without the AAP having retracted or having issued any other policy statements or guidelines on circumcision in the intervening years since the 1989 guidelines were issued.[11] Shingo was born to Adam and Aiko Lavine in December, 1997 at Princeton Medical Center in Plainsboro, New Jersey. Shortly after his birth, on or about December 18, 1997, the obstetrician who did the delivery (Dr. Jeffrey L. Chait, M.D.), circumcised Shingo. (Compl. para. 6). In the course of soliciting and obtaining the permission of Shingo's father, Adam Lavine[12], Dr. Chait told him that the AAP had issued guidelines on circumcision. (Compl. para. 10). Dr. Chait then provided the AAP's presentation

---

[11] The AAP issued its next guidelines/policy statement on circumcision in 1999, a little over a year after Shingo was born.

[12] Shingo's mother, Aiko, was incapacitated on Percocet and morphine due to a difficult 36 hour labor and therefore could not properly give her consent.

on circumcision as promulgated through the 1989 guidelines, replete with a misrepresentation about the efficacy of circumcision in preventing STD's, penile cancer, and UTI's, and a complete omission about: 1). circumcision not being routine medicine anywhere else, 2). the function/value of the foreskin, 3). the psychological harm that can result, 4). the complications of painful erections, scrotal webbing and hypersensitivity of the glans arising, 5). the true complication rate, 6). the regret of parents, 7). the controversy around the procedure, and 8). the improper training of many practitioners. (Compl. para. 12).

Approximately a month after the circumcision, Shingo's parents observed that Shingo's penis had not healed properly and looked unusual. (Compl. para. 13). Between January 10-15, they brought Shingo to Shingo's pediatrician, Dr. David Sharlin of Delaware Valley Pediatrics with concerns about Shingo's penis. (Compl. para. 14) After examining Shingo, Dr. Sharlin told them that he believed that complications had arisen from Shingo's circumcision, namely that not enough foreskin had been removed. (Compl. para. 14) He recommended a follow-up with Dr. Joseph Barone, Chief of Section of Pediatric Urology at Robert Wood Johnson University Hospital, New Brunswick, New Jersey.

On January 21, 1998, Adam and Aiko presented Shingo to Dr. Barone for examination. Dr. Barone observed blood and scarring on Shingo's penis. He cleaned the penis, then diagnosed Shingo as suffering from phimosis and buried penis. (Compl. para. 15) He recommended what he called a "second circumcision." (Compl. para. 15) Dr. Barone thereafter performed a second circumcision surgery on Shingo. He wrote a letter later that day stating that, "Shingo should do very well with the circumcision." (Compl. para. 15).

**D.  DELAYED DISCOVERY OF FRAUD**

Shingo, however, did not do very well after his circumcision. While the circumcision may initially have appeared to be a success, Shingo began noticing physical complications on his penis. (Compl. para. 16) These complications included painful erections, pubic hair bearing down to the circumcision scar line, impaired sexual functioning, meatal stenosis (narrowing of the urethral opening), scrotal webbing, and hypersensitivity of the glans. (Compl. para. 16). In part due to the pervasive normality of circumcision within American culture, the difficulty of getting accurate information on the subject, and the latency or delayed onset of some of the circumcision related maladies, Shingo was not able to attribute the complications to the AAP's fraud until September 25, 2020. (Compl. para. 23). It was at this point that the Lavines spoke with the law professor Peter W. Adler, an expert on circumcision and the law. He informed them that the foreskin is a natural body and the most sensitive part of the penis, men value it, and physicians in most other countries outside the United States leave it alone. He further explained that unnecessary surgery on a child violates the ethical and legal right of boys and the men they become to bodily integrity and self-determination. (Compl. para. 23). This was the first time that the Lavines linked the maladies that Shingo had been experiencing to the AAP's fraud, as their social background inculcated them in the normality of circumcision, and came shortly on the heels of Shingo's first attempts to deal with the effects of the circumcision related maladies he was experiencing. (Compl. para. 24)

For several months, Shingo had become became involved with Foregen, a medical organization devoted to regenerating foreskin, specifically the specialized structures including nerve endings that are removed or destroyed during circumcision. (Compl. para. 19). On or about June 15, 2020, Shingo began partial restoration of his foreskin, a highly intensive daily routine to

attempt to recover the tissue lost during the circumcision. (Compl. para. 20) It requires wearing weights attached to the penis and pulling for 3-4 hours per day for 5-10 years, which is very uncomfortable and time consuming. (Compl. para. 20). Shingo has spent more than 700 hours over the course of almost 1,000 sessions as part of the process to partially "restore" his foreskin. (Compl. para. 20). On July 29, 2020, Shingo began psychotherapy to try to cope with the severe emotional distress he feels about his circumcision, but to date, it has not diminished his distress. (Compl. para. 21). This budding awareness led to the aforementioned September 25, 2020 meeting with Professor Adler whereby they first became aware of the AAP's fraud.

