**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SHINGO LAVINE, ADAM LAVINE AND AIKO LAVINE, | : | CIVIL ACTION |
| | : | |
| | : | 3:21-CV-17099-ZNQ-LHG |
| Plaintiffs, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**DEFENDANT AMERICAN ACADEMY OF PEDIATRICS INC.'S NOTICE OF AMENDED MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR FAILURE TO PLEAD FRAUD WITH SPECIFICITY AND FAILURE TO STATE A CLAIM <u>PURSUANT TO FED. R. CIV. P. 9(b) and 12(b)(6)</u>**

TO:    Andrew DeLaney, Esq.
       Andrew DeLaney, Attorney at Law LLC
       6 South Street, Suite 203
       Morristown, New Jersey 07960
       (973) 606-6090
       Andrewdelaney21@gmail.com

**PLEASE TAKE NOTICE** that, pursuant to Local Rule 7.1 and Federal Rules of Civil Procedure 9(b) and 12(b)(6), defendant, American Academy of Pediatrics Inc. ("AAP") moves before the United States District Court for the District of New Jersey for an order dismissing plaintiffs Shingo Lavine, Adam Lavine, and Aiko Lavine's complaint for failure to plead fraud with specificity and failure to state a claim.

**PLEASE TAKE FURTHER NOTICE** that in support of this motion, the defendant shall rely on the enclosed brief, statement of facts, Counsel Certification, and referenced exhibits; and

**PLEASE TAKE FURTHER NOTICE** that a proposed form of order is attached.

27881747v.1

**WHITE AND WILLIAMS LLP**

BY: _____

Jared K. Levy, Esquire
457 Haddonfield Road | Libertyview, Suite 400 |
Cherry Hill, NJ 08034
Phone: 856.986.3642
Email: levyj@whiteandwilliams.com
Attorneys for Defendant American
Academy of Pediatrics Inc.

Dated:  October 12, 2021

27881747v.1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SHINGO LAVINE, ADAM LAVINE AND AIKO LAVINE, | : : : | CIVIL ACTION |
| Plaintiffs, | : : | 3:21-CV-17099-ZNQ-LHG |
| v. | : : : | |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : : | |
| Defendant. | : : : | |

_____

**DEFENDANT AMERICAN ACADEMY OF PEDIATRICS INC.'S AMENDED MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR FAILURE TO PLEAD FRAUD WITH SPECIFICITY AND FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 9(b) and 12(b)(6)**

Defendant American Academy of Pediatrics Inc. ("AAP"), by and through its attorneys, White and Williams LLP, hereby moves to dismiss plaintiffs' complaint for failure to plead fraud with specificity and failure to state a claim pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6) and Local Rule 7.1, and in support thereof, avers as follows:

1.     This matter arises out of an allegedly botched circumcision and an unsuccessful second circumcision, both performed on plaintiff Shingo Lavine about 23 years ago. *See* plaintiff's complaint, attached to Counsel Cert., Exhibit "A."

2.     On February 4, 2021, Plaintiffs Shingo Lavine and his parents, Adam Lavine and Aiko Lavine, filed a complaint against Princeton Medical Group, P.A., the company for whom the now deceased obstetrics and gynecology doctor (Dr. Chait) who performed the circumcision worked, and the American Academy of Pediatrics, Inc. in New Jersey Superior Court, alleging that the AAP and Princeton, somehow caused Shingo's injuries by fraud.  *Ibid*.

3.      Plaintiffs allege that Dr. Chait committed "fraud" when he allegedly failed to properly inform them on the risks of circumcision, and that the AAP should be held liable as well solely because Dr. Chait supposedly told Adam as part of his medical consultation that the AAP issued guidelines about circumcision showing that circumcision reduces the risk of certain diseases. Princeton and AAP filed a motion to dismiss plaintiffs' complaint in New Jersey state court in June 2021.  *Ibid*.

4.      Plaintiffs voluntarily dismissed Princeton on September 7, 2021, and AAP timely removed the case to this Court because Princeton's dismissal created diversity jurisdiction.

5.      The Court granted AAP leave to file an amended motion to dismiss on September 28, 2021.

6.      For the reasons stated in the accompanying brief, plaintiffs' complaint fails to plead fraud with specificity and fails to state a claim against AAP as a matter of law.

**WHEREFORE**, the AAP prays that the court enter an order dismissing plaintiffs' complaint for failure to plead fraud with specificity and failure to state a claim pursuant to Rules 9(b) and 12(b)(6).

**WHITE AND WILLIAMS LLP**

BY: _____
Jared K. Levy, Esquire
457 Haddonfield Road | Libertyview, Suite 400 |
Cherry Hill, NJ 08034
Phone: 856.986.3642
Email: levyj@whiteandwilliams.com
Attorneys for Defendant American Academy of Pediatrics Inc.

Dated: October 12, 2021

-2-

27881747v.1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SHINGO LAVINE, ADAM LAVINE AND AIKO LAVINE, | : | CIVIL ACTION |
| | : | |
| | : | 3:21-CV-17099-ZNQ-LHG |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT AMERICAN ACADEMY OF PEDIATRICS INC.'S AMENDED MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR FAILURE TO PLEAD FRAUD WITH SPECIFICITY AND FAILURE TO STATE A CLAIM
PURSUANT TO FED. R. CIV. P. 9(b) AND 12(b)(6)**

**PRELIMINARY STATEMENT**

This case arises from a botched circumcision and an unsuccessful second circumcision, both of which occurred about 23 years ago. In a veiled attempt to avoid the long expired medical malpractice statute of limitations, the plaintiffs (the Lavine parents and their now-adult son) frame this matter as a fraud case on the theory that they were misled by a doctor's statement wherein he recommended the procedure. In short, they claim they would not have gone through with the circumcision if they had been fully informed.

Regardless of what the plaintiffs pled, the gravamen of their complaint is a type of malpractice (lack of informed consent) arising from the doctor's statements to them, not fraud, which cannot be sustained. Even if this case was timely filed, it would not be a typical malpractice claim, because the plaintiffs contend that even a properly performed circumcision is malpractice,

27881747v.1

calling it battery and abuse. As such, their attempt to bring this as a fraud case is also an attempt to avoid having to prove that circumcision as a procedure violates a proper standard of care.

The history of this malpractice claim dates back to the late 90s. According to the plaintiffs, complications arose after Shingo Lavine was circumcised as an infant in December 1997 because the obstetrician who performed the procedure, Dr. Jeffrey Chait, removed too much shaft skin. Shingo's parents, Adam and Aiko Lavine, were aware of the injury at the time—they noticed that Shingo was not healing and took him to a pediatrician in January 1998. The second doctor concluded that Dr. Chait had not removed enough foreskin and recommended a third doctor. The third doctor performed a second circumcision in 1998.

As Shingo grew up, he experienced physical complications from the botched circumcision. The Lavines did nothing about Shingo's claimed issues for over two decades until they met with a law professor in 2020 who told them that circumcision is violence, genital mutilation, and a "fraud" when performed by physicians and hospitals in the United States. Even though their complaint cites numerous examples showing that this view of circumcision existed in the 1980s, they say they did not discover this information until the law professor told them in 2020.

