ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>Defendant | Civil Action No.: 3:21-cv-17099<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, Shingo Lavine, Adam Lavine, and Aiko Lavine, by way of Complaint against the above-named defendant, say:

## NATURE OF ACTION

1. A reputable organization can cause profound damage when, cloaking itself in the mantle of scientific legitimacy, it disseminates inaccurate, misleading and incomplete information to the public in furtherance of the undisclosed pecuniary and legal interests of its constituents. An organization that does so commits a reprehensible breach of trust.

2. The American Academy of Pediatrics ("AAP"), which touts as its motto "Dedicated to the Health of all Children," holds itself out as an organization to whom medical professionals, parents and the public alike may turn for accurate, complete, and unbiased guidance. According to the AAP's Constitution, the organization strives "to encourage the development of high quality pediatric educational programs for students and health professionals at all levels of education and experience"; "stimulate and conduct public informational and educational programs designed to improve the health and welfare of infants, children, adolescents, and young adults"; and "encourage support of basic and applied research into all aspects of health, health care, and disorders of infants, children, adolescents, and young adults". AAP Constitution, Art. IV, *Goals and Purposes.*

3. Given these laudable objectives, it is both disappointing and disheartening when, in 1989, the AAP permitted its Task Force on Circumcision to promulgate a report declaring circumcision on newborns to be a "safe surgical procedure when performed carefully by trained, experienced operators using strict aseptic technique". Published in *Pediatrics*, the AAP's flagship peer-reviewed journal, this conclusion is inconsistent with earlier AAP pronouncements, which found circumcision to be medically unnecessary.

4. Although the Task Force ostensibly relied upon the "newest" and "most up-to-date" scientific evidence, its chair was a physician whose outspoken (and non-medical) bias in favor of circumcision was known to the AAP, but never disclosed, and its report was predicated upon false, misleading and inaccurate information, some of which derived from methodologically flawed studies.

5. Plaintiffs Adam, Aiko and Shingo Lavine suffered because of this breach of trust. When Shingo was born 1997, the Lavines' obstetrician recommended that Shingo be circumcised and, in so doing, he invoked the aforementioned AAP Task Force's 1989 report. In reliance on this advice, the Lavines elected to circumcise Shingo.

6.  Suffice it to say that things did not go smoothly, and certainly not as smoothly as the Lavines were led to believe it would. Shingo endured a botched circumcision and a second "corrective" circumcision. In addition, he continues to suffer painful aftereffects, both physical and psychological, all derived from having been circumcised.

7.  Had the Lavines received accurate and complete information from their doctor in 1997 (and had the doctor received accurate and complete information from the AAP, whose report was relied upon in recommending circumcision), Adam and Aiko would never have authorized the surgery.

8.  This lawsuit seeks to hold the AAP accountable for its abrogation of its self-imposed responsibilities.

## PARTIES

9.  Plaintiff Shingo Lavine ("Shingo") is a natural person who is a citizen of the State of Rhode Island.

10. Plaintiffs Adam Lavine ("Adam") and Aiko Lavine ("Aiko") are natural persons who, until April of 2021, resided in and were citizens of the State of California. Thereafter, they moved to and became residents and citizens of the State of Nevada. Adam and Aiko are the natural parents of Plaintiff Shingo Lavine.

11. Defendant American Academy of Pediatrics, Inc. ("AAP") is an Illinois corporation registered to do business in the State of New Jersey. It is subject to the jurisdiction of this Court and may be served with process by serving its registered agent, Corporation Service Company, Princeton South Corporate Center, 100 Charles Ewing Blvd., Suite 160, Ewing, NJ 08628.

## JURISDICTION AND VENUE

12. Defendant removed this action pursuant to 28 USC §1441 from New Jersey Superior Court, Mercer County, to this Court. The predicate for removal was the existence of diversity jurisdiction pursuant to 28 USC § 1332(a).

13. Venue lies in this Court because the action originally commenced by plaintiffs in the New Jersey Superior Court, Mercer County, was pending in this district and division. See 28 U.S.C. § 1441(a).

14. Defendant AAP is subject to personal jurisdiction in this Court because it does business in the State of New Jersey and maintains a registered agent within the state upon whom service may be (and here, was) effectuated.

## FACTS

### The American Academy of Pediatrics

15. The AAP is a professional organization of and for physicians specializing in pediatrics. The AAP is not exclusively organized for charitable or educational purposes; rather, it is a trade organization organized to protect the economic welfare of its members who practice medicine in part for a profit. It actively lobbies federal and state legislatures for laws beneficial to its members.

16. The AAP also claims to lead the field of pediatric medicine in setting standards of practice and recommendations for practice.  Towards that end, it promulgates advisory reports, recommendations, and guidelines for both the medical profession as well as for the general public. It expects the profession and the general public to rely on these publications, and the profession and general public do so rely.

### The Evolution of AAP's "Guidance" on Circumcision

17. One of the issues falling into the AAP's bailiwick is circumcision, which became entrenched in the American psyche during the early part of the 20th century, untethered to any religious rite from which the practice derived. Elective non-therapeutic male circumcision is not medically necessary[1], and physicians in most countries leave the foreskin of healthy boys alone.

---

[1] In 1980, Springer Publishing Company, a major medical publisher in New York, published a 197-page heavily sourced book entitled, *Circumcision:  An American Health Fallacy*. The book examined the apparent disconnect between circumcision's prevalence in the United States and its concomitant lack of medical justification. The author, medical writer Edward Wallerstein, concluded with the following observations:  "The medical profession bears

18.   In 1971, the AAP explicitly acknowledged that the procedure is not medically necessary. At that time, the AAP's Committee on the Fetus and Newborn issued *Standards and Recommendations of Hospital Care of Newborn Infants* observed unqualifiedly that, "there are no valid indications for circumcision in the neonatal period."

19.   Shortly thereafter, in 1975, an Ad Hoc Task Force of that same AAP committee reiterated this conclusion, opining that, "There is no absolute medical indication for routine circumcison of the newborn". The Task Force observed that, "[t]he immediate hazards of circumcision of the newborn include local infection which may progress to septicemia, significant hemorrhage, and mutilation. Incomplete removal of the prepuce may result in phimosis. Neonatal circumcision predisposes to meatitis, which may lead to meatal stenosis."[2] It concluded that "A program of education leading to continuing good personal hygiene would offer all the advantages of circumcision without the attendant surgical risk."

20.   The AAP's view remained unchanged for nearly a decade.  In fact, in a 1984 pamphlet entitled "Care of the Uncircumcised Penis," the AAP went so far as to extol the health benefits associated with the foreskin: "**The Function of the Foreskin**: The glans at birth is delicate and easily irritated by urine and feces.  The foreskin shields the glans; with circumcision, this protection is lost.  In such cases, the glans and especially the urinary opening (meatus) may become irritated or infected, causing ulcers, meatitis (inflammation of the meatus), and meatal stenosis (a narrowing of the urinary opening).  Such problems virtually never occur in uncircumcised penises.  The foreskin protects the glans throughout life."

21.   That same year marked a watershed event – one of several that would alter the AAP's position on circumcision for years to come. In 1984, Trudie London filed a lawsuit on behalf

---

responsibility for the introduction of prophylactic circumcision without scientific basis in the past and for its continued use and rationalization without scientific basis in the present.  The profession seems to accept circumcision as a 'national cultural trait' as much as do lay people.  With evidence at hand to disprove the prophylactic benefits of the surgery, the medical profession has the responsibility to discourage this practice.  The pretense of neutrality is a negative stance."  In the final paragraph, Mr. Wallerstein noted that "**Today circumcision is a solution in search of a problem. The operation, as prophylaxis, has no place in a rational society.** " **(Emphasis added).**

[2] "Meatal stenosis" is the narrowing or stricture of the urinary opening and may include symptoms such as "urinary deviation in an upward direction, penile pain at the initiation of urination and a high velocity, narrow urinary stream."  Palmer, J.S., M.D., Editor, *Pediatric Urology: A General Urologist's Guide* (Humana Press), p. 161. Notably, acquired (as opposed to congenital) meatal stenosis "occurs almost exclusively in circumcised children." *Id.*

of her son, Adam London, in Marin County, California Superior Court, Docket No. 118799, against Adam's circumciser, Dr. Mark Glasser, as well as Kaiser Foundation Hospitals and The Permanente Medical Group. She alleged that the circumcision constituted common law battery, willful cruelty, unjustifiable infliction of pain, and child abuse, among other torts. While she acknowledged that she consented to the procedure, Ms. London argued that her consent was invalid because it related to a medically unnecessary procedure.

22. Although Ms. London's case was unsuccessful, it received significant publicity, including an article in *Time Magazine*. The lawsuit and its associated press coverage alarmed those in the medical profession who perform lucrative circumcisions as a routine part of their practice, including Dr. Glasser, the defendant in the London litigation, as as well as others.

