## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SHINGO LAVINE, ADAM LAVINE AND AIKO LAVINE, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | 3:21-CV-17099-ZNQ-LHG |
| | : | |
| | : | |
| v. | : | |
| | : | |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

### DEFENDANT AMERICAN ACADEMY OF PEDIATRICS INC.'S NOTICE OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM PURSUANT FED. R. CIV. P. 12(b)6

TO:    Andrew DeLaney, Esq.
Andrew DeLaney, Attorney at Law LLC
6 South Street, Suite 203
Morristown, New Jersey 07960
(973) 606-6090
Andrewdelaney21@gmail.com

Jonathan D. Lupkin, Esquire
Lupkin PLLC
80 Broad Street, Suite 1301
New York, NY 10004
Phone No:  (646) 367-2771
Emails:  Jlupkin@lupkinpllc.com

**PLEASE TAKE NOTICE** that, pursuant to Local Rule 7.1 and Federal Rules of Civil Procedure 12(b)(6), defendant, American Academy of Pediatrics Inc. ("AAP") moves before the United States District Court for the District of New Jersey for an order dismissing plaintiffs Shingo Lavine, Adam Lavine, and Aiko Lavine's amended complaint for failure to state a claim.

**PLEASE TAKE FURTHER NOTICE** that in support of this motion, the defendant shall rely on the enclosed brief, statement of facts, Counsel Certification, and referenced exhibits; and

28150795v.1

**PLEASE TAKE FURTHER NOTICE** that a proposed form of order is attached.

WHITE AND WILLIAMS LLP

BY: _____
Jared K. Levy
457 Haddonfield Road | Libertyview, Suite
400|Cherry Hill, NJ 08034
Phone: 856.317.3642
Email: levyj@whiteandwilliams.com
Attorneys for Defendant American
Academy of Pediatrics Inc.

Dated:  December 13, 2021

28150795v.1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SHINGO LAVINE, ADAM LAVINE AND AIKO LAVINE, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | 3:21-CV-17099-ZNQ-LHG |
| | : | |
| | : | |
| v. | : | |
| | : | |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**DEFENDANT AMERICAN ACADEMY OF PEDIATRICS INC.'S RULE 12(b)(6) MOTION TO DISMISS THIRD-PARTY PLAINTIFFS' AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

Defendant AAP, by and through its attorneys, White and Williams LLP, hereby moves to dismiss plaintiffs' amended complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and Local Rule 7.1, and in support thereof, avers as follows:

1.     This matter arises out of an allegedly botched circumcision and an unsuccessful second circumcision, both performed on plaintiff Shingo Lavine about 23 years ago. *See* plaintiffs' complaint, attached to Counsel Cert., Exhibit "A."

2.     On February 4, 2021, Plaintiffs Shingo Lavine and his parents, Adam Lavine and Aiko Lavine, filed a complaint against Princeton Medical Group, P.A., the company for whom the now deceased obstetrics and gynecology doctor (Dr. Chait) who performed the circumcision worked, and the American Academy of Pediatrics, Inc. (the "Academy") in New Jersey Superior Court, alleging that the Academy and Princeton, somehow caused Shingo's injuries by fraud.

3.     Plaintiffs specifically alleged that Dr. Chait committed "fraud" when he allegedly

28150795v.1

failed to properly inform them on the risks of circumcision, and that the Academy should be held liable as well solely because Dr. Chait supposedly told Adam as part of his medical consultation that the Academy issued guidelines about circumcision showing that circumcision reduces the risk of certain diseases. Princeton and AAP filed a motion to dismiss plaintiffs' complaint in New Jersey state court in June 2021.

4.      Plaintiffs voluntarily dismissed Princeton on September 7, 2021, and the Academy timely removed the case to this Court because Princeton's dismissal created diversity jurisdiction.

5.      The Court granted plaintiffs leave to file an amended complaint by November 29, 2021, with the Academy's motion to dismiss due by December 13, 2021.  See plaintiffs' amended complaint, attached to Counsel Cert., Exhibit "B" (called the "amended complaint" in these papers, though it does not include "amended" in its title).

6.      For the reasons stated in the accompanying brief, plaintiffs' amended complaint fails to state a claim against the Academy as a matter of law.

**WHEREFORE**, the Academy prays that the Court enter an order dismissing plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6).

WHITE AND WILLIAMS LLP

BY: _____
Jared K. Levy
457 Haddonfield Road | Libertyview, Suite 400| Cherry Hill, NJ 08034
Phone: 856.317.3642
Email: levyj@whiteandwilliams.com
Attorneys for Defendant American Academy of Pediatrics Inc.

Dated: December 13, 2021

-2-

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SHINGO LAVINE, ADAM LAVINE AND AIKO LAVINE, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | 3:21-CV-17099-ZNQ-LHG |
| | : | |
| v. | : | |
| | : | |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT AMERICAN ACADEMY OF PEDIATRICS INC.'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

**PRELIMINARY STATEMENT**

This case arises from a botched circumcision and an unsuccessful second circumcision, both of which occurred about 24 years ago. The Lavine family (Shingo and his parents, Adam and Aiko) allege that the obstetrician who performed—and botched—Shingo's 1997 circumcision did not provide them sufficient and accurate information about the risks of circumcision and that they were therefore unable to give informed consent for the surgery. But they did not bring a malpractice action 24 years ago or even after Shingo turned 18, based on either potential act of malpractice by the obstetrician (Dr. Chait)—either his performance of the surgery without informed consent or his alleged malpractice during the surgery.

Instead, they now bring this fraud suit, not against the doctor who advised them and who performed the circumcision, but against the American Academy of Pediatrics, Inc. (the "Academy"), with whom they have no relationship. They base their fraud claim on a single, hearsay statement that the now-deceased doctor allegedly made 24 years ago when recommending

-3-

circumcision. Specifically, they allege that Dr. Chait informed the father "that the AAP had issued guidelines about circumcision showing that circumcision reduces the incidence of urinary tract infections and penile cancer" and that Dr. Chait portrayed circumcision as routine and safe. (Amended Compl. ¶ 36.) The plaintiffs contend that the Academy issued guidelines that falsely promoted the benefits of circumcision. At the very outset, the fraud claim suffers from a fatal flaw: the amended complaint fails to identify any "guidelines" that the Academy published before 1998 to advise parents about whether to have a son circumcised. Indeed, while the amended complaint attaches an Academy publication that includes guidelines, those guidelines are not about whether to *obtain* a circumcision, but about how parents should care for a son *after* a circumcision—"Newborns: Care of the Uncircumcised Penis, Guidelines for Parents." (Amended Compl. Exh. D.)

Instead of identifying guidelines about circumcision issued by the Academy, the Lavines point to a 1989 research report, entitled "Report of the Task Force on Circumcision." (Amended Compl. Exh. A). But there is no basis to think Dr. Chait was referring to this 1989 report when he supposedly mentioned "guidelines," because it is not an official guideline of the Academy, nor does it contain any guidelines. In short, though required to plead with specificity when bringing a fraud claim, the Lavines offer no facts linking the unspecified "guidelines about circumcision" that Dr. Chait mentioned in 1997 to this 1989 report, instead of to actual AAP guidelines, like "Newborns: Care of the Uncircumcised Penis, Guidelines for Parents" or the *Guidelines for Perinatal Care* (another set of guidelines referenced in the report).

Their fraud claims suffer from additional flaws that also independently warrant dismissal. First, New Jersey law bars plaintiffs from asserting a fraud claim based on a lack of informed consent from misrepresentations that occur before surgery. Fraud claims based pre-surgery misrepresentations must be brought as *malpractice* claims, not *fraud* claims. *Howard v. Univ. of*

-4-

*Med. & Dentistry of New Jersey*, 172 N.J. 537, 559 (2002) (dismissing a fraud claim because it was "cognizable in a claim based on lack of informed consent"). And because this claim is really a malpractice claim, it is barred by the statute of limitations.

