# EXHIBIT "A"

## SUMMONS

Attorney(s) Andrew DeLaney

Office Address 6 South Street, Suite 203

Town, State, Zip Code Morristown, NJ 07960

Telephone Number 973-606-6090

Attorney(s) for Plaintiff Andrew DeLaney

Shingo Lavine, Adam Lavine,

Aiko Lavine

      Plaintiff(s)

vs.

American Academy Pediatrics Inc.

Princeton Medical Group, P.A.

      Defendant(s)

# Superior Court of
# New Jersey

Mercer ☑ County

Civil Division

Docket No: MER-L-000272-21

# CIVIL ACTION
# SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

    The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

    If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

    If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

                                      S/ Michelle Smith

                             Clerk of the Superior Court

DATED: 02/16/2021

Name of Defendant to Be Served: American Academy of Pediatrics, Inc.    c/o CSC

Address of Defendant to Be Served: Princeton South Corp. Center, 100 Charles Ewing Blvd., Suite 160, Ewing, NJ

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>　　　　Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY<br><br>DOCKET NO.:<br><br>Civil Action<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, Shingo Lavine, Adam Lavine, and Aiko Lavine, by way of Complaint against the above-named defendants, say:

1

## PARTIES

1. Plaintiff Shingo Lavine ("Shingo") is a natural person who is a citizen of the State of Rhode Island.

2. Plaintiffs Adam Lavine ("Adam") and Aiko Lavine ("Aiko") are natural persons who reside in and are citizens of the State of California. They are the natural parents of Plaintiff Shingo Lavine.

3. Defendant Princeton Medical Group, P.A. ("Princeton") is a New Jersey professional association. It is subject to the jurisdiction of this Court and may be served with process by serving its registered agent Joan Hagadron at 419 North Harrison Street, Suite 203, Princeton, NJ 08540. It is subject to the jurisdiction of this Court and venue is properly laid herein.

4. Defendant American Academy of Pediatrics, Inc. ("AAP") is an Illinois corporation registered to do business in the State of New Jersey. It is subject to the jurisdiction of this Court and may be served with process by serving its registered agent, Corporation Service Company, Princeton South Corporate Center, 100 Charles Ewing Blvd., Suite 160, Ewing, NJ 08628. It is subject to the jurisdiction of this Court and venue is properly laid herein.

## FACTS

5. In December,1997, Shingo Lavine was born to Adam and Aiko Lavine at Princeton Medical Center in Plainsboro, Mercer County, New Jersey.

6. On or about December 18, 1997, Dr. Jeffrey L. Chait, M.D., the obstetrician who delivered him, an employee and agent of Defendant Princeton Medical Group, P.A., circumcised Shingo Lavine. Defendant Princeton thereafter billed Adam and Aiko Lavine or their insurer or both for the circumcision and received money for Dr. Chait's performance of it.

7. Defendant Princeton is liable for the torts of its employees and agents, including Dr. Chait, under the doctrine of *respondeat superior*.

8. Shingo's mother, Aiko, is of Japanese heritage. Japan is not a circumcising society, and until she came to the United States and eventually married Adam, she had never heard of it. After Shingo's birth and before the circumcision, Aiko was incapacitated due to a difficult 36-hour labor on medications and a Caesarean section. Just prior to the circumcision she was being administered morphine and Percocet® (brand of oxycodone and acetaminophen) and other medications.

9. Prior to the circumcision Dr. Chait did not ask Aiko to give her permission to have her son circumcised, and she did not give permission for the circumcision.

10. After Shingo was born, Dr. Chait solicited Adam's verbal consent to have Shingo circumcised. Dr. Chait informed him that the American Academy of Pediatrics had issued guidelines about circumcision showing that circumcision reduces the incidence of urinary tract infections, penile cancer, and sexually transmitted diseases including HIV. Dr. Chait portrayed circumcision as a minor, safe, and harmless procedure and as a routine and normal part of childbirth, and he portrayed parental permission as expected and as a formality.

11. Adam does not recall signing a form giving consent to have Dr. Chait circumcise his son Shingo. If wording about consenting to circumcision was in a hospital admission form, it was not brought to his attention, and he did not see it during the rush of getting his wife Aiko admitted to the hospital to give birth. If Adam did give written permission, he did so in reliance upon the representations made, expressly, impliedly, and by omission, by Dr. Chait and the AAP, enumerated in this Complaint, which Adam had no reason to doubt and did not doubt.

12. Dr. Chait did not disclose to Adam and Aiko, and they were completely unaware, that circumcision was a highly controversial topic, nor did he convey to them any opinion other than that circumcision was good for health. He did not disclose to them that circumcision is surgery; that it is painful; that it risks many complications and can be fatal; that men may resent having been circumcised at birth without their consent and when they were unable to prevent it and that it can cause psychological problems; he did not disclose that the foreskin of the penis is highly erogenous; and he did not disclose the functions of the foreskin. He did not disclose to them the risk of any complications or the common occurrence of loss of shaft skin and consequent tight erections with hair on the shaft of the penis.

13. After the circumcision, Dr. Chait seemed distinctly less confident than he had been before. He expressed concern about the circumcision to Shingo's parents and told them that they would "have to keep an eye on it" and let him know if there were any problems with Shingo's penis. This was a surprising and concerning reaction to what had been presented as a routine and simple procedure. However, Dr. Chait did not disclose exactly what his concerns were and he did not disclose that too much shaft skin had been removed.  Adam and Aiko observed that after about one month, Shingo's penis had not healed and looked unusual to them, and they became concerned the circumcision had not been properly performed..

14. Sometime between January 10-15, 1998, Adam and Aiko took Shingo to Shingo's pediatrician, Dr. David Sharlin of Delaware Valley Pediatrics, with concerns about Shingo's penis. After examining Shingo, Dr. Sharlin told them that he believed that complications had arisen from Shingo's circumcision, namely that not enough foreskin had been removed. He recommended a follow-up with Dr. Joseph Barone, Chief of the Section of Pediatric Urology at Robert Wood Johnson University Hospital, New Brunswick, New Jersey.

15. On January 21, 1998, Adam and Aiko presented Shingo to Dr. Barone for examination. Dr. Barone observed blood and scarring on Shingo Lavine's penis. He cleaned the penis, then diagnosed Shingo as suffering from phimosis and a buried penis. He recommended what he called a "second circumcision." Dr. Barone presented the "second circumcision" as if it were also routine. Thereafter, Dr. Barone performed a second circumcision surgery on Shingo. He wrote a letter that day stating that, "Shingo should do very well with the circumcision." In fact, after Dr. Barone's surgery, Shingo did not "do very well" at all.  Unknown to his parents until recently, Shingo's penis had insufficient shaft skin coverage so that his erections were and are to this day too tight and pull pubic skin onto the shaft. In addition, Shingo had and has pubic hair bearing skin down to the circumcision scar line, which is unsightly, and which interferes with normal sexual functioning.

16. When Shingo reached adolescence, he suffered from physical complications caused by the circumcisions, including painful erections, meatal stenosis (narrowing of the urethral opening), scrotal webbing, and hypersensitivity of the glans.

4

17. By June 2020, Shingo experienced serious angst and anger that physicians had circumcised him, twice, and had caused his injuries, when he had been in perfect health at birth, did not need the operation, would not have chosen it for himself, and was powerless to prevent it. He was and is also unhappy with the unsightly appearance of his penis.

18. In June 2020, Shingo discovered that although it is a common sentiment in the United States is that circumcision is normal and good for health, and that one would have utterly no reason for experiencing the feelings that he has, he is by no means alone: many circumcised men in the U.S. share the same anger and profound sense of loss as Shingo, and many, like him, suffer from various physical and psychological complications.

19. On or about June 15, 2020, Shingo became involved with Foregen, a medical organization devoted to regenerating foreskin, specifically the specialized structures including nerve endings that are removed or destroyed during circumcision.

20. On or about June 15, 2020, Shingo began partial restoration of his foreskin, a highly intensive daily routine to attempt to recover the denuded glans by stretching the loose skin of the penile shaft, although circumcision is irreversible surgery, and the specialized erotogenic nerves are lost forever when it is performed. Upon information and belief, more than 60,000 men in the United States currently practice foreskin restoration. It requires wearing weights attached to the penis and pulling for 3-4 hours per day for 5-10 years, which is very uncomfortable and time consuming. Shingo has spent more than 700 hours over the course of almost 1,000 sessions as part of the process to partially "restore" his foreskin.

21. On July 29, 2020, Shingo began psychotherapy to try to cope with the severe emotional distress he feels about his circumcision, but to date it has not diminished his distress.

## DELAYED DISCOVERY THAT SHINGO, ADAM, AND AIKO WERE DEFRAUDED

22. Notwithstanding the physical issues that Shingo started becoming aware of in adolescence, none of the Lavines had any reason to question the circumcisions or the result, given the pervasiveness of the procedure in American culture.

23. The Lavines only became truly aware of how the physical issues Shingo was experiencing related to the circumcisions when the Lavines spoke with the law professor Peter W. Adler, an expert on circumcision and the law, on September 25, 2020. Professor Adler informed them that the foreskin is a natural body part and the most sensitive part of the penis, men value it, and physicians in most countries outside the United States leave it alone. Unnecessary surgery on a child violates the ethical and legal right of boys and the men they become to bodily integrity and self-determination. Circumcision, which began as a sacrificial religious ritual and painful rite of passage, is violence and genital mutilation, the opposite of medicine, and a fraud when performed by physicians and hospitals in the U.S., as explained in two law review articles.[1] First, physicians target newborn boys unable to refuse, mothers who are incapacitated, give fathers only minutes to decide, and badger parents who say no until they consent. This constitutes unfair, deceptive, and *fraudulent misconduct*. Second, physicians and their trade association, the American Academy of Pediatrics, make knowingly *false and fraudulent medical claims*. They portray circumcision as a normal, simple, safe, and harmless medical procedure, when they know that like any surgery it is very painful, risks many complications, can be fatal, and can cause psychological harm. They also use fear of urinary tract infections (UTIs), penile cancer, and sexually transmitted infections, including HIV, to sell circumcision to parents, when the treatment for UTIs is antibiotics, boys are not at risk of adult diseases, and those diseases can be prevented easily and more effectively without loss of the foreskin and the circumcision's attendant risks; and they use false diagnoses such as phimosis or a tight foreskin, which is normal in the newborn. Parental consent is therefore not fully informed, it is legally invalid, and the operation is a battery. Third, they and the AAP make the *false legal claims* that physicians have the right to operate on a healthy child and that parents have the right to elect circumcision, when circumcision violates the child's right to bodily integrity, and the child's rights supersede the parents' rights. Professor Adler told the Lavines that

---

[1] Matthew R. Giannetti. *Circumcision and the American Academy of Pediatrics: Should Scientific Misconduct Result in Trade Association Liability*, 85 Iowa L. Rev. 1507 (2000) at <http://www.cirp.org/library/legal/giannetti/> and Peter W. Adler, Robert Van Howe, Felix Daase, and Travis Wisdom, *Is Circumcision a Fraud?*, Cornell J. L. & Public Policy (Vol 30 No. 1 Fall 2020) at <https://www.lawschool.cornell.edu/research/JLPP/index.cfm>.

they had legal claims against the physician, medical group, and the AAP for battery, breach of fiduciary duty and hence constructive fraud (where intent to defraud is presumed, even if it is absent, to prevent unfairness).