## LEGAL STANDARD

Under New Jersey law, a Motion to Dismiss may only be granted when a cause of action cannot be suggested by the facts alleged in the Complaint. *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 746 (1989); *Rieder v. State*, 221 N.J. Super. 547, 552 (App. Div. 1987). In reviewing the Complaint for facts that would suggest a cause of action (and therefore preclude a Motion to Dismiss), the Court must search in depth and with liberality, "with a generous and hospitable approach." *Printing Mart-Morristown*, 116 N.J. at 746. Every reasonable inference of fact must be given to the Plaintiff, and the Court is to give no weight to the likelihood of success. *Id*; *Lieberman v. Port Auth. of N.Y. &N.J.*, 132 N.J. 76, 79 (1993). As such, Motions to Dismiss are extraordinary remedies that Courts should only grant in the rarest instances. *Id*. The same standard applies in fraud cases, except that a fraud claim requires the particulars of the of the wrong, including dates to the extent practicable. *Rule* 4:5-8.

## LEGAL ARGUMENT

**I.    THE LAVINES' CLAIM IS BASED ON THE AAP'S AFFIRMATIVE ACTS OF FRAUD, NOT LACK OF INFORMED CONSENT**

The AAP attempts to misrepresent what this case is truly about by stating that the gravamen of the Lavines' claim is lack of informed consent and medical malpractice (due to a doctor's failure to fully inform them of the risks of circumcising their son and the subsequent damage suffered as a result of the circumcision). However, the central essence of the claim is the Lavines' reliance on the AAP's fraudulently promulgated guidelines on circumcision, and the AAP's attempts to frame it differently are downright deceptive. As shown in the following section of this Legal Argument, the law is clear that the AAP faces trade association liability when it makes negligent or, as here, fraudulent claims that injure a plaintiff, and the AAP's invocation of law that applies specifically to malpractice/negligence cases where a doctor, not a trade association is the liable party, is totally misplaced.

One of the primary reasons that Adam chose to circumcise Shingo is that he was told that the AAP had issued guidelines on circumcision showing that it reduced the incidence of urinary tract infections, penile cancer, and sexually transmitted diseases, and that circumcision was a minor, safe and harmless procedure, without any mention of the controversy around circumcision, the resentment some men feel about, the true complications that can result, or the function/erogenous purpose of the foreskin. (Compl. para. 10-12, 40, 44, 69). The AAP—which portrays itself as an authority on circumcision, which the obstetrician invoked as an authority on circumcision, and which Adam understood to be an authority on circumcision—thus claimed, expressly and by implication, that these are good and valid medical reasons to have boys circumcised. More importantly, it omitted very crucial reasons why a parent like Adam would choose not to elect it.

The AAP tries to limit their responsibility for inducing the Lavines' circumcision decision by characterizing their role as being relevant only for evaluating whether the Lavines had enough

information from the doctor to provide informed consent. However, the allegations in the Complaint belie this assertion, particularly when put into the context of how the information (or lack thereof) that the Lavines relied on in reaching their circumcision decision can be directly linked back to the AAP's intentionally fraudulent manner of promulgating the 1989 guidelines on circumcision, as opposed to the independent failure on the part of the doctor to properly inform them of the risk/benefit ratio of circumcision. For instance, the AAP failed to make any mention in its 1989 guidelines on circumcision that the foreskin has a function (which it had previously discussed at length in a 1984 pamphlet for parents of newborns entitled "Care of the Uncircumcised Penis"), namely protecting the head of the penis from the irritation caused by feces and urine, which in turn can cause ulcers, meatitis (inflammation of the urinary opening), meatal stenosis (narrowing of the urinary opening), all of which virtually never occur in uncircumcised penises. (Compl. para. 31, 40). Additionally, the guidelines failed to disclose: the controversy around the procedure (Compl. para. 33, 34, 61), the growing opposition and resentment/regret about the procedure (Compl. para. 32, 44, 72, 73), the fact that UTI's can be easily treated with antibiotics as they are in girls, and that girls have many times more UTI's than boys, circumcised or not (Compl. para. 75), the fact that circumcision is unique as a routine neonatal practice in the United States and uncommon elsewhere (Compl. para. 60), and numerous complications of circumcision, including the complications suffered by Shingo like painful erections, scrotal webbing, hypersensitivity of the glans and unsatisfactory cosmetic appearance. (Compl. para. 69). In addition, the AAP makes several affirmative misrepresentations in the guidelines. It cites the risk of complications as being 0.2% and 0.6%, when the true rate of complications is 13% and the rate of the severe complications is 2-4%.

(Compl. para. 69). It also falsely claims that circumcision is a valid prophylactic against penile cancer, deviating from its own 1975 Policy Statement on circumcision which found that there was no solid evidence for using circumcision to prevent penile cancer (Compl. para. 76).