Now, 23 years after the surgery (and five years after Shingo turned 18 years old), the Lavines bring this suit for fraud and constructive fraud seeking monetary damages for Shingo's physical injuries and pain and suffering. The Lavines originally sued both Dr. Chait's medical group ("Princeton") and AAP, claiming that Dr. Chait committed "fraud" when he allegedly failed to properly inform them of the risks of circumcision, but now they have voluntarily dismissed Princeton. The Lavines maintain their claims against AAP, however, they do not allege any connection between AAP and any of the doctors who treated Shingo or any of the procedures that were performed. Instead, the Lavines claim that AAP should be held liable for Shingo's injuries

-4-

27881747v.1

because when Dr. Chait recommended the procedure to Shingo's father and obtained his consent, Dr. Chait supposedly told Shingo's father as part of his medical consultation "that the American Academy of Pediatrics had issued guidelines about circumcision showing that the circumcision reduces the incidence of urinary tract infections, penile cancer, and sexually transmitted diseases including HIV." (Compl. ¶ 10.) That single hearsay sentence supposedly uttered 23 years ago by the doctor as part of advising his patient is the entirety of plaintiffs' claim against AAP.

Based on that sentence, the plaintiffs seek to hold the AAP liable for fraud and constructive fraud for damage caused by the doctors' malpractice. They do this by speculating about what the "guidelines" were that Dr. Chait supposedly mentioned in 1998, asserting that he was referring to a 1989 report published in the AAP's journal, *Pediatrics*, almost a decade before Shingo's circumcision.   They then assert that the 1989 report contained "numerous intentional misrepresentations and omissions." (*Id.* ¶ 42.) This speculation will never be resolved, because Dr. Chait died in 2018, which also means the sole statement on which this case rests is inadmissible hearsay. Yet, based on this speculation about what Dr. Chait meant when he supposedly made the statement as part of his medical consultation, the Lavines are trying to transform this medical-malpractice case into a fraud claim, to try to hook the AAP into a lawsuit and to try to avoid the statute of limitations that bars their claims for the medical-malpractice claim that accrued in 1998.

The plaintiffs' pleading machinations cannot save their purported claim. The plaintiffs' claim for fraud is time barred and substantively deficient, thus warranting dismissal. The plaintiffs also do not plead their fraud claims with particularity; indeed, with Dr. Chait now deceased, they cannot even allege with specificity any facts showing what "guidelines" his statement referenced, as there was no actual "guidelines" then published by the AAP. Plaintiffs merely rename the 1989 report as "guidelines" in the complaint to fit their allegations.

-5-

Further, AAP as a publisher does not have any special relationship with the Lavines that would impose a duty of care to prevent any misstatements from appearing in its medical journal. And even if it did, the plaintiffs fail to allege the elements necessary for a fraud claim. They cannot show a misrepresentation of fact, because the 1989 report that they speculate Dr. Chait was referring to provides a medical *opinion* about whether newborn circumcision is a generally safe procedure; that medical judgment about safety is merely an opinion, not a statement of fact. Further, not only do they fail to allege that AAP intended for them to rely on the report to obtain some benefit or undue advantage from them, they also could not reasonably rely on the 1989 report when it contained disclaimers that the report did "not indicate an exclusive course of treatment or procedure to be followed" and that "[w]hen circumcision is being considered, the benefits and risks should be explained to the parents and informed consent obtained." (Compl. Ex. B, 1989 Rept. at 388.) Rather, the Lavines were relying on Dr. Chait's advice as their personal physician within the context of that doctor-patient relationship and their individual circumstances. And they also cannot show causation, where their own allegations show that Dr. Chait's medical advice and recommendation were intervening causes to their decision to have Shingo circumcised. The plaintiffs are required to plead facts to support each element, but their complaint fails on all and should be dismissed.

In the end, the plaintiffs' real complaint is that they oppose the practice of circumcision, even when done properly: they allege that it is an "[u]nnecessary surgery," apparently in all instances, and it is "violence and genital mutilation, the opposite of medicine, and a fraud when performed" by doctors. (Compl. ¶ 23.) They go so far as to allege that "[t]he AAP knows that circumcision is not safe." (Compl. ¶ 67.) But while the plaintiffs are entitled to their opinion, it is not fraud for the AAP to publish a report by doctors about the medical research concerning

circumcision in a medical journal in 1989. The plaintiffs' claims against the AAP must be dismissed.

**STATEMENT OF FACTS**

**I.      Dr. Chait performs a circumcision on Shingo.**

In December 1997, Dr. Chait, an employee of Princeton in Princeton, New Jersey, solicited Adam's verbal consent to perform a circumcision on his infant son, Shingo. (Compl. ¶¶ 5–10.) While explaining his recommendation that he perform a circumcision on Shingo, Dr. Chait allegedly stated that the AAP had issued guidelines showing that circumcision reduced incidence of urinary tract infections, penile cancer, and HIV, and opined that circumcision was a minor, routine procedure. (*Id.* ¶ 10.) The plaintiffs allege that Dr. Chait did not disclose the risks and complications associated with circumcision. (*Id.* ¶ 12.)

Adam does not recall signing a consent form but he acknowledges that he verbally consented to the procedure. (*Id.* ¶ 10.) Aiko was medicated and incapacitated following the Caesarean section procedure used to deliver Shingo at the time Dr. Chait sought consent for the circumcision. (*Id.*) Adam alleges that he verbally consented in reliance, in part, on representations made by Dr. Chait and Dr. Chait's reference to the AAP's position. (*Id.* ¶¶ 8, 10.) The plaintiffs do not allege that they had any knowledge of any guidelines or other publications from the AAP. They also do not allege that Dr. Chait would not have recommended circumcision but for the purported AAP guidelines. The plaintiffs do not allege that the AAP was involved in the circumcision or their medical care in any way. The plaintiffs also fail to allege that Dr. Chait is even a member of the AAP, that he had any other relationship with it at all, or that he even read the purported "guidelines."

During the circumcision, Dr. Chait removed too much shaft skin. (*Id.* ¶ 13.) Afterwards, Dr. Chait expressed concerns to Adam and Aiko about the success of the procedure. (*Id.*)

-7-

**II.      During the next month, Adam and Aiko were aware that the circumcision was not done properly, and Shingo experienced related issues as he grew up.**

In the month after the circumcision, Adam and Aiko became concerned that Dr. Chait did not perform the circumcision properly, and they acted on their concern. (*Id.* ¶¶ 13-14.) Between January 10 and 15, 1998, Adam and Aiko took Shingo to his pediatrician, who warned them that Dr. Chait had not removed enough foreskin. (*Id.* ¶ 14.) This second doctor recommended that Adam and Aiko take Shingo to Dr. Barone, chief of pediatric urology at Robert Wood Johnson University Hospital in New Brunswick, New Jersey. (*Id.*) Dr. Barone diagnosed Shingo with "phimosis and a buried penis" and recommended a corrective procedure or "second circumcision." (*Id.* ¶ 15.) After the second circumcision, Shingo had insufficient shaft skin coverage and public hair bearing skin down into the surgery scar line. (*Id.*) Further (and is relevant to whether the Lavines could have discovered their claims earlier), by 1998 questions about whether circumcision should be a normal procedure were already part of the public discussion. (*Id.* ¶¶ 30, 32 (discussing books, lawsuits, and even a *Time Magazine* article critical of circumcision).

Many years later, after reaching adolescence, Shingo began suffering physical complications from the circumcision, including painful erections, meatal stenosis, scrotal webbing, and hypersensitivity of the glans. (*Id.* ¶ 16.) Shingo lived with these complications for years without remedial efforts until June 2020, when Shingo began undergoing a process to regenerate foreskin that involved wearing weights attached to the penis and pulling for three to four hours per day for five to ten years. (*Id.* ¶¶ 19–20.) In July 2020, Shingo began undergoing psychotherapy to cope with the emotional distress resulting from his circumcision. (*Id.* ¶ 21.)