23. The rationale for the profession's concerns is obvious; the theories advanced in Ms. London's lawsuit could, some point, gain a foothold in American jurisprudence. Ultimately, any such alteration of the legal landscape regarding circumcisions could disrupt this lucrative income stream for medical practitioners who routinely perform circumcisions and may well expose them to financially crippling liability.[3]

24. Physicians began to react. In May 1985, pediatrician Thomas Wiswell, MD published an article in the AAP's journal, *Pediatrics*, suggesting that circumcision might reduce the number of urinary tract infections in boys. Almost immediately, other physicians latched onto Dr. Wiswell's conclusions, including urologist Dr. Aaron Fink, who wrote in a letter to *Pediatrics*, "I suspect that similar studies will be repeated elsewhere and, if confirmed, become an important reference to justify a medical indication for a newborn circumcision. **It presumably might even invalidate litigation** based on removal of the natural protection afforded by the foreskin as well as, by reason of wrongful and malicious acts performed by medical as well as mohel (ritual) circumcisers." (Emphasis added)

25. The London litigation also alarmed Dr. Edgar J. Schoen, a pediatric endocrinolgist and AAP member. A friend of Dr. Glasser, the defendant in London, Dr. Schoen jumped onto the

---

[3] The contemporaneous literature reflects this mounting anxiety among medical practitioners. "See Expanding Liability Risks in Circumcision." *Ob-Gyn News* ( November 15-30, 1986)(citing to another case in California in addition to London in which plaintiff argued that "the procedure violated the boy's constitutional right to privacy, safety, and happiness", that the boy lacked the cognitive ability to consent and that that the circumcision constituted a battery.)

6

proverbial bandwagon in defense of the procedure.  So strident was his apologetic that it actually took the form of a glib poem that was published in in the *American Journal of Diseases of Children*.  Entitled "Ode to the Circumcised Male," (see Exhibit A), the poem contained several noteworthy passages, including "If you're the son of a Berkeley professor, your genital skin will be greater, not lesser".  His poem styled a non-circumcised penis as "genital chic" and ended with hopeful words of consolation for the circumcised male: "Just hope that one day, you can say with a smile that your glans ain't passé [and] it will rise up in style."

26.   But Dr. Schoen was destined to take his zeal to another level.  In or around 1988, he accepted an appointment by the then-President of the AAP to to chair its Task Force on Circumcision. The AAP appointed Dr. Schoen to this position despite his outspoken views, including the aforementioned poem, which suggested that his strident advocacy on behalf of circumcision transcended notions of medical necessity. Schoen additionally expressed alarm that but for recent evidence that circumcision potentially decreased the rate of urinary tract infections, third party insurance payers would stop covering it, and "the anti-circumcision tide" would prevail.

27.   The Task Force issued a "Report of the Task Force on Circumcision (RE9148)," which was published in the AAP's journal Pediatrics in August 1989 ("1989 Guidelines") (see Exhibit B). The 1989 Guidelines concluded that "newborn circumcision is a rapid and generally safe procedure when performed by an experienced operator" and made clear on its face that the AAP intended for doctors to use it as a basis for discussion with parents. But while the document admittedly warns that "when circumcision is being considered, the benefits and risks should be explained to the parents and informed consent obtained," it does not provide an adequate basis for assessing those risks and benefits.  More troubling, it contains any number of serious flaws, including undisclosed bias, important and misleading omissions, and outright untruths, as well as relies upon studies that the Task Force itself acknowledged as methodologically impaired:

- The 1989 Guidelines declares that "[c]ircumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique." Yet the AAP knows that many physicians, medical students, and nurses

who circumcise are neither well-trained nor experienced.[4] In addition, while circumcision carries the risk of more than 50 possible complications, the 1989 Guidelines fail to disclose most of them. In fact, they do not even mention the possibility of catastrophic and even fatal injuries.

- As to those risks the AAP *did* disclose, the 1989 Guidelines drastically understated them. For example: (a) The 1989 Guidelines claimed a complication rate of 0.2-0.6%, facially dubious data given that elsewhere, the Guidelines note that "[t]he exact incidence of post operative complications is unknown"; (b) The 1989 Guidelines fail to disclose that some studies (none of which are mentioned) fix the risk of complications from circumcisions as high as 13%; (c) The 1989 Guidelines misrepresent the rate of severe complications, which is as high as 2-4%, and they make no mention whatsoever of complications that occur later in childhood or during adulthood, including painful erections, scrotal webbing, hypersensitivity of the glans, and unsatisfactory cosmetic appearance; and (d) with respect to the most common complication following circumcision, meatal stenosis (a narrowing of the urethral opening), the 1989 Guidelines falsely state that "[t]here is no evidence that meatitis leads to stenosis of the urethral meatus." In fact, meatal stenosis occurs in 5% to 20% of boys following circumcision.

- Upon information and belief, one or more members of the committee that wrote the 1989 Guidelines, including Dr. Schoen, were Jewish, and in Judaism, circumcision is a sacred religious rite practiced for thousands of years. Thus, he had an undisclosed religious bias in favor of protecting circumcision.

---

[4] In a glimmer of candor published some 23 years later, the AAP's Task Force on Circumcision acknowledged in 2012 that while the obstetricians, family physicians, and pediatricians "are the principal clinicians who perform newborn circumcisions in medical settings[,] there is no single system of training or credentialing for circumcision in use nationwide . . .[and t]here is good and fair evidence of considerable variation in provider type by region and by hospital with midwives performing circumcision in some locations." AAP Task Force on Circumcision, "Male Circumcision", *Pediatrics,* Vol 130, Issue 3 (September 2012). After noting that "[t]raining curricula for teaching newborn circumcision in departments of pediatrics and family medicine have been described," the Task Force acknowledged that they provide no "information on how widely used they are or the trainings' results and/or effectiveness." *Id.* The Task Force then "strongly recommends" the development of educational materials for clinicians to enhance practitioners' competency in discussing the benefits and risks of circumcision with parents" and further "recommends that the key professional organizations (including the AAP) develop a consensus plan for teach[ing] the procedure and analgesic techniques during postgraduate training programs . . . and develop[ing] standards of trainee proficiency." *Id.*

- The 1989 Guidelines fail to disclose that Dr. Schoen was an outspoken proponent of circumcision, having penned his infamous "Ode to the Circumcised Male", and that, consequently, he was neither neutral nor objective.

- The 1989 Guidelines fail to disclose that, on information and belief, most (if not all) of the task force members performed circumcisions regularly and therefore stood to benefit financially from a continued stream of circumcision patients.

- The 1989 Guidelines state that most male infants born in this country are circumcised as newborns, implying that it is a routine part of the practice of medicine worldwide. They fail to disclose that non-therapeutic circumcision by physicians is uncommon outside the United States; that other English-speaking countries largely abandoned the practice; and that physicians outside the United States do not solicit parental permission to surgically remove the foreskin or other healthy parts of their child's body.

- The 1989 AAP Guidelines fail to disclose that circumcision has been controversial for many years, and they also fail to disclose the notable opposition to the practice on medical, ethical, and legal grounds inside and outside the United States.

- The 1989 AAP Guidelines mislead by failing to disclose that non-therapeutic circumcision is inconsistent with numerous provisions of the American Medical Association's Code of Medical Ethics including Article 5.5 (Medically Ineffective Interventions: "Physicians should only recommend and provide interventions that are medically appropriate—i.e., scientifically grounded—and that reflect the physician's considered medical judgment about the risks and likely benefits of available options in light of the patient's goals for care), and the general rules of medical ethics: autonomy; non-maleficence ("First, Do No Harm"); beneficence ("do good"); proportionality; and justice.

- The 1989 AAP Guidelines understated the pain endured by infants who undergo circumcision. While acknowledging that "[i]nfants undergoing circumcision without anesthesia demonstrate physiologic responses suggesting that they are experiencing pain," they fail to acknowledge that circumcision is one of the most

painful procedures in neonatal medicine; that the pain often continues for many days after the circumcision; and that physicians often circumcise boys without providing any pain relief.

- The 1989 Guidelines bolster the AAP's endorsement of circumcision by suggesting that the procedure may confer medical benefits even where the studies relied upon were faulty. Urinary tract infections ("UTIs") provide a notable example. As to UTIs, the AAP notes that "[p]reliminary data suggest the incidence of urinary tract infection in male infants may be reduced when [circumcision] is performed during the newborn period." But while invoking this "[p]reliminary data" to support the AAP's position, the 1989 Guidelines acknowledged that the studies "may have methodological flaws".

- The 1989 Guidelines spend significant time discussing penile cancer, noting that its incidence in the United States has been estimated to be ".7 to .9 per 100,000 men"; that the mortality rate for such cancer "is as high as 25%"; and that "the condition occurs almost exclusively in uncircumcised men." It concludes by identifying "lack of circumcision" as "correlative" to the incidence of penile cancer. The 1989 Guidelines thus invoke the frightening specter of cancer to commend the procedure. In doing so, however, the AAP ignores its own 1975 Policy Statement, which concluded that "optimal hygiene confers as much or nearly as much protection against penile cancer as circumcision," and that a "great deal of unnecessary surgery, with attendant complications would have to be done if circumcision were to be used as prophylaxis against [penile cancer]."