Second, the Academy as a publisher did not owe a duty of care to the Lavines with respect to articles published in its medical journal, *Pediatrics*. There is no special relationship between the Lavines and the Academy that would justify holding the Academy as a publisher liable for any factual errors in a medical journal article written by six doctors.

Third, even if the Lavines could bring a fraud claim for something that was malpractice 24 years after the fact, it would still fail to satisfy the elements of fraud. For one, there is no false statement of fact, because the Lavines have failed to identify any "guidelines" that make any statements about urinary tracts infections or penile cancer. Even if the 1989 report constituted guidelines, there would still be no false statement of fact because the statement that circumcision may reduce incidents of urinary tract infections and penile cancer is a statement of medical *opinion* about future *probabilities*; it is not a statement susceptible of exact knowledge when the statement is made. For another, the Lavines fail to even *allege* that the Academy knew that any statements in the 1989 report were false, much less allege facts to support an allegation that the Academy knew, particularly where the report cited 13 separate studies about cancer and six studies about urinary tract infections. For yet another, the Lavines cannot show either that the Academy intended for them to rely on the statements made in the journal for pediatricians or that they could reasonably rely on the report, given that the report itself included a disclaimer that doctors must consider individual circumstances and identified benefits *and* risks of circumcision. And for yet another, they relied on the advice of their doctor, within the patient-client relationship, and his advice is an intervening cause.

28150795v.1

In the end, the plaintiffs' real complaint is that they oppose the practice of circumcision, even when done properly: they allege that it is "medically unnecessary," apparently in all instances. They say it is performed without informed consent because it is portrayed as safe, without a full explanation of the risks. (Amended Compl. ¶¶ 3, 7, 50.) They go so far as to suggest that the statement that "[c]ircumcision is a safe medical procedure if performed carefully by a trained, experience operator" is false because "the AAP knows that many physicians, medical students, and nurses who circumcise are neither well-trained nor experienced." (Amended Compl. ¶ 27.) But while the plaintiffs are entitled to their opinion, it is not fraud for the Academy to publish a report by doctors about research on circumcision in a medical journal in 1989. The plaintiffs' claims against the Academy should be dismissed.

## STATEMENT OF FACTS

**I.      Dr. Chait recommends and then performs a circumcision on Shingo.**

In December 1997, Dr. Chait, an employee of Princeton in Princeton, New Jersey, solicited Adam's verbal consent to perform a circumcision on his infant son, Shingo. (Amended Compl. ¶¶ 32–36.) While explaining his recommendation that he perform a circumcision on Shingo, Dr. Chait allegedly stated that the AAP had issued guidelines showing that circumcision reduced incidence of urinary tract infections and penile cancer, and he allegedly portrayed circumcision as a minor, safe, routine procedure. (*Id.* ¶ 36.) The plaintiffs allege that Dr. Chait did not disclose the risks and complications associated with circumcision. (*Id.* ¶ 38.)

Adam acknowledges that he verbally consented to the procedure. (*Id.* ¶ 37.) Aiko was medicated and incapacitated following the Caesarean section procedure used to deliver Shingo at the time Dr. Chait sought consent for the circumcision. (*Id.* ¶ 34.) Adam alleges that he verbally consented in reliance, in part, on representations made by Dr. Chait and Dr. Chait's reference to the Academy's position. (*Id.* ¶¶ 36–37.) The plaintiffs do not allege that they had any knowledge

-6-

of any guidelines or other publications from the Academy. They also do not allege that Dr. Chait recommended circumcision *only* because of the purported Academy guidelines; they allege it was "among the bases" he invoked. (*Id.* ¶ 50). The plaintiffs do not allege that the Academy was involved in the circumcision or their medical care in any way. The plaintiffs, who acknowledge that Dr. Chait was an obstetrician (*id.* ¶ 33), not a pediatrician, also fail to allege that Dr. Chait is even a member of the American Academy of Pediatrics, that he had any other relationship with it at all, or that he even read the purported "guidelines."

During the circumcision, Dr. Chait removed too much shaft skin. (*Id.* ¶ 13.) Afterwards, Dr. Chait expressed concerns to Adam and Aiko about the success of the procedure. (*Id.*)

**II.   During the next month, Adam and Aiko were aware that the circumcision was not done properly, and Shingo experienced related issues as he grew up.**

In the month after the circumcision, Adam and Aiko became concerned that Dr. Chait did not perform the circumcision properly, and they acted on their concern. (*Id.* ¶¶ 39–41.) Through mid-January 1998, Adam and Aiko took Shingo to his pediatrician multiple times. (*Id.* ¶ 40.) While they alleged in their original verified complaint that the pediatrician warned them that Dr. Chait had not removed enough foreskin (Original Compl. ¶ 14), this time they simply allege that this second doctor recommended that they take Shingo to Dr. Barone, chief of pediatric urology at Robert Wood Johnson University Hospital in New Brunswick, New Jersey. (Amended Compl. ¶ 40.) Dr. Barone diagnosed Shingo with "phimosis and a buried penis" and recommended a corrective procedure or "second circumcision." (*Id.* ¶ 41.) And while their original verified complaint alleged that Shingo had insufficient shaft skin coverage after the second circumcision (Original Compl. ¶ 15), this time they simply allege that Shingo "did not 'do very well'" after it. (Amended Compl. ¶ 42.) Further (and as relevant to whether the Lavines could have discovered their claims earlier), by 1998 questions about whether circumcision should be a normal procedure

28150795v.1

were already part of the public discussion. (*Id.* ¶¶ 17 n.1, 21–22 (discussing books, lawsuits, and even a *Time Magazine* article critical of circumcision).

Many years later, after reaching adolescence, Shingo began experiencing "urologial" issues, including "increased pubic hair growth bearing skin down the circumcision scar line," glans hypersensitivity, and discomfort during erections. (*Id.* ¶ 44.) Shingo lived with these complications for years without remedial efforts until June 2020, when Shingo began a process to regenerate foreskin that involved wearing weights attached to the penis and pulling for three to four hours per day for five to ten years. (*Id.* ¶¶ 47.) In July 2020, Shingo began undergoing psychotherapy to cope with the emotional distress resulting from his circumcision. (*Id.* ¶ 48.)

According to the amended complaint, the Lavines were not aware "that circumcision was a highly controversial topic" or that anyone believed "that circumcision was anything other than medically beneficial." (*Id.* ¶ 38.) They allege that they first discovered that "[p]arental permission" is "not fully informed" in light of how "circumcision is routinely portrayed" "as a normal, simple, safe, and harmless medical procedure" in September 2020. (Amended Compl. ¶¶ 50–51.) They learned this when speaking with a law professor, Peter Adler, who "has focused much of his academic energy on circumcision and its legal ramifications" (Amended Compl. ¶ 50); in their original verified complaint, they also explain that he viewed circumcision as "violence and genital mutilation" and "a fraud when performed by physicians" (Original Compl. ¶ 23). It was in talking with the law professor that they discovered there might be "legal consequences for those who promote [circumcision] as a routine medical procedure." (*Id.*)

**III.   The allegations relating to the Academy rest on a report published in its journal, *Pediatrics*.**

In alleging that Dr. Chait mentioned "guidelines" issued by the Academy, the plaintiffs do not allege that Dr. Chait referred to any specific document. (*Id.* ¶ 36.) The plaintiffs do not even

-8-

allege that the Academy had issued "guidelines" about circumcision before 1997. Instead, the plaintiffs base their fraud allegations on "a 'Report of the Task Force on Circumcision (RE9148),' which was published in the AAP's journal *Pediatrics* in August 1989 ('1989 Guidelines')." (*Id.* ¶ 27.) Although they acknowledge that the AAP publishes a variety of different materials, including "advisory reports, recommendations, and guidelines" (*id.* ¶ 16), the plaintiffs define the 1989 Report of the Task Force in their complaint as the "1989 Guidelines." (*Id.* ¶ 27.) By sleight of editing, the plaintiffs try to transform the 1989 report into "guidelines" in order to fit Dr. Chait's purported statement. Despite defining the 1989 report as the "1989 Guidelines" (*id.*), the 1989 report does not actually include any guidelines. (*Id.* Ex. B.) In fact, the word "guidelines" appears in the 1989 report only twice, in both instances referring to another document with actual guidelines—*Guidelines on Perinatal Care*. (*Id.* Ex. B at 388 & n.2.)