24. The Lavines were dumbfounded to learn this, as this was the first time they had heard the normality of circumcision (which had been adopted into their worldview, as it has been for most of the American public) and the physician's right to perform it had been challenged. They realized that what Professor Adler described is exactly what had actually happened to them when Shingo was born, as detailed in this Complaint. Additionally, the Lavines were stunned to realize that the United States has one of the highest rates of circumcision in the developed world and that the AAP guidelines are opposite to the recommendations of most developed nations' medical experts.

### 1989 AAP GUIDELINES ON CIRCUMCISION

25. The AAP is an organization of physicians who specialize in pediatrics, the care of children from birth to the age of 21. The AAP is not exclusively organized for charitable or educational purposes; rather it is also organized to protect the economic welfare of its members, who practice medicine in part for a profit. The AAP actively lobbies federal and state legislatures for laws beneficial to its members. It claims to lead the pediatric medicine community in setting standards of practice and recommendations for practice. It voluntarily issues advisory reports, recommendations, and guidelines for both the medical profession as well as for the general public, including the Plaintiffs herein, upon which both the profession and the general public are expected to, and do, rely.

26. The AAP owes a duty to the general public, including the Plaintiffs herein, to tell the truth, the **whole** truth, and nothing but the truth when issuing reports, policy statements, and guidelines for medical care and procedures.

27. The AAP owes a duty to the general public, including the Plaintiffs herein, to refrain from failing to disclose all relevants facts and considerations when issuing reports, recommendations, and guidelines.

28. By words and conduct the AAP invites other medical associations such as the American College of Obstetricians and Gynecologists, obstericians and gynecologists, pediatricians, other physicians, and the general public to rely upon the AAP's reports, recommendations and guidelines.

29.   In 1971 the AAP Committee on the Fetus and Newborn issued *Standards and Recommendations of Hospital Care of Newborn Infants.* In it, the AAP stated the truth that, " there are no valid indications for circumcision in the neonatal period." In 1975 an Ad Hoc Task Force of that committee found no basis for changing that statement, while stating that "there is no absolute medical indication for routine circumcison of the newborn."

30.  In 1980, Springer Publishing Company, a major medical publisher in New York, published the 197 page heavily footnoted book, *Circumcision: An American Health Fallacy* by Edward Wallerstein, a medical writer.  The thesis of the book is that neonatal circumcision is needless, damaging, and not medically justified.  At its conclusion Wallerstein wrote:  "The medical profession bears responsibility for the introduction of prophylactic circumcision without scientific basis in the past and for its continued use and rationalization without scientific basis in the present. The profession seems to accept circumcision as a 'national cultural triat' as much as do lay people. With evidence at hand to disprove the prophylactic benefits of the surgery, the medical profession has the responsibility to discourage this practice.  The pretense of neutrality is a negative stance." His final paragraph stated, **"Today circumcision is a solution in search of a problem. The operation, as prophylaxis, has no place in a rational society. The final conclusion to be drawn is that routine infant health circumcision is archaic, useless, potentially dangerous, and therefore should cease."** (Emphasis added).

31. In 1984 the AAP published a pamphlet for the parents of newborns entitled, "Care of the Uncircumcised Penis."  It contained the following paragraph: **"The Function of the Foreskin:** The glans at birth is delicate and easily irritated by urine and feces. The foreskin shields the glans; with circumcision, this protection is lost.  In such cases, the glans and especially the urinary opening (meatus) may become irritated or infected, causing ulcers, meatitis (inflammation of the meatus), and meatal stenosis (a narrowing of the urinary opening).  Such problems virtually never

8

occur in uncircumcised penises. The foreskin protects the glans throughout life. " **By 1994, the AAP had removed that paragraph from the most recent edition of its pamphlet.**

32. In 1984 Trudie London on behalf of her son Adam London, to whose circumcision shortly after birth she had consented, filed a lawsuit in Marin County, California Superior Court, Docket No. 118799, against his circumciser Mark Glasser, M.D. and Kaiser Foundation Hospitals and The Permanente Medical Group, in which she claimed that the circumcision constituted common law battery, willful cruelty, unjustifiable infliction of pain, child abuse, kidnapping, false imprisonment, and mayhem. In essence, she contended that parental consent for a medically unnecessary circumcision was legally invalid and that circumcision itself constituted battery and violated several California statutes. Although the case was not successful, it received significant publicity, including an article in the then-influential Time Magazine. This suit alarmed the medical profession, including the defendant Glasser in that lawsuit, as well as his friend and acquaintance Edgar J. Schoen, M.D., a pediatric endocronolgist and member of the AAP.

33. In Volume 23, No. 3 (1984-1985) of the *Journal of Family Law*, published by the University of Louisville School of Law, there appeared an article by William E. Brigman, an Assistant Professor, entitled "Circumcision as Child Abuse: The Legal and Constitutional Issues." In it, Professor Brigman contended, "Since circumcision is not medically warranted, has no significant physiological benefits, is painful because it is performed without anesthesia and leaves a wound in which urinary salts burn, carries significant risk of surgical complications, including death, and deforms the penis, it would seem that as a nonaccidental physical injury, it is properly included in the definition of child abuse." He opined that, "Suits for damages against surgeons, hospitals, and conceivably parents are possible . . . . " He suggested that, "The most promising approach would seem to be a civil rights class action against hospitals . . . . ".

34. Growing opposition to neonatal circumcision alarmed the medical profession, which was increasingly afraid of lawsuits. The November 15-30, 1986 issue of *Ob-Gyn News* carried an article entitled, "See Expanding Liability Risks In Circumcision." It cited another California case arising from a botched circumcision that contended that, "the procedure violated the boy's constitutional right to privacy, safety,and happiness" and also claimed that the circumcision constituted a battery. Charles Bonner, the plaintiff's attorney, claimed, according to the article,

"The boy [7 weeks old at the time] did not himself consent to the procedure, and under California law parents have no ability to consent to a medically unnecessary surgery . . . . "

35. In May 1985 a pediatrician, Thomas Wiswell, M.D., published an article in the AAP's journal *Pediatrics* that suggested that circumcision might reduce the number of urinary tract infections in boys. Almost immediately, this was latched onto by circumcision proponents such as urologist Aaron Fink, M.D., whose letter to *Pediatrics* stated, "I suspect that similar studies will be repeated elsewhere and, if confirmed, become an important reference to justify a medical indication for a newborn circumcision. It presumably might even invalidate litigation based on removal of the natural protection afforded by the foreskin' as well as 'by reason of wrongful and malicious acts' performed by medical as well as 'mohel' (ritual) circumcisers."

36. In 1987 Edgar J. Schoen, M.D., a friend of Mark Glasser, M.D., who had been sued in the <u>London</u> case, published a poem in the *American Journal of Diseases of Children,* entitled "Ode to the Circumcised Male" in which he derided those opposed to circumcision. (<u>See</u> Exhibit A). After noting that "third-party payers are increasiningly refusing to pay for the procedure," Schoen set forth the poem that said, "If you're the son of a Berkeley professor, your genital skin will be greater, not lesser: styled the non-circumcised state as ,genital chic"; and ended with the consoling line for the circumcised, "Just hope that one day, you can say with a smile that your glans ain't passé it will rise up in style."

37. In 1988 Aaron Fink, M.D. published a book entitled *CIRCUMCISION: A Parent's Decision for Life.* In it he alleged that circumcision had potential medical benefits and he derided the idea that loss of sensation occurs because of circumcision.

38. In 1988 or 1989 Edgar J. Schoen, M.D. volunteered to chair a Task Force of the AAP on Circumcision. Dr. Schoen was a zealous proponent of circumcision whose poem suggested that he had undisclosed religious and personal motives for advocating circumcision that went beyond medicine. Dr. Schoen additionally expressed alarm that but for recent evidence that circumcision potentially decreased the rate of urinary tract infections, third party insurance payers would stop covering it, and "the anti-circumcision tide" would prevail.

39. The Task Force issued a "Report of the Task Force on Circumcision (RE9148)," which was published in the AAP's journal *Pediatrics* in August 1989 ("1989 Guidelines"). (See Exhibit B). Those were the AAP guidelines regarding circumcision in place at the time of Shingo's birth and subsequent circumcisions.

40. The 1989 Guidelines did not contain any information on the functions of the foreskin, the tissue that is removed by circumcision, even though the AAP in its 1984 pamphlet for parents had explained some of its functions and thus was aware of them. (See Exhibit C). This section was removed in its 1994 pamphlet. (See Exhibit D).

41. The AAP issued its 1989 Guidelines specifically to protect the medical profession in general, and pediatricians in particular, from legal liability for performing unnecessary, risky, debilitating, damaging surgery, circumcision, on the penises of minor boys, and to protect the pocketbooks of AAP members, many of whom perform neonatal circumcision for money.

42. The 1989 AAP Policy Statement contained numerous intentional misrepresentations and omissions[2] as detailed in Count III of this Complaint.

43. As much of its justification for promulgating its 1989 Guidelines, the AAP claims that boys who have not been circumcised show an increased rate of urinary tract infections. The AAP itself stated that the studies may have methodologic flaws; UTIs can be treated with antibiotics; and Dr. Thomas Wiswell, the doctor responsible for the studies, has stated that there was tremendous financial incentive for doctors to continue performing circumcisions routinely on neonatal boys.

44. The 1989 Guidelines did not disclose the risk of parental anger and regret, despite the fact that the London case and the increasing opposition to circumcision as noted above had alerted the AAP to that very real risk. Adam and Aiko are angry that defendants did not fully inform them about circumcision, in which case they would have stopped Dr. Chait and the hospital from performing the unnecessary operation. It has created tremendous hardship for Adam and Aiko Lavine to try to

---

[2] See Matthew R. Giannetti. *Circumcision and the American Academy of Pediatrics: Should Scientific Misconduct Result in Trade Association Liability*, 85 Iowa L. Rev. 1507 (2000) at <http://www.cirp.org/library/legal/giannetti/>.

come to terms with the strained relationship with their son caused by the first circumcision surgery and subsequent revision surgery.

## COUNT I

### (Intentional Fraud)
### Princeton Medical Group, P.A.

45. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 44 as if set forth at length herein.

46. Dr. David Chait was acting as an employee and agent of Princeton Medical Group, P.A. and within the course and scope of his employment relationship with it when he solicited permission to circumcise Shingo and when he performed the circumcision. At all times relevant hereto Dr. Chait, as a physician, was in a fiduciary relationship with the Plaintiffs and owed them a duty of care as a fiduciary to act with the utmost good faith in his dealings with them.