In light of this, any lack of informed consent (to the extent the AAP would try to frame the Lavines circumcision decision around that) cannot be delinked from the guidelines the AAP promulgated in 1989. This means that any informed consent argument here would need to incorporate the acts of the AAP into it, unless the AAP were to take the logically absurd position that the doctor failed to elicit proper informed consent from the Lavines by following the very guidelines that the AAP promulgated. However, the case law the AAP so heavily relies on in advancing the argument that this case is one about lack of informed consent, is rendered inapplicable by the nature of the AAP's involvement in this case. Under the AAP's own argument, "informed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to evaluate knowledgably the options available and the risks attendant upon each before subjecting the patient to a course of treatment." *Howard v. Univ. of Med. & Dentistry of New Jersey*, 172 N.J. 537, 548 (2002). Furthermore, the case law that it cites for the proposition that this is an informed consent case has reasoning that is specific not just to the doctor-patient context, but even more specifically to malpractice claims within the doctor-patient context. The court in *Howard* articulates this by stating that they are reluctant to allow a fraud claim when it arises ***exclusively*** from the doctor-patient relationship. *Id* at 554. To the extent that the AAP references "*Howard's* Test" as a dispositive holding that controls here is deceptive. The so-called *Howard* Test is only referenced in a parenthetical to a New York case (see *Spinosa v. Weinstein*, 571 N.Y.S.2d. 747, 753

[N.Y.App.Div.1991]), and its holding (that a doctor's concealment of his own malpractice does not give rise to a claim of fraud and that a fraud claim can only arise when it occurs separately from and subsequent to the malpractice and only when it gives rise to damages separate and distinct from those flowing from the malpractice) only applies to the specific circumstance of a physician concealing their own malpractice, not as a broad-based principle of law, as the AAP is trying to morph it into. (The reasoning makes sense since in the malpractice context where the person committing the fraud and the malpractice are one in the same, since the claims would and could merge into one another and otherwise would be duplicative). Here, the Lavines are not alleging mere negligence by the AAP, nor are they alleging medical malpractice by the AAP, and nor are they even continuing to allege any claims at all against the doctor who performed the circumcision; they are alleging fraud against the AAP. Thus, any argument that tries to pigeonhole this case as being about lack of informed consent lacks merit. This case is about fraud committed by a trade association (the AAP), and accordingly the law establishing liability for trade associations must apply.

## II.     THE AAP BEARS TRADE ASSOCIATION LIABILITY TO THE GENERAL PUBLIC AND HENCE THE LAVINES FOR HAVING PROMULGATED THE 1989 GUIDELINES

The New Jersey Supreme Court has found that trade associations bear responsibility to members of the general public who are damaged as an indirect result of the trade association's policy positions (notwithstanding whether there is any direct relationship between the trade association and the damaged party, and regardless of whether the damaged party was even told about or had heard about the association or its position). *Snyder v. American Association of Blood Banks*, 144 N.J. 269, 292-93 (1996). In *Snyder*, the plaintiff contracted HIV from a blood

transfusion. The defendant American Association of Blood Banks ("AABB") had no connection with the transfusion, whatsoever, except for their recognized role as being a leader in setting policy in the blood banking/transfusion industry. *Id* at 277-78. Their purpose, as a "professional, non-profit, scientific and administrative association," was to develop and recommend standards on the practice of blood banking, to help promote public health, and to conduct numerous programs for communication and education among organization members and the public at large. *Id* at 278. (The AABB had falsely claimed that blood transfusions are safe). Notwithstanding the fact that the AABB had no direct or immediate connection with the damaged plaintiff, the Court found that the unique and dominant role of the AABB in blood banking, and the extent of its control over its institutional members established the requisite relationship between AABB and blood product recipients. *Id* at 275. The Court specifically found that the absence of a direct relationship between the AABB and blood recipient was not dispositive. *Id* at 292. Instead, it found that the determination of the existence of a duty ultimately is a question of fairness and policy, and that am important, although not dispositive consideration, is the foreseeability of injury to others from defendant's conduct. *Id*. In reaching its holding finding liability against AABB, the Court stated that the AABB sought and cultivated responsibility of blood safety by their words and conduct that the public ultimately relied on. *Id* at 293.[13]

Here, the AAP's role is remarkably similar to that of the AABB and it should be found responsible under the same theory of (trade association) liability. Like the AABB, the AAP is a trade association that is organized to protect the economic welfare of its members, and it actively

---

[13] See also Matthew R. Gianetti, *Circumcision and the American Academy of Pediatrics: Should Scientific Misconduct Result in Trade Association Liability*, 85 Iowa L. Rev. 1507 (2000). Gianetti asserts in his law review article that the AAP's 1989 guidelines on circumcision constituted fraudulent misrepresentation in that they violated a duty of care by erroneously and falsely touting medical benefits and lack of risks involved. Furthermore, he asserts that the AAP bears liability to any of those injured as a result of its guidelines under the holding in *Snyder*.

lobbies federal and state legislatures for laws beneficial to its members. It also claims to lead the pediatric medicine community in setting standards of practice and recommendations, and guidelines for both the medical profession as well as for the general public. (Compl. Para. 25). Additionally, by its words and conduct, the AAP invites other medical associations such as the American College of Obstetricians and Gynecologists, obstetricians and gynecologists, pediatricians, other physicians, and the general public to rely upon the AAP's reports, recommendations and guidelines. (Compl. para. 28). Thus, finding that the AAP owed no duty to the Lavines for the guidelines it disseminated that ultimately induced their circumcision decision would be to completely ignore the unequivocal holding of *Snyder* that trade associations owe a duty to the general public for the dissemination of position statements and guidelines that ultimately impact the public.