According to the complaint, the Lavines first discovered that anyone questioned "the normality of circumcision" and "the physician's right to perform [a circumcision]" in September

27881747v.1

2020. (Compl. ¶¶ 23–24.) They learned this when speaking with a law professor, Peter Adler, who informed them that circumcision "is violence and genital mutilation, the opposite of medicine, and a fraud when performed by physicians and hospitals in the U.S., as explained in two law review articles." (Compl. ¶ 23.) It was in talking with the law professor that they discovered "that they had legal claims" arising from the circumcision. (*Id.*)

**III.    The allegations relating to the AAP rest on articles or reports that were published in its journal, *Pediatrics*.**

In alleging that Dr. Chait mentioned "guidelines" issued by the AAP, the plaintiffs do not allege that Dr. Chait referred to any specific document. (*Id.* ¶ 10.) The plaintiffs do not even allege that the AAP had issued "guidelines" before 1997. Instead, the plaintiffs base their fraud allegations on "a 'Report of the Task Force on Circumcision (RE9148),' which was published in the AAP's journal *Pediatrics* in August 1989 ('1989 Guidelines')." (*Id.* ¶ 39.) After acknowledging that the AAP publishes a variety of different materials, including "reports, policy statements, and guidelines" (*id.* ¶ 26), the plaintiffs then define the 1989 Report of the Task Force in their complaint as the "1989 Guidelines." (*Id.* ¶ 39.) By sleight of editing, the plaintiffs try to transform the 1989 report into "guidelines" in order to fit Dr. Chait's purported statement. Despite defining the 1989 report as the "1989 Guidelines" (*id.*), the 1989 report does not actually include any guidelines. (*Id.* Ex. B.) In fact, the word "guidelines" appears in the 1989 report only twice, in both instances referring to another document (*Guidelines on Perinatal Care*). (*Id.* Ex. B.)

The 1989 report, which was written by six doctors, describes their medical opinion on the safety of circumcision, concluding that it is a "generally safe procedure." (*Id.* Ex. B at 390.) In the article, these doctors offered their opinion that "[n]ewborn circumcision has potential medical benefits and advantages as well as disadvantages and risks." (*Id.*) In a section entitled "Contraindications, Complications, Informed Consent," the article specifically notes risks

-9-

associated with circumcision: it notes that while postoperative conditions occur at a low rate, with the most common complications being "local infection and bleeding," the procedure has resulted in three instances of death. (*Id.*) The article also notes infants who undergo circumcision without anesthesia experience pain. (*Id.* at 389.)

The article states that "parents should be fully informed of the possible benefits and potential risks of newborn circumcision" and about other factors that may affect the parents' decisions, "including esthetics, religion, cultural attitudes, social pressures, and tradition." (*Id.* at 390.) And the article also includes a disclaimer advising doctors that they must take into account the specific circumstances of the patient. (*Id.* at 388 ("The recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed. Variations, taking into account individual characteristics, may be appropriate.").)

According to the plaintiffs, however, the 1989 report contained numerous intentional misrepresentations and omissions, including that the article touted the benefits of circumcision while omitting or underplaying the risks and pain associated with the procedure (*id.* ¶¶ 42 (referring to a "1989 AAP Policy Statement," which apparently refers to the 1989 report), 65-66.) They also allege that the Task Force and the AAP maintained a religious and cultural bias toward circumcision. (*Id.* ¶¶ 58-59.) Finally, the plaintiffs allege that they are entitled to compensatory and punitive damages for the pain and suffering they endured arising from the negligently performed circumcisions. (*Id.* at 20.)

## LEGAL ARGUMENT

### I.      THE PLAINTIFFS FAIL TO STATE A CLAIM PURSUANT TO RULE 12(b)(6).

#### A.      Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. When considering a Rule 12(b)(6) motion, the

-10-

court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997). But the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Ibid.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "[T]he court need not credit bald assertions or legal conclusions alleged in the complaint." *New Jersey Protection & Advocacy, Inc. v. New Jersey Dept. of Ed.*, 563 F. Supp. 2d 474, 480 (D.N.J. 2008). Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Further, while "[t]he plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility . . . ." *Iqbal*, 556 U.S. at 678.

### B.   The Lavines may not assert a "fraud" claim based on a lack of informed consent.

Only one allegation links the AAP to the circumcision at issue in this case: the allegation that Dr. Chait informed Adam "that the American Academy of Pediatrics had issued guidelines about circumcision" while he was in the process of "solicit[ing] Adam's verbal *consent* to have Shingo circumcised . . . ." (Compl. ¶ 10 (emphasis added).) This allegation reveals that the alleged "guidelines" are relevant for only one reason: for evaluating whether the Lavines had enough information to provide informed consent for the circumcision. Other allegations in the complaint confirm this. For example, the complaint alleges that "Dr. Chait did not disclose to Adam and Aiko," among other things, "that circumcision is surgery," "that it is painful," and "that it risks many complications and can be fatal." (*Id.* ¶ 12.) Indeed, the final allegation in the complaint before stating Count I is the allegation that defendants "did not fully inform the Lavine parents

-11-

about circumcision," and that if the parents had been fully informed, "they would have stopped Dr. Chait and the hospital from performing the unnecessary operation." (*Id.* ¶ 44; *see also* ¶ 48 ("If fully informed about the pain, risks, and harms of circumcision, both Adam Lavine and Aiko Lavine would have told Dr. Chait not to perform the unnecessary procedure.").) The key to the Lavines' claims is thus that they would not have consented to the circumcision had Dr. Chait fully informed them of the risks—which is the very essence of a claim for lack of informed consent.

This is significant because New Jersey courts have repeatedly found that plaintiffs may not assert a fraud claim based on a lack of informed consent resulting from misrepresentations that occur pre-surgery. "[I]nformed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to evaluate knowledgeably the options available and the risks attendant upon each before subjecting that patient to a course of treatment." *Howard v. Univ. of Med. & Dentistry of New Jersey*, 172 N.J. 537, 548 (2002) (stating that an informed-consent plaintiff must "prove that a reasonably prudent patient in the plaintiff's position would have declined to undergo the treatment if informed of the risks that the defendant failed to disclose"); see also *Matthies v. Mastromonaco*, 160 N.J. 26, 33 (1999) (a "physician has a duty to disclose information that will enable a patient 'to consider and weigh knowledgeably the options available and the risk attendant to each.'").

In *Howard*, the plaintiffs brought a medical-malpractice action based on a lack of informed consent after an unsuccessful cervical surgery rendered the patient a quadriplegic. 172 N.J. at 544, 556. Because the defendant doctor had misrepresented his credentials and experience at the time he obtained their consent to perform the surgery, the plaintiffs sought to bring a claim based on fraud, alleging that they would not have consented to surgery had they known of the defendant's true qualifications. *Id.* at 556. But the New Jersey Supreme Court held that a fraud claim was unavailable to the plaintiffs, because allowing a "fraud or deceit-based cause of action in this

-12-

doctor-patient context" "would circumvent the requirements for proof of both causation and damages imposed in a traditional informed consent setting." *Id.* at 554. The New Jersey Supreme Court found that fraud is actionable "only when the alleged fraud occurs separately from and subsequent to the malpractice . . . and then only where the fraud claim gives rise to damages separate and distinct from those flowing from the malpractice." *Id.* (emphasis added). The New Jersey Supreme Court concluded that the supposed fraud claim was really an informed consent claim.