- The 1989 Guidelines failed to disclose the documented incidences of psychological harm and trauma experienced among adult males circumcised at birth.

- The 1989 Guidelines fail to disclose (much less address) the regret and guilt experienced by many parents after consenting to circumcision of their male child.

- The 1989 Guidelines fail to describe the benefits of the foreskin irreversibly removed by circumcision, including that it is highly erogenous and that its inner

lining is a moist and mobile mucous membrane, which reduces friction during masturbation and sexual intercourse.[5]

28. To summarize: In 1971 (and again in 1975), the AAP correctly stated that there is no medical indication to circumcise a newborn boy. Yet when faced with concerns about its membership's financial prosperity and potential legal exposure, the AAP inexplicably reversed course, concluding that circumcision is a "generally safe procedure when performed by an experienced operator" and attempted to justify its new position by, among other things, instilling fear about UTIs and penile cancer based upon methodologically questionable and inaccurate data.

29. And while it is certainly true in the abstract that scientific views may evolve and change over time, the 1989 Guidelines reflected a fundamentally changed viewpoint without providing a complete, fully accurate, unbiased and balanced scientific rationale for the change – one that would allow parents to knowledgably balance the "risks and benefits" of circumcision.

30. Instead, the AAP issued its 1989 Guidelines to provide medical and scientific cover for its constituents and simultaneously to maximize the chances that those constituents receive an uninterrupted stream of revenue from preforming a medically unnecessary, painful, and potentially harmful procedure.

31. The AAP's 1989 Guidelines were the ones in effect in 1997, when plaintiffs Adam and Aiko Lavine welcomed their son, plaintiff Shingo Lavine, into the world.

**The Birth of Shingo Levine and the Misguided "Medical" Decision to Have him Circumcised**

32. Shingo Lavine was born to Adam and Aiko Lavine in December 1997, at Princeton Medical Center ("Princeton") in Plainsboro, Mercer County, New Jersey.

---

[5] To slant further (and improperly) the parental decision-making process regarding circumcision's "risks and benefits", the AAP even saw fit to remove from its 1984 parental guidance pamphlet, referenced at paragraph 20, supra, its informational description of the foreskin's attributes and functions. The updated 1994 version deleted that section entirely. (*Compare* Exhibit C (1984 version) *with* Exhibit D (1994 version)).

33. On or about December 18, 1997, Dr. Jeffrey L. Chait, the obstetrician who delivered him, circumcised the newborn. Princeton thereafter billed Shingo's parents or their insurer (or both) for the circumcision and received financial compensation for it.

34. Shingo's mother, Aiko, was born in Japan. Japan is not a circumcising society, and until she came to the United States and eventually married Adam, she had never heard of it. After Shingo's birth and before the circumcision, Aiko was incapacitated and, due to a difficult 36-hour labor and a Caesarean section, on medication. Just prior to the circumcision, the hospital administered morphine and Percocet®, as well as other medications.

35. Notwithstanding the lack of exigency, Dr. Chait did not wait to ask Aiko for her permission to have her son circumcised, and consequently, she did not give permission for the surgery.

36. Instead, almost immediately after the birth, Dr. Chait solicited Adam's verbal consent to have Shingo circumcised. Dr. Chait informed him that the AAP had issued guidelines about circumcision showing that circumcision reduces the incidence of urinary tract infections and penile cancer, among other maladies. In conformity with the 1989 Guidelines, Dr. Chait portrayed circumcision as a minor, safe, harmless, and medically beneficial procedure, as well as a routine and normal part of childbirth. He also portrayed parental permission as expected and as a formality.

37. In reliance upon the representations made—representations that Adam had no reason to doubt—Adam agreed to have Shingo circumcised.

38. Adam and Aiko were never made aware that circumcision was a highly controversial topic or, for that matter, that circumcision was anything other than medically beneficial. They were never made aware that circumcision is painful; that there are any number of potential complications; that some men who were circumcised at birth resent it having been performed without their consent; that it can lead to psychological problems; or that the foreskin serves several physiological functions that would be destroyed upon its amputation.

39. After the circumcision, Dr. Chait seemed distinctly less confident than he had been prior to the operation. He expressed concern to Shingo's parents about the circumcision. He told

them that they would "have to keep an eye on it" and let him (Dr. Chait) know if there were any problems with Shingo's penis. Given the pre-procedure picture painted by Dr. Chait and based explicitly upon defendant the AAP's then-current guidelines, Adam and Aiko were both surprised and dismayed, but they followed their doctor's advice and remained vigilant. After about one month, Adam and Aiko observed that Shingo's penis had not healed and looked abnormal to them.

40. From late December, 1997 until mid-January 1998, Adam and Aiko took Shingo for a series of visits to Dr. David Sharlin of Delaware Valley Pediatrics, with concerns about Shingo's penis, among other issues. He recommended a follow-up with Dr. Joseph Barone, Chief of the Section of Pediatric Urology at Robert Wood Johnson University Hospital, New Brunswick, New Jersey.

41. On January 21, 1998, Adam and Aiko brought Shingo to Dr. Barone for examination. Dr. Barone observed blood and scarring on Shingo Lavine's penis. He cleaned the member and then diagnosed Shingo as suffering from phimosis and a buried penis. He recommended what he called a "second circumcision." Dr. Barone presented the "second circumcision" as if it too was routine. Thereafter, Dr. Barone performed a second circumcision surgery on Shingo. He wrote a letter that day stating that, "Shingo should do very well with the circumcision."

42. In fact, after Dr. Barone's surgery, Shingo did not "do very well" at all.

**The Lavines' Path to Discovering the AAP's Fraud**

43. In the ensuring years, Shingo would undergo his routine annual physicals, which, until recently, were performed by Shingo's pediatricians and, upon turning 18, by Shingo's internist. During those regular examinations, the doctor would take measurements such as weight, height, blood pressure and raise issues of concern. Despite performing gential examinations as part of those examinations, they never once raised any problems with (or irregularities presenting on) his penis.

44. When Shingo reached adolescence, he began to experience urologial issues. These included increased pubic hair growth bearing skin down to the circumcision scar line, whch created irritation, as well as glans hypersensitivity that was sufficiently disruptive that it

often woke him in the middle of the night. When he became sexually active, he noticed that his erection caused him great discomfort. But due to circumcision's prevalence in the United States, Shingo had no reason to suspect that his issues related to the procedure performed upon him as an infant.

45. Shingo, an inquisitive young man raised in the so-called "information age", decided to research his symptoms on his own to determine their cause as well as the existence of a potential treatment. Shingo's research lead him to accounts of other men experiencing the same issues as he. As he performed further research, Shingo became increasingly concerned that circumscion might be the cause of his problems and that the cause was likely irreversable.

46. On or about June 15, 2020, Shingo became involved with Foregen, a medical organization devoted to regenerating foreskin, specifically the specialized structures including nerve endings that are removed or destroyed during circumcision.

47. On or about June 15, 2020, although circumcision is irreversible surgery, Shingo began the attempted partial restoration of his foreskin, a highly intensive daily routine to attempt to recover the denuded glans by stretching the loose skin of the penile shaft. Upon information and belief, more than 60,000 men in the United States currently practice foreskin restoration. It requires the patient to attach weights to the penis for an uncomfortable 3-4 hours per day, for 5-10 years. Shingo has spent more than 700 hours over the course of almost 1,000 sessions as part of the process to partially "restore" his foreskin.

48. On July 29, 2020, Shingo began psychotherapy to cope with the severe emotional distress stemming from his circumcision, but to date, it has not diminished his distress.

49. Shingo discussed his situation with Adam, who reached out in August 2020 to Dr.Gabriella Avellino, a top urologist at Brown University. Shingo made an appointment with Dr. Avellino, but the doctor dismissed his concerns. In fact, she went so far as to extol the purported benefits of circumcision using studies that were deeply flawed from a methodological and academic standpoint.

50. In September of 2020, Shingo was introduced to University of Massacheusetts Professor Peter Adler, a legal scholar who has focused much of his academic energy on circumcision

and its legal ramifications.  Based upon his research, Professor Adler enlighted the Lavines about several things:

- He informed them that physicians in most countries outside the United States do not recommend or perform unnecessary circumcisions, and that its pervasiveness in the United States may have legal consequences for those who promote it as a routine medical procedure.

- He informed them that physicians typically broach the subject of circumcision with the new parents almost immediately after the birth, and often while the mother is still under the influence of pain medication, affording the parents only minutes to decide.

- He informed them that circumcision is routinely portrayed to these parents as a normal, simple, safe, and harmless medical procedure – one that confers any number of medical benefits, including the reduction in the risk of UTIs and penile cancer – without explaining that it is a painful surgery that carries with it the real risk of complications. Parental permission is therefore not fully informed and consequently, is legally invalid.