The 1989 report, which was written by six doctors, describes their medical opinion on the safety of circumcision, concluding that it is a "generally safe procedure." (*Id.* Ex. B at 390.) In the article, these doctors offered their opinion that "[n]ewborn circumcision has potential medical benefits and advantages as well as disadvantages and risks." (*Id.*) In a section entitled "Contraindications, Complications, Informed Consent," the article specifically notes risks associated with circumcision: it notes that while postoperative conditions occur at a low rate, with the most common complications being "local infection and bleeding," the procedure has resulted in three instances of death. (*Id.*) The article also notes infants who undergo circumcision without anesthesia experience pain. (*Id.* at 389.)

The article states that "parents should be fully informed of the possible benefits and potential risks of newborn circumcision" and about other factors that may affect the parents' decisions, "including esthetics, religion, cultural attitudes, social pressures, and tradition." (*Id.* at 390.) And the article also includes a disclaimer advising doctors that they must take into account

-9-

28150795v.1

the specific circumstances of the patient. (*Id.* at 388 ("The recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed. Variations, taking into account individual characteristics, may be appropriate.").)

According to the plaintiffs, however, the 1989 report contained "materially misleading, inaccurate, and incomplete information about the risk of circumcision and its oftentimes deleterious physiological and psychological ramifications." (*Id.* ¶¶ 42 (referring to the "1989 Guidelines".) Despite the fact that the 1989 report specifically describes three instances of death from circumcision (*id.* Exh. B), they assert that the report does "not even mention the possibility of catastrophic and even fatal injuries." (*Id.* ¶ 27.) They also allege that the Task Force and the Academy maintained a religious bias toward circumcision. (*Id.* ¶ 27.) Finally, the plaintiffs allege that they are entitled to compensatory and punitive damages for the pain and suffering they endured arising from the negligently performed circumcisions. (*Id.* at 19.)

## LEGAL ARGUMENT

I. **Standard of review for motion to dismiss under *Rule* 12(b)(6).**

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. For a *Rule* 12(b)(6) motion, the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). But the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Ibid.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "[T]he court need not credit bald assertions or legal conclusions alleged in the complaint." *New Jersey Prot. & Advocacy, Inc. v. New Jersey Dept. of Ed.*, 563 F. Supp. 2d 474, 480 (D.N.J. 2008). "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than

-10-

conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). While "[t]he plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility . . . ." *Iqbal*, 556 U.S. at 678.

## II.   Heightened pleading standard under Rule 9(b).

Because this case assert fraud claims, Federal Rule of Civil Procedure 9(b) applies, and therefore the Lavines "must state with particularity the circumstances constituting fraud or mistake." Under the heightened pleading standard of *Rule* 9(b), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal citations omitted).

*Rule* 9(b)'s particularity requirement applies to New Jersey common law fraud claims in diversity cases. E.g., *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994); *District 1199P Health and Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 532 (D.N.J. 2011).

## III.   The Lavines may not assert a fraud claim based on a lack of informed consent.

Only one allegation links the Academy to the circumcision at issue in this case: the allegation that Dr. Chait informed Adam "that the AAP had issued guidelines about circumcision" while he was in the process of "solicit[ing] Adam's verbal *consent* to have Shingo circumcised . . . ." (Amended Compl. ¶ 36 (emphasis added).) This allegation reveals that the alleged "guidelines" are relevant for only one reason: for evaluating whether the Lavines had enough information to provide informed consent for the circumcision. Other allegations in the complaint confirm this. For example, the amended complaint alleges that Dr. Chait did not disclose to Adam and Aiko, among other things, "that circumcision is painful" and "that there are any number of potential complications." (*Id.* ¶ 38.) Indeed, the final allegation in the amended complaint before stating Count I is the allegation that Adam and Aiko "were never fully informed about the risk

-11-

and downsides of circumcision," and that "[h]ad they not been so fundamentally misled, they would never have consented to the procedure" that Dr. Chait performed." (*Id.* ¶ 52; *see also* ¶ 7 ("Had the Lavines received accurate and complete information from their doctor in 1997 (and had the doctor received accurate and complete information from the AAP, whose report was relied upon in recommending circumcision, Adam and Aiko would never have authorized the surgery.").) The key to the Lavines' claims is thus that they would not have consented to the circumcision had Dr. Chait fully informed them of the risks—which is the very essence of a claim for lack of informed consent.

This is significant because New Jersey courts have repeatedly found that plaintiffs may not assert a fraud claim based on a lack of informed consent resulting from misrepresentations that occur pre-surgery. "[I]nformed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to evaluate knowledgeably the options available and the risks attendant upon each before subjecting that patient to a course of treatment." *Howard v. Univ. of Med. & Dentistry of New Jersey*, 172 N.J. 537, 548 (2002) (stating that an informed-consent plaintiff must "prove that a reasonably prudent patient in the plaintiff's position would have declined to undergo the treatment if informed of the risks that the defendant failed to disclose"); see also *Matthies v. Mastromonaco*, 160 N.J. 26, 33 (1999) (a "physician has a duty to disclose information that will enable a patient 'to consider and weigh knowledgeably the options available and the risk attendant to each.'").

In *Howard*, the plaintiffs brought a medical-malpractice action based on a lack of informed consent after an unsuccessful cervical surgery rendered the patient a quadriplegic. 172 N.J. at 544, 556. Because the defendant doctor had misrepresented his credentials and experience at the time he obtained their consent to perform the surgery, the plaintiffs sought to bring a claim based on fraud, alleging that they would not have consented to surgery had they known of the defendant's

-12-

true qualifications. *Id.* at 556. But the New Jersey Supreme Court held that a fraud claim was unavailable to the plaintiffs, because allowing a "fraud or deceit-based cause of action in this doctor-patient context" "would circumvent the requirements for proof of both causation and damages imposed in a traditional informed consent setting." *Id.* at 554. The New Jersey Supreme Court found that fraud is actionable "only when the alleged fraud occurs separately from and subsequent to the malpractice . . . and then only where the fraud claim gives rise to damages separate and distinct from those flowing from the malpractice." *Id.* (emphasis added). The New Jersey Supreme Court concluded that the supposed fraud claim was really an informed consent claim.

Here, the alleged misstatements that form the basis of Plaintiffs' fraud claims against the Academy fail both parts of *Howard*'s test. First, the allegedly fraudulent statement occurred as part of the negligently performed circumcisions, not separately from it. (Amended Compl. ¶¶ 6–7, 33–39.) In fact, under the Lavines' allegations that the doctor failed to provide them with sufficient information for them to be able to provide informed consent (*id.* ¶¶ 7, 36–37), the statement recommending circumcision *was* the malpractice. As *Howard* explains, "[a] physician violates his duty to the patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment." 172 N.J. at 547. Under *Howard*, Dr. Chait's statement is the heart of the informed-consent issue because they claim that it was his statement that led them to consent to the procedure. *Id.* at 548 (requiring a plaintiff seeking to recover under a theory of informed consent "to prove that a reasonably prudent patient in the plaintiff's position would have declined to undergo the treatment if informed of the risks that the defendant failed to disclose").