47. Dr. Chait, acting within the course and scope of his employment and agency with Princeton Medical Group, P.A., failed to act with the utmost good faith and intentionally defrauded Adam and Aiko Lavine into permitting the circumcision of their newborn son Shingo by the following unfair and deceptive misconduct, misrepresentations, and omissions; which Dr. Chait intended the Plaintiffs Adam and Aiko Lavine rely upon; which they did rely upon; and which resulted in the damages to them and to Shingo Lavine that are complained of herein.

- Fraudulent conduct in the hospital, including, without limitation: not obtaining written parental permission, or hiding the permission form in a hospital admission form; targeting a newborn baby boy, Shingo Lavine, who was unable to refuse; targeting Aiko Lavine and not giving her the opportunity to participate when she was legally incapacitated and would have refused; and giving Adam Lavine only a few minutes to make the circumcision decision, an unfair high-pressure sales tactic that constituted coercion and duress.

- Making false medical claims (express, implied, or by omission), including without limitation: not disclosing that physicians in most countries leave boys genitally

intact and that circumcision is controversial; falsely portraying circumcision to the Lavine parents as a normal and routine part of childbirth; not disclosing that the foreskin is a natural body part, highly erogenous, and functional, and that men value it; not disclosing that circumcision is unnecessary and not medically indicated; not disclosing that it is irreversible surgery; claiming that circumcision has potential medical benefits when it does not benefit most boys or men at all, when any benefits can be achieved without it, and when it did not benefit Shingo Lavine; mentioning urinary tract infections as a reason to circumcise when UTIs can be easily treated with antibiotics; using the scare tactic of mentioning prevention of penile cancer and STDs including HIV, when circumcision does not prevent them, boys are not at risk of those diseases, and they can be easily prevented without loss of the foreskin; not disclosing that circumcision is extremely painful, and circumcising Shingo Lavine without any pain relief or without adequate pain relief during and after the surgery; not disclosing that circumcision risks more than 50 minor and serious complications including the physical injuries that Shingo Lavine suffers from; not disclosing that circumcision can be fatal; not disclosing the risk of psychological harm that Shingo Lavine suffered and suffers from; not disclosing that circumcision could impair Aiko and Adam Lavine's relationship with their son and that the Lavine parents might come to regret the circumcision.

- Making the implied false claim that it is ethical and legal for physicians to perform irreversible unnecessary genital surgery on a healthy infant, and to solicit parental consent to do so.

48. But for the foregoing misconduct, misrepresentations, and omissions, Adam Lavine would not have given permission to have his son circumcised.  If fully informed about the pain, risks, and harms of circumcision, both Adam Lavine and Aiko Lavine would have told Dr. Chait not to perform the unnecessary operation.

49. By the foregoing misconduct, misrepresentations, and omissions, Dr. Chait intentionally defrauded the Plaintiffs Adam Lavine, Aiko Lavine, to their damage and to the damage of Shingo Lavine and Princeton Medical Group, P.A. is liable to them for said fraud pursuant to the doctrines of agency and *respondeat superior*.

**WHEREFORE**, Plaintiffs demand judgment that the defendant Princeton Medical Group, P.A., acting by and through its employee and agent Dr. Chait, intentionally defrauded the Plaintiffs, and they pray for the relief requested below.

## COUNT II
### (Constructive Fraud)
### Princeton Medical Group, P.A.

50. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 49 as if set forth at length herein.

51. When a physician violates the trust that a patient (here Shingo Lavine) and/or those representing him (here Adam and Aiko Lavine) places in the physician in the slightest way by any unfair or wrongful act—including without limitation by fraud, breach of fiduciary duty, mistake, undue influence, or the physician unjustly enriches himself—a cause of action lies for constructive fraud, where fraud is presumed even if intent to defraud is absent.

52. The misconduct, misrepresentations, and omissions described in this Complaint and in Count I constitute unfair and wrongful acts, including, without limitation, unfairness, fraudulent conduct, fraudulent medical claims, fraudulent legal claims, breach of fiduciary duty, mistake, coercion, duress, undue influence; and Dr. Chait and Princeton Medical Group, P.A. unjustly enriched themselves at the expense of their healthy "patient" Shingo Lavine. Dr. Chait thereby committed constructive fraud against the Plaintiffs, which damaged them. Princeton Medical Group, P.A. is liable to them for said constructive fraud pursuant to the doctrines of agency and *respondeat superior*.

**WHEREFORE**, Plaintiffs demand judgment that Princeton Medical Group, P.A. committed constructive fraud against them, and they pray for the relief requested below.

## COUNT III
### (Intentional Fraud)
### The American Academy of Pediatrics

14

53. Plaintiffs repeat and re-allege the prior facts and allegations contained in Paragraphs 1 through 52 as if set forth at length herein.

54. As set forth above, Dr. Chait referenced the AAP's circumcision policy statement then in effect (the "1989 Guidelines") when he solicited Adam Lavine's permission to circumcise Shingo Lavine and when he portrayed circumcision as routine, as medicine, and as a parental right.

55. Adam Lavine, who knew nothing about medicine or medical aspects of circumcision—and who was representing his newborn son and his incapacitated wife at the time—relied upon Dr. Chait's reference to those AAP guidelines in support of circumcision when he consented to the circumcision.

56. The AAP 1989 Guidelines contain numerous false and fraudulent representations and omissions as set forth herein; the AAP knew that they were false or made them with reckless disregard of their falsity; the AAP intended that physicians, here Dr. Chait, and parents offered circumcision representing boys, here Adam Lavine representing Shingo and Aiko Lavine, rely upon them; the Lavines did rely upon them; damages resulted from such reliance; and the AAP thereby defrauded the Plaintiffs.

57. Undisclosed Financial Bias. The 1989 AAP Guidelines fail to disclose that the AAP is not only a medical association but also a trade association representing the financial interest of its members. The AAP failed to disclose the financial bias of at least some of the committee members in perpetuating circumcision for financial reasons, and that at least some of the committee members were not neutral.

58. Undisclosed Religious Bias. Upon information and belief, one or more members of the committee that wrote the 1989 Guidelines were Jewish, including Dr. Schoen. Circumcision is a sacred religious rite among Jews. The AAP failed to disclose the religious bias of at least one and perhaps more of its committee members in favor of perpetuating circumcision, and he or they were not neutral.

59. Undisclosed Cultural Bias. The 1989 AAP Guidelines fail to disclose that the U.S. is an outlier among physicians worldwide in circumcising healthy boys, and that its authors were culturally biased in favor of circumcision and not neutral.

60. Not Common or Routine or Medicine. The 1989 Guidelines state that most male infants born in this country are circumcised during in the newborn period, implying that it is a routine part of the practice of medicine. This fails to disclose that non-therapeutic circumcision by physicians is uncommon outside the U.S.; that it is unlike anything else in medicine worldwide as physicians do not solicit parental permission to surgically remove other healthy parts of their child's body and take orders from parents to do so; and that non-therapeutic circumcision, or circumcision that is not needed to treat a medical condition, is violence, the opposite of medicine.

61. Undisclosed Controversy. The 1989 AAP Guidelines fail to disclose that circumcision has been controversial for years, and they fail to disclose that there is widespread opposition to the practice on medical, ethics, and legal grounds inside and outside the U.S.

62. Unethical. The 1989 AAP Guidelines falsely claim by omission that circumcision is ethical when it violates numerous provisions of the AMA Code of Medical Ethics, including the prohibition against unnecessary surgery, and the general rules of medical ethics: autonomy; non-maleficence ("First, Do No Harm"); beneficence ("do good); proportionality; and justice or fairness.

63. Unlawful and a Crime. The 1989 AAP Guidelines falsely claim by omission that it is legal for physicians to circumcise or perform unnecessary genital surgery on healthy boys when it violates a child's right to bodily integrity and self-determination, constitutes a battery, which is a tort and a crime, and as William E. Brigman showed in his 1984 law review article, it is statutory criminal child abuse in every U.S. state,[3] including New Jersey.

64. Scientific Misconduct. The 1989 AAP Guidelines did not follow accepted scientific methods; its pro-circumcision conclusions were not scientifically defensible; and its authors engaged in scientific misconduct.

65. Pain Understated. The 1989 AAP Guidelines state, "Infants undergoing circumcision without anesthesia demonstrate physiologic responses suggesting that they are experiencing pain." This understates pain as circumcision is one of the most painful procedures in neonatal medicine. The AAP states that behavioral changes arising from pain are transient, not disclosing that pain continues for many days after the circumcision.

66. No Anesthetics. The AAP knew that circumcision is extremely painful and that the pain continues after the operation, but it did not even recommend that anesthesia be used to try to lessen the pain during and after the operation.

67. False Claim that Circumcision is Safe. The AAP claimed in 1989 that "[c]ircumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique." The AAP knows that circumcision is not safe. It risks many complications. The 1989 Guidelines admit that the "exact incidence of postoperative complications is unknown," while deceptively suggesting that "the rate is low." This ignores the fact that a significant part of the surgical practice of pediatric urologists is made up of treating circumcision complications or sequelae, a fact that had to be known to the prominent urologist on the committee, Frank Hinman, Jr., M.D., author of a major text on pediatric urologic surgery.

---

[3] William E. Brigman. Circumcision as Child Abuse: The Legal and Constitutional Issues, 23 J Fam Law 337 (1985).

68. Failure to Disclose Lack of Training. The AAP failed to disclose that many physicians who perform circumcisions are not well trained, even though at least one member of the committee had to have known this to be so.

69. Undisclosed and Understated Complications. (a) The AAP failed to disclose most of the complications of circumcision--there are more than 50—or the complications that Shingo Lavine suffers from including painful erections, scrotal webbing, hypersensitivity of the glans, and unsatisfactory cosmetic appearance. (b) The AAP understated the rate of complications at 0.2% and 0.6% when according to one study the rate is as high as 13%. (c) The AAP failed to take into account complications that occur later in childhood and in adulthood. (d) The AAP did not disclose severe complications such as the risk of cutting off all or part of the glans penis. (e) The AAP misrepresented the rate of severe complications, which is as high as 2-4%. (f) The AAP stated, "The exact incidence of postoperative complications is unknown." Thus, the AAP knew that it did not have enough data to conclude that circumcision is safe in 1989. (g) The most common complication following male circumcision, meatal stenosis, which is a narrowing of the urethral opening that interferes with micturition, is seen in 5% to 20% of boys following circumcision, and happened to Shingo Lavine, is only addressed in passing: "There is no evidence that meatitis leads to stenosis of the urethral meatus."

70. Risks Unknown. The 1989 Guidelines advise physicians to inform parents of the risks, but this is impossible as the Guidelines state, "The exact incidence of postoperative complications is unknown."