## III.     THE LAVINES' CLAIM IS NOT TIME BARRED

Since this is a fraud case (and not a medical malpractice one), the statute of limitations could not begin tolling until Shingo discovered he had been defrauded, which in this case occurred on September 25, 2020 when they met Professor Peter Adler, who first explained the link between Shingo's physical and psychological maladies from the circumcisions, and the AAP's fraud. (Compl. para. 23). Under New Jersey law, the statute of limitations for fraud is six years, *N.J.S.A.* 2A:14-1, but the statute of limitations is tolled by a "discovery rule," which holds that the limitations period does not commence until the fraud was discovered, or through reasonable diligence, should have been discovered. *Catena v. Raytheon*, 447 N.J. Super. 43, 53 (App. Div. 2016); *Simpson v. Widger*, 311 N.J. Super. 379, 391 (App. Div. 1998). Thus, the clock only started to run on the Lavines' claims against the AAP on September 25, 2020, and they brought

suit on February 3, 2021, within five months and thus well within the allowable six-year statute of limitations timeline.

The reasoning that underpins that rationale for the discovery rule applies remarkably well to this case. The rule is designed to prevent a defendant from benefitting its own deceptive conduct, insofar as it impedes a plaintiff's ability to even know he has been defrauded, and to prevent a defendant from taking advantage of its own fraudulent conduct being part of the reason for the delay in prosecuting the claims. *Catena*, 447 N.J. Super at 54. As such, mere suspicion of a claim is insufficient to stop the tolling of the statute of limitations. *Id.* Additionally, courts have found that where the nature of the case or injury makes discovery less readily ascertainable, the tolling of the statute of limitations becomes more critical. *Vispiano v. Ashland Chemical Co.*, 107 N.J. 416, 434 [1987]. In *Vispiano*, which involved a toxic tort, the court held that the injured person was unaware of the cause of his injury, and lacking specialized medical knowledge, he could not in the exercise of reasonable diligence have discovered it. *Id* at 435.

The same reasoning applies to the AAP's claims against the AAP. Shingo had not conceived of, let alone even thought about, the AAP's fraud in promulgating the 1989 guidelines that ultimately induced Adam into choosing circumcision for him until he met Professor Peter W. Adler on September 25, 2020. (Compl. para. 23). This in part is due to the fact that the AAP's fraud involves complex medical and legal claims. Laypeople know little or nothing about medicine or about the law, so it would have been exceptionally difficult, if not impossible for the Lavines to have discovered the fraud until it was explained to them.

Moreover, it was the AAP's very own acts of deception and concealment bear directly on this case insofar as it applies to the Lavines ability to reasonably discover the AAP's fraud. As has

already been noted, the AAP did not disclose the fact that circumcision is uncommon as routine neonatal medicine in other countries (Compl. para. 60), did not disclose the controversy surrounding circumcision (Compl. para. 61), did not disclose the parental regret and angst that can result from it (Compl. para. 44, 73), did not disclose the breadth and depth of complications that result, including many of the very complications Shingo suffered from (Compl. para. 69), did not disclose the function of the foreskin (Compl. para. 31, 40, 71), and did not disclose the psychological damage that can result from it (Compl. para. 72). The comprehensive and deliberate concealment/non-disclosure of these facts apply write large, together with the fact that the concealment involved facts about medicine and health (which the Lavines knew nothing about) made it impossible for the Lavines to link Shingo's maladies (which he was beginning to take active note of in June, 2020) to the AAP's fraudulent conduct. It took the September 25, 2020 discussion with Professor Peter W. Adler to do that.

The AAP's great leaps to transform this into a medical malpractice case are unavailing (though perhaps understandable given how this claim could *only* be time barred if it were a medical malpractice claim, not a fraud claim), as are its arguments about how and why the Lavines should have or could have discovered the fraud earlier than they did. They erroneously treat the complications from the first circumcision (which could have been a medical malpractice claim had it been brought, but it was not), as being dispositive to the claim in this case. They state that "these allegations concede that the Lavines were on notice in January 1998 that the circumcision had not been performed properly." This might be relevant if the claim were against the first doctor for malpractice, but it is not. It is not at issue whether the operation was performed negligently or badly. The Lavines are alleging that the AAP damaged them by

inducing them into circumcising Shingo at all, and for all damage that has ultimately accrued from that decision. Thus, any notice the Lavines may have been on about damage from the first botched circumcision is ultimately irrelevant. What matters is that the Lavines had no idea they had been defrauded until they spoke with Professor Peter W. Adler on September 25, 2020.