Here, the alleged misstatements that form the basis of Plaintiffs' fraud claims against the AAP fail both parts of *Howard*'s test. First, the allegedly fraudulent statement occurred as part of the negligently performed circumcisions, not separately from it. (Compl. ¶¶ 9–13.) In fact, under the Lavines' theory that circumcision is "a fraud when performed by physicians" (*id.* ¶ 23), the statement recommending circumcision *was* the malpractice. As *Howard* explains, "[a] physician violates his duty to the patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment." 172 N.J. at 547. Under *Howard*, Dr. Chait's statement is the heart of the informed-consent issues because they claim that it was the statement led them to consent to the procedure. *Id.* at 548 (requiring a plaintiff seeking to recover under a theory of informed consent "to prove that a reasonably prudent patient in the plaintiff's position would have declined to undergo the treatment if informed of the risks that the defendant failed to disclose").

Second, the damages that the Lavines claim arise from pain, suffering, and costs related to the circumcisions. (E.g., Compl. ¶ 13 (alleging Dr. Chait removed "too much shaft skin"), ¶ 16 (alleging "physical complications caused by the circumcisions"), ¶ 17 (alleging "angst and anger" because "physicians had circumcised him, twice, and had caused his injuries"), ¶ 21 (alleging severe emotional distress "about his circumcision"). They do not identify any damages that are

-13-

separate and distinct from the circumcision-caused damages. Therefore, the Lavines must bring their claim as medical-malpractice claim, not as a claim alleging fraud.

The complaint should be dismissed because the Lavines' claims for medical malpractice cannot be brought against the AAP. The AAP has no doctor-patient relationship with the Lavines, and so it owes no duty to them, including any duty to provide sufficient information for informed consent. *Ryans v. Lowell*, 484 A.2d 1253, 1257 (N.J. Super. App. Div. 1984) ("in physician-malpractice cases, the duty owed by the physician arises from the physician-patient relationship"). The AAP did not advise the Lavines to have Shingo circumcised or seek their consent to perform the procedure on Shingo, so even if there was a lack of informed consent, the AAP is not the proper defendant for the claims that really underlie this suit—the claims for medical malpractice by Dr. Chait.

### C. The Lavines' claims are time-barred.

#### 1. The statutes of limitations for medical malpractice bar all the claims.

Because the plaintiffs' claims are really malpractice claims, they are barred by the statute of limitations. Under N.J.S.A 2A:14-2(a), "every action at law for an injury to the person caused by the wrongful act, neglect or default of any person" must be commenced within two years, "except that an action by or on behalf of a minor that has accrued for medical malpractice for injuries sustained at birth shall be commenced prior to the minor's 13th birthday." Therefore, if Shingo's injury is considered to be sustained at birth, then the claims had to be brought by his 13th birthday, which was in December 2010. If his injury is not considered sustained at birth, then the claims fall under the two-year limitations period, which means the claims would need to have been brought by December 1999. N.J.S.A. 2A:14-2(A); N.J.S.A. 2A:14-2.1 (giving the parent of an injured child "the same period of time as provided by law in the case of the said minor child so injured"). Either way, the claims are too late.

-14-

In substance all three of the Lavines are bringing medical malpractice claims, not fraud claims. See *New Jersey Educ. Ass'n v. New Jersey*, Civ. No. 11-5024, 2012 WL 715284, *4 (D.N.J. Mar. 5, 2012) ("a court should look to substance over form and be mindful of the fact that "the line between permitted and prohibited suits will often be indistinct" (quoting *Papasan v. Allain*, 478 U.S. 265, 278–79 (1986)); see also *Thomas v. Adams*, 55 F. Supp. 3d 552, 563 (D.N.J. 2014) (courts analyzing a complaint for entitlement to relief must look to "substance-over-form"). Accordingly, their claims are all time barred.

Further, it would be futile for the plaintiffs to attempt to amend their complaint, because they cannot change the fact that the lack of informed consent for the circumcision occurred in 1998; any attempt at amending to bring a claim based on this set of facts would still be time barred. Therefore, their claims should be dismissed with prejudice.

### 2. Even if Shingo had a real fraud claim, his parents' claims would still be time barred.

The likely reason that the Lavines present their medical-malpractice claim as a fraud claim is to try to avoid the malpractice statute-of-limitations, by relying on the six-year statute of limitations for fraud. N.J.S.A. 2A:14–1; *D'Angelo v. Miller Yacht Sales*, 261 N.J. Super. 683, 688 (App. Div. 1993) (recognizing that the statute of limitations for fraud is six years). But even if the fraud statute of limitations would not starting running for Shingo until he turned 18, N.J.S.A. 2A:14-21, his parents' claims would still need to be dismissed because they had no disability that would have tolled the limitations period for their fraud claims. Further, they cannot benefit from any discovery rule because a claim accrues when the plaintiff "is aware of facts that would alert a reasonable person to the possibility of an actionable claim." *Cantena v. Raytheon Co.*, 447 N.J. Super. 43, 54 (App. Div. 2016). For fraud, the limitations period begins when "the fraud was

-15-

discovered, or *through reasonable diligence should have been discovered*." *Id.* at 53 (emphasis added).

Here, the parents were aware in 1998 of all the facts relating to the injury and alleged fraud, including the facts they now rely on in their attempt to link the circumcision to the AAP. As to the injury, they were aware that Dr. Chait performed a circumcision on Shingo and were aware of any statements Dr. Chait made at the time. In short, if the circumcision itself was the injury, the Lavines were on notice in December 1997 that Shingo had been circumcised.

As to any fraud linked to the AAP, Adam and Aiko Lavine were aware in 1997 that Dr. Chait allegedly referred to unspecified guidelines from the AAP when explaining why he recommended circumcision. They thus could have discovered, through reasonable diligence, the 1989 report that they now assume is what Dr. Chait meant when he supposedly referenced AAP "guidelines." (*Id.* ¶ 39.) Indeed, while they assert that they did not learn until 2020 that people were challenging both the "normality of circumcision" and "the physician's right to perform" circumcisions (*id.* ¶ 24), their own complaint demonstrates that they could have learned about those very ideas in 1997. For example, they allege that a "major medical publisher" published a book in 1980—17 years before Shingo's circumcision—that argued "that neonatal circumcision is needless, damaging, and not medically justified." (*Id.* ¶ 30.) They point to a lawsuit in 1984— 13 years before Shingo's circumcision—that contended that circumcision was "common law battery, willful cruelty, unjustifiable infliction of pain, child abuse, kidnapping, false imprisonment, and mayhem," and they note that this lawsuit "received significant publicity, including an article in the then-influential *Time Magazine*." (*Id.* ¶ 32.) Indeed, the Lavines could have written in 1998 *the exact same allegations* they wrote in 2021, as every article that the complaint mentions predates the 1998 injury (*id.* ¶¶ 29–44). Put simply, the Lavines either had discovered or could have discovered all of the factual bases for their claims in 1998, and they thus

-16-

had sufficient information to alert them "to the possibility of an actionable claim." *Cantena*, 447 N.J. at 53.

While the Lavines assert that they were not truly aware of their claim until they met with a law professor in September 2020 who told them that circumcision is violence and genital mutilation and a "fraud" (Compl. ¶ 23), that is not the proper standard for accrual under New Jersey law. For example, in *Burd v. New Jersey Tel. Co.*, 76 N.J. 284 (1978), the New Jersey Supreme Court specifically corrected a lower court for concluding that "the applicable limitations period does not begin running until [a claimant] learns from a lawyer that those facts equate with a legal cause of action against the producer or originator of the injurious source or cause." *Id.* at 291; see also *Catena*, 447 N.J. at 54 (the "discovery rule does not toll the statute until the plaintiff has 'legal certainty' of an actionable claim, or until the full extent of the damage becomes apparent") (internal citations omitted). Because the Lavines' claims accrued in 1998, the statute of limitations for fraud ran in 2004, and their claims are thus time-barred.