- He brought to the Lavine's attention the 1989 Guidelines, which Adam remembered as being as among the bases invoked by by Dr. Chait when the latter recommended Shingo's circumcison and downplayed the serious nature of the surgery.  Professor Adler then explained the flaws in those guidelines and, more troubling, how the AAP was well aware of those flaws at the time of their publication in 1989.

51. The Lavines were shocked at what they had learned; they realized that what Professor Adler described is exactly what had actually happened to them when Shingo was born, as detailed in this Complaint. Their distress over being defrauded was only compounded by their profound disillusionment with the AAP for (mis)using its reputation to enrich and protect its constitutent members.

52. Adam and Aiko are angry that they were never fully informed about the risks and downsides of circumcision. Had they not been so fundamentally misled, they would never

have consented to the procedure that has created for them a difficult and strained relationship with their son – one marked by guilt, anger and resentment.

## COUNT I

### (Intentional Fraud)
### The American Academy of Pediatrics

53. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 52 as if set forth at length herein.

54. By its words and conduct, the AAP invites other medical associations such as the American College of Obstetricians and Gynecologists, obstericians and gynecologists, pediatricians, other physicians, and the general public to rely upon the AAP's reports, recommendations and guidelines.

55. Having undertaken the role of educating the public and providing guidance, the AAP owes that public a duty to to disclose (and not shield from disclosure to) all relevant facts and considerations when issuing reports, recommendations, and guidelines on the subjects (including circumcision) upon which they opine. Stated differently, the AAP owes a duty to the general public, including the plaintiffs herein, to tell the truth, the whole truth, and nothing but the truth when issuing reports, policy statements, and guidelines for medical care and procedures.

56. The AAP expected parents to consider and rely upon the information contained in the 1989 Guidelines in deciding whether to circumcise their child, and, as it pertains to the plaintiffs, Dr. Chait referred specifically to the 1989 Guidelines in portraying circumcision as safe, routine and medically advantageous.

57. As set forth at length above, the 1989 Guidelines contain materially misleading, inaccurate, and incomplete information about the risks of circumcision and its oftentimes deleterious physiological and psychological ramifications.

58. The AAP's decision to publish the 1989 Guidelines, which fundamentally changed the organization's stated views on circumcision, was calculated to deceive those relying upon

it and calculated to provide "scientific cover" for its constituent members who wished to continue the lucrative practice of circumcision and mitigate claims of legal liability.

59. To the extent that the members of the 1989 AAP Task Force on Circumcision did not have knowledge of the falsity of the claims enumerated above, the AAP acted recklessly in disregard of the truth or falsity of said claims.

60. Adam Lavine, who knew nothing about medicine or medical aspects of circumcision—and who was representing his newborn son and his incapacitated wife at the time—relied upon Dr. Chait's reference to those AAP guidelines in support of circumcision when he consented to the circumcision.

61. The AAP thereby defrauded Adam Lavine, acting on behalf of his son Shingo Lavine and his wife Aiko Lavine, and therefore defrauded all three Plaintiffs.

62. By reason of the foregoing, plaintiffs are entitled to judgment in an amount to be determined at trial.

## COUNT II

### (Constructive or Equitable Fraud)

### The American Academy of Pediatrics

63. Plaintiffs repeat and re-allege the facts and allegations in Paragraphs 1-62 as if set forth at length herein.

64. The AAP is a medical organization, comprised of physicians licensed to practice medicine, that issues guidelines for physicians to follow in the practice of medicine and here, the practice of circumcision.

65. The AAP promulgates these guidelines with the intent and expectation that they will be relied upon and shared with parents in assisting them to weigh knowledgeably weigh the pros and cons of certain medical decisions regarding their children, including circumcision.

66. The 1989 Policy Statement was prepared by an ad hoc committee of the AAP, published in its ostensibly peer-reviewed journal, *Pediatrics*.

67. The AAP specifically intended for the the information contained in the 1989 Policy Statement to be used by doctors in speaking to parents about circumcision and parents in making the decision whether or not to circumcise their newborn.

68. The AAP owes a duty to patients and their legal representatives who learn about, are informed about, and who rely upon the AAP's circumcision guidelines, here Adam Lavine's reliance on the AAP's 1989 Policy Statement.

69. The AAP has abused its self-professed position as a respected source of medical knowledge and unbiased information to which the public can turn. It convened a Task Force on Circumcision that promulgated guidelines in 1989 not for the purpose of advancing the health of boys and men, but to enable its Task Force Chair's zealous and personal predilection for circumcision as well as its own undisclosed objective to shield the medical profession from circumcision-related litigation.

70. When the AAP violated the trust reposed in it by a physician (here Dr. Chait), a patient (here Shingo Lavine as his parents acted on his behalf), and/or those representing him (here Adam and Aiko Lavine), a cause of action lies for constructive or equitable fraud, even if a specific intent to defraud is absent.

71. The AAP's wrongful and unfair acts enumerated herein constitute constructive or equitable fraud.

72. By reason of the foregoing, plaintiffs have suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Shingo Lavine, Adam Lavine, and Aiko Lavine demand judgement against defendant American Academy of Pediatrics, Inc. and they seek the following relief:

(a)     Compensation for Shingo Lavine for the pain caused by each of the two circumcisions; the pain caused by his injuries; for the emotional distress, suffering, stress, pain, and mental anguish caused by the circumcisions.

(b)     Compensation for the pain and pain and suffering and emotional distress associated with attempting partial foreskin restoration to try to mitigate the damage caused by the circumcisions; and compensation for the time spent and that will be spent on foreskin restoration.

(c)     Compensation for the mental anguish suffered by Adam and Aiko Lavine because of the two circumcisions.

(d)     Attorneys' fees, pre- and post-judgment interest and costs of this lawsuit;

(e)     Punitive damages; and

(f)     Such other relief as the court may deem just and equitable under the circumstances.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 29, 2021

_____
ANDREW DELANEY, ATTORNEY AT LAW, LLC
6 South Street, Suite 203
Morristown, NJ 07960
973-606-6090
Andrewdelaney21@gmail.com
095232013
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Of Counsel:

Jonathan D. Lupkin (Admitted *Pro Hac Vice*)
LUPKIN PLLC
80 Broad Street, Suite 1301
New York, New York  10004
(Tel): 646-367-2771
(Fax): 646-219-4870
Email: jlupkin@lupkinpllc.com

## **CERTIFICATION**

The undersigned hereby certifies that the matter in controversy between the parties herein is not the subject of any other action pending in any Court or any arbitration proceeding, and that no other action or arbitration proceeding with respect to the matter in controversy is contemplated.

The undersigned further certifies that the names of any non-parties who should be joined in the action pursuant to Rule 4:28, or who are subject to joinder pursuant to Rule 4:29-1(b) because of potential liability to any party on the basis of the facts set forth in the within complaint are: None.

I certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

Dated: November 29, 2021               BY: _____
                                        ANDREW DELANEY, ESQ.

## LIST OF ATTACHED EXHIBITS

**EXHIBIT A**

"Ode to the Circumcised Male," Poem by Edgar Schoen, M.D., chair of the 1989 Task Force of the AAP on Circumcision

**EXHIBIT B**

"Report of the Task Force on Circumcision, RE9148" *Pediatrics*, 989;84(4):388-91 (August, 1989)

**EXHIBIT C**

"Care of the Uncircumcised Penis," AAP Pamphlet, 1984

**EXHIBIT D**

"Newborns: Care of the Uncircumcised Penis," AAP Pamphlet, 1994

# EXHIBIT A

mother-child resemblances as adulthood approaches, again without apparent influence of the sex of the child.[4]

STANLEY M. GARN, PhD
TIMOTHY V. SULLIVAN
The Center for Human Growth
and Development
The University of Michigan
300 North Ingalls Bldg
Ann Arbor, MI 48109

1. Ruvalcaba RHA: Familial sexual precocity. AJDC 1986;140:742.
2. Garn SM: Continuities and changes in maturational timing, in Brim OG, Kagan J (eds): Constancy and Change in Human Development. Cambridge, Mass, Harvard University Press, 1980, pp 113-162.
3. Garn SM, Bailey SM: Genetics of maturational processes, in Falkner F, Tanner JM (eds): Human Growth. New York, Plenum Publishing Corp, 1978, pp 307-330.
4. Garn SM, Rohmann CG: Interaction of nutrition and genetics in the timing of growth and development. Pediatr Clin North Am 1966;13: 353-379.

## 'Ode to the Circumcised Male'

*Sir.*—Before the mid-1970s, the American standard of care included neonatal circumcision, a minor surgical procedure that promoted genital hygiene and prevented later penile cancer as well as cervical cancer in female sexual partners. More recently, evidence has suggested that adequate hygiene is all that is needed and that circumcision is an unnecessary and traumatic procedure. In 1983, the American Academy of Pediatrics and the American College of Obstetrics and Gynecology jointly agreed that routine circumcision is not necessary,[1] and third-party payers are increasingly refusing to pay for the procedure. Whether recent evidence of a decreased incidence of urinary tract infections in circumcised male infants[2] can stem the anticircumcision tide is questionable.