Second, the damages that the Lavines claim arise from pain, suffering, and costs related to the circumcisions. (E.g., Amended Compl. ¶ 16 (alleging physical complications caused by the

28150795v.1

circumcisions), ¶ 48 (alleging "severe emotional distress stemming from his circumcision"), & p. 19 (seeking damages for the pain "caused by each of the two circumcisions"). They identify no damages separate and distinct from the circumcision-caused damages. Therefore, the Lavines must bring their claim as medical-malpractice claim, not as a fraud claim.

The amended complaint should be dismissed because the Lavines' claims for medical malpractice cannot be brought against the Academy. The Academy has no doctor-patient relationship with the Lavines, and so it owes no duty to them, including any duty to provide sufficient information for informed consent. *Ryans v. Lowell*, 484 A.2d 1253, 1257 (N.J. Super. App. Div. 1984) ("in physician-malpractice cases, the duty owed by the physician arises from the physician-patient relationship"). The Academy did not advise the Lavines to have Shingo circumcised or seek their consent to perform the procedure on Shingo, so even if there was a lack of informed consent, the Academy is not the proper defendant for the claims that really underlie this suit—the claims for medical malpractice by Dr. Chait.

## IV.     The Lavines' claims are time-barred.

### A.     The statutes of limitations for medical malpractice bar all the claims.

Because the plaintiffs' claims are really malpractice claims, they are barred by the statute of limitations. Under *N.J.S.A.* 2A:14-2(a), "every action at law for an injury to the person caused by the wrongful act, neglect or default of any person" must be commenced within two years, "except that an action by or on behalf of a minor that has accrued for medical malpractice for injuries sustained at birth shall be commenced prior to the minor's 13th birthday." Therefore, if Shingo's injury is considered to be sustained at birth, then the claims had to be brought by his 13th birthday, which was in December 2010. If his injury is not considered sustained at birth, then the claims fall under the two-year limitations period, which means the claims would need to have been brought by December 1999. *N.J.S.A.* 2A:14-2(A); *N.J.S.A.* 2A:14-2.1 (giving the parent of

-14-

an injured child "the same period of time as provided by law in the case of the said minor child so injured"). Either way, the claims are too late.

In substance all three of the Lavines are bringing medical malpractice claims, not fraud claims. See *New Jersey Educ. Ass'n v. New Jersey*, Civ. No. 11-5024, 2012 WL 715284, *4 (D.N.J. Mar. 5, 2012) ("a court should look to substance over form and be mindful of the fact that "the line between permitted and prohibited suits will often be indistinct" (quoting *Papasan v. Allain,* 478 U.S. 265, 278–79 (1986)); see also *Thomas v. Adams*, 55 F. Supp. 3d 552, 563 (D.N.J. 2014) (courts analyzing a complaint for entitlement to relief must look to "substance-over-form"). Accordingly, their claims are all time barred.

Further, it would be futile for the plaintiffs to attempt to amend their complaint, because they cannot change the fact that the lack of informed consent for the circumcision occurred in 1998; any attempt at amending to bring a claim based on this set of facts would still be time barred. Therefore, their claims should be dismissed with prejudice.

**B.      Even if Shingo had a fraud claim, his parents' claims are time barred.**

The likely reason that the Lavines present their medical-malpractice claim as a fraud claim is to try to avoid the malpractice statute-of-limitations, by relying on the six-year statute of limitations for fraud. *N.J.S.A.* 2A:14–1; *D'Angelo v. Miller Yacht Sales*, 261 N.J. Super. 683, 688 (App. Div. 1993). But even if the fraud statute of limitations would not starting running for Shingo until he turned 18, *N.J.S.A.* 2A:14-21, his parents' claims would still need to be dismissed because they had no disability that would have tolled the limitations period for their fraud claims. Further, they cannot benefit from any discovery rule because a claim accrues when the plaintiff "is aware of facts that would alert a reasonable person to the possibility of an actionable claim." *Cantena v. Raytheon Co.*, 447 N.J. Super. 43, 54 (App. Div. 2016). The limitations period begins when "the

-15-

28150795v.1

fraud was discovered, or *through reasonable diligence should have been discovered*." *Id.* at 53 (emphasis added).

Here, the parents were aware in 1998 of all the facts relating to the injury and alleged fraud, including the facts they now rely on in their attempt to link the circumcision to the Academy. As to the injury, they were aware that Dr. Chait performed a circumcision on Shingo and were aware of any statements Dr. Chait made at the time. In short, if the circumcision itself was the injury, the Lavines were on notice in December 1997 that Shingo had been circumcised.

As to any fraud linked to the Academy, Adam and Aiko were aware in 1997 that Dr. Chait allegedly referred to unspecified guidelines from the Academy when he recommended circumcision. They thus could have discovered, through reasonable diligence, the 1989 report that they now assume is what Dr. Chait meant when he supposedly referenced Academy "guidelines." (*Id.* ¶ 36.) Indeed, while they assert that they did not learn until 2020 that people were criticizing the necessity or safety of circumcision (*id.* ¶¶ 50–51), their own complaint demonstrates that they could have learned about those very ideas in 1997. For example, they allege that a "major medical publisher" published a book in 1980—17 years before Shingo's circumcision—that argued that neonatal circumcision lack[s] medical justification." (*Id.* ¶ 30.) They point to a lawsuit in 1984—13 years before Shingo's circumcision—that contended that circumcision was "common law battery, willful cruelty, unjustifiable infliction of pain, and child abuse," and they note that this lawsuit "received significant publicity, including an article in *Time Magazine*." (*Id.* ¶¶ 21–22.) Indeed, the Lavines could have written in 1998 *the exact same allegations* they wrote in 2021, as every article that the amended complaint mentions predates the 1998 injury (*id.* ¶¶ 17–23). Put simply, the Lavines either had discovered or could have discovered all of the factual bases for their claims in 1998, and they thus had sufficient information to alert them "to the possibility of an actionable claim." *Cantena*, 447 N.J. at 53.

-16-

The Lavines assert that they were not "enlightened" about the basis of their claim until they met with a law professor in September 2020 (after having met with a renowned urologist who dismissed their claim). (Am. Compl. ¶ 49.) The law professor told them that parental permission for circumcision is "not fully informed" and so "legally invalid" (Am. Compl. ¶ 50), that is not the proper standard for accrual under New Jersey law. For example, in *Burd v. New Jersey Tel. Co.*, 76 N.J. 284 (1978), the New Jersey Supreme Court specifically corrected a lower court for concluding that "the applicable limitations period does not begin running until [a claimant] learns from a lawyer that those facts equate with a legal cause of action against the producer or originator of the injurious source or cause." *Id.* at 291; see also *Catena*, 447 N.J. at 54 (the "discovery rule does not toll the statute until the plaintiff has 'legal certainty' of an actionable claim, or until the full extent of the damage becomes apparent") (internal citations omitted). Because the Lavines' claims accrued in 1998, the statute of limitations for fraud ran in 2004, and their claims are thus time-barred.

**V.    The plaintiffs cannot establish the Academy's liability for the authors' opinions in the 1989 report as the report's publisher.**

The Academy did not author the 1989 report. Six task force members authored it and rendered the opinions in it. The Academy later published it in its journal *Pediatrics*. The Lavines cannot meet their burden to establish liability against the Academy as a mere publisher of the 1989 report. The gravamen of their allegations is that the Academy, the publisher of *Pediatrics*, should be held liable for the alleged misstatements and omissions by the authors of the 1989 report because their report appeared in *Pediatrics*.