71. Not Harmless. The 1989 AAP guidelines imply by omission that circumcision is harmless when properly performed. The AAP did not discuss the anatomy and physiology of the foreskin of the penis, however, the body part being irreversibly amputated. The AAP did not disclose that the foreskin is highly erogenous, as has been known since ancient times; that its inner lining is a moist and mobile mucous membrane, which reduces friction during masturbation and sexual intercourse. The AAP did not disclose that men prize the foreskin and that men who have one rarely volunteer to part with it. Thus, the AAP assigned no value to the foreskin that circumcision irreversibly amputates, even though males do, and thereby impliedly told parents asked to make the circumcision decision, here the Lavines, relying on the AAP's guidelines, that the foreskin is worthless.

72. No Disclosure of the Risk of Psychological Harm. The AAP did not disclose that boys and men may be angry to have been circumcised and that circumcision can cause psychological harm.

73. No Disclosure of the Risk of Parental Regret. The AAP did not disclose that boys and men may be angry that their parents gave permission to have them circumcised, which they would not have chosen for themselves; that this may impair the relationship between parents and son; and that parents may regret having given permission.

17

74. Thus, the AAP 1989 Guidelines promoted circumcision by falsely portraying it as medicine, and as the simple, safe, and painless snip of a worthless piece of skin. Although the American public often refers to circumcision as a "snip," the AAP did not correct the public's false belief in the Guidelines.

75. False Claims About UTIs. The AAP promoted circumcision in its 1989 Guidelines largely based on the claim that it reduces the risk of urinary tract infections. But the AAP knew that "these studies [about UTIs] may have methodologic flaws." The AAP failed to state the simple fact that UTIs in boys can easily be treated with antibiotics, as they are in girls.  They failed to point out that girls have many times more UTIs than boys, circumcised or not.

76. False Claims About Penile Cancer. Penile cancer is a rare disease that occurs in old age. Boys are not at risk of it. The AAP also knew, as it stated in 1975, that, "optimal hygiene confers as much or nearly as much protection against penile cancer as circumcision," and a "great deal of unnecessary surgery, with attendant complications would have to be done if circumcision were to be used as prophylaxis against [penile cancer]". The possible reduction in penile cancer is not a valid medical reason to circumcise, so the Guidelines should have not discussed them as a reason to elect circumcision, in which case Dr. Chait would not have advanced penile cancer citing the AAP Guidelines as a reason to do so. The AAP deviated without valid scientific evidence from its 1975 AAP Policy Statement on circumcision, which found no solid evidence for using circumcision to prevent penile cancer. The mention of penile cancer is a scare tactic designed to sell circumcision.

77. False Claims About STDs. The AAP truthfully stated in 1975 that, "evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting." Similarly, the AAP 1989 Guidelines state, "Evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting" and that "methodologic problems render these reports about some STDs inconclusive". In any event, newborn boys and older boys are not at risk of STDs. Furthermore, males must still practice safe sex to avoid STDs and HIV. As the AMA later wrote in 1999, circumcision cannot responsibly be advanced as protection against STDs. The Guidelines should have not discussed them as a reason to elect circumcision, and Dr. Chait should not have advanced STDs and HIV, citing the AAP Guidelines, as a reason to do so. The AAP's mention of STDs is a scare tactic designed to sell circumcision.

78. The AAP did not disclose that even granting the AAP's claims, for example that it reduces the risk of UTIs by 1%, circumcision has little prospect of benefiting any boy or man, violating the ethical rule that medical procedures must do good. And insofar as circumcision is painful, risky, and causes substantial harm in every case, it violates the ethical rule, "First, Do No Harm".

79. As physicians and members of a medical organization issuing medical guidelines, the members of the 1989 task force on circumcision had an ethical and legal duty to use their independent

medical judgment to determine whether circumcision is medically indicated and hence justified or not, and, if not, as the AAP stated in 1971 and 1975, to recommend against it. The implied legal claim by the AAP in 1989 that physicians have the right to perform the operation, and to take orders from parents who know little or nothing about medicine to do so, is false and was known by the AAP to be false. The rule for physicians is: do not operate on a healthy child; only operate on a child when he or she needs the operation. The AAP Guidelines were completely fraudulent in promoting circumcision, if parents elect it, when physicians are not allowed to perform the operation unless it is medically necessary.

80. To the extent that the members of the 1989 AAP task force on circumcision did not have knowledge of the falsity of any its false claims enumerated above, they and the AAP acted recklessly in disregard of the truth or falsity or said claim or claims, and are liable for fraud.

81. The AAP thereby intentionally defrauded Adam Lavine, acting on behalf of his son Shingo Lavine and his wife Aiko Lavine, and therefore intentionally defrauded the three Plaintiffs.

**WHEREFORE,** Plaintiffs demand judgment that the American Academy of Pediatrics committed intentional fraud against them, and they pray for the relief requested below.

## COUNT IV

### (Constructive Fraud)

### The American Academy of Pediatrics

82. Plaintiffs repeat and re-allege the facts and allegations in Paragraphs 1-81 as if set forth at length herein.

83. The AAP is a medical organization, comprised of physicians licensed to practice medicine, that issues guidelines for physicians to follow in the practice of medicine and here, the practice of circumcision.

84. The AAP owes a fiduciary duty to patients and their legal representatives who learn about or are informed about and who rely upon the AAP's circumcision guidelines, here Adam Lavine's reliance on the AAP's 1989 Policy Statement.

85. When the AAP violates the trust that a physician (here Dr. Chait), a patient (here Shingo Lavine) and/or those representing him (here Adam and Aiko Lavine) places in the AAP by some wrongful or unfair act—including without limitation by unfair conduct, unethical conduct, unlawful conduct, by fraud, breach of fiduciary duty, mistake, undue influence, coercion, duress,

or unjustly enriches itself—a cause of action lies for constructive fraud, even if intent to defraud is absent.

86. The AAP's wrongful and unfair acts enumerated in this Complaint and in Count III—including without limitation undisclosed conflicts of interest, scientific misconduct, failure to use independent and neutral medical judgment, fraudulent medical claims and omissions, scare tactics, fraudulent legal claims and omissions, promotion of unethical conduct, violation of boys' rights, breach of fiduciary duty, unfairness, mistake, undue influence, coercion, duress, and unjust enrichment—constitute constructive fraud.

**WHEREFORE**, Plaintiffs demand judgment that the American Academy of Pediatrics committed constructive fraud against them, and they pray for the relief requested below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Shingo Lavine, Adam Lavine, and Aiko Lavine demand judgement against defendants, Princeton Medical Group, P.A. and the American Academy of Pediatrics, Inc. and they seek the following relief:

  (a) Compensation for Shingo Lavine for the pain caused by each of the two circumcisions; the pain caused by his injuries; for the emotional distress, suffering, stress, pain, and mental anguish caused by the circumcisions.

  (b) Compensation for the pain and pain and suffering and emotional distress associated with attempting partial foreskin restoration to try to mitigate the damage caused by the circumcisions; and compensation for the time spent and that will be spent on foreskin restoration.

  (c) Compensation for the mental anguish suffered by Adam and Aiko Lavine as a result of the two circumcisions.

  (d) Attorneys' fees, pre- and post-judgment interest and costs of this lawsuit;

  (e) Punitive damages; and

  (f) Such other relief as the court may deem just and equitable under the circumstances.

_____

**ANDREW DELANEY, ATTORNEY AT LAW, LLC**
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated: February 4, 2021

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 4:35-1(a) and (b) respectively, Plaintiffs respectfully demand a trial by jury on all issues in the within action so triable.

Dated: February 4, 2021                     BY: _____
                                            ANDREW DELANEY, ESQ.

## DESIGNATION OF TRIAL COUNSEL

In accordance with Rule 4:25-4, Andrew DeLaney, Esq. is hereby designated as trial counsel on behalf of Plaintiffs.

Dated: February 4, 2021                     BY: _____
                                            ANDREW DELANEY, ESQ.

## CERTIFICATION

The undersigned hereby certifies that the matter in controversy between the parties herein is not the subject of any other action pending in any Court or any arbitration proceeding, and that no other action or arbitration proceeding with respect to the matter in controversy is contemplated.

The undersigned further certifies that the names of any non-parties who should be joined in the action pursuant to Rule 4:28, or who are subject to joinder pursuant to Rule 4:29-1(b)

because of potential liability to any party on the basis of the facts set forth in the within complaint are: None.

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

Dated: February 4, 2021                    BY: _____
                                           ANDREW DELANEY, ESQ.

## LIST OF ATTACHED EXHIBITS

### EXHIBIT A

"Ode to the Circumcised Male," Poem by Edgar Schoen, M.D., chair of the 1989 Task Force of the AAP on Circumcision

### EXHIBIT B

"Report of the Task Force on Circumcision, RE9148" *Pediatrics*, 989;84(4):388-91 (August, 1989)

### EXHIBIT C

"Care of the Uncircumcised Penis," AAP Pamphlet, 1984

### EXHIBIT D

"Newborns: Care of the Uncircumcised Penis," AAP Pamphlet, 1994

# EXHIBIT A

mother-child resemblances as adult-hood approaches, again without apparent influence of the sex of the child.[4]

STANLEY M. GARN, PhD
TIMOTHY V. SULLIVAN
The Center for Human Growth
and Development
The University of Michigan
300 North Ingalls Bldg
Ann Arbor, MI 48109

1. Ruvalcaba RHA: Familial sexual precocity. AJDC 1986;140:742.
2. Garn SM: Continuities and changes in maturational timing, in Birn OG, Kagan J (eds): Constancy and Change in Human Development. Cambridge, Mass, Harvard University Press, 1980, pp 113-162.
3. Garn SM, Bailey SM: Genetics of maturational processes, in Falkner F, Tanner JM (eds): Human Growth. New York, Plenum Publishing Corp, 1978, pp 307-330.
4. Garn SM, Rohmann CG: Interaction of nutrition and genetics in the timing of growth and development. Pediatr Clin North Am 1966;13: 353-379.

## 'Ode to the Circumcised Male'

Sir.—Before the mid-1970s, the American standard of care included neonatal circumcision, a minor surgical procedure that promoted genital hygiene and prevented later penile cancer as well as cervical cancer in female sexual partners. More recently, evidence has suggested that adequate hygiene is all that is needed and that circumcision is an unnecessary and traumatic procedure. In 1983, the American Academy of Pediatrics and the American College of Obstetrics and Gynecology jointly agreed that routine circumcision is not necessary,[1] and third-party payers are increasingly refusing to pay for the procedure. Whether recent evidence of a decreased incidence of urinary tract infections in circumcised male infants[2] can stem the anticircumcision tide is questionable.

The purpose of this communication is to offer some solace to the generations of circumcised males who are now being told that they have undergone an unnecessary and deforming procedure, which may also have been brutal and psychologically traumatic. To them I offer these lines:

### Ode to the Circumcised Male

We have a new topic to heat up our passions—the foreskin is currently top of the fashions.

If you're the new son of a Berkeley professor, your genital skin will be greater, not lesser.

For if you've been circ'ed or are Moslem or Jewish, you're outside the mode; you are old-ish not new-ish.