Additionally, the AAP's argument that the Lavines could have obtained a copy of the 1989 report at issue here is woefully misplaced since that is the very document by which the fraudulent information was disseminated; reading it would have only further exacerbated the fraud, since the Lavines would have been unable to discern from the guidelines themselves whether they were fraudulent.

To the extent the AAP argues that the Lavines had access to medical articles referenced in the Complaint, this is a stretch, especially in this phase of litigation where every inference is to go in the Plaintiff's favor, since access to many of these articles is limited and since it is unreasonable to expect a layperson to have the wherewithal to look for them (especially in this context where knowledge about circumcision issues is not readily disseminated). More importantly, Shingo did not begin becoming actively aware of the problems manifesting from his circumcisions until June, 2020 (Compl. para. 17) so any article that may have made them aware of the AAP's wrongdoing would not have become relevant until this point.

## IV.  THE AAP IS NOT JUST A MERE PUBLISHER

The AAP's characterization of itself as a mere publisher that should be shielded from liability is grossly inappropriate and the court must reject it as patently absurd on its face. The AAP in this case went so far beyond just acting as a mere publisher, that it constrains credulity to conceive how it could have the temerity to even proffer such an argument. It convened a Task

Force on circumcision, it put as Chair of that Task Force a man so zealously in support of circumcision that he authored a poem extolling his own predilection for boys' circumcised penises (See Exhibit A; Compl. para. 38), its members made up the Task Force (See Exhibit B), and it claims to lead the pediatric medicine community in setting standards of practice and recommendations for practice (Compl. para. 25). These are not the actions of a mere publisher, as the AAP would try to deceive the court into believing as a way of shielding itself from liability. The fact that it also published the guidelines that are at question here in its journal, *Pediatrics*, and thereby also became a publisher, is a collateral happenstance since it is being sued for all of its actions that are separate and apart from its role in publishing. By way of illustration, had the guidelines been issued in another medium where the AAP was not a publisher, they would bear the exact same responsibility. Likewise, had they published the exact same guidelines in their journal, but promulgated by a completely independent 3rd party unrelated to the AAP, their liability would not be what it is here. The AAP is liable as an active promulgator of the guidelines, not as a passive publisher, and any attempt to frame their role otherwise is misplaced.

## V.      THE LAVINES HAVE PROPERLY PLEADED INTENTIONAL FRAUD

In order to prevail on a common law fraud claim in New Jersey, a plaintiff must show that defendant: 1). Made a representation or *omission* of a material fact, 2). With knowledge of its falsity, 3). Intending that the misrepresentation be relied upon, 4). Which resulted in reasonable reliance, 5). With the plaintiff suffering damages. *Depolink Court Reporting & Litigation Support Services v. Rochman*, 430 N.J. Super. 325, 336 (App. Div. 2013).

Here, the Lavines have successfully plead all five elements of fraud. Therefore, the AAP's Motion to Dismiss must be denied in its entirety.

## A. THE LAVINES ALLEGE NUMEROUS MISREPRESENTATIONS AND OMISSIONS

The Complaint is replete with allegations of material misrepresentations and omissions by the AAP. These include include: failure to disclose the function of the foreskin (Compl. para. 31, 40, 71), failure to disclose parental anger/regret (Compl. para. 44, 73), failure to disclose financial, cultural and religious biases (Compl. para 57-59), failure to disclose that circumcision is extremely uncommon as routine neonatal medicine outside the United States (Compl. para. 60), failure to disclose the controversy around circumcision (Compl. para. 61), failure to disclose lack of training by practitioners (Compl. para. 68), failure to disclose the very complications that Shingo suffered from (Compl. para. 69), failure to disclose the risk of psychological harm (Compl. para. 72), misrepresenting the true rate of complications (Compl. para. 69), and misrepresenting the efficacy of circumcision in preventing UTI's, penile cancer and STD's (Compl. para. 75-77).

Faced with these allegations, the AAP invokes several erroneous arguments. First, it tries to imply that the misrepresentations of the AAP are non-actionable statements of opinion, notwithstanding the fact that *none* of the omissions and misrepresentations listed could be considered opinion even if the AAP were to be given the most favorable inference (which they are not for purposes of this motion). In support of this position, the AAP takes *one* of the alleged misrepresentations (while ignoring or barely mentioning the litany of those listed above), which is that the AAP misrepresented the safety of circumcision. (Compl. para. 67). Even if the AAP were correct in its assertion that this is opinion, this is just one of *numerous* other

misrepresentations and omissions that *are* unequivocally fact based, yet the AAP has chosen to inexplicably almost completely ignore in its brief.