**D.    The plaintiffs cannot establish the AAP's liability for the authors' opinions in the 1989 report as the report's publisher.**

The AAP did not author the 1989 report. Six task force members authored it and rendered the opinions in it. The AAP later published it in its journal *Pediatrics*. The Lavines cannot meet their burden to establish liability against the AAP as a mere publisher of the 1989 report. The gravamen of their allegations is that the AAP, the publisher of *Pediatrics*, should be held liable for the alleged misstatements and omissions by the authors of the 1989 report because their report appeared in *Pediatrics*.

But courts across jurisdictions have been reluctant to hold publishers liable for articles or books they publish. As one court put it, outside of the defamation context "[a] review of the applicable law reveals no cases that have directly held publishers liable based on the content of a

-17-

publication," and "[t]he cases contrary to holding publishers liable are legion." *Smith v. Linn*, 48 Pa. D. & C.3d 339, 342 (Pa. Com. Pl. 1988) (citing cases); *see also id.* at 346 ("The court found no duty existed on a publisher with respect to the content of its publication outside the area of defamation."). For example, when a plaintiff "sued the publisher of the 'Merck Index,' which contained information about drugs, chemicals and biologicals including their toxicity," the suit based on negligence and willful misrepresentation was dismissed, because a court found "no duty owed to plaintiff by Merck." *Id.* at 346–47 (discussing *Demuth Dev. Co. v. Merck & Co.*, 432 F. Supp. 990 (E.D. N.Y. 1977)). As another example, in a negligence case against the publisher of a "how to" book, a court "reasoned that the publisher owed no duty to the reading public as to the contents of a publication authored by another." *Id.* at 347 (discussing *Alm v. Van Nostrand Reinhold Co.*, 134 Ill. App. 3d 716, 720–21 (1985)). The Pennsylvania court also examined numerous sections of Restatement (Second) of Torts and concluded that none of them suggest the sections were meant to be applied to publishers. *Id.* at 354 (analyzing "sections 302(a), 303, 307, 308, 310, 311, 321, 388, 390 and 402B").

Numerous other courts have taken the same view. As the Ninth Circuit has explained, a publisher has "no duty to investigate the accuracy of the contents of the books it publishes." *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1037 (9th Cir. 1991). "[T]here is nothing inherent in the role of publisher or the surrounding legal doctrines to suggest that such a duty should be imposed on publishers," and "[i]ndeed the cases uniformly refuse to impose such a duty." *Id.* at 1037 & n.8 (listing cases); *see also First Equity Corp. of Florida v. Standard & Poor's Corp.*, 869 F.2d 175, 179–80 (2d Cir. 1989) (concluding that publisher of securities information publication has no duty to verify information) (citing cases). The Ninth Circuit also noted the First Amendment concerns with imposing liability on publishers: "Were we tempted to create this duty, the gentle tug of the First Amendment and the values embodied therein would remind us of the

-18-

social costs." *Winter*, 938 F.2d at 1037; see also *Tumminello v. Bergen Evening Record, Inc.*, 454 F. Supp. 1156 (D.N.J. 1978) (concluding a publisher had no duty under traditional tort principles and warning of a chilling effect if a duty were imposed).

Based on the foregoing, and despite Plaintiffs' conclusory allegations, the AAP owes no duty to the Lavines. The Lavines do not allege any special relationship with the AAP and were not members of the AAP nor subscribers to *Pediatrics*. In fact, the Lavines do not allege that they ever reviewed *Pediatrics* or the 1989 report—or even that Dr. Chait reviewed the 1989 report. Thus, permitting the Lavines to recover for the alleged misstatements or omissions by the authors in a scientific journal article would create a new duty outside the defamation context, would significantly expand publisher liability, and would chill future medical publications. But under the case law, without a special relationship or duty there can be no recovery for any misstatements by the AAP. As a result, the AAP should not be held liable to the Lavines for fraud based on its publication of an article.

## II.   THE PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM FOR FRAUD OR CONSTRUCTIVE FRAUD.

Even if the AAP could be held liable as a publisher, the plaintiffs' claims for fraud and constructive fraud still should be dismissed with prejudice because the Lavines have not adequately pled any of the elements required for a fraud or constructive fraud claim.

### A.   <u>Heightened pleading standard under Rule 9(b).</u>

Because this case assert fraud claims, Federal Rule of Civil Procedure 9(b) applies, and therefore the Lavines "must state with particularity the circumstances constituting fraud or mistake." Under the heightened pleading standard of Rule 9(b), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" Frederico v. Home Depot, 507 F.3d

-19-

188, 200 (3d Cir. 2007) (internal citations omitted). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id*. At a minimum, a plaintiff must support the allegations fraud with all the factual background that would accompany "'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." In re Supreme Specialties, Inc. Sec. Litig., 438 F.3d 256, 276–77 (3d Cir. 2006) (citations omitted); see also Moscinski v. Bristol-Myers Squibb Co., Civil Action No. 06-6055 (FLW), 2009 WL 5216962, at *6 (D.N.J. Dec. 30, 2009).

Rule 9(b)'s particularity requirement applies to New Jersey common law fraud claims in diversity cases. E.g., F.D.I.C. v. Bathgate, 27 F.3d 850, 876 (3d Cir. 1994); District 1199P Health and Welfare Plan v. Janssen, L.P., 784 F. Supp. 2d 508, 532 (D.N.J. 2011).

**B.**     **The plaintiffs fail to plead either fraud with the required particularity.**

Despite the requirement of Rule 9(b) that plaintiffs must plead fraud with particularity, the Lavines fail to plead any facts that link Dr. Chait's statement about "guidelines" to the 1989 report. Even assuming Adam Lavine's recollection of Dr. Chait's advice was correct, the plaintiffs *speculate* that Dr. Chait was referring to the 1989 report (Compl. ¶ 39), but the complaint does not give any plausible basis assuming that Dr. Chait was actually referring to a 1989 report written by a group of doctors when he referred to supposed AAP "guidelines." There is no AAP "guidelines on circumcision" document. The Lavines simply assume that the 1989 report is the document Dr. Chait referenced, apparently on the theory that the 1989 report was "the AAP's circumcision policy then in effect" during Shingo's circumcision. (Compl. ¶ 54.) But this assumption is inconsistent with the complaint's own allegations, which recognize repeatedly that the AAP publishes several different categories of documents: "advisory reports, recommendations, and guidelines," as well as "policy statements." (Compl. ¶¶ 25–28.) And the

27881747v.1

vagueness of this allegation is further exacerbated by the fact that the complaint itself references another document issued by the AAP, Standards and Recommendations for Hospital Care of Newborn Infants, without explaining why that document might not be the "guidelines" Dr. Chait meant. (*Id.* ¶¶ 29, 38–39.) The plaintiffs cannot rename an almost decade earlier report summarizing then then-known medical literature as "the Academy's Guidelines" to create a claim against the AAP based on a comment by a doctor.

Further, the plaintiffs will never be able to show what Dr. Chait meant by his supposed reference, because 23 years have passed now, and Dr. Chait has passed away. Thus, the plaintiffs will never be able to prove the specific content of statement that is basis of their fraud claim— that Dr. Chait was referencing the 1989 report. Further, the statement itself is inadmissible hearsay, as the declarant is now deceased, and no hearsay exception applies. *See* Fed. R. Evid. 804(a)(4), (b).