The purpose of this communication is to offer some solace to the generations of circumcised males who are now being told that they have undergone an unnecessary and deforming procedure, which may also have been brutal and psychologically traumatic. To them I offer these lines:

Ode to the Circumcised Male

We have a new topic to heat up our passions—the foreskin is currently top of the fashions.

If you're the new son of a Berkeley professor, your genital skin will be greater, not lesser.

For if you've been circ'ed or are Moslem or Jewish, you're outside the mode; you are old-ish not new-ish.

You have broken the latest society rules; you may never get into the finest of schools.

Noncircumcised males are the "genital chic"—if your foreskin is gone, you are now up the creek.

It's a great work of art like the statue of Venus, if you're wearing a hat on the head of your penis.

When you gaze through a looking glass, don't think of Alice; don't rue that you suffered a rape of your phallus.

Just hope that one day you can say with a smile that your glans ain't passé; it will rise up in style.

EDGAR J. SCHOEN, MD
Department of Pediatrics
Kaiser Permanente
Medical Center
280 W MacArthur Blvd
Oakland, CA 94611

1. American Academy of Pediatrics and American College of Obstetrics and Gynecology: Guidelines for Perinatal Care. Evanston, Ill, AAP/ACOG, 1983.
2. Wiswell TE, Smith FR, Bass JW: Decreased incidence of urinary tract infections in circumcised male infants. Pediatrics 1985;76: 901-903.

## Gastric Acid Aspiration Possible During Flexible Endoscopy Without General Anesthesia

*Sir.*—I wish to comment on Dr Bendig's recent article, "Removal of Blunt Esophageal Foreign Bodies by Flexible Endoscopy Without General Anesthesia."

I suggest that Dr Bendig has been fortunate in avoiding pulmonary aspiration of gastric contents in his patients, a life-threatening complication. Animal studies have suggested a critical gastric volume of 0.4 mL/kg and a pH of 2.5 or less as predisposing to serious pulmonary aspiration.[2] Pediatric patients are even more likely than adults to exceed this critical volume and pH.[3,4] Coté et al[5] found 50 of 51 pediatric patients to have gastric pH less than 2.5 immediately after induction of general anesthesia. Of these 51 children, 76% had gastric pH less than 2.5 and gastric volume greater than 0.4 mL/kg, placing them at risk for acid aspiration syndrome.

I suspect that many of Dr Bendig's patients were also at risk for acid aspiration both intraoperatively and postoperatively, despite the six-hour nothing-by-mouth period. Dr Bendig used chlorpromazine hydrochloride, meperidine hydrochloride, and diazepam to sedate his patients, a combination similar to "lytic cocktail," except for the substitution of diazepam for pro-

methazine. In addition, t ynx was topically anesth: lidocaine or benzocaine, ability to perform esoph: otherwise uncooperativ speaks for the inability t airways—the cough and [ were abolished. When a pa protect and control his airway, it is the responsi physician to control it to p gerous aspiration. Dr Ber that "there were no comp sedation or of the endoscop Was aspiration looked fo tively? Did all children k postoperative chest roent Did no child have a temper tion postoperatively?

General anesthesia wi cheal intubation provides trol and considerable pro pulmonary aspiration of ; tents. Recovery from an anesthetic is also much from the above-mentioned suggest that the risks fr anesthesia in this situati than that of gastric acid a:

Despite Dr Bendig's c trained pediatric suppor and equipment be availabl if airway obstruction or . tent regurgitation were to would not arrive in time. more prudent to have an volved at the start. I also one takes Dr Bendig's su couragement to perform dure without appropriate : sonnel and equipment.

MICHAEL J. KIBEL
Department of An(
Geisinger Medical
Danville, PA 1782:

1. Bendig DW: Removal of b foreign bodies by flexible end general anesthesia. AJDC 1986:
2. Greenfield LJ, Singleton DR, et al: Pulmonary effects graded aspiration of hydrochlori 1969;170:74-84.
3. Teabeault JR II: Aspiratio tents: An experimental study. A 28:51-67.
4. Salem MR, Wong AY, Ma medicant drugs and gastric juic in pediatric patients. Anesth 216-219.
5. Coté CJ, Goudsouzian MD Assessment of risk factors relat tion syndrome in pediatric pati and residual volume. Anesth 70-72.

*In Reply.*—Dr Kibelbek with the potential risk of gastric contents utilizi;

# EXHIBIT B

- ·623 -

PLAINTIFF'S
EXHIBIT
67



Task Force on Circumcision

# Report of the Task Force on Circumcision (RE9148)

The 1971 edition of *Standards and Recommendations of Hospital Care of Newborn Infants* by the Committee on the Fetus and Newborn of the American Academy of Pediatrics (AAP) stated that "there are no valid medical indications for circumcision in the neonatal period."[1(p110)] In 1975, an Ad Hoc Task Force of the same committee reviewed this statement and concluded that "there is no absolute medical indication for routine circumcision of the newborn."[2(p67)] The 1975 recommendation was reiterated in 1983 by both the AAP and the American College of Obstetrics and Gynecology in the jointly published *Guidelines to Perinatal Care*.[3]

Large-scale studies of US hospitals indicate that most male infants born in this country are circumcised in the newborn period,[4] although the circumcision rate recently appears to be decreasing.[5] Since the 1975 report, new evidence has suggested possible medical benefits from newborn circumcision. Preliminary data suggest the incidence of urinary tract infection in male infants may be reduced when this procedure is performed during the newborn period. There is also additional published information concerning the relationship of circumcision to sexually transmitted diseases and, in turn, the relationship of viral sexually transmitted diseases to cancer of the penis and cervix.

## DEFINITIONS, PENILE HYGIENE, AND LOCAL INFECTIONS

The penis consists of a cylindrical shaft with a rounded tip (the glans). The shaft and glans are separated by a groove called the coronal sulcus. The foreskin, or prepuce, is the fold of skin covering the glans. At birth, the prepuce is still developing histologically, and its separation from the glans is usually incomplete. Only about 4% of boys have a retractable foreskin at birth, 15% at 6 months, and 50% at 1 year; by 3 years, the foreskin can be retracted in 80% to 90% of uncircumcised boys.[6]

Phimosis is stenosis of the preputial ring with resultant inability to retract a fully differentiated foreskin. Paraphimosis is retention of the preputial ring proximal to the coronal sulcus, creating a tension greater than lymphatic pressure resulting in subsequent edema of the prepuce and glans distal to the ring. Balanitis is inflammation of the glans, and posthitis is inflammation of the prepuce; these conditions usually occur together (balanoposthitis). Meatitis is inflammation of the external urethral meatus.

Newborn circumcision consists of removal of the foreskin to near the coronal sulcus performed in early infancy (before age 2 months). The procedure prevents phimosis, paraphimosis, and balanoposthitis. Meatitis is more common in circumcised boys. There is no evidence that meatitis leads to stenosis of the urethral meatus.

It is particularly important that uncircumcised boys be taught careful penile cleansing. As the boy grows, cleansing of the distal portion of the penis is facilitated by gently, never forcibly, retracting the foreskin only to the point where resistance is met. Full retraction may not be achieved until age 3 years or older.

A small percentage of boys who are not circumcised as newborns will later require the procedure for treatment of phimosis, paraphimosis, or balanoposthitis. When performed after the newborn period, circumcision may be a more complicated procedure.[7]

## CANCER OF THE PENIS

The overall annual incidence of cancer of the penis in US men has been estimated to be 0.7 to 0.9 per 100 000 men and the mortality rate is as high as 25%.[8-11] This condition occurs almost exclusively in uncircumcised men.[12-14] In five major reported series since 1932, not one man had been circumcised neonatally.[11,15-19] The predicted lifetime risk of cancer of the penis developing in an uncircumcised man has been estimated at 1 in 600 men in the United States[20]; in Denmark, the estimate is 1 in 909 men.[21] In developed countries where

The recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed. Variations, taking into account individual circumstances, may be appropriate.
PEDIATRICS (ISSN 0031 4005). Copyright © 1989 by the American Academy of Pediatrics.

- 624 -

neonatal circumcision is not routinely performed, the incidence of penile cancer is reported to range from 0.3 to 1.1 per 100 000 men per year.[4] This low incidence is about half that found in uncircumcised US men, but greater than that in circumcised US men.

Factors other than circumcision are important in the etiology of penile cancer. The incidence of penile cancer is related to hygiene. In developing nations with low standards of hygiene, the incidence of cancer of the penis in uncircumcised men is 3 to 6 per 100 000 men per year.[22] The decision not to circumcise a male infant must be accompanied by a lifetime commitment to genital hygiene to minimize the risk of penile cancer developing. Recently, human papillomavirus types 16 and 18 DNA sequences have been found in 31 of 53 cases of penile cancer, suggesting the importance of these viruses in the development of this condition.[23] Poor hygiene, lack of circumcision, and certain sexually transmitted diseases all correlate with the incidence of penile carcinoma.