But courts across jurisdictions have been reluctant to hold publishers liable for articles or books they publish. As one court put it, outside of the defamation context "[a] review of the applicable law reveals no cases that have directly held publishers liable based on the content of a

-17-

publication," and "[t]he cases contrary to holding publishers liable are legion." *Smith v. Linn*, 48 Pa. D. & C.3d 339, 342 (Pa. Com. Pl. 1988) (citing cases); see also *id.* at 346 ("The court found no duty existed on a publisher with respect to the content of its publication outside the area of defamation."). For example, when a plaintiff "sued the publisher of the 'Merck Index,' which contained information about drugs, chemicals and biologicals including their toxicity," the suit based on negligence and willful misrepresentation was dismissed, because a court found "no duty owed to plaintiff by Merck." *Id.* at 346–47 (discussing *Demuth Dev. Co. v. Merck & Co.*, 432 F. Supp. 990 (E.D. N.Y. 1977)). As another example, in a negligence case against the publisher of a "how to" book, a court "reasoned that the publisher owed no duty to the reading public as to the contents of a publication authored by another." *Id.* at 347 (discussing *Alm v. Van Nostrand Reinhold Co.*, 134 Ill. App. 3d 716, 720–21 (1985)). The Pennsylvania court also examined numerous sections of Restatement (Second) of Torts and concluded that none of them suggest the sections were meant to be applied to publishers. *Id.* at 354 (analyzing "sections 302(a), 303, 307, 308, 310, 311, 321, 388, 390 and 402B").

Numerous other courts have taken the same view. As the Ninth Circuit has explained, a publisher has "no duty to investigate the accuracy of the contents of the books it publishes." *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1037 (9th Cir. 1991). "[T]here is nothing inherent in the role of publisher or the surrounding legal doctrines to suggest that such a duty should be imposed on publishers," and "[i]ndeed the cases uniformly refuse to impose such a duty." *Id.* at 1037 & n.8 (listing cases); see also *First Equity Corp. of Florida v. Standard & Poor's Corp.*, 869 F.2d 175, 179–80 (2d Cir. 1989) (concluding that a publisher of securities information publication has no duty to verify information) (citing cases). The Ninth Circuit also noted the First Amendment concerns with imposing liability on publishers: "Were we tempted to create this duty, the gentle tug of the First Amendment and the values embodied therein would remind us of the

-18-

social costs." *Winter*, 938 F.2d at 1037; see also *Tumminello v. Bergen Evening Record, Inc.*, 454 F. Supp. 1156 (D.N.J. 1978) (concluding a publisher had no duty under traditional tort principles and warning of a chilling effect if a duty were imposed).

Based on the foregoing, and despite Plaintiffs' conclusory allegations, the Academy owes no duty to the Lavines. The Lavines do not allege any special relationship with the Academy and were not members of the Academy nor subscribers to *Pediatrics*. In fact, the Lavines do not allege that they ever reviewed *Pediatrics* or the 1989 report—or even that Dr. Chait reviewed the 1989 report. Thus, permitting the Lavines to recover for the alleged misstatements or omissions by the authors in a scientific journal article would create a new duty outside the defamation context, would significantly expand publisher liability, and would chill future medical publications. But under the case law, without a special relationship or duty there can be no recovery for any misstatements by the Academy. As a result, the Academy should not be held liable to the Lavines for fraud based on its publication of an article.

**VI.    The plaintiffs' amended complaint fails to state a claim for fraud or constructive.**

Even if the Academy could be held liable as a publisher—which it cannot—the plaintiffs' claims for fraud and constructive fraud should be dismissed with prejudice because the Lavines have not adequately pled any of the elements required for a fraud or constructive fraud claim.

**A.    The plaintiffs fail to plead either fraud with the required particularity.**

Despite *Rule* 9(b)'s requirement that plaintiffs must plead fraud with particularity, the Lavines fail to plead any facts that link Dr. Chait's statement about "guidelines" to the 1989 report. Even assuming Adam Lavine's recollection of Dr. Chait's advice was correct, the plaintiffs *speculate* that Dr. Chait was referring to the 1989 report (Compl. ¶ 27), but the amended complaint does not give any plausible basis for assuming that Dr. Chait was actually referring to a 1989 report written by a group of doctors when he referred to supposed AAP "guidelines." The

plaintiffs' own complaint and exhibits identify two documents that, unlike the 1989 report, actually *are* guidelines: "Newborns: Care of the Uncircumcised Penis, Guidelines for Parents" and *Guidelines for Perinatal Care*. (*Id.* Exh. D & Exh. B. at 388). "Where the facts as stated in the exhibits cannot be reconciled with the facts alleged in the pleading, the exhibit controls." *Kwanzaa v. Tell*, 2019 WL 5541280, at *1 (D.N.J. Oct. 28, 2019). And the complaint refers to yet another document (*Standards and Recommendations for Hospital Care of Newborn Infants* (*id.* ¶ 18). The Lavines simply assume that the 1989 report is the document Dr. Chait referenced, apparently on the theory that the 1989 report was "in effect in 1997" during Shingo's circumcision. (*Id.* ¶ 31.) But this assumption is inconsistent with the amended complaint's own allegations, which recognize repeatedly that the Academy publishes several different categories of documents: "advisory reports, recommendations, and guidelines," as well as "policy statements" (Amended Compl. ¶¶ 16, 55), and is inconsistent with the complaint's exhibits, which show the 1989 report contains no guidelines. The plaintiffs cannot rename an almost decade earlier report summarizing then then-known medical literature as "the Academy's Guidelines" to create a claim against the Academy based on a comment by a doctor.

Further, the plaintiffs will never be able to show what Dr. Chait meant by his supposed reference, because Dr. Chait has passed away. Thus, the plaintiffs will never be able to prove the specific content of the statement that is basis of their fraud claim—that Dr. Chait was referencing the 1989 report. Further, the statement itself is inadmissible hearsay, as the declarant is now deceased, and no hearsay exception applies. See *Fed. R. Evid*. 804(a)(4), (b).

The plaintiffs cannot rely on inferences about what Dr. Chait meant by the "guidelines" because *Rule* 9(b) requires particularity in describing the content of the fraud. Under *Rule* 9(b), the complaint must set forth, among other things, "precisely what statements were made *in what documents* or oral representations or what omissions were made," and "the content of such

-20-

statements . . . ." *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 225 (S.D.N.Y. 1989) (emphasis added). Plaintiffs cannot comply with *Rule* 9(b) because they do not know the content of a crucial part of the statements, namely what document Dr. Chait meant by the "guidelines"—the *Guidelines on Perinatal Care*, the "Newborns Care" guidelines for parents, the *Standards and Recommendations*, the 1989 report, or something else. The allegations regarding Dr. Chait and the 1989 report (or so-called "guidelines") are, at best, ambiguous, which requires the plaintiffs to guess at what document Dr. Chait was referring to. This is insufficient under *Rule* 9(b). See, e.g., *Weill v. Dominion Res., Inc.*, 875 F. Supp. 331, 338 (E.D. Va. 1994) ("Plaintiffs' allegations have been stated with such vagueness and ambiguity that they fail to meet the particularity requirements"). This is also true as to the plaintiffs' allegations of the Academy's knowledge of some kind of "fraud"—the amended complaint's only allegations regarding the Academy's knowledge of fraud are conclusory and speculative. See *Shaffer v. Eden*, 209 F.R.D. 460, 463 (D. Kan. 2002) (claims of fraud may not be based "on speculation and conclusory allegations") (citations omitted). These claims should, therefore, be dismissed.