You have broken the latest society rules; you may never get into the finest of schools.

Noncircumcised males are the "genital chic"—if your foreskin is gone, you are now up the creek.

It's a great work of art like the statue of Venus, if you're wearing a hat on the head of your penis.

When you gaze through a looking glass, don't think of Alice; don't rue that you suffered a rape of your phallus.

Just hope that one day you can say with a smile that your glans ain't passé; it will rise up in style.

EDGAR J. SCHOEN, MD
Department of Pediatrics
Kaiser Permanente
Medical Center
280 W MacArthur Blvd
Oakland, CA 94611

1. American Academy of Pediatrics and American College of Obstetrics and Gynecology: Guidelines for Perinatal Care. Evanston, Ill, AAP/ACOG, 1983.
2. Wiswell TE, Smith FR, Bass JW: Decreased incidence of urinary tract infections in circumcised male infants. Pediatrics 1985;75: 901-903.

## Gastric Acid Aspiration Possible During Flexible Endoscopy Without General Anesthesia

Sir.—I wish to comment on Dr Bendig's recent article, "Removal of Blunt Esophageal Foreign Bodies by Flexible Endoscopy Without General Anesthesia."

I suggest that Dr Bendig has been fortunate in avoiding pulmonary aspiration of gastric contents in his patients, a life-threatening complication. Animal studies have suggested a critical gastric volume of 0.4 mL/kg and a pH of 2.5 or less as predisposing to serious pulmonary aspiration.[2] Pediatric patients are even more likely than adults to exceed this critical volume and pH.[3,4] Coté et al[5] found 50 of 51 pediatric patients to have gastric pH less than 2.5 immediately after induction of general anesthesia. Of these 51 children, 76% had gastric pH less than 2.5 and gastric volume greater than 0.4 mL/kg, placing them at risk for acid aspiration syndrome.

I suspect that many of Dr Bendig's patients were also at risk for acid aspiration both intraoperatively and postoperatively, despite the six-hour nothing-by-mouth period. Dr Bendig used chlorpromazine hydrochloride, meperidine hydrochloride, and diazepam to sedate his patients, a combination similar to "lytic cocktail," except for the substitution of diazepam for pro-

methazine. In addition, t[he] ynx was topically anesth[etized with] lidocaine or benzocaine. [The patients'] ability to perform esoph[ageal] otherwise uncooperativ[e] speaks for their inability t[o protect their] airways—the cough and [gag reflexes] were abolished. When a pa[tient cannot] protect and control his [own] airway, it is the responsi[bility of the] physician to control it to p[revent a dan]gerous aspiration. Dr Be[ndig states] that "there were no comp[lications from] sedation or of the endosco[py procedure.] Was aspiration looked for [prospec]tively? Did all children [receive a] postoperative chest roent[genogram?] Did no child have a temper[ature eleva]tion postoperatively?

General anesthesia wi[th endotra]cheal intubation provides [airway con]trol and considerable prot[ection from] pulmonary aspiration of g[astric con]tents. Recovery from an [endotracheal] anesthetic is also much [quicker] from the above-mentioned [drugs. I] suggest that the risks fr[om general] anesthesia in this situati[on are less] than that of gastric acid a[spiration.]

Despite Dr Bendig's c[laim to have] trained pediatric suppor[t personnel] and equipment he admits [that even] if airway obstruction or [inadver]tent regurgitation were to [occur, help] would not arrive in time. [It would be] more prudent to have an[esthesia in]volved at the start. I also [think that] one takes Dr Bendig's su[ggested en]couragement to perform [this proce]dure without appropriate [support per]sonnel and equipment.

MICHAEL J. KIBEL[BECK, MD]
Department of An[esthesia]
Geisinger Medical [Center]
Danville, PA 1782[2]

1. Bendig DW: Removal of b[lunt esophageal] foreign bodies by flexible end[oscopy without] general anesthesia. AJDC 1986;[.]
2. Greenfield LJ, Singleton [RM, McCaffree] DR, et al: Pulmonary effects o[f experimental] graded aspiration of hydrochlori[c acid. Ann Surg] 1969;170:74-84.
3. Teabeault JR II: Aspiratio[n of gastric con]tents: An experimental study. A[m J Pathol] 28:51-67.
4. Salem MR, Wong AY, Ma[ni M, et al: Anti]medicant drugs and gastric juic[e volume and pH] in pediatric patients. Anesth[esiology 1976;44:] 216-219.
5. Coté CJ, Goudsouzian NG[, Liu LMP, et al:] Assessment of risk factors relat[ed to the aspira]tion syndrome in pediatric pati[ents. Anesthesiology] 70-72.

In Reply.—Dr Kibelbek [is concerned] with the potential risk of [aspiration of] gastric contents utilizi[ng]

# EXHIBIT B


PLAINTIFF'S
EXHIBIT
67

Task Force on Circumcision

# Report of the Task Force on Circumcision (RE9148)

The 1971 edition of *Standards and Recommendations of Hospital Care of Newborn Infants* by the Committee on the Fetus and Newborn of the American Academy of Pediatrics (AAP) stated that "there are no valid medical indications for circumcision in the neonatal period."[1(p110)] In 1975, an Ad Hoc Task Force of the same committee reviewed this statement and concluded that "there is no absolute medical indication for routine circumcision of the newborn."[2(p87)] The 1975 recommendation was reiterated in 1983 by both the AAP and the American College of Obstetrics and Gynecology in the jointly published *Guidelines to Perinatal Care.*[3] Large-scale studies of US hospitals indicate that most male infants born in this country are circumcised in the newborn period,[4] although the circumcision rate recently appears to be decreasing.[5] Since the 1975 report, new evidence has suggested possible medical benefits from newborn circumcision. Preliminary data suggest the incidence of urinary tract infection in male infants may be reduced when this procedure is performed during the newborn period. There is also additional published information concerning the relationship of circumcision to sexually transmitted diseases and, in turn, the relationship of viral sexually transmitted diseases to cancer of the penis and cervix.

## DEFINITIONS, PENILE HYGIENE, AND LOCAL INFECTIONS

The penis consists of a cylindrical shaft with a rounded tip (the glans). The shaft and glans are separated by a groove called the coronal sulcus. The foreskin, or prepuce, is the fold of skin covering the glans. At birth, the prepuce is still developing histologically, and its separation from the glans is usually incomplete. Only about 4% of boys have a retractable foreskin at birth, 15% at 6 months, and 50% at 1 year; by 3 years, the foreskin can be retracted in 80% to 90% of uncircumcised boys.[6]

Phimosis is stenosis of the preputial ring with resultant inability to retract a fully differentiated foreskin. Paraphimosis is retention of the preputial ring proximal to the coronal sulcus, creating a tension greater than lymphatic pressure resulting in subsequent edema of the prepuce and glans distal to the ring. Balanitis is inflammation of the glans, and posthitis is inflammation of the prepuce; these conditions usually occur together (balanoposthitis). Meatitis is inflammation of the external urethral meatus.

Newborn circumcision consists of removal of the foreskin to near the coronal sulcus performed in early infancy (before age 2 months). The procedure prevents phimosis, paraphimosis, and balanoposthitis. Meatitis is more common in circumcised boys. There is no evidence that meatitis leads to stenosis of the urethral meatus.

It is particularly important that uncircumcised boys be taught careful penile cleansing. As the boy grows, cleansing of the distal portion of the penis is facilitated by gently, never forcibly, retracting the foreskin only to the point where resistance is met. Full retraction may not be achieved until age 3 years or older.

A small percentage of boys who are not circumcised as newborns will later require the procedure for treatment of phimosis, paraphimosis, or balanoposthitis. When performed after the newborn period, circumcision may be a more complicated procedure.[7]

## CANCER OF THE PENIS

The overall annual incidence of cancer of the penis in US men has been estimated to be 0.7 to 0.9 per 100 000 men and the mortality rate is as high as 25%.[8-11] This condition occurs almost exclusively in uncircumcised men.[12-14] In five major reported series since 1932, not one man had been circumcised neonatally.[11,15-19] The predicted lifetime risk of cancer of the penis developing in an uncircumcised man has been estimated at 1 in 600 men in the United States[20]; in Denmark, the estimate is 1 in 909 men.[21] In developed countries where

The recommendations in this statement do not indicate an exclusive course of treatment or procedure to be followed. Variations, taking into account individual circumstances, may be appropriate.
PEDIATRICS (ISSN 0031 4005). Copyright © 1989 by the American Academy of Pediatrics.

neonatal circumcision is not routinely performed, the incidence of penile cancer is reported to range from 0.3 to 1.1 per 100 000 men per year.[4] This low incidence is about half that found in uncircumcised US men, but greater than that in circumcised US men.

Factors other than circumcision are important in the etiology of penile cancer. The incidence of penile cancer is related to hygiene. In developing nations with low standards of hygiene, the incidence of cancer of the penis in uncircumcised men is 3 to 6 per 100 000 men per year.[22] The decision not to circumcise a male infant must be accompanied by a lifetime commitment to genital hygiene to minimize the risk of penile cancer developing. Recently, human papillomavirus types 16 and 18 DNA sequences have been found in 31 of 53 cases of penile cancer, suggesting the importance of these viruses in the development of this condition.[23] Poor hygiene, lack of circumcision, and certain sexually transmitted diseases all correlate with the incidence of penile carcinoma.

## URINARY TRACT INFECTIONS

A 1982 series of infants with urinary tract infections noted that males preponderated, contrary to female preponderance later in life, and that 95% of the infected boys were uncircumcised.[24] Beginning in 1985, studies conducted at US Army hospitals involving more than 200 000 men showed a greater than tenfold increase in urinary tract infections in uncircumcised compared with circumcised male infants; moreover, as the rate of circumcision declined throughout the years, the incidence of urinary tract infection increased.[5,25] In another army hospital study, infants were examined in the first month of life and it was concluded that the high incidence of urinary tract infection in uncircumcised boys was accompanied by a similarly increased incidence of other significant infection, including bacteremia and meningitis[26]; however, the authors of that study did not distinguish between bacteriuria secondary to septicemia and primary urinary tract infection. Still another recent army hospital study lends support to a 1986 hypothesis that circumcision prevents preputial bacterial colonization and thus protects male infants against urinary tract infection.[27,28] It should be noted that these studies in army hospitals are retrospective in design and may have methodologic flaws. For example, they do not include all boys born in any single cohort or those treated as outpatients, so the study population may have been influenced by selection bias.

## SEXUALLY TRANSMITTED DISEASES

Evidence regarding the relationship of circumcision to sexually transmitted diseases is conflicting.