The AAP also tries to defend itself by invoking a statement in the 1989 guidelines that the report is providing a general opinion about safety, not specifically tailored to a particular patient and that the recommendations do not indicate an exclusive course of treatment or procedure to be followed. However, this statement does not undo the damage that the numerous factual misrepresentations and omissions caused. New Jersey has made clear that liability waivers are unenforceable to the extent that they try to exculpate against grossly negligent conduct since it would be against public policy to indemnify conduct that goes beyond mere negligence. *Steinberg v. Sahara Sam's Oasis, LLC*, 226 N.J. 344, 359 (2016). Here, the AAP is trying to indemnify its own willful and fraudulent misrepresentations in clear violation of New Jersey policy as articulated in *Steinberg*.

To the extent that the AAP tries to invoke the learned intermediary doctrine, its invocation in this context would lead to a logically absurd outcome, and is barred under the law. The AAP is essentially saying that the doctor performing a circumcision has an obligation as learned intermediary to advise the Lavines *not* to follow the AAP guidelines. More importantly, the learned intermediary doctrine, to the extent it would apply beyond the context of drug and medical device manufacturers, imposes liability notwithstanding the presence of a learned intermediary when the health-care provider (or learned intermediary) is not warned of risks. *Perez v. Wyeth Labs*, 161 N.J. 1, 14 (1999). Here, the AAP's numerous omissions and misrepresentations bar the invocation of the learned intermediary doctrine pursuant to the holding in *Perez*.

23

The AAP's contention that it has no duty to disclose when a fraud claim is based on silence or concealment is equally unavailing. The case the AAP cites to advance this proposition actually holds entirely the opposite, as it states: "Although a party may keep absolute silent and violate no rule of law or equity, yet if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to discover the whole truth." *Berman v. Gurwicz*, 189 N.J. Super. 89, 93 (Ch. Div. 1981). This is important. Here, once the AAP has chosen to make affirmative statements on circumcision, it became liable for any concealments on the subject, and there were many, for not telling the whole truth. Even if the AAP's characterization of the law on concealment were entirely accurate, the *Snyder* case discussed earlier also makes clear that the AAP (as a trade association promulgating guidelines) did have a duty to the Lavines, thereby implying a duty to disclose and not conceal.

### B.  THE LAVINES HAVE PROPERLY ALLEGED THE AAP'S KNOWLEDGE OF FALSITY

The Lavines assert multiple allegations that establish knowledge of falsity on the part of the AAP. First, the AAP deliberately omitted any discussion of the function of the foreskin from its 1989 guidelines. (Compl. para. 31, 71). This was despite the fact that its own pamphlet from 1984 (but which was subsequently removed from their 1994 pamphlet) for the parents of newborns titled "Care of the Uncircumcised Penis," went into great detail about the function of the foreskin. (Compl. para. 31). Thus, the AAP intended to conceal that the foreskin has functions and is not a useless piece of skin. Second, the AAP failed to disclose that there is any controversy surrounding circumcision. (Compl. para. 61). This was because the AAP was on notice of at least two lawsuits claiming that circumcision constituted a common law battery (Compl. para. 32, 34), and an article published by the University of Louisville School of Law

characterizing circumcision as "child abuse." (Compl. para. 33). The chair of the 1989 Task Force on Circumcision that issued the guidelines, Dr. Edgar Schoen, M.D., even expressed his alarm at the rising "anti-circumcision tide" prevailing and the increasing refusal of third-party payers to cover the procedure. (Compl. para. 36, 38). Lastly, the AAP knowingly and vastly understated the rate of complications despite having a urologist on the committee (Frank Hinman, Jr., who was the author of a major text on pediatric urologic surgery) who had to know the understatement of complications given that a significant part of the practice of pediatric urologists is devoted to trying to repair circumcision complications. (Compl. para. 67).

The AAP attempts to deflect from this issue by pointing to the allegedly well-documented body of evidence in its guidelines. This documentation does nothing to disprove the allegation that, notwithstanding the fact that *some* data in the guidelines may have been well-supported, other pieces of data were either omitted or misrepresented. Furthermore, the AAP chooses to focus their argument related to this issue on one point in the guidelines (UTI's), while making no mention of the AAP's knowledge of falsity of the issues listed in the preceding paragraph.

## C. THE LAVINES HAVE PROPERLY ALLEGED THAT THE AAP INTENDED FOR THEM TO RELY ON THEIR MISREPRESENTATIONS AND OMISSIONS AND THE LAVINES DID SO RELY