The plaintiffs cannot rely on inferences about what Dr. Chait meant by the "guidelines" because Rule 9(b) requires particularity in describing the content of the fraud. Under Rule 9(b), the complaint must set forth, among other things, "precisely what statements were made in what documents or oral representations or what omissions were made," and "the content of such statements . . . ." *O'Brien v. National Property Analysts Partners*, 719 F. Supp. 222, 225 (S.D.N.Y. 1989). Plaintiffs cannot comply with Rule 9(b) because they do not know the content of a crucial part of the statements, namely what Dr. Chait meant by the "guidelines." The allegations regarding Dr. Chait and the 1989 so-called "guidelines" are, at best, ambiguous, which requires the plaintiffs to guess at what document Dr. Chait was referring to. This is insufficient under Rule 9(b). See, e.g., *Weill v. Dominion Resources, Inc.*, 875 F. Supp. 331, 338 (E.D. Va. 1994) ("Plaintiffs' allegations have been stated with such vagueness and ambiguity that they fail to meet the particularity requirements"). This is also true as to the plaintiffs' allegations of the

27881747v.1

AAP's knowledge of some kind of "fraud"—the complaint's only allegations regarding the AAP's knowledge of fraud are conclusory and speculative. See *Shaffer v. Eden*, 209 F.R.D. 460, 463 (D. Kan. 2002) (claims of fraud may not be based "on speculation and conclusory allegations") (citations omitted).

### C.   The plaintiffs fail to allege an actionable fraud claim.

The elements of common-law fraud are "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate New Jersey Ins. Co. v. Lajara*, 222 N.J. 129, 147 (N.J. 2015). "Misrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them." *Banco Popular*, 184 N.J. at 261.

### 1.   The plaintiffs have not alleged a misstatement of fact.

The Lavines' fraud claim fails on the first element, because statements of opinion, rather than statements of fact, are not actionable for fraud. See *Alexander v. CIGNA*, 991 F. Supp. 427, 435 (D.N.J. 1998) ("A statement's content must be susceptible of 'exact knowledge' at the time it is made" to be a statement of fact that is actionable for fraud.). "The distinction between fact and opinion is broadly indicated by the generalization that what was susceptible of exact knowledge when the statement is made is usually considered to be a matter of fact." *Joseph J. Murphy Realty, Inc. v. Shervan*, 159 N.J. Super. 546, 551 (App. Div. 1978). Courts have admonished that representations pertaining to "matters not susceptible of personal knowledge are generally to be regarded as mere expressions of opinion, and that is held to be so even though they are made positively and as though they are based upon the maker's own knowledge." *Id.*; see also *Paul v. Mayo Clinic*, No. 3:15-CV-1244-J-20MCR, 2017 WL 9937984, at *7 (M.D. Fla. June 6, 2017) (holding that a "difference in medical opinion" did not establish a misrepresentation).

-22-

Further, when a "false representation" involves a subject that can be investigated by both parties, "[s]tatements as to future or contingent events, as to expectations and probabilities, or as to what will be or is intended to be done in the future, do not constitute misrepresentations . . . ." *Middlesex Cty. Sewerage Auth. v. Borough of Middlesex*, 74 N.J. Super. 591, 604, 605 (Law. Div. 1962).

Here, the alleged misrepresentations set forth in the complaint are not facts; they are the medical opinions of the 1989 report's authors. For example, the 1989 report provides the authors' medical opinion that newborn circumcision is a "general safe procedure." (Compl. Exh. B. at 390.) Determining whether a medical procedure is safe necessarily requires a judgment call about the competing risks and benefits of the procedure made between the treating physician and the patient, as the 1989 report indicates. That doctor/patient judgment call is the medical opinion the Lavines now disagree with, decades later, after talking to a law professor. Put simply, the Lavines base their entire suit on their current medical opinion "that circumcision is not safe" (Compl. ¶ 67). Apparently, the Lavines now would weigh the risks of complications from the procedure differently (as is perhaps inevitable, given the effects of hindsight bias). For example, many of the Lavines' allegations are that the author-physicians overstated the benefits while understating the risks of undergoing circumcision—in other words, that the doctors should have weighed those factors differently and concluded it was not generally safe. (See Compl. ¶¶ 42–44, 60, 65–67, 69–70.) The Lavines allege that "[t]he AAP knows that circumcision is not safe" (Compl. ¶ 67), but that allegation is simply the medical (and philosophical) opinion that the Lavines hold. The medical opinions of the doctors who wrote the 1989 report are precisely the type of statements that are not "susceptible" of exact knowledge, and therefore not actionable as fraud. Indeed, the complaint itself shows how opinions about circumcision varied over time; it alleges that in the 1970s the AAP said neonatal circumcision was not necessary as a routine matter (Compl. ¶ 29),

-23-

but that opinion about probabilities evolved into the recommendation that doctors consider it based on "individual circumstances" (Compl. Ex. B).

Further, the first page of the 1989 report provides a disclaimer highlighting that the report is providing a general opinion about safety, not one specifically tailored to a particular patient: "[t]he recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed." (Compl. Ex. B, 1989 Rept. at 388.) It further states that "[v]ariations, taking into account individual circumstances, may be appropriate." (*Id.*) The article mentions that "[n]ewborn circumcision has potential medical benefits and advantages as well as disadvantages and risks," and specifically mentions the risk of "postoperative complications" (including three deaths). (*Id.* at 390.) The report also states only that "*[p]roperly performed* newborn circumcision" may result in some benefits. (Id) (emphasis added). Obviously an improperly performed procedure may give rise to complications. And in providing their opinions about the general safety of circumcision, the author-physicians state that parents should consult with a medical professional before proceeding with any course of treatment, so that they can be "fully informed of the possible benefits and potential risks" of newborn circumcision in their particular context. (*Id.*) Here, the Lavines acted in accord with that recommendation and consulted with Dr. Chait, but they claim they were not fully informed as the risks of circumcision by Dr. Chait, which would be solely the fault of Dr. Chait and not the AAP. Dr. Chait was the learned intermediary with a duty to the Lavines as their treating physician to advise them, not the AAP.

As shown in the products-liability context under the "learned intermediary doctrine," such warnings and disclaimers are sufficient to discharge a defendant of liability. *See Niemiera v. Schneider*, 114 N.J. 550, 559 (1989) ("a pharmaceutical manufacturer generally discharges its duty to warn the ultimate user of prescription drugs by supplying physicians with information about the drug's dangerous propensities"); *see also Grobelny v. Baxter Healthcare Corp.*, 341 F.

-24-

App'x. 803, 806 (3d Cir. 2009) (explaining that, "[t]he crucial question [under the doctrine] is whether the warning was adequate to apprise a physician, not a consumer, of the risks."). In the products-liability context, a defendant will not be held accountable because of the failure to warn, if a sufficient warning would not have altered the physician's decision to prescribe the drug in dispute. *Strumph v. Schering Corp.*, 256 N.J. Super. 309, 323 (App. Div. 1992). The same reasoning applies here: Dr. Chait's duty to exercise his independent medical judgment and his failure to perform a circumcision properly are intervening causes here.

Plaintiffs also contend that the 1989 report contains a number of omissions that are actionable as fraud; for example, they contend that it was fraudulent for the AAP to not disclose it is a trade association, that some of the report authors had religious affiliations, and that the report authors had a cultural bias toward circumcision. (Compl. ¶¶ 56–59, 61, 68–69, 72–73.) The Lavines are in effect challenging the merits of the physician-authors' opinions on the ground that the authors allegedly failed to acknowledge additional counter arguments. But the fact that the Lavines disagree with the authors about which arguments to focus on does not mean there was any actionable fraud. Where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a "special relationship." *Berman v. Gurwicz*, 189 N.J. Super. 89, 458 A.2d 1311, 1313 (Ch. Div. 1981).

Here, as addressed earlier, no relationship, let alone a "special relationship," exists between the parties, so no duty to inform arose. *See* Restatement (Second) of Torts § 551. Accordingly, any alleged omissions in the 1989 report are not actionable for fraud.