## URINARY TRACT INFECTIONS

A 1982 series of infants with urinary tract infections noted that males preponderated, contrary to female preponderance later in life, and that 95% of the infected boys were uncircumcised.[24] Beginning in 1985, studies conducted at US Army hospitals involving more than 200 000 men showed a greater than tenfold increase in urinary tract infections in uncircumcised compared with circumcised male infants; moreover, as the rate of circumcision declined throughout the years, the incidence of urinary tract infection increased.[6,25] In another army hospital study, infants were examined in the first month of life and it was concluded that the high incidence of urinary tract infection in uncircumcised boys was accompanied by a similarly increased incidence of other significant infection, including bacteremia and meningitis[26]; however, the authors of that study did not distinguish between bacteriuria secondary to septicemia and primary urinary tract infection. Still another recent army hospital study lends support to a 1986 hypothesis that circumcision prevents preputial bacterial colonization and thus protects male infants against urinary tract infection.[27,28] It should be noted that these studies in army hospitals are retrospective in design and may have methodologic flaws. For example, they do not include all boys born in any single cohort or those treated as outpatients, so the study population may have been influenced by selection bias.

## SEXUALLY TRANSMITTED DISEASES

Evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting.

Early series indicated a higher risk of gonococcal and nonspecific urethritis in uncircumcised men,[29,30] whereas one recent study shows no difference in the incidence of gonorrhea and a higher incidence of nonspecific urethritis in circumcised men.[31] Although published reports suggest that chancroid, syphilis, human papillomavirus, and herpes simplex virus type 2 infection are more frequent in uncircumcised men, methodologic problems render these reports inconclusive.[29,30,32-34]

## CERVICAL CARCINOMA

There appears to be a strong correlation between squamous cell carcinoma of the cervix and sexually transmitted diseases. Human papillomavirus types 16 and 18 are the viruses most commonly associated with cancer of the cervix[35-38]; Herpes simplex virus type 2 has also been linked with cervical cancer.[36,39] Although human papillomavirus types 16 and 18 are also associated with cancer of the penis,[23,37] evidence linking uncircumcised men to cervical carcinoma is inconclusive. The strongest predisposing factors in cervical cancer are a history of intercourse at an early age and multiple sexual partners. The disease is virtually unknown in nuns and virgins.

## PAIN AND BEHAVIORAL CHANGES

Infants undergoing circumcision without anesthesia demonstrate physiologic responses suggesting that they are experiencing pain.[40] The observed responses include behavioral, cardiovascular, and hormonal changes. Pain pathways as well as the cortical and subcortical centers necessary for pain perception are well developed by the third trimester. Responses to painful stimuli have been documented in neonates of all viable gestational ages. Behavioral changes include a cry pattern indicating distress during the circumcision procedure and changes in activity (irritability, varying sleep patterns) and in infant-maternal interaction for the first few hours after circumcision.[41-43] These behavioral changes are transient and disappear within 24 hours after surgery.[43]

## SURGICAL TECHNIQUES AND LOCAL ANESTHESIA

Circumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique. The procedure should be performed only on a healthy, stable infant. Clamp techniques (eg, Gomco or Mogen clamps) or a Plastibell give equally good results.[44] Techniques that may reduce postoperative complications include (1) using a surgical marking pen to mark the location of the coronal sulcus on the shaft

- 625 -

skin preoperatively; (2) identifying the urethral meatus; (3) bluntly freeing the foreskin from the glans with a flexible probe; (4) completely retracting the foreskin; and (5) identifying the coronal sulcus, all before applying the clamp or Plastibell and before excising any foreskin.[45] Electrocautery should not be used in conjunction with metal clamps. At the initial health supervision visit following hospital discharge, the penis should be carefully examined and the parents given instructions concerning on-going care.

Dorsal penile nerve block using no more than 1% lidocaine (without epinephrine) in appropriate doses (3 to 4 mg/kg) may reduce the pain and stress of newborn circumcision.[41,46-49] However, reported experience with local anesthesia in newborn circumcision is limited, and the procedure is not without risk (see "Complications").

## CONTRAINDICATIONS, COMPLICATIONS, INFORMED CONSENT

Circumcision is contraindicated in an unstable or sick infant. Infants with genital anomalies, including hypospadias, should not be circumcised because the foreskin may later be needed for surgical correction of the anomalies. Appropriate laboratory studies should be performed when there is a family history of bleeding disorders. Infants who have demonstrated an uncomplicated transition to extrauterine life are considered stable. Signs of stability include normal feeding and elimination and maintenance of normal body temperature without an incubator or radiant warmer. A period of observation may allow for recognition of abnormalities or illnesses (eg, hyperbilirubinemia, infection, or manifest bleeding disorder) that should be addressed before elective surgery. It is prudent to wait until a premature infant meets criteria for discharge before performing circumcision.

The exact incidence of postoperative complications is unknown,[50] but large series indicate that the rate is low, approximately 0.2% to 0.6%.[44,45,51,52] The most common complications are local infection and bleeding. Deaths attributable to newborn circumcision are rare; there were no deaths in 500 000 circumcisions in New York City[52] or in 175 000 circumcisions in US Army hospitals.[51] A communication published in 1979 reported one death in the United States due to circumcision in 1973, and the authors' review of the literature during the previous 25 years documented two previous deaths due to this procedure.[53]

Complications due to local anesthesia are rare and consist mainly of hematomas and local skin necrosis.[41,46-49,54] However, even a small dose of lidocaine can result in blood levels high enough to produce measurable systemic responses in neonates.[55,56] Local anesthesia adds an element of risk and data regarding its use have not been reported in large numbers of cases. Circumferential anesthesia may be hazardous. It would be prudent to obtain more data from large controlled series before advocating local anesthesia as an integral part of newborn circumcision.

When considering circumcision of their infant son, parents should be fully informed of the possible benefits and potential risks of newborn circumcision, both with and without local anesthesia. In addition to the medical aspects, other factors will affect the parents' decisions, including esthetics, religion, cultural attitudes, social pressures, and tradition.

## SUMMARY

Properly performed newborn circumcision prevents phimosis, paraphimosis, and balanoposthitis and has been shown to decrease the incidence of cancer of the penis among US men. It may result in a decreased incidence of urinary tract infection. However, in the absence of well-designed prospective studies, conclusions regarding the relationship of urinary tract infection to circumcision are tentative. An increased incidence of cancer of the cervix has been found in sexual partners of uncircumcised men infected with human papillomavirus. Evidence concerning the association of sexually transmitted diseases and circumcision is conflicting.

Newborn circumcision is a rapid and generally safe procedure when performed by an experienced operator. It is an elective procedure to be performed only if an infant is stable and healthy. Infants respond to the procedure with transient behavioral and physiologic changes.

Local anesthesia (dorsal penile nerve block) may reduce the observed physiologic response to newborn circumcision. It also has its own inherent risks. However, reports of extensive experience or follow-up with the technique in newborns are lacking.

Newborn circumcision has potential medical benefits and advantages as well as disadvantages and risks. When circumcision is being considered, the benefits and risks should be explained to the parents and informed consent obtained.

AAP Task Force on Circumcision
Edgar J. Schoen, MD, Chairman
Glen Anderson, MD
Constance Bohon, MD
Frank Hinman, Jr, MD
Ronald L. Poland, MD
E. Maurice Wakeman, MD

REFERENCES

1. American Academy of Pediatrics, Committee on Fetus and Newborn. *Standards and Recommendations for Hospital Care of Newborn Infants.* 5th ed. Evanston, IL: American Academy of Pediatrics; 1971

2. Thompson HC, King LR, Knox E, et al. Report of the ad hoc task force on circumcision. *Pediatrics.* 1975;56:610–611

3. American Academy of Pediatrics, Committee on Fetus and Newborn. *Guidelines for Perinatal Care.* 1st ed. Evanston, IL: American Academy of Pediatrics; 1983

4. Wallerstein E. Circumcision: the uniquely American medical enigma. *Urol Clin North Am.* 1985;12:123–132

5. Wiswell TE, Enzanauer RW, Holton ME, et al. Declining frequency of circumcision: implications for changes in the absolute incidence and male to female-sex ratio of urinary tract infection in early infancy. *Pediatrics.* 1987;79:338–342

6. Gairdner D. The fate of the foreskin: a study of circumcision. *Br Med J.* 1949;2:1433–1437

7. Warner E, Strashin E. Benefits and risks of circumcision. *Can Med Assoc J.* 1981;125:967–976,992

8. Cutler SJ, Young JL, Jr. eds. *Third National Cancer Survey: Incidence Data.* National Cancer Institute Monograph 41. Bethesda, MD: US Dept of Health, Education, and Welfare; 1975.