**B.     The plaintiffs fail to allege an actionable fraud claim.**

The elements of common-law fraud are "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate New Jersey Ins. Co. v. Lajara*, 222 N.J. 129, 147 (N.J. 2015). "Misrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them." *Banco Popular*, 184 N.J. at 261.

**1.     The plaintiffs have not alleged a misstatement of fact.**

The Lavines' fraud claim fails on the first element, because statements of opinion, rather than statements of fact, are not actionable for fraud. See *Alexander v. CIGNA*, 991 F. Supp. 427,

435 (D.N.J. 1998) ("A statement's content must be susceptible of 'exact knowledge' at the time it is made" to be a statement of fact that is actionable for fraud.). "The distinction between fact and opinion is broadly indicated by the generalization that what was susceptible of exact knowledge when the statement is made is usually considered to be a matter of fact." *Joseph J. Murphy Realty, Inc. v. Shervan*, 159 N.J. Super. 546, 551 (App. Div. 1978). Courts have admonished that representations pertaining to "matters not susceptible of personal knowledge are generally to be regarded as mere expressions of opinion, and that is held to be so even though they are made positively and as though they are based upon the maker's own knowledge." *Id.*; see also *Paul v. Mayo Clinic*, No. 3:15-CV-1244-J-20MCR, 2017 WL 9937984, at *7 (M.D. Fla. June 6, 2017) (holding that a "difference in medical opinion" did not establish a misrepresentation). Further, when a "false representation" involves a subject that can be investigated by both parties, "[s]tatements as to future or contingent events, as to expectations and probabilities, or as to what will be or is intended to be done in the future, do not constitute misrepresentations . . . ." *Middlesex Cty. Sewerage Auth. v. Borough of Middlesex*, 74 N.J. Super. 591, 604, 605 (Law. Div. 1962).

Here, while the plaintiffs point to many statements in the 1989 report (Am. Compl. ¶ 27), most of them are irrelevant; for example, even if the report understated infant pain, Dr. Chait made no reference to that when advising Adam; he mentioned only general safety and reducing the risk of urinary tract infections and penile cancer. (*Id.* ¶ 36.) And as to those statements, they are not statements of fact; they are the medical opinions of the 1989 report's authors about the probability of future events. For example, the 1989 report provides the authors' medical opinion that newborn circumcision is a "generally safe procedure." (Am. Compl. Exh. B. at 390.) Determining whether a medical procedure is safe necessarily requires a judgment call about the competing risks and benefits of the procedure made between the treating physician and the patient.

-22-

That doctor/patient judgment call is the medical opinion the Lavines now disagree with, decades later, after talking to a law professor. Put simply, the Lavines base their entire suit on their current medical opinion that circumcision is not a "safe" and "medically beneficial procedure." (Am. Compl. ¶ 36.) Apparently, the Lavines now would weigh the risks of complications from the procedure differently (as is perhaps inevitable, given the effects of hindsight bias). Many of the Lavines' allegations are that the author-physicians overstated the benefits while understating the risks—in other words, that the doctors should have weighed those factors differently and concluded it was not generally safe. (See Am. Compl. ¶¶ 42–44, 60, 65–67, 69–70.) The Lavines allege that it is false to say that "[c]ircumcision is a safe surgical procedure if performed carefully by a trained, experienced operator" (Am. Compl. ¶ 27), but saying there are untrained doctors does not make that statement false. The medical opinions of the doctors who wrote the 1989 report are precisely the type of statements that are not "susceptible" of exact knowledge, and therefore not actionable as fraud.

Further, the first page of the 1989 report provides a disclaimer highlighting that the report is providing a general opinion about safety, not one specifically tailored to a particular patient: "[t]he recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed." (Amended Compl. Ex. B, 1989 Rept. at 388.) This language shows the 1989 report is not even making a recommendation—it leaves that judgment to the treating doctor. If Dr. Chait said the 1989 report was guidelines, then he was mistaken. The report states that "[v]ariations, taking into account individual circumstances, may be appropriate." (*Id.*) The article mentions that "[n]ewborn circumcision has potential medical benefits and advantages as well as disadvantages and risks," and specifically mentions the risk of "postoperative complications" (including three deaths). (*Id.* at 390.) The report also states only that "*[p]roperly performed* newborn circumcision" may result in some benefits and that it is a "generally safe

-23-

procedure when performed by an experienced operator." (*Id.*) (emphasis added). Obviously an improperly performed procedure may give rise to complications—and to a *malpractice* claim (not a fraud claim). And in providing their opinions about the safety of circumcision, the author-physicians state that parents should consult with a medical professional before proceeding with any course of treatment, so that they can be "fully informed of the possible benefits and potential risks" of newborn circumcision in their particular context. (*Id.*) Here, the Lavines acted in accord with that recommendation and consulted with Dr. Chait, but they claim they were not fully informed as the risks of circumcision by Dr. Chait, which would be solely the fault of Dr. Chait and not the Academy. Dr. Chait was the learned intermediary with a duty to the Lavines as their treating physician to advise them, not the Academy.

As shown in the products-liability context under the "learned intermediary doctrine," such warnings and disclaimers are sufficient to discharge a defendant of liability. See *Niemiera v. Schneider*, 114 N.J. 550, 559 (1989) ("a pharmaceutical manufacturer generally discharges its duty to warn the ultimate user of prescription drugs by supplying physicians with information about the drug's dangerous propensities"); see also *Grobelny v. Baxter Healthcare Corp.*, 341 F. App'x. 803, 806 (3d Cir. 2009) (explaining that, "[t]he crucial question [under the doctrine] is whether the warning was adequate to apprise a physician, not a consumer, of the risks."). In the products-liability context, a defendant will not be held accountable because of the failure to warn, if a sufficient warning would not have altered the physician's decision to prescribe the drug in dispute. *Strumph v. Schering Corp.*, 256 N.J. Super. 309, 323 (App. Div. 1992). The same reasoning applies here: Dr. Chait's duty to exercise his independent medical judgment and his failure to perform a circumcision properly are intervening causes here.

Plaintiffs also contend that the 1989 report contains a number of omissions that are actionable as fraud. For example, they contend that it was fraudulent for the Academy to "not

-24-

even mention the possibility of catastrophic and even fatal injuries" (Amended Compl. ¶ 27). But their own exhibit, which controls, shows this allegation is false: the 1989 report specifically mentions "one death in the United States due to circumcision in 1973" and "two previous deaths due to this procedure." (*Id.* Exh. B at 390.) They also contend that it was fraudulent for the Academy to not disclose that "many physicians, medical students, and nurses who circumcise are neither well-trained nor experienced," to understate risks, to not disclose that some of the report authors had religious affiliations, and to not disclose that the report authors regularly performed circumcisions and therefore "stood to benefit financially from a continued stream of circumcision patients." (Amended Compl. ¶ 27.) The Lavines are in effect challenging the merits of the physician-authors' opinions on the ground that the authors allegedly failed to acknowledge additional counter arguments. But the fact that the Lavines disagree with the authors about which arguments to focus on does not mean there was any actionable fraud. Where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a "special relationship." *Berman v. Gurwicz*, 189 N.J. Super. 89, 458 A.2d 1311, 1313 (Ch. Div. 1981).

Here, as addressed earlier, no relationship, let alone a "special relationship," exists between the parties, so no duty to inform arose. See Restatement (Second) of Torts § 551. Accordingly, any alleged omissions in the 1989 report are not actionable for fraud.