Early series indicated a higher risk of gonococcal and nonspecific urethritis in uncircumcised men,[29,30] whereas one recent study shows no difference in the incidence of gonorrhea and a higher incidence of nonspecific urethritis in circumcised men.[31] Although published reports suggest that chancroid, syphilis, human papillomavirus, and herpes simplex virus type 2 infection are more frequent in uncircumcised men, methodologic problems render these reports inconclusive.[29,30,32-34]

## CERVICAL CARCINOMA

There appears to be a strong correlation between squamous cell carcinoma of the cervix and sexually transmitted diseases. Human papillomavirus types 16 and 18 are the viruses most commonly associated with cancer of the cervix[35-38]; Herpes simplex virus type 2 has also been linked with cervical cancer.[36,39] Although human papillomavirus types 16 and 18 are also associated with cancer of the penis,[23,37] evidence linking uncircumcised men to cervical carcinoma is inconclusive. The strongest predisposing factors in cervical cancer are a history of intercourse at an early age and multiple sexual partners. The disease is virtually unknown in nuns and virgins.

## PAIN AND BEHAVIORAL CHANGES

Infants undergoing circumcision without anesthesia demonstrate physiologic responses suggesting that they are experiencing pain.[40] The observed responses include behavioral, cardiovascular, and hormonal changes. Pain pathways as well as the cortical and subcortical centers necessary for pain perception are well developed by the third trimester. Responses to painful stimuli have been documented in neonates of all viable gestational ages. Behavioral changes include a cry pattern indicating distress during the circumcision procedure and changes in activity (irritability, varying sleep patterns) and in infant-maternal interaction for the first few hours after circumcision.[41-43] These behavioral changes are transient and disappear within 24 hours after surgery.[43]

## SURGICAL TECHNIQUES AND LOCAL ANESTHESIA

Circumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique. The procedure should be performed only on a healthy, stable infant. Clamp techniques (eg, Gomco or Mogen clamps) or a Plastibell give equally good results.[44] Techniques that may reduce postoperative complications include (1) using a surgical marking pen to mark the location of the coronal sulcus on the shaft

skin preoperatively; (2) identifying the urethral meatus; (3) bluntly freeing the foreskin from the glans with a flexible probe; (4) completely retracting the foreskin; and (5) identifying the coronal sulcus, all before applying the clamp or Plastibell and before excising any foreskin.[45] Electrocautery should not be used in conjunction with metal clamps. At the initial health supervision visit following hospital discharge, the penis should be carefully examined and the parents given instructions concerning on-going care.

Dorsal penile nerve block using no more than 1% lidocaine (without epinephrine) in appropriate doses (3 to 4 mg/kg) may reduce the pain and stress of newborn circumcision.[41,46-49] However, reported experience with local anesthesia in newborn circumcision is limited, and the procedure is not without risk (see "Complications").

## CONTRAINDICATIONS, COMPLICATIONS, INFORMED CONSENT

Circumcision is contraindicated in an unstable or sick infant. Infants with genital anomalies, including hypospadias, should not be circumcised because the foreskin may later be needed for surgical correction of the anomalies. Appropriate laboratory studies should be performed when there is a family history of bleeding disorders. Infants who have demonstrated an uncomplicated transition to extrauterine life are considered stable. Signs of stability include normal feeding and elimination and maintenance of normal body temperature without an incubator or radiant warmer. A period of observation may allow for recognition of abnormalities or illnesses (eg, hyperbilirubinemia, infection, or manifest bleeding disorder) that should be addressed before elective surgery. It is prudent to wait until a premature infant meets criteria for discharge before performing circumcision.

The exact incidence of postoperative complications is unknown,[50] but large series indicate that the rate is low, approximately 0.2% to 0.6%.[44,45,51,52] The most common complications are local infection and bleeding. Deaths attributable to newborn circumcision are rare; there were no deaths in 500 000 circumcisions in New York City[52] or in 175 000 circumcisions in US Army hospitals.[51] A communication published in 1979 reported one death in the United States due to circumcision in 1973, and the authors' review of the literature during the previous 25 years documented two previous deaths due to this procedure.[53]

Complications due to local anesthesia are rare and consist mainly of hematomas and local skin necrosis.[41,46-49,54] However, even a small dose of lidocaine can result in blood levels high enough to produce measurable systemic responses in neonates.[55,56] Local anesthesia adds an element of risk and data regarding its use have not been reported in large numbers of cases. Circumferential anesthesia may be hazardous. It would be prudent to obtain more data from large controlled series before advocating local anesthesia as an integral part of newborn circumcision.

When considering circumcision of their infant son, parents should be fully informed of the possible benefits and potential risks of newborn circumcision, both with and without local anesthesia. In addition to the medical aspects, other factors will affect the parents' decisions, including esthetics, religion, cultural attitudes, social pressures, and tradition.

## SUMMARY

Properly performed newborn circumcision prevents phimosis, paraphimosis, and balanoposthitis and has been shown to decrease the incidence of cancer of the penis among US men. It may result in a decreased incidence of urinary tract infection. However, in the absence of well-designed prospective studies, conclusions regarding the relationship of urinary tract infection to circumcision are tentative. An increased incidence of cancer of the cervix has been found in sexual partners of uncircumcised men infected with human papillomavirus. Evidence concerning the association of sexually transmitted diseases and circumcision is conflicting.

Newborn circumcision is a rapid and generally safe procedure when performed by an experienced operator. It is an elective procedure to be performed only if an infant is stable and healthy. Infants respond to the procedure with transient behavioral and physiologic changes.

Local anesthesia (dorsal penile nerve block) may reduce the observed physiologic response to newborn circumcision. It also has its own inherent risks. However, reports of extensive experience or follow-up with the technique in newborns are lacking.

Newborn circumcision has potential medical benefits and advantages as well as disadvantages and risks. When circumcision is being considered, the benefits and risks should be explained to the parents and informed consent obtained.

AAP TASK FORCE ON CIRCUMCISION
Edgar J. Schoen, MD, Chairman
Glen Anderson, MD
Constance Bohon, MD
Frank Hinman, Jr, MD
Ronald L. Poland, MD
E. Maurice Wakeman, MD

## REFERENCES

1. American Academy of Pediatrics, Committee on Fetus and Newborn. *Standards and Recommendations for Hospital Care of Newborn Infants.* 5th ed. Evanston, IL: American Academy of Pediatrics; 1971

2. Thompson HC, King LR, Knox E, et al. Report of the ad hoc task force on circumcision. *Pediatrics.* 1975;56:610-611

3. American Academy of Pediatrics, Committee on Fetus and Newborn. *Guidelines for Perinatal Care.* 1st ed. Evanston, IL: American Academy of Pediatrics; 1983

4. Wallerstein E. Circumcision: the uniquely American medical enigma. *Urol Clin North Am.* 1985;12:123-132

5. Wiswell TE, Enzenauer RW, Holton ME, et al. Declining frequency of circumcision: implications for changes in the absolute incidence and male to female sex ratio of urinary tract infection in early infancy. *Pediatrics.* 1987;79:338-342

6. Gairdner D. The fate of the foreskin: a study of circumcision. *Br Med J.* 1949;2:1433-1437

7. Warner E, Strashin E. Benefits and risks of circumcision. *Can Med Assoc J.* 1981;125:967-976,992

8. Cutler SJ, Young JL, Jr. eds. *Third National Cancer Survey: Incidence Data.* National Cancer Institute Monograph 41. Bethesda, MD: US Dept of Health, Education, and Welfare; 1975.

9. Young JL, Percy CL, Asire AJ. *Surveillance, epidemiology and End Results, Incidence and Mortality Data 1973-1977.* National Cancer Institute Monograph 41. Bethesda, MD: US Dept of Health, Education, and Welfare; 1981; 17

10. Young JL. *Surveillance, Epidemiology and End Results 1978-1982.* Bethesda, MD: US Dept of Health and Human Services; YEAR;PAGE

11. Persky L, deKernion J. Carcinoma of the penis. *Cancer J Clin.* 1986;35:5:258-273

12. Leiter E, Lefkovits AM. Circumcision and penile carcinoma. *NY State J Med.* 1975;75:1520-1522

13. Boczko S, Freed S. Penile carcinoma in young circumcised males. *NY State J Med.* 1979;79:1903-1904

14. Rogus BJ. Squamous cell carcinoma in a young circumcised man, *J Urol.* 1987;138:861-862

15. Wolbarst AL. Circumcision and penile cancer. *Lancet.* 1932;1:150-153

16. Dean AL Jr. Epithelioma of the penis. *J Urol.* 1935;33:252-283

17. Lenowitz H, Graham AP. Carcinoma of the penis. *J Urol.* 1946;56:458-484

18. Hardner GJ, Bhanalaph T, Murphy GP, et al. Carcinoma of the penis: analysis of therapy in 100 consecutive cases, *J Urol.* 1974;108:428-430

19. Dagher R, Selzer ML, Lapides J. Carcinoma of the penis and the anti-circumcision crusade. *J Urol.* 1973;110:79-80

20. Kochen M, McCurdy S. Circumcision and the risk of cancer of the penis: a life-table analysis. *Am J Dis Child.* 1980;134:484-486

21. Swafford TD. Circumcision and the risk of cancer of the penis. *Am J Dis Child.* 1985;139:112

22. Garfinkel L. Circumcision and penile cancer. *Cancer J Clin.* 1983;33:320

23. McCance DJ, Kalache A, Ashdown K, et al. Human papillomavirus types 16 and 18 in carcinomas of the penis from Brazil. *Int J Cancer.* 1986;37:55-59

24. Ginsburg CM, McCracken GH Jr. Urinary tract infections in young infants. *Pediatrics.* 1982;69:409-412

25. Wiswell TE, Smith FR, Bass JW. Decreased incidence of urinary tract infections in circumcised male infants. *Pediatrics.* 1985;75:901-903

26. Wiswell TE, Geschke DW. Risks from circumcision during the first month of life compared with those of the uncircumcised boys. *Pediatrics.* 1989;83:1011-1015

27. Roberts JA. Does circumcision prevent urinary tract infection? *J Urol.* 1986;135:991-992

28. Wiswell TE, Miller GM, Gelston HM, et al. The effect of circumcision status on periurethral bacterial flora during the first year of life. *J Pediatr.* 1988;113:442-446

29. Wilson RA. Circumcision and venereal disease. *Can Med Assoc J.* 1947;56:54-56

30. Parker SW, Stewart AJ, Wren MN, et al. Circumcision and sexually transmissible disease. *Med J Aust.* 1983;2:288-290

31. Smith GL, Greenup R, Takafuji ET. Circumcision as a risk factor for urethritis in racial groups. *Am J Public Health.* 1987;77:452-454

32. Thirumoorthy T, Sng EH, Doraisingham S, et al. Purulent-penile ulcers of patients in Singapore: *Genitourin Med.* 1986;62:252-255

33. Oriel JD. Condyloma acuminata as a sexually transmitted disease. *Dermatol Clin.* 1983;1:93-102

34. Taylor PK, Rodin P. Herpes genitalis and circumcision. *Br J Vener Dis.* 1975;51:274-277

35. Baird PJ. The causation of cervical cancer, part II: the role of human papilloma and other viruses. In: Singer A, ed. *1985 Clinics in Obstetrics and Gynecology.* London, England: WB Saunders Co; 1985;12:19-32