While the general rule on fraud is that there must be actual receipt and consideration of any misstatement, courts allow for "indirect reliance" to be the basis for a fraud claim. *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 97 (2000). This allows for a plaintiff to prove a fraud action when he or she heard a statement not from the party that defrauded him or her, but from the party's agent or from someone to whom the party communicated the false statement with the intention that the victim hear it, rely on it, and act on it to his or her detriment. *Id* at 108. Thus, if a party to a

transaction makes a false statement to another party, intending or knowing that the other party will hear it and rely on it, and the second party actually hears the substance of the misrepresentation by means however attenuated, and considers the actual content of that misrepresentation, then that person has established indirect reliance to support a fraud claim. *Id* at 111. Here, the Lavines plainly and clearly allege that the doctor who circumcised Shingo told them that the AAP had issued guidelines on circumcision that extolled its benefits in reducing the incidence of UTI's, penile cancer and sexually transmitted diseases. (Compl. para. 10). Additionally, the AAP's numerous alleged concealments were equally "disseminated" insofar as the doctor provided a similar non-disclosure of these issues. The AAP's own guidelines (See Exhibit B to the Complaint) undercut any argument it might make that it was not its intent for the information to be disseminated to parents like the Lavines, as the last sentence of the guidelines tells the doctors (who are presumably the intended direct recipients of it) how to communicate the information contained within it to parents.

To the extent that the AAP argues that neither the Lavines nor the doctor reviewed the guidelines, it cannot make this argument as to the Lavines since the doctrine of indirect reliance applies directly to situations like the one at hand here, and it cannot make it as to the doctor since his own statement referencing the guidelines disproves the very point the AAP is trying to make. The AAP attempts to work around this issue by trying to sow confusion with a semantical argument about the proper terminology for the 1989 guidelines, and whether the doctor's statement referencing guidelines was actually referring to Exhibit B. This argument holds no merit, however, since the contents of the doctor's statement would reasonably indicate he was referring to the 1989 guidelines. The inference most reasonable to the plaintiff (which the court

must defer to for purposes of this motion), is that this is what the doctor was referring to, not some other illusory document.

Additionally, the Lavines have alleged the requisite malintent on the part of the AAP in inducing their reliance, in that they have shown the AAP intended to obtain an undue advantage. For one, there is tremendous financial incentive for doctors to continue performing circumcisions routinely. (Compl. para. 43). The Chair of the Task Force also had such an intense personal desire to perpetuate the practice, that he actually authored a poem discussing his predilection for boys' circumcised penises. (See Exhibit A to the Complaint; Compl. para. 36).

### D. THE LAVINES HAVE PROPERLY ALLEGED PROXIMATE DAMAGES AND THE QUESTION OF SUPERSEDING CAUSE SHOULD BE LEFT TO A JURY

Here, the Lavines have made a prima facie case that the damage Shingo suffered, while it may have been exacerbated by the negligence of the doctors in *how* they carried out the circumcisions, is at root the result of the fact that the circumcisions were carried out *at all*, which can be traced directly back to the guidelines the AAP promulgated. More importantly, the damage that Shingo suffered was a reasonably foreseeable outcome and a normal incident of risk related to circumcision, thought this is a question that a jury would need to decide, not a Judge in the Motion to Dismiss phase of litigation.

While New Jersey does recognize the doctrine of superseding cause, it notes that this question is ordinarily one left to a jury as a fact-based question, rather than one that should be decided in a motion to dismiss, as is the case here. *Lynch v. Scheininger*, 162 N.J. 209, 235 (2000). Additionally, superseding, or intervening causes that are reasonably foreseeable or are

normal incidents of a risk do not relieve a tortfeasor of liability. *Cruz-Mendez v. ISU/Insurance Services*, 156 N.J. 556, 575 (1999).

## VI.   THE LAVINES HAVE PROPERLY ALLEGED CONSTRUCTIVE FRAUD

Under New Jersey law, constructive (or equitable) fraud has the same elements as intentional fraud, except that it does not require a showing of knowledge of falsity. *Daibo v. Kirsch*, 316 N.J. Super. 580, 588 (App. Div. 1999). Thus, even an innocent misrepresentation can constitute constructive, or equitable, fraud. *Ledley v. William Penn Life Ins. Co.*, 138 N.J. 627, 635 (1995). Case law from other jurisdictions helps elucidate the doctrine more extensively.[14] The California Appeals Court observed that, "Most acts by an agent in breach of his fiduciary duties [to the principal] constitute constructive fraud." *Salahutdin v. Valley of California, Inc.*, 24 Cal. App. 4th 555, 562 (1994). In such a case, a presumption of fraud arises in order to prevent unfairness to the plaintiff. A fiduciary is liable to his principal for *constructive fraud* even though his conduct is not actually fraudulent. *Id.* Courts have found constructive fraud can arise from any unfair conduct: a false statement or omission that misleads the plaintiff such as a negligent misrepresentation (see *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439 [Tex. 1991]); a material omission or failure to disclose what a fiduciary knew or should have known (see *Karle v. Seder*, 214 P.2d 684 [Wash. 1950]); unfair conduct such as self-dealing; acting in bad faith, disloyally, consciously disregarding duties, or for personal gain (see *Ryan v. Gifford*, 918 A.2d 341, 357 [Del. Ch. 2007]); and taking advantage of a position of trust, (see *White v. Consolidated Planning, Inc.*, 603 S.E.2d 147, 156 [N.C. 2004]), gaining an advantage, or

---

[14] See Peter W. Adler, Robert Van Howe, Felix Daase, and Travis Wisdom, *Is Circumcision a Fraud?*, 30 Cornell Journal of Law and Public Policy 1 (Fall, 2020).

obtaining a possible benefit. (see *Dawson v. Hummer*, 649 N.E.2d. 653, 661 [Ind. Ct. App. 1995]).