### 2. The plaintiffs have not alleged the AAP's knowledge of any falsity.

The Lavines' fraud claim also fails because they have failed to allege that the AAP knew that the authors' opinions in the 1989 report were allegedly false. To establish that a defendant

-25-

knowingly made a false misrepresentation, a plaintiff must show: (1) defendant knows or believes that the matter is not as he represents it to be, (b) defendant does not have the confidence in the accuracy of his representation that he states or implies, or (c) defendant knows that he does not have the basis for his representation that he states or implies. *Island Insteel Sys. Inc. v. Waters*, 296 F.3d 200, 212 (3d Cir. 2002) (citing Restatement (Second) Torts § 526).

Although Plaintiffs assert that the AAP knew the alleged false representations and omissions set forth in the 1989 report were false (Compl. ¶ 56), the report itself belies this assertion for the simple reason that it addresses probabilities about future contingent events. For example, the three risks Dr. Chait allegedly mentioned from the report—the risk of urinary-tract infection, penile cancer, and future STDs—are all statements as to "future or contingent events" or as to "probabilities" and so "do not constitute misrepresentations" under New Jersey law. *Middlesex Cty. Sewerage Auth.*, 74 N.J. Super. at 605. For example, because the 1989 report addressed probabilities, such as when addressing urinary tract infections, it even advises the reader of a possible issue with studies—a step that increases the amount of information informing any decisions based on the report—while noting that five separate studies all suggested a relationship between circumcision and urinary tract infections. (Comp. Exh. B at 389 & nn.24–28). This highlights that the report's statements are medical opinions about possible risks, not statements of fact that the AAP could know were false. Further, and as discussed earlier, the disclaimer puts readers on notice that statements in the article need to be evaluated with the guidance of a physician in light of individual circumstances. (Compl. Ex. B at 388.)

### 3.   The plaintiffs cannot establish that the AAP intended for them to rely on the alleged misstatements in the report.

The Lavines' fraud claim suffers from additional fatal flaws. New Jersey courts have held that "actual receipt and consideration of any misstatement remains central to the case of any

27881747v.1

plaintiff seeking to prove that he or she was deceived by the misstatement or omission." *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109 (2000). Further, plaintiffs must demonstrate "an intention to obtain an undue advantage therefrom." *Farris v. Cty. of Camden*, 61 F. Supp. 2d 307, 345 (D.N.J. 1999) (quoting *Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599, 609 (1989)). "Every fraud in its most general and fundamental conception consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith." *Jewish Ctr. of Sussex Cnty. v. Whale*, 86 N.J. 619, 624 (1981).

Here, the Lavines do not even allege that they received and actually considered the medical opinions proffered in the 1989 report or that the AAP intended to obtain some benefit from Shingo's procedure. As a result, they cannot show that the AAP intended for them to rely on the report's statements.

In fact, the Lavines do not allege that even Dr. Chait actually reviewed the 1989 report or communicated to them the medical opinions it contained; instead, they simply allege that Dr. Chait mentioned some undefined "guidelines." (Compl. ¶ 10.) Thus, the Lavines were never in "receipt" of any alleged misstatement in the 1989 report and so cannot establish that the AAP ever intended them to rely on the misstatements.

Further, they fail to allege that the AAP ever intended or derived any benefit or undue advantage from the procedure. *Farris*, 61 F. Supp. 2d at 346 ("a plaintiff must show that the defendant had an intention to obtain an undue advantage from the alleged false representation"). The AAP neither sought nor received any discernable benefit from the circumcision—the AAP was not even aware of Shingo's procedure until the instigation of this lawsuit. See *United States v. Czubinski*, 106 F.3d 1069, 1077 (1st Cir. 1997) (overturning conviction for honest-services fraud because the accused "did not receive, nor can it be found that he intended to receive, any

27881747v.1

tangible benefit"). Thus, the Lavines have failed to establish that the AAP intended for them to rely on any alleged misstatements.

<strong>4.      The plaintiffs do not allege reasonable reliance.</strong>

The Lavines' allegations also fail because they have not alleged sufficient facts to show they actually and reasonably relied on any misstatements. New Jersey courts have consistently held that "[w]ithout reasonable reliance on a material misrepresentation, an action in fraud must fail." *Triffin v. Automatic Data Processing, Inc.*, 397 N.J. Super. 237, 249 (App. Div. 2007) ("Reliance is an essential element of common law fraud."). The Restatement (Second) of Torts § 537 (1977) requires that there be justifiable reliance if one is to recover on a fraudulent misrepresentation. Section 537(a) requires a recipient of a fraudulent misrepresentation to rely on the misrepresentation "in acting or refraining from action." Triffin, 397 N.J. Super. at 249.

In the instant case, the Lavines' allegations show that their decision to proceed with the procedure was based upon Dr. Chait's recommendation as the treating physician for the procedure. At the outset, the complaint shows that Mrs. Lavine could not have relied on the statement, because she was "incapacitated" at the time and played no role in granting consent. (Compl. ¶ 8.) Therefore, her claim should be dismissed.

In any event, in this context where the plaintiffs must plead with specificity the content of the fraud and where it is unclear which document Dr. Chait was referencing, the Lavines have not sufficiently alleged that either they or Dr. Chait relied upon the 1989 report when deciding whether to have the circumcision performed.

Moreover, the Lavines appear rely on a theory of indirect reliance, which is equally impermissible under the facts of this case. Section 533 of the Restatement of Torts states:

> The maker of a fraudulent misrepresentation in a business
> transaction is subject to liability to another who acts in justifiable
> reliance upon it if the misrepresentation, although not made

-28-

> directly to the other, is made to a third person for the purpose of having him repeat its terms or communicate its substance to the other in order to influence his conduct in a particular transaction or type of transaction.

And if a plaintiff does not hear the misrepresentation directly, "a plaintiff must prove that he or she was an intended recipient of the defendant's misrepresentations." *Port Liberte Homeowner's Ass'n, Inc. v. Sordoni Const. Co.*, 393 N.J. Super. 492, 508 (App. Div. 2007).

Further, the complaint does not assert that this statement was the *only* guidance Dr. Chait provided about the circumcision; rather, it says Dr. Chait "portrayed circumcision as a minor, safe, and harmless procedure" and as routine. (Compl. ¶ 10.) All of Dr. Chait's statements must be considered when evaluating whether there was reasonable reliance on the statement about the AAP. In fact, given that the whole context here is about determining whether the Lavines were fully informed about the risks, this case illustrates the wisdom of the rule from *Howard*: fraud allegations arising in conjunction with malpractice must be evaluated as malpractice, not as fraud, because the totality of the information matters for informed consent.

Here, the Lavines have not alleged that any of the medical opinions in the 1989 report were proffered to persuade them to have the circumcision performed. Indeed, the disclaimer makes it clear that the report counseled readers—who would largely be doctors, not patients— that doctors would need to aid patients in deciding whether to elect a course of treatment. See *Eli Lilly Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 493 (D.N.J. 1998) (plaintiff pharmaceutical company could not assert common law fraud claims because plaintiff was not the intended recipient of those misrepresentations). Accordingly, Plaintiffs have failed to establish reasonable reliance, the death knell for any fraud claim. See *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774 (SRC), 2009 WL 2043604, at *33 (D.N.J. July 10, 2009) ("[I]ndirect reliance in the context of fraud requires that, where a plaintiff has not actually

-29-

received and considered an alleged fraudulent, he must prove that he was at least an intended recipient of the misrepresentation."); *Port Liberte Homeowners Ass'n, Inc. v. Sordoni Constr. Co.*, 393 N.J. Super. 492, 508 (App. Div. 2007) ("[A] plaintiff must prove that he or she was an intended recipient of the defendant's misrepresentations" to assert a claim for fraud).