9. Young JL, Percy CL, Asire AJ. *Surveillance, epidemiology and End Results, Incidence and Mortality Data 1973–1977.* National Cancer Institute Monograph 41. Bethesda, MD: US Dept of Health, Education, and Welfare; 1981; 17

10. Young JL. *Surveillance, Epidemiology and End Results 1978–1982.* Bethesda, MD: US Dept of Health and Human Services; YEAR;PAGE

11. Persky L, deKernion J. Carcinoma of the penis. *Cancer J Clin.* 1986;35:5:258–273

12. Leiter E, Lefkovitis AM. Circumcision and penile carcinoma. *NY State J Med.* 1975;75:1520–1522

13. Boczko S, Freed S. Penile carcinoma in young circumcised males. *NY State J Med.* 1979;79:1903–1904

14. Rogus BJ. Squamous cell carcinoma in a young circumcised man. *J Urol.* 1987;138:861–862

15. Wolbarst AL. Circumcision and penile cancer. *Lancet.* 1932;1:150–153

16. Dean AL Jr. Epithelioma of the penis. *J Urol.* 1935;33:252–283

17. Lenowitz H, Graham AP. Carcinoma of the penis. *J Urol.* 1946;56:458–484

18. Hardner GJ, Bhanalaph T, Murphy GP, et al. Carcinoma of the penis: analysis of therapy in 100 consecutive cases. *J Urol.* 1974;108:428–430

19. Dagher R, Selzer ML, Lapides J. Carcinoma of the penis and the anti-circumcision crusade. *J Urol.* 1973;110:79–80

20. Kochen M, McCurdy S. Circumcision and the risk of cancer of the penis: a life-table analysis. *Am J Dis Child.* 1980;134:484–486

21. Swafford TD. Circumcision and the risk of cancer of the penis. *Am J Dis Child.* 1985;139:112

22. Garfinkel L. Circumcision and penile cancer. *Cancer J Clin.* 1983;33:320

23. McCance DJ, Kalache A, Ashdown K, et al. Human papillomavirus types 16 and 18 in carcinomas of the penis from Brazil. *Int J Cancer.* 1986;37:55–59

24. Ginsburg CM, McCracken GH Jr. Urinary tract infections in young infants. *Pediatrics.* 1982;69:409–412

25. Wiswell TE, Smith FR, Bass JW. Decreased incidence of urinary tract infections in circumcised male infants. *Pediatrics.* 1985;75:901–903

26. Wiswell TE, Geschke DW. Risks from circumcision during the first month of life compared with those of the uncircumcised boys. *Pediatrics.* 1989;83:1011–1015

27. Roberts JA. Does circumcision prevent urinary tract infection? *J Urol.* 1986;135:991–992

28. Wiswell TE, Miller GM, Gelston HM, et al. The effect of circumcision status on periurethral bacterial flora during the first year of life. *J Pediatr.* 1988;113:442–446

29. Wilson RA. Circumcision and venereal disease. *Can Med Assoc J.* 1947;56:54–56

30. Parker SW, Stewart AJ, Wren MN, et al. Circumcision and sexually transmissible disease. *Med J Aust.* 1983;2:288–290

31. Smith GL, Greenup R, Takafuji ET. Circumcision as a risk factor for urethritis in racial groups. *Am J Public Health.* 1987;77:452–454

32. Thirumoorthy T, Sng EH, Doraisingham S, et al. Purulent-penile ulcers of patients in Singapore: *Genitourin Med.* 1986;62:252–255

33. Oriel JD. Condyloma acuminata as a sexually transmitted disease. *Dermatol Clin.* 1983;1:93–102

34. Taylor PK, Rodin P. Herpes genitalis and circumcision. *Br J Vener Dis.* 1975;51:274–277

35. Baird PJ. The causation of cervical cancer, part II: the role of human papilloma and other viruses. In: Singer A, ed. *1985 Clinics in Obstetrics and Gynecology.* London, England: WB Saunders Co; 1985;12:19–32

36. Kaufman RH, Adam E. Herpes simplex virus and human papilloma virus in the development of cervical carcinoma. *Clin Obstet Gynecol.* 1986;29:678–692

37. McCance DJ. Human papillomaviruses and cancer. *Biochim Biophys Acta.* 1986;823:195–205

38. zur Hausen H. Genital papillomavirus infections. *Prog Med Virol.* 1985;32:15–21

39. Kessler II. Etiological concepts in cervical carcinogenesis. *Appl Pathol.* 1987;5:57–75

40. Anand KJS, Hickey PR. Pain and its effects in the human neonate and fetus. *N Engl J Med.* 1987;317:1321–1329

41. Dixon S, Snyder J, Holve R, et al. Behavioral effects of circumcision with and without anesthesia. *J Devel Behav Pediatr.* 1984;5:246–250

42. Marshall RE, Stratton WC, Moore JA, et al. Circumcision: effects upon newborn behavior. *Infant Behav Dev.* 1980;3:1–14

43. Marshall RE, Porter FL, Rogers AG, et al. Circumcision, II: Effects upon mother-infant. interaction. *Early Hum Dev.* 1982;7:367–374

44. Geo WF, Ansell JS. Neonatal circumcision: a ten-year overview with comparison of the Gomco clamp and the Plastibell device. *Pediatrics.* 1976;56:824–827

45. Harkavy KL. The circumcision debate. *Pediatrics.* 1987; 79:649–660. Letter

46. Kirya C, Werthmann MW. Neonatal circumcision and penile dorsal nerve block—a painless procedure. *J Pediatr.* 1978;92:998–1000

47. Williamson PS, Williamson MI. Physiologic stress reduction by a local anesthetic during newborn circumcision. *Pediatrics.* 1983;71:36–40

48. Holve RL, Bromberger PJ, Groveman HD, et al. Regional anesthesia during newborn circumcision: effect on infant pain response. *Clin Pediatr.* 1983;22:813–818

49. Stang HJ, Gunnar MR, Snellman L, et al. Local anesthesia for neonatal circumcision; effect on distress and cortisol response. *JAMA.* 1988;259:1507–1511

50. Kaplan GW. Complications of circumcision. *Urol Clin North Am.* 1983;10:543–549

51. Wiswell TE. The circumcision debate. *Pediatrics.* 1987; 79:649–660. Letter

52. King LR. Neonatal circumcision in the United States in 1982. *J Urol.* 1982;128:1135–1136

53. Kochen M, McCurdy SA. Circumcision. *Am J Dis Child.* 1979;133:1079–1080. Letter

54. Sara CA, Lowry CJ. A complication of circumcision and dorsal nerve block of the penis. *Anaesth Intensive Care.* 1985;13:79–82

55. Diaz M, Graff M, Hiatt M, et al. Prenatal lidocaine and the auditory evoked responses in term infants. *Am J Dis Child.* 1988;142:160–161

56. Maxwell LG, Yaster M, Wetzell RC, et al. Penile nerve block for newborn circumcision. *Obstet Gynecol.* 1987;70:415–419

- 627 -

## ERRATUM

## Policy Statement RE9148

## Report of the Task Force on Circumcision

Under the heading of "Urinary Tract Infections" (line 6, page 389), "men" should be changed to "infant boys." The complete statement should now read:

Beginning in 1985, studies conducted at US Army hospitals involving more than 200 000 infant boys showed a greater than tenfold increase in urinary tract infections in uncircumcised compared with circumcised male infants; moreover, as the rate of circumcision declined throughout the years, the incidence of urinary tract infection increased.


The Task Force on Circumcision would also like to acknowledge the following for their provision of expert advice:

David T. Mininberg, MD, FAAP, Section Liaison
Jerome O. Klein, MD, FAAP
Edward A. Mortimer, Jr, MD, FAAP

# EXHIBIT C



# Newborns

## Care of the Uncircumcised Penis

American Academy of Pediatrics

NATIONAL ORGANIZATION
of
CIRCUMCISION INFORMATION
RESOURCE CENTERS
P.O. Box 369
Corte Madera, California 94925-0369

**For additional copies, contact:** American Academy of Pediatrics, Publications Department, P.O. Box 927, Elk Grove Village, IL 60007. Price: $15/100.

Copyright © 1984 by the American Academy of Pediatrics

need for concern even after a longer period. No harm will come in leaving the foreskin alone.

**Testing Foreskin Retraction:** To test retraction occasionally, hold the penile shaft with one hand and with the other hand, push the foreskin back *gently – never forcibly –* perhaps ⅛ of an inch. Retraction may also be done with one hand pushing the shaft skin gently toward the abdomen. This will automatically retract the foreskin.

If there is any *discomfort* in your baby or if you feel resistance, stop. Try again in a few months. If the retraction is easy for both the child and the parent, further retraction may be attempted in due time. There should be no rush to retract. Eventually, the foreskin will retract completely, exposing the entire glans. This may take several years.

**Hygiene of the Fully Retracted Foreskin:** For the first few years, an occasional retraction with cleansing beneath is sufficient.