### 2. The plaintiffs have not alleged the Academy's knowledge of any falsity.

The Lavines' fraud claim also fails because they have failed to allege that the Academy knew that the authors' opinions in the 1989 report were allegedly false. To establish that a defendant knowingly made a false misrepresentation, a plaintiff must show: (1) defendant knows or believes that the matter is not as he represents it to be, (b) defendant does not have the confidence in the accuracy of his representation that he states or implies, or (c) defendant knows

-25-

28150795v.1

that he does not have the basis for his representation that he states or implies. *Island Insteel Sys. Inc. v. Waters*, 296 F.3d 200, 212 (3d Cir. 2002) (citing Restatement (Second) Torts § 526).

Plaintiffs do not directly assert that the Academy knew the alleged false representations and omissions set forth in the 1989 report were false. (*Compare* Original Compl. ¶ 56 (previously alleging that "the AAP knew they were false"), *with* Am. Compl. ¶ 59 (asserting reckless disregard of truth)). This failure to plead the Academy's knowledge of the falsity is fatal to Plaintiffs' intentional fraud claim because intentional fraud requires actual knowledge or belief and reckless disregard of the truth is not sufficient. *See, e.g., Enright v. Lubow*, 202 N.J. Super. 58, 72 (1985). But the report itself belies even an assertion of reckless disregard for the truth. First, the report cites 13 separate medical studies on the relation between cancer and circumcision (in its footnotes 11–23), and similarly cites six separate studies (in footnotes 5 and 24–28), and it is not reckless disregard for the truth to rely on medical research. Second, the report addresses opinions about probabilities of future contingent events. For example, the two risks Dr. Chait allegedly mentioned from the report—the risk of urinary-tract infection and penile cancer—are all statements as to "future or contingent events" or as to "probabilities" and so "do not constitute misrepresentations" under New Jersey law. *Middlesex Cty. Sewerage Auth.*, 74 N.J. Super. at 605. While the complaint criticizes the studies cited as flawed (Am. Compl. ¶ 27), a methodological flaw (if one existed) is not fraud. Similarly, even if hygiene is *also* helpful in preventing penile cancer, as the plaintiffs allege (*id.*), that would not establish that circumcision was *unhelpful* in preventing penile cancer. The report's statements cited by Dr. Chait are medical opinions about possible risks, not statements of fact that the Academy could know were false. Further, and as noted earlier, the disclaimer puts readers on notice that statements in the article need to be evaluated with the guidance of a physician in light of individual circumstances. (Am. Compl. Ex. B at 388.)

-26-

28150795v.1

### 3.      The plaintiffs cannot establish that the Academy intended for them to rely on the alleged misstatements in the report.

The Lavines' fraud claim suffers from additional fatal flaws. New Jersey courts have held that "actual receipt and consideration of any misstatement remains central to the case of any plaintiff seeking to prove that he or she was deceived by the misstatement or omission." *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109 (2000). Further, plaintiffs must demonstrate "an intention to obtain an undue advantage therefrom." *Farris v. Cty. of Camden*, 61 F. Supp. 2d 307, 345 (D.N.J. 1999) (quoting *Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599, 609 (1989)). "Every fraud in its most general and fundamental conception consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith." *Jewish Ctr. of Sussex Cnty. v. Whale*, 86 N.J. 619, 624 (1981).

Here, the Lavines do not even allege that they received and actually considered the medical opinions proffered in the 1989 report or that the Academy intended to obtain some benefit from Shingo's procedure. As a result, they cannot show that the Academy intended for them to rely on the report's statements.

In fact, the Lavines do not allege that even Dr. Chait actually reviewed the 1989 report or communicated to them the medical opinions it contained; instead, they simply allege that Dr. Chait mentioned some undefined "guidelines." (Amended Compl. ¶ 36.) Thus, the Lavines were never in "receipt" of any alleged misstatement in the 1989 report and so cannot establish that the Academy ever intended them to rely on the misstatements.

Further, they fail to allege that the Academy ever intended or derived any benefit or undue advantage from the procedure. *Farris*, 61 F. Supp. 2d at 346 ("a plaintiff must show that the defendant had an intention to obtain an undue advantage from the alleged false representation"). The Academy neither sought nor received any discernable benefit from the circumcision—the

-27-

Academy was not even aware of Shingo's procedure until the instigation of this lawsuit. See *United States v. Czubinski*, 106 F.3d 1069, 1077 (1st Cir. 1997) (overturning conviction for honest-services fraud because the accused "did not receive, nor can it be found that he intended to receive, any tangible benefit"). Thus, the Lavines have failed to establish that the Academy intended for them to rely on any alleged misstatements.

### 4.    The plaintiffs do not allege reasonable reliance.

The Lavines' allegations also fail because they have not alleged sufficient facts to show they actually and reasonably relied on any misstatements. New Jersey courts have consistently held that "[w]ithout reasonable reliance on a material misrepresentation, an action in fraud must fail." *Triffin v. Automatic Data Processing, Inc.*, 397 N.J. Super. 237, 249 (App. Div. 2007) ("Reliance is an essential element of common law fraud."). The Restatement (Second) of Torts § 537 (1977) requires that there be justifiable reliance if one is to recover on a fraudulent misrepresentation. Section 537(a) requires a recipient of a fraudulent misrepresentation to rely on the misrepresentation "in acting or refraining from action." *Triffin*, 397 N.J. Super. at 249.

In the instant case, the Lavines' allegations show that their decision to proceed with the procedure was based upon Dr. Chait's recommendation as the treating physician for the procedure. At the outset, the complaint shows that Mrs. Lavine could not have relied on the statement, because she was "incapacitated" at the time and played no role in granting consent. (Compl. ¶ 34.) Therefore, her claim should be dismissed.

In any event, in this context where the plaintiffs must plead with specificity the content of the fraud and where it is unclear which document Dr. Chait was referencing, the Lavines have not sufficiently alleged that either they or Dr. Chait relied upon the 1989 report when deciding whether to have the circumcision performed.

-28-

Moreover, the Lavines appear rely on a theory of indirect reliance, which is equally impermissible under the facts of this case. Section 533 of the Restatement of Torts states:

> The maker of a fraudulent misrepresentation in a business transaction is subject to liability to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person for the purpose of having him repeat its terms or communicate its substance to the other in order to influence his conduct in a particular transaction or type of transaction.

And if a plaintiff does not hear the misrepresentation directly, "a plaintiff must prove that he or she was an intended recipient of the defendant's misrepresentations." *Port Liberte Homeowner's Ass'n, Inc. v. Sordoni Const. Co.*, 393 N.J. Super. 492, 508 (App. Div. 2007).

Further, the amended complaint does not assert that this statement was the *only* guidance Dr. Chait provided about the circumcision; rather, it says Dr. Chait "portrayed circumcision as a minor, safe, harmless, and medically beneficial procedure" and that the guidelines were "among the bases invoked" by Dr. Chait. (Amended Compl. ¶¶ 36, 50.) All of Dr. Chait's statements must be considered when evaluating whether there was reasonable reliance. In fact, given that the whole context here is about determining whether the Lavines were fully informed about the risks, this case illustrates the wisdom of the rule from *Howard*: fraud allegations arising in conjunction with malpractice must be evaluated as malpractice, not as fraud, because the totality of the information matters for informed consent.

Here, the Lavines have not alleged that any of the medical opinions in the 1989 report were proffered to persuade them to have the circumcision performed. Indeed, the disclaimer makes it clear that the report informed readers—who would largely be doctors, not patients—that doctors would need to aid patients in deciding whether to elect a course of treatment. See *Eli Lilly Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 493 (D.N.J. 1998) (plaintiff pharmaceutical company could not assert common law fraud claims because plaintiff was not the intended recipient of those

-29-

misrepresentations). Accordingly, Plaintiffs have failed to establish reasonable reliance, the death knell for any fraud claim. See *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774 (SRC), 2009 WL 2043604, at \*33 (D.N.J. July 10, 2009) ("[I]ndirect reliance in the context of fraud requires that, where a plaintiff has not actually received and considered an alleged fraudulent, he must prove that he was at least an intended recipient of the misrepresentation."); *Port Liberte Homeowners Ass'n, Inc. v. Sordoni Constr. Co.*, 393 N.J. Super. 492, 508 (App. Div. 2007).