36. Kaufman RH, Adam E. Herpes simplex virus and human papilloma virus in the development of cervical carcinoma. *Clin Obstet Gynecol.* 1986;29:678-692

37. McCance DJ. Human papillomaviruses and cancer. *Biochim Biophys Acta.* 1986;823:195-205

38. zur Hausen H. Genital papillomavirus infections. *Prog Med Virol.* 1985;32:15-21

39. Kessler II. Etiological concepts in cervical carcinogenesis. *Appl Pathol.* 1987;5:57-75

40. Anand KJS, Hickey PR. Pain and its effects in the human neonate and fetus. *N Engl J Med.* 1987;317:1321-1329

41. Dixon S, Snyder J, Holve R, et al. Behavioral effects of circumcision with and without anesthesia. *J Devel Behav Pediatr.* 1984;5:246-250

42. Marshall RE, Stratton WC, Moore JA, et al. Circumcision: effects upon newborn behavior. *Infant Behav Dev.* 1980;3:1-14

43. Marshall RE, Porter FL, Rogers AG, et al. Circumcision, II: Effects upon mother-infant interaction. *Early Hum Dev.* 1982;7:367-374

44. Gee WF, Ansell JS. Neonatal circumcision: a ten-year overview with comparison of the Gomco clamp and the Plastibell device. *Pediatrics.* 1976;58:824-827

45. Harkavy KL. The circumcision debate. *Pediatrics.* 1987; 79:649-650. Letter

46. Kirya C, Werthmann MW. Neonatal circumcision and penile dorsal nerve block—a painless procedure. *J Pediatr.* 1978;92:998-1000

47. Williamson PS, Williamson MI. Physiologic stress reduction by a local anesthetic during newborn circumcision. *Pediatrics.* 1983;71:36-40

48. Holve RL, Bromberger PJ, Groveman HD, et al. Regional anesthesia during newborn circumcision: effect on infant pain response. *Clin Pediatr.* 1983;22:813-818

49. Stang HJ, Gunnar MR, Snellman L, et al. Local anesthesia for neonatal circumcision; effect on distress and cortisol response. *JAMA.* 1988;259:1507-1511

50. Kaplan GW. Complications of circumcision. *Urol Clin North Am.* 1983;10:543-549

51. Wiswell TE. The circumcision debate. *Pediatrics.* 1987; 79:649-650. Letter

52. King LR. Neonatal circumcision in the United States in 1982. *J Urol.* 1982;128:1135-1136

53. Kochen M, McCurdy SA. Circumcision. *Am J Dis Child.* 1979;133:1079-1080. Letter

54. Sara CA, Lowry CJ. A complication of circumcision and dorsal nerve block of the penis. *Anaesth Intensive Care.* 1985;13:79-82

55. Diaz M, Graff M, Hiatt M, et al. Prenatal lidocaine and the auditory evoked responses in term infants. *Am J Dis Child.* 1988;142:160-161

56. Maxwell LG, Yaster M, Wetzell RC, et al. Penile nerve block for newborn circumcision. *Obstet Gynecol.* 1987;70:415-419

ERRATUM

Policy Statement RE9148

Report of the Task Force on Circumcision

Under the heading of "Urinary Tract Infections" (line 6, page 389), "men" should be changed to "infant boys." The complete statement should now read:

> Beginning in 1985, studies conducted at US Army hospitals involving more than 200 000 infant boys showed a greater than tenfold increase in urinary tract infections in uncircumcised compared with circumcised male infants; moreover, as the rate of circumcision declined throughout the years, the incidence of urinary tract infection increased.

The Task Force on Circumcision would also like to acknowledge the following for their provision of expert advice:

David T. Mininberg, MD, FAAP, Section Liaison
Jerome O. Klein, MD, FAAP
Edward A. Mortimer, Jr, MD, FAAP

# EXHIBIT C

Case 2:21-cv-17299-ZNQ-LHG   Document 14-1   Filed 12/13/21   Page 35 of 48 PageID: 503



NATIONAL ORGANIZATION
of
CIRCUMCISION INFORMATION
RESOURCE CENTERS
P.O. Box 369
Corte Madera, California 94925-0369

For additional copies, contact: American
Academy of Pediatrics, Publications
Department, P.O. Box 927, Elk Grove Village,
IL 60007. Price: $15/100

Copyright 1990 by the American Academy of Pediatrics

need for concern even after a longer period. No harm will come in leaving the foreskin alone.

**Testing Foreskin Retraction:** To test retraction occasionally, hold the penile shaft with one hand and with the other hand, push the foreskin back *gently – never forcibly* – perhaps ⅓ of an inch. Retraction may also be done with one hand pushing the shaft skin gently toward the abdomen. This will automatically retract the foreskin.

If there is any *discomfort* in your baby or if you feel resistance, stop. Try again in a few months. If the retraction is easy for both the child and the parent, further retraction may be attempted in due time. There should be no rush to retract. Eventually, the foreskin will retract completely, exposing the entire glans. This may take several years.

**Hygiene of the Fully Retracted Foreskin:** For the first few years, an occasional retraction with cleansing beneath is sufficient.

Penile hygiene will later become a part of a child's total body hygiene, including hair shampooing, cleansing the folds of the ear and brushing teeth. At puberty, the male should be taught the importance of retracting the foreskin and cleaning beneath during his daily bath.

**Summary:** Care of the uncircumcised boy is quite easy. "Leave it alone" is good advice. External washing and rinsing on a daily basis is all that is required. Do not retract the foreskin in an infant, as it is almost always attached to the glans. Forcing the foreskin back may harm the penis, causing pain, bleeding, and possibly adhesions. The natural separation of the foreskin from the glans may take many years. After puberty, the adult male learns to retract the foreskin and cleanse under it on a daily basis.

## Care of the Uncircumcised Penis

At birth, the penis consists of a cylindrical shaft with a rounded end called the glans. The shaft and glans are separated by a groove called the sulcus. The entire penis – shaft and glans – is covered by a continuous layer of skin. The section of the penile skin that covers the glans is called the foreskin or prepuce. The foreskin consists of two layers, the outer foreskin and an inner lining similar to a mucous membrane.

Before birth, the foreskin and glans develop as one tissue. The foreskin is firmly attached – really fused – to the glans. Over time, this fusion of the inner surface of the prepuce with the glans skin begins to separate by shedding the cells from the surface of each layer. Epithelial layers of the glans and the inner foreskin lining are regularly replaced, not only in infancy but throughout life. The discarded cells accumulate as whitish, cheesy "pearls" which gradually work their way out via the tip of the foreskin.

Eventually, sometimes as long as 5 or even 10 years after birth, full separation occurs and the foreskin may then be pushed back away from the glans toward the abdomen. This is called foreskin retraction. The foreskin may retract spontaneously with erections which occur normally from birth on and even occur in fetal life. Also, all children "discover" their genitals as they become more aware of their bodies and may retract the foreskin themselves. If foreskin does not seem to retract easily early in life, it is important to realize that this is not abnormal and that it will eventually do so.



Diagrammatic Representation of the Inner and Outer Foreskin Layers.

Outer Foreskin Layer — Preputial Orifice — Inner Foreskin Layer — Sulcus — Shaft — Urinary Meatus — Glans — Frenum

Drawing reprinted with permission of Edward Wallerstein, author of Circumcision: An American Health Fallacy.

**The Function of the Foreskin:** The glans at birth is delicate and easily irritated by urine and feces. The foreskin shields the glans; with circumcision, this protection is lost. In such cases, the glans and especially the urinary opening (meatus) may become irritated or infected, causing ulcers, meatitis (inflammation of the meatus), and meatal stenosis (a narrowing of the urinary opening). Such problems virtually never occur in uncircumcised penises. The foreskin protects the glans throughout life.

**Infant Smegma:** Skin cells from the glans of the penis and the inner foreskin are shed throughout life. This is especially true in childhood; natural skin shedding serves to separate the foreskin from the glans. Since this shedding takes place in a relatively closed space – with the foreskin covering the glans – the shed skin cells cannot escape in the usual manner. They escape by working their way to the tip of the foreskin. These escaping discarded skin cells constitute infant smegma.

**Adult Smegma:** Specialized sebaceous glands – Tyson's Glands – which are located on the glans under the foreskin, are largely inactive in childhood. At puberty, Tyson's Glands produce an oily substance, which, when mixed with shed skin cells, constitute adult smegma. Adult smegma serves as a protective, lubricating function for the glans.

**Foreskin Hygiene:** The foreskin is easy to care for. The infant should be bathed or sponged frequently, and all parts should be washed including the genitals. The external penile skin is soft and pliable and easy to wash. *It is not necessary to retract any part of the skin in order to wash under it.* The uncircumcised penis is easy to keep clean. No special care is required! Leave the penis alone. The body provides its own protection of the glans area because the foreskin is fused to it. As the shed epithelial cells ooze from underneath the foreskin, clean away this infant smegma. No other manipulation is necessary. There is no need for Q-tips, irrigation or antiseptics; soap and water will suffice.

**Foreskin Retraction:** As noted, the foreskin and glans develop as one tissue. Separation will evolve over time. It should not be forced. When will separation occur? Each child is different. Separation may occur before birth; this is rare. It may take a few days, weeks, months or even years. *This is normal.* Although most foreskins are retracted by age 5, there is no

# EXHIBIT D

# Newborns: Care of the Uncircumcised Penis

## Guidelines for Parents



American Academy of Pediatrics





---

The American Academy of Pediatrics is an organization of 47,000 pediatricians dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults.

Now available: *Caring for Your Baby and Young Child: Birth to Age 5*, available at the special discount price of more than 25 percent off the $16 list price. To order your copy, send a check or money order for $11.95, plus $2.75 per copy shipping and handling, to:

AAP Publications — Child Care Book, Birth to Age 5, 141 Northwest Point Blvd, PO Box 927, Elk Grove Village, IL 60009-0927.

For additional copies, contact:
American Academy of Pediatrics
Division of Publications
141 Northwest Point Blvd, PO Box 927
Elk Grove Village, IL 60009-0927

Minimum order 100
Price $23.50/100 (members)
$28.50/100 (nonmembers)
Copyright ©1990
HE0023R

American Academy of Pediatrics

1/94

---

**Summary:** Care of the uncircumcised boy is quite easy. "Leave it alone" is good advice. External washing and rinsing on a daily basis is all that is required. Do not retract the foreskin in an infant, as it is almost always attached to the glans. Forcing the foreskin back may harm the penis, causing pain, bleeding, and possibly adhesions. The natural separation of the foreskin from the glans may take many years. After puberty, the adult male learns to retract the foreskin and cleanse under it on a daily basis.

The information contained in this publication should not be used as a substitute for the medical care and advice of your pediatrician. There may be variations in treatment that your pediatrician may recommend based on individual facts and circumstances.