Here, it has been established that under *Snyder*, the AAP (as a trade organization) owed a duty to the general public and hence the Lavines, and that by egregiously breaching this duty committed constructive fraud for which the court must hold them liable. The AAP has abused its position as a respected institution for medical knowledge and unbiased information that the public can turn to, by convening a Task Force On Circumcision that promulgated guidelines on circumcision not for the purpose of advancing the public good and the profession of medicine as a whole, but to enable its Task Force Chair's zealous and warped personal predilection for circumcision and its own objective to shield the medical profession from circumcision-related litigation. It did this through numerous omissions and misrepresentations documented throughout this brief and the Complaint. In doing so, it has threatened the integrity of the medical profession as a whole, and given undue credence to those who might try to use this one instance of misconduct to impugn the medical profession as a whole. If the court finds in favor of the AAP here, it is granting license to institutions like the AAP to engage in such conduct with impunity. As such, this court must hold the AAP liable (under the doctrine of constructive fraud, as an alternative to intentional fraud).

## VII.    PUBLIC POLICY MANDATES A RULING IN PLAINTIFFS' FAVOR

A ruling in defendant's favor would be an egregious injustice and send a heinous message to all medical trade associations (like the AAP) on which the general public and the medical community writ large rely upon for accurate and honest information. It would send the message that these associations can act with impunity, and without any concern that they will be held

accountable for their actions, no matter how wantonly they may be acting. Here, the AAP had a known zealot on circumcision (who was on record as extolling his personal predilection for circumcised penises and the desire for the universality of circumcision) as chair of its Task Force on Circumcision, which then promulgated a set of guidelines through its policy statement in 1989 that contained a litany of misrepresentations and omissions that were all in favor of circumcision. The AAP did this in response to the threat of lawsuits that were beginning to spring up in the 1980's. It now shamefully seeks to shirk any and all responsibility for this, despite the fact that the Plaintiff has stated that it was the AAP's guidelines, disseminated to them through their obstetrician Jeffrey Chait, that induced them to have the circumcision done that has ultimately led to Shingo's damages. The court cannot allow this, and must hold the AAP liable for its intentional and constructive fraud and the damages caused thereby.

## CONCLUSION

For the foregoing reasons, the defendant, American Academy of Pediatrics' Motion to Dismiss must be denied in its entirety.

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated September 2, 2021                     BY: _____
                                            ANDREW DELANEY, ESQ.

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO, AIKO AND ADAM LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A.<br>AND AMERICAN ACADEMY OF<br>PEDIATRICS, INC.<br>Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MERCER COUNTY<br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br><br>**NOTICE OF DISMISSAL AS AGAINST<br>PRINCETON MEDICAL GROUP, P.A.** |

The above-captioned is hereby dismissed in its entirety, with prejudice, *solely* as against

defendant, Princeton Medical Group, P.A., without costs as to any party as against another.

Dated September 2, 2021

BY: _____
ANDREW DELANEY, ESQ.
Attorney for Plaintiffs,
Shingo, Adam and Aiko Lavine

Stephanie Viola, Esq
Attorney for Defendant,
Princeton Medical Group, P.A

MERCER COUNTY COURTHOUSE
CIVIL CASE MANAGMENT OFFICE
175 SOUTH BROAD ST P O BOX 8068
TRENTON          NJ 08650-0068

                              DISMISSAL NOTICE

TELEPHONE - (609) 571-4200 EXT. 74432,NANCY NOCELLA        TEAM 050
COURT HOURS:  8:30 AM - 4:30 PM

                    DATE: SEPTEMBER 10, 2021
                    RE: LAVINE ADAM  VS AMERICAN ACADEMY OF  PEDIATRIC
                 DOCKET: MER L -000272 21
                 PARTY:   AMERICAN ACADEMY OF



        PLEASE TAKE NOTICE THAT ON NOVEMBER 09, 2021  (60 DAYS FROM DATE OF
THIS NOTICE), THE COURT WILL DISMISS THE ABOVE PARTY OR PARTIES FOR LACK OF
PROSECUTION WITHOUT PREJUDICE, PURSUANT TO RULE 1:13-7 OR RULE 4:43-2 UNLESS ACTION
REQUIRED UNDER THE ABOVE RULES IS TAKEN.


    HON DOUGLAS H. HURD                          ATT: ANDREW S. DELANEY
   _____             ANDREW DELANEY, ATTORNEY
AT LA
        JUDGE                                    6 SOUTH ST
                                                 STE 203
                                                 MORRISTOWN       NJ 07960