### 5.   The plaintiffs have also failed to plead that the APA's alleged misstatements proximately caused their damage.

The Lavines' fraud allegations lack another fundamental ingredient—they have not alleged that the AAP's alleged fraudulent conduct is the source of their damages. Indeed, the allegations make clear that the compensation Plaintiffs seek is "for the pain caused by each of the two circumcisions." (Compl. at 20.) The only portion of the complaint that addresses the basis of Plaintiffs' claim for damages is the prayer for relief, in which Plaintiffs request "[c]ompensation for the pain and pain [sic] and suffering and emotional distress associated with attempting partial foreskin restoration to try to mitigate the damage caused by the circumcisions," as well as "[c]ompensation for the time spent and that will be spent on foreskin restoration." (*Id.*) Additionally, they seek "[c]ompensation for the mental anguish suffered by [Plaintiff-parents] as a result of the two circumcisions." (*Id.*) These are all damages based on the failed medical procedures that Shingo endured, not on the AAP's alleged misstatements.

The complaint specifically alleges an intervening, superseding event that would relieve the AAP of any liability for the failed circumcisions: Dr. Chait's recommendation. The New Jersey Supreme Court has explained that "if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm." *Lynch v. Scheininger*, 162 N.J. 209, 226 (2000) (quoting Restatement (Second) of Torts § 440 cmt. b (1965)). Courts have resolved questions of

superseding cause by focusing on whether the intervening cause is so closely connected with the defendant's conduct that responsibility should not be terminated. *Id.* Courts consider numerous factors in addressing this issue, including (1) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation; (2) the fact that the operation of the intervening force is due to a third person's act or to his failure to act; (3) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; and (4) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion. *Id.* (quoting Restatement (Second) of Torts § 442 (1965)).

All these factors militate against finding the AAP liable for the Lavines' damages. The Lavines consented to the circumcision based on the consultation with Dr. Chait, their treating physician, which is an event that occurred independently of the AAP or its issuance of the 1989 report. (Compl. ¶¶ 10–11.) And the intervening force of Dr. Chait's advice to operate (and his eventual negligent handling of the circumcision) is precisely the conduct that resulted in Shingo's injuries. As a result, Dr. Chait's recommendation is an intervening, superseding force that absolve the AAP of any liability for alleged misstatements.

### D.    The plaintiffs fail to allege an actionable equitable-fraud claim.

The Lavines' constructive-fraud claim fares no better than their fraud claim. To advance a constructive-fraud claim, plaintiffs "need not demonstrate scienter, but must establish the other elements of fraud by clear and convincing evidence." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1182-83 (3d Cir. 1993); *see also Daibo v. Kirsch*, 316 N.J. Super. 580, 588 (App. Div. 1999) (requiring proof of reasonable reliance"). But as already explained, the Lavines' fraud claim fails to establish the other elements of fraud, such as a misrepresentation of fact or reasonable reliance on any misstatements, and even alleges facts showing that intervening causes are

-31-

responsible for any damages. These deficiencies defeat the Lavines' constructive-fraud claim. See, e.g., *id.* at 590 (dismissing plaintiff's equitable-fraud claim because a plaintiff's allegation reflected an opinion). And while the Lavines cite affirmative defenses (including mistake, coercion, duress, and undue influences) as bases for their equitable-fraud claim (Compl. ¶ 85), none of these defenses is a basis for asserting equitable fraud.

In addition, New Jersey law is clear that "[i]n an action for equitable fraud, the only relief that may be obtained is equitable relief, such as rescission or reformation of an agreement and not monetary damages." *Daibo*, 316 N.J. Super. at 592 (emphasis added and citations omitted). Here, the Lavines unambiguously seek compensatory and punitive damages and do not seek any form of equitable relief (other than the catch-all request for "[s]uch other relief as the court may deem just and equitable"). (Compl. at 20.) The law is clear that "money damages cannot be awarded for an equitable fraud." *Daibo*, 316 N.J. Super. at 592. Accordingly, Plaintiffs' equitable fraud claim should also be dismissed.

## CONCLUSION

For all of these reasons, it is respectfully submitted that the Court dismiss plaintiffs' complaint with prejudice for failing to plead fraud with specificity and for failing to state a claim.

Dated: October 12, 2021

**WHITE AND WILLIAMS LLP**

BY: _____

Jared K. Levy, Esquire
457 Haddonfield Road | Libertyview, Suite 400 |
Cherry Hill, NJ 08034
Phone: 856.986.3642
Email: levyj@whiteandwilliams.com
Attorneys for Defendant American Academy of Pediatrics Inc.

-32-

27881747v.1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SHINGO LAVINE, ADAM LAVINE and AIKO LAVINE, | : : | CIVIL ACTION |
| Plaintiffs, | : : : | 3:21-CV-17099-ZNQ-LHG |
| v. | : : : | |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : : | |
| Defendant. | : : : | |

_____

**CERTIFICATE OF COUNSEL IN SUPPORT OF DEFENDANT THE AMERICAN ACADEMY OF PEDIATRICS INC.'S NOTICE OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO PLEAD FRAUD WITH SPECIFICITY AND FAILURE TO STATE A CLAIM <u>PURSUANT TO FED. R. CIV. P. 9(b) and 12(b)(6)</u>**

I, Jared K. Levy, Esquire, being of full age, hereby certify:

1.      I am an attorney-at-law in the State of New Jersey and counsel in the law firm of White and Williams, LLP, attorneys for Defendant American Academy of Pediatrics Inc. I am assigned to the handling of the within matter and, as such, I am fully familiar with the facts of this case.

2.      Attached as Exhibit "A" is a true and correct copy of Plaintiff's Complaint.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of those statements are willfully false, I am subject to punishment.

27881747v.1

**WHITE AND WILLIAMS LLP**

BY: _____
Jared K. Levy, Esquire
457 Haddonfield Road | Libertyview, Suite
400 |
Cherry Hill, NJ 08034
Phone: 856.986.3642
Email: levyj@whiteandwilliams.com

Dated: October 12, 2021
Attorneys for Defendant American
Academy of Pediatrics Inc.

-2-

27881747v.1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE AND AIKO LAVINE, | : CIVIL ACTION |
| | : |
| Plaintiffs, | : 3:21-CV-17099-ZNQ-LHG |
| | : |
| v. | : |
| | : |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : |
| | : |
| Defendant. | : |

_____

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing Motion to Dismiss, supporting Memorandum of Law, Certification of Counsel and Exhibits were filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access the filing through the court system.

**WHITE AND WILLIAMS LLP**

BY: _____
Jared K. Levy, Esquire
457 Haddonfield Road | Libertyview, Suite 400 |
Cherry Hill, NJ 08034
Phone: 856.986.3642
Email: levyj@whiteandwilliams.com
Attorneys for Defendant American Academy of Pediatrics Inc.

Dated: October 12, 2021

27881747v.1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE AND AIKO LAVINE | : CIVIL ACTION |
| | : |
| Plaintiffs, | : 3:21-CV-17099-ZNQ-LHG |
| | : |
| v. | : |
| | : |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : |
| | : |
| Defendant. | : |
| _____ | : |

**<u>ORDER</u>**

AND NOW, this _____ day of _____, 20__, upon consideration of defendant, American Academy of Pediatrics Inc.'s Amended Motion to Dismiss Plaintiffs' Complaint and any Responses thereto, it is hereby ORDERED and DECREED that the motion is GRANTED. Plaintiffs' Complaint is hereby dismissed with prejudice.

BY THE COURT:

_____
                                                                        J.

27881747v.1