Penile hygiene will later become a part of a child's total body hygiene, including hair shampooing, cleansing the folds of the ear and brushing teeth. At puberty, the male should be taught the importance of retracting the foreskin and cleaning beneath during his daily bath.

**Summary:** Care of the uncircumcised boy is quite easy. "Leave it alone" is good advice. External washing and rinsing on a daily basis is all that is required. Do not retract the foreskin in an infant, as it is almost always attached to the glans. Forcing the foreskin back may harm the penis, causing pain, bleeding, and possibly adhesions. The natural separation of the foreskin from the glans may take many years. After puberty, the adult male learns to retract the foreskin and cleanse under it on a daily basis.

# Care of the Uncircumcised Penis

At birth, the penis consists of a cylindrical shaft with a rounded end called the glans. The shaft and glans are separated by a groove called the sulcus. The entire penis – shaft and glans – is covered by a continuous layer of skin. The section of the penile skin that covers the glans is called the foreskin or prepuce. The foreskin consists of two layers, the outer foreskin and an inner lining similar to a mucous membrane.

Before birth, the foreskin and glans develop as one tissue. The foreskin is firmly attached – really fused – to the glans. Over time, this fusion of the inner surface of the prepuce with the glans skin begins to separate by shedding the cells from the surface of each layer. Epithelial layers of the glans and the inner foreskin lining are regularly replaced, not only in infancy but throughout life. The discarded cells accumulate as whitish, cheesy "pearls" which gradually work their way out via the tip of the foreskin.

Eventually, sometimes as long as 5 or even 10 years after birth, full separation occurs and the foreskin may then be pushed back away from the glans toward the abdomen. This is called foreskin retraction. The foreskin may retract spontaneously with erections which occur normally from birth on and even occur in fetal life. Also, all children "discover" their genitals as they become more aware of their bodies and may retract the foreskin themselves. If foreskin does not seem to retract easily early in life, it is important to realize that this is not abnormal and that it will eventually do so.

Diagrammatic Representation of the Inner and Outer Foreskin Layers:



Drawing reprinted with permission of Edward Wallerstein, author of Circumcision: An American Health Fallacy.

**The Function of the Foreskin:** The glans at birth is delicate and easily irritated by urine and feces. The foreskin shields the glans; with circumcision, this protection is lost. In such cases, the glans and especially the urinary opening (meatus) may become irritated or infected, causing ulcers, meatitis (inflammation of the meatus), and meatal stenosis (a narrowing of the urinary opening). Such problems virtually never occur in uncircumcised penises. The foreskin protects the glans throughout life.

**Infant Smegma:** Skin cells from the glans of the penis and the inner foreskin are shed throughout life. This is especially true in childhood; natural skin shedding serves to separate the foreskin from the glans. Since this shedding takes place in a relatively closed space – with the foreskin covering the glans – the shed skin cells cannot escape in the usual manner. They escape by working their way to the tip of the foreskin. These escaping discarded skin cells constitute infant smegma.

**Adult Smegma:** Specialized sebaceous glands – Tyson's Glands – which are located on the glans under the foreskin, are largely inactive in childhood. At puberty, Tyson's Glands produce an oily substance, which, when mixed with shed skin cells, constitute adult smegma. Adult smegma serves as a protective, lubricating function for the glans.

**Foreskin Hygiene:** The foreskin is easy to care for. The infant should be bathed or sponged frequently, and all parts should be washed including the genitals. The external penile skin is soft and pliable and easy to wash. *It is not necessary to retract any part of the skin in order to wash under it.* The uncircumcised penis is easy to keep clean. No special care is required! Leave the penis alone. The body provides its own protection of the glans area because the foreskin is fused to it. As the shed epithelial cells ooze from underneath the foreskin, clean away this infant smegma. No other manipulation is necessary. There is no need for Q-tips, irrigation or antiseptics; soap and water will suffice.

**Foreskin Retraction:** As noted, the foreskin and glans develop as one tissue. Separation will evolve over time. It should not be forced. When will separation occur? Each child is different. Separation may occur before birth; this is rare. It may take a few days, weeks, months or even years. *This is normal.* Although most foreskins are retracted by age 5, there is no

# EXHIBIT D

# Newborns: Care of the Uncircumcised Penis

## Guidelines for Parents



American Academy of Pediatrics



The American Academy of Pediatrics is an organization of 47,000 pediatricians dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults.

Now available: *Caring for Your Baby and Young Child: Birth to Age 5*, available at the special discount price of more than 25 percent off the $16 list price. To order your copy, send a check or money order for $11.95, plus $2.75 per copy shipping and handling, to:
AAP Publications — Child Care Book, Birth to Age 5, 141 Northwest Point Blvd. PO Box 927, Elk Grove Village, IL 60009-0927.

For additional copies, contact:
American Academy of Pediatrics
Division of Publications
141 Northwest Point Blvd. PO Box 927
Elk Grove Village, IL 60009-0927

Minimum order 100
Price $23.50/100 (members)
$28.50/100 (nonmembers)
Copyright © 1990
HE0025R

American Academy of Pediatrics

1/94

**Summary:** Care of the uncircumcised boy is quite easy. "Leave it alone" is good advice. External washing and rinsing on a daily basis is all that is required. Do not retract the foreskin in an infant, as it is almost always attached to the glans. Forcing the foreskin back may harm the penis, causing pain, bleeding, and possibly adhesions. The natural separation of the foreskin from the glans may take many years. After puberty, the adult male learns to retract the foreskin and cleanse under it on a daily basis.

The information contained in this publication should not be used as a substitute for the medical care and advice of your pediatrician. There may be variations in treatment that your pediatrician may recommend based on individual facts and circumstances.

# Newborns:
# Care of the
# Uncircumcised Penis

At birth, the penis consists of a cylindrical shaft with a rounded end called the glans. The shaft and glans are separated by a groove called the sulcus. The entire penis — shaft and glans — is covered by a continuous layer of skin. The section of the penile skin that covers the glans is called the foreskin or prepuce. The foreskin consists of two layers, the outer foreskin and an inner lining similar to a mucous membrane.

Before birth, the foreskin and glans develop as one tissue. The foreskin is firmly attached — really fused — to the glans. Over time, this fusion of the inner surface of the prepuce with the glans skin begins to separate by shedding the cells from the surface of each layer. Epithelial layers of the glans and the inner foreskin lining are regularly replaced, not only in infancy but throughout life. The discarded cells accumulate as whitish, cheesy "pearls" which gradually work their way out via the tip of the foreskin.

Eventually, sometimes as long as 5, 10, or more years after birth, full separation occurs and the foreskin may then be pushed back away from the glans toward the abdomen. This is called foreskin retraction. The foreskin may retract spontaneously with erections which occur normally from birth on and even occur in fetal life. Also, all children "discover" their genitals as they become more aware of their bodies and may retract the foreskin themselves. If the foreskin does not seem to retract easily early in life, it is important to realize that this is not abnormal and that it should eventually do so.

**Infant Smegma:** Skin cells from the glans of the penis and the inner foreskin are shed throughout life. This is especially true in childhood; natural skin shedding serves to separate the foreskin from the glans. Since this shedding



Diagrammatic Representation of the inner and Outer Foreskin Layers

Sulcus

Shaft

Urinary Meatus

Outer Foreskin Layer

Preputial Orifice

Glans

Frenum

Inner Foreskin Layer

Drawing reprinted with permission of Edward Wallerstein.

takes place in a relatively closed space — with the foreskin covering the glans — the shed skin cells cannot escape in the usual manner. They escape by working their way to the tip of the foreskin. These escaping discarded skin cells constitute infant smegma, which may appear as white "pearls" under the skin.

**Adult Smegma:** Specialized sebaceous glands — Tyson's Glands — which are located on the glans under the foreskin, are largely inactive in childhood. At puberty, Tyson's Glands produce an oily substance, which, when mixed with shed skin cells, constitute adult smegma. Adult smegma serves as a protective, lubricating function for the glans.

**Foreskin Hygiene:** The foreskin is easy to care for. The infant should be bathed or sponged frequently, and all parts should be washed including the genitals. The uncircumcised penis is easy to keep clean. No special care is required! No attempt should be made to forcably retract the foreskin. No manipulation is necessary. There is no need for special cleansing with Q-tips, irrigation, or antiseptics; soap and water externally will suffice.

**Foreskin Retraction:** As noted, the foreskin and glans develop as one tissue. Separation will evolve over time. It should not be forced. When will separation occur? Each child is different. Separation may occur before birth; this is rare. It may take a few days, weeks, months, or even years. *This is normal.* Although many foreskins will retract by age 5, there is no need for concern even after a longer period. Some boys do not attain full retractability of the foreskin until adolescence.

**Hygiene of the Fully Retracted Foreskin:** For the first few years, an occasional retraction with cleansing beneath is sufficient.

Penile hygiene will later become a part of a child's total body hygiene, including hair shampooing, cleansing the folds of the ear, and brushing teeth. At puberty, the male should be taught the importance of retracting the foreskin and cleaning beneath during his daily bath.