> **5.      The plaintiffs have also failed to plead that the Academy's alleged misstatements proximately caused their damage.**

The Lavines' fraud allegations lack another fundamental ingredient—they have not alleged that the Academy's alleged fraudulent conduct is the source of their damages. Indeed, the allegations make clear that the compensation Plaintiffs seek is "for the pain caused by each of the two circumcisions[.]" (Compl. at 19.) The only portion of the amended complaint that addresses the basis of Plaintiffs' claim for damages is the prayer for relief, in which Plaintiffs request "[c]ompensation for the pain and pain [sic] and suffering and emotional distress associated with attempting partial foreskin restoration to try to mitigate the damage caused by the circumcisions," as well as "[c]ompensation for the time spent and that will be spent on foreskin restoration." (*Id.*) They also seek "[c]ompensation for the mental anguish suffered by [Plaintiff-parents] because of the two circumcisions." (*Id.*) These are all damages based on the failed medical procedures that Shingo endured, not on the Academy's alleged misstatements.

The amended complaint specifically alleges an intervening, superseding event that would relieve the Academy of any liability for the failed circumcisions: Dr. Chait's recommendation. The New Jersey Supreme Court has explained that "if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated,

-30-

28150795v.1

there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm." *Lynch v. Scheininger*, 162 N.J. 209, 226 (2000) (quoting Restatement (Second) of Torts § 440 cmt. b (1965)). Courts have resolved questions of superseding cause by focusing on whether the intervening cause is so closely connected with the defendant's conduct that responsibility should not be terminated. *Id.* Courts consider numerous factors in addressing this issue, including (1) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation; (2) the fact that the operation of the intervening force is due to a third person's act or to his failure to act; (3) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; and (4) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion. *Id.* (quoting Restatement (Second) of Torts § 442 (1965)).

All these factors militate against finding the Academy liable for the Lavines' damages. The Lavines consented to the circumcision based on the consultation with Dr. Chait, their treating physician, which is an event that occurred independently of the Academy or its issuance of the 1989 report. (Amended Compl. ¶¶ 33–39.) And the intervening force of Dr. Chait's advice to operate (and his eventual negligent handling of the circumcision) is precisely the conduct that resulted in Shingo's injuries. As a result, Dr. Chait's recommendation is an intervening, superseding cause that bars the Academy of any liability for alleged misstatements.

### C.     The plaintiffs fail to allege an actionable equitable-fraud claim.

The Lavines' constructive-fraud claim fares no better than their fraud claim. To advance a constructive-fraud claim, plaintiffs "need not demonstrate scienter, but must establish the other elements of fraud by clear and convincing evidence." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1182-83 (3d Cir. 1993); see also *Daibo v. Kirsch*, 316 N.J. Super. 580, 588 (App. Div.

-31-

1999) (requiring proof of reasonable reliance"). But as already explained, the Lavines' fraud claim fails to establish the other elements of fraud, such as a misrepresentation of fact or reasonable reliance on any misstatements, and even alleges facts showing that intervening causes are responsible for any damages. These deficiencies defeat the Lavines' constructive-fraud claim. See, e.g., *id.* at 590 (dismissing plaintiff's equitable-fraud claim because a plaintiff's allegation reflected an opinion).

In addition, New Jersey law is clear that "[i]n an action for equitable fraud, the only relief that may be obtained is equitable relief, such as rescission or reformation of an agreement and not monetary damages." *Daibo*, 316 N.J. Super. at 592 (emphasis added and citations omitted). Here, the Lavines unambiguously seek compensatory and punitive damages and do not seek any form of equitable relief (other than the catch-all request for "[s]uch other relief as the court may deem just and equitable"). (Compl. at 20.) The law is clear that "money damages cannot be awarded for an equitable fraud." *Daibo*, 316 N.J. Super. at 592. Accordingly, Plaintiffs' equitable fraud claim should also be dismissed.

## CONCLUSION

For all of these reasons, it is respectfully submitted that the Court dismiss plaintiffs' amended complaint with prejudice for failure to state a claim.

Dated: December 13, 2021

WHITE AND WILLIAMS LLP

BY: _____
Jared K. Levy
457 Haddonfield Road | Libertyview, Suite
400| Cherry Hill, NJ 08034
Phone: 856.317.3642
Email: levyj@whiteandwilliams.com
Attorneys for Defendant American
Academy of Pediatrics Inc.

-32-

28150795v.1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SHINGO LAVINE, ADAM LAVINE and AIKO LAVINE, | : | CIVIL ACTION |
| | : | |
| | : | 3:21-CV-17099-ZNQ-LHG |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**CERTIFICATION OF COUNSEL IN SUPPORT OF DEFENDANT THE AMERICAN ACADEMY OF PEDIATRICS INC.'S NOTICE OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6)**

I, Jared K. Levy, Esquire, being of full age, hereby certify:

1.      I am an attorney-at-law in the State of New Jersey and counsel in the law firm of White and Williams, LLP, attorneys for Defendant American Academy of Pedatrics Inc. I am assigned to the handling of the within matter and, as such, I am fully familiar with the facts of this case.

2.      Attached as Exhibit "A" is a true and correct copy of Plaintiffs' Complaint.

3.      Attached as Exhibit "B" is a true and correct copy of Plaintiffs' Amended Complaint.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of those statements are willfully false, I am subject to punishment.

28150795v.1

WHITE AND WILLIAMS LLP

BY: _____

Jared K. Levy
457 Haddonfield Road | Libertyview, Suite
400| Cherry Hill, NJ 08034
Phone: 856.317.3642
Email: levyj@whiteandwilliams.com
Attorneys for Defendant American
Academy of Pediatrics Inc.

Dated: December 13, 2021

28150795v.1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

SHINGO LAVINE, ADAM LAVINE AND AIKO LAVINE,

       Plaintiffs,

   v.

AMERICAN ACADEMY OF PEDIATRICS INC.,

       Defendant.

_____

     :  CIVIL ACTION
     :
     :  3:21-CV-17099-ZNQ-LHG
     :

## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the foregoing Motion to Dismiss, supporting Memorandum of Law, Certification of Counsel and Exhibits were filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access the filing through the court system.

            WHITE AND WILLIAMS LLP

       BY: _____
          Jared K. Levy
          457 Haddonfield Road | Libertyview, Suite
          400| Cherry Hill, NJ 08034
          Phone: 856.317.3642
          Email: levyj@whiteandwilliams.com
          Attorneys for Defendant American
          Academy of Pediatrics Inc.

Dated: December 13, 2021

28150795v.1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SHINGO LAVINE, ADAM LAVINE AND AIKO LAVINE | : | CIVIL ACTION |
| | : | |
| | : | 3:21-CV-17099-ZNQ-LHG |
| Plaintiffs, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| AMERICAN ACADEMY OF PEDIATRICS INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

## <u>ORDER</u>

        AND NOW, this _____ day of _____, 20__, upon consideration of

defendant, American Academy of Pediatrics Inc.'s Motion to Dismiss Plaintiffs' Amended

Complaint and any Responses thereto, it is hereby ORDERED and DECREED that the motion is

GRANTED. Plaintiffs' Amended Complaint is hereby dismissed with prejudice.

                                        BY THE COURT:

                                        _____
                                                                     J.

28150795v.1