# Newborns: Care of the Uncircumcised Penis

A t birth, the penis consists of a cylindrical shaft with a rounded end called the glans. The shaft and glans are separated by a groove called the sulcus. The entire penis — shaft and glans — is covered by a continuous layer of skin. The section of the penile skin that covers the glans is called the foreskin or prepuce. The foreskin consists of two layers, the outer foreskin and an inner lining similar to a mucous membrane.

Before birth, the foreskin and glans develop as one tissue. The foreskin is firmly attached — really fused — to the glans. Over time, this fusion of the inner surface of the prepuce with the glans skin begins to separate by shedding the cells from the surface of each layer. Epithelial layers of the glans and the inner foreskin lining are regularly replaced, not only in infancy but throughout life. The discarded cells accumulate as whitish, cheesy "pearls" which gradually work their way out via the tip of the foreskin.

Eventually, sometimes as long as 5, 10, or more years after birth, full separation occurs and the foreskin may then be pushed back away from the glans toward the abdomen. This is called foreskin retraction. The foreskin may retract spontaneously with erections which occur normally from birth on and even occur in fetal life. Also, all children "discover" their genitals as they become more aware of their bodies and may retract the foreskin themselves. If the

foreskin does not seem to retract easily early in life, it is important to realize that this is not abnormal and that it should eventually do so.

**Infant Smegma:** Skin cells from the glans of the penis and the inner foreskin are shed throughout life. This is especially true in childhood; natural skin shedding serves to separate the foreskin from the glans. Since this shedding



Diagrammatic Representation of the Inner and Outer Foreskin Layers

Sulcus

Urinary Meatus

Shaft

Glans

Frenum

Outer Foreskin Layer

Preputial Orifice

Inner Foreskin Layer

Drawing reprinted with permission of Edward Wallerstein.

takes place in a relatively closed space — with the foreskin covering the glans — the shed skin cells cannot escape in the usual manner. They escape by working their way to the tip of the foreskin. These escaping discarded skin cells constitute infant smegma, which may appear as white "pearls" under the skin.

**Adult Smegma:** Specialized sebaceous glands — Tyson's Glands — which are located on the glans under the foreskin, are largely inactive in childhood. At puberty, Tyson's Glands produce an oily substance, which, when mixed with shed skin cells, constitute adult smegma. Adult smegma serves as a protective, lubricating function for the glans.

**Foreskin Hygiene:** The foreskin is easy to care for. The infant should be bathed or sponged frequently, and all parts should be washed including the genitals. The uncircumcised penis is easy to keep clean. No special care is required! No attempt should be made to forcibly retract the foreskin. No manipulation is necessary. There is no need for special cleansing with Q-tips, irrigation, or antiseptics; soap and water externally will suffice.

**Foreskin Retraction:** As noted, the foreskin and glans develop as one tissue. Separation will evolve over time. It should not be forced. When will separation occur? Each child is different. Separation may occur before birth; this is rare. It may take a few days, weeks, months, or even years. *This is normal.* Although many foreskins will retract by age 5, there is no need for concern even after a longer period. Some boys do not attain full retractability of the foreskin until adolescence.

**Hygiene of the Fully Retracted Foreskin:** For the first few years, an occasional retraction with cleansing beneath is sufficient.

Penile hygiene will later become a part of a child's total body hygiene, including hair shampooing, cleansing the folds of the ear, and brushing teeth. At puberty, the male should be taught the importance of retracting the foreskin and cleaning beneath during his daily bath.

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>  Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>  Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY<br><br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br><br>**PLAINTIFF SHINGO LAVINE'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANT AMERICAN ACADEMNY OF PEDIATRICS, INC.** |

COMES NOW Plaintiff Shingo Lavine and requests that Defendant American Academy

of Pediatrics, Inc. (hereinafter the "AAP") produce the following books, documents, or other

1

tangible things, within 45 days of the service of these Requests upon it, at the offices of Andrew Delaney, Attorney at Law LLC, 6 South Street, Suite 203, Morristown, New Jersey 07960.

No request shall be interpreted as requiring the production of attorney work product or materials protected by the attorney-client privilege.

## REQUESTS

1.     Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, oral communications that were recorded in some physical form, journal articles, research articles, texts, opinions, graphs, charts, newspaper or magazine articles or opinion pieces, surveys, compilations of data, or the like, that were submitted to the AAP Task Force on Circumcision (hereinafter the "Task Force") whose report (hereinafter "the Report") was published in *Pediatrics* 1989;84;388-391 and a copy of which is attached to the Complaint in this case.

2.     Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, oral communications that were recorded in some physical form, journal articles, research articles, texts, opinions, graphs, charts, newspaper or magazine articles or opinion pieces, surveys, compilations of data, or the like, that were considered by the Task Force before the approval and publication of the Report.

3.     Any and all books, documents, and other tangible things, including but not limited to minutes, notes, or sound or video recordings, that record any of the deliberations of the Task Force

or the approval of the Report by any other body or person within or acting upon the behalf of the AAP.

4.      Any and all drafts of the Report or a suggested report that were submitted to, formulated by, or considered by the Task Force or any member thereof before the approval and issuance of the final version of the Report.

5.      Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, and oral communications that were recorded in some physical form, that suggested or led to the formation of the Task Force.

6.      Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, and oral communications that were recorded in some physical form, that dealt with the selection of the members of the Task Force, including but not limited to requests for appointment thereto, invitations to participate as a member of the Task Force, letters of acceptance, letters declining to participate, and the like.

7.      Any and all books, documents, and other tangible things, including but not limited to letters, memoranda, written communications, and oral communications that were recorded in some physical form, that dealt with the selection of the Chairman of the Task Force, including but not limited to requests for appointment as such, invitations to participate as Chairman of the Task Force, letters of acceptance, letters declining to participate, and the like.

8.    Any and all books, documents, and other tangible things reflecting communications between members of the Task Force themselves in regard to the subject of the Task Force or its operations, deliberations, or report.

9.    Any and all books, documents, and other tangible things reflecting communications between members of the Task Force and any other member of the AAP in regard to the subject of the Task Force or its operations, deliberations, or report.

10.    Any and all books, documents, and other tangible things reflecting communications between members of the Task Force and any member of any other professional association or organization, including but not limited to the American College of Obstetricians and Gynecologists, the American Academy of Family Physicians, the American Cancer Society, or the American Urological Association, in regard to the subject of the Task Force or its operations, deliberations, or report.

11.    Any and all books, documents, and other tangible things reflecting communications between members of the Task Force and any person associated with any governmental agency, including but not limited to the National Institutes of Health or the Centers for Disease Control, in regard to the subject of the Task Force or its operations, deliberations, or report.

12.    Any and all books, documents, and other tangible things reflecting the formulation of, drafting of, content of, or production of the AAP's 1984 pamphlets "NEWBORNS: Care of the Uncircumcised Penis."

4

13.    Any and all books, documents, and other tangible things reflecting the formulation of, drafting of, content of, or production of the AAP's 1994 pamphlet "NEWBORNS: Care of the Uncircumcised Penis," including without limitation those items reflecting or concerning the modification of the language therein whereby the section in the 1984 pamphlets entitled "The Function of the Foreskin:" was eliminated and the reference in the "Diagrammatic Representation of the Inner and Outer Foreskin Layers" was modified to eliminate the reference to "author of Circumcision:    An American Health Fallacy."    This request includes, specifically, any documentation that evidences the reason(s) for the elimination of the referenced portions and the identity of the persons who suggested and/or authorized such changes.

14.    Any and all letters or comments, whether or not published, received by the editors of *Pediatrics* in regard to the Report as published.

15.    Any and all books, documents, and other tangible things reflecting any dissent from the Report by any member of the Task Force.

16.    Any and all versions of the pamphlet "Newborns: Care of the Uncircumcised Penis" from 1984 up to and through 1997.

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated: February 9, 2021

ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E. andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

| | |
|---|---|
| SHINGO LAVINE, ADAM LAVINE, AND AIKO LAVINE,<br><br>    Plaintiffs,<br><br>vs.<br><br>PRINCETON MEDICAL GROUP, P.A. AND AMERICAN ACADEMY OF PEDIATRICS INC.,<br><br>    Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MERCER COUNTY<br><br>DOCKET NO.: MER-L-000272-21<br><br>Civil Action<br><br>**PLAINTIFF SHINGO LAVINE'S FIRST INTERROGATORIES TO DEFENDANT AMERICAN ACADEMNY OF PEDIATRICS, INC.** |

COMES NOW Plaintiff Shingo Lavine and requests that Defendant American Academy

of Pediatrics, Inc. (hereinafter the "AAP") answer the following interrogatories within the time

1

No interrogatory shall be interpreted as requiring the revelation of attorney work product or matters or materials protected by the attorney-client privilege.

## INTERROGATORIES

1.    Please state the names and last known physical addresses, email addresses, and telephone numbers of the members of the AAP Task Force on Circumcision (hereinafter the "Task Force") whose report (hereinafter "the Report") was published in *Pediatrics* 1989;84;388-391 and a copy of which is attached to the Complaint in this case.

2.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of the person or persons who selected the members of the Task Force.

3.    Please state name(s) and last known physical address(es), email address(es), and telephone number(s) of the person or persons who selected the Chairman of the Task Force.

4.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of the person or persons who decided to convene and appoint the Task Force.

5.    Who requested that the Task Force be convened and why was the Task Force convened?

6.     Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any employees or agents of the AAP who assisted the Task Force, consulted with the Task Force, kept the records of the Task Force, received information to convey to the Task Force, or attended any of its meetings.

7.     How many times did the Task Force meet, how did it meet (in person, by telephone, etc.), where did it meet, how were its proceedings recorded, and who kept the minutes of its proceedings?

8.     Did any member of the Task Force ever leave a meeting because of a disagreement with any other member or members of the Task Force?  If so, give complete details, including who left the meeting, when the incident occurred, the reasons given for the person(s) leaving the meeting, and the like.

9.     Did any member of the Task Force draft or present a dissenting report?  If so, give complete details, including who drafted or presented a dissenting report, the contents thereof, the reason(s) for it, and the disposition of such.

10.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any person(s) who authored, drafted, approved or had anything to do with the content of the AAP's 1984 pamphlets "NEWBORNS:  Care of the Uncircumcised Penis."

3

11.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any person(s) who authored, drafted, approved or had anything to do with the content of the AAP's 1994 pamphlet "NEWBORNS: Care of the Uncircumcised Penis."

12.    Please state the name(s) and last known physical address(es), email address(es), and telephone number(s) of any person(s) who had anything to do with the modifications of the language in the AAP pamphlet "NEWBORNS: Care of the Uncircumcised Penis" whereby the section in the 1984 pamphlets entitled "The Function of the Foreskin:" was eliminated in the 1994 edition and the reference in the "Diagrammatic Representation of the Inner and Outer Foreskin Layers" was modified in the 1994 edition to eliminate the reference to "author of Circumcision: An American Health Fallacy" and state ALL of the reason(s) for those modifications.

ANDREW DELANEY, ATTORNEY AT LAW, LLC
*Attorney for Plaintiffs Shingo, Aiko and Adam Lavine*

Dated: February 9, 2021