ANDREW DELANEY, ATTORNEY AT LAW LLC
By: Andrew DeLaney, Esq.
6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*
Attorney ID: 095232013

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SHINGO LAVINE, AIKO LAVINE, AND ADAM LAVINE,<br><br>Plaintiffs,<br><br>-against-<br><br>AMERICAN ACADEMY OF PEDIATRICS, INC.,<br><br>Defendant. | Civil Action<br><br>3:21-CV-17099-ZNQ-LHG |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

Of Counsel:

Jonathan D. Lupkin (admitted *pro hac vice*)
LUPKIN PLLC
80 Broad Street, Suite 1301
New York, New York  10004
Tel: (646) 367-2771
Fax: (646) 219-4870
Email: jlupkin@lupkinpllc.com

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................... iii

PRELIMINARY STATEMENT............................................................................. 1

STATEMENT OF FACTS...................................................................................... 3

I.    Background About the AAP and Circumcision ............................................. 3

II.   Dr. Schoen's "Ode to the Circumcised Male" ........................................... 4

III.  The AAP Task Force on Circumcision ....................................................... 5

IV.  Shingo's Circumcision ................................................................................ 6

V.   The Lavines Discover the Fraud ................................................................. 7

ARGUMENT ......................................................................................................... 8

I.    The New Jersey Supreme Court's Decision in *Snyder* Establishing Trade Association
Liability is Dispositive ............................................................................... 10

   A. The AAP Affirmatively Assumed Responsibility for the Health and Well-Being of its
Constituents' Patients............................................................................11

      1.  Assumed Duty to Inform ................................................................ 12

      2.  Indirect Reliance ............................................................................ 13

      3.  Learned Intermediary ..................................................................... 13

   B.  The Risk that the AAP's Guidelines Would Cause Severe Harm was Foreseeable ....... 13

   C.  The AAP's Members have a Substantial Financial Interest in the Promotion of Routine
Neonatal Circumcision............................................................................ 14

   D.  If the AAP Cannot be Sued, the AAP Cannot be Held Accountable............................. 15

II.   The Lavines have Adequately Pleaded the Elements of Fraud ......................... 15

   A. The Lavines have Identified with Particularity the Allegedly Fraudulent Representations
and Omissions................................................................................... 16

      1.  The Guidelines are not "Mere Opinions"....................................... 16

*i*

2.   The AAP Can and Must be Held Liable Even for its Omissions ............................... 17

B.   The AAP Knew that its Guidelines were Materially Misleading .................................... 18

C.   The AAP Intended for Parents to Rely on the Guidelines ................................................ 19

D.   The Lavines Reasonably Relied on the Guidelines ............................................................ 20

1.   Dr. Chait Relied Upon, and Conveyed the Substance of, the Guidelines .................. 20

2.   The AAP Cannot Hide Behind "Weasel Words" in its Guidelines............................... 22

E.   The AAP's Fraud Caused the Lavines' Harm ....................................................................... 23

1.   This Court Cannot Conclude that Dr. Chait's Recommendation Was a Superseding Cause at the Pleading Stage .................................................................. 23

2.   The Learned Intermediary Doctrine is Unavailing........................................................ 24

III.   The AAP's Semantic Arguments Are Unavailing................................................................ 24

IV.   The Lavines' Claims are not Time-Barred............................................................................ 25

V.   Howard is Irrelevant ................................................................................................................ 27

A.   Howard is Inapposite.............................................................................................................. 28

B.   There is no "Howard Test"...................................................................................................... 28

VI.   The Lavines have Stated a Claim for Constructive Fraud.................................................. 29

CONCLUSION........................................................................................................................................ 29

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Berman v. Gurwicz,*
   189 N.J. Super. 89 (Ch. Div. 1981) ............................................................. 12, 16, 17

*Cruz-Mendez v. ISU/Insurance Services,*
   156 N.J. 556 (1999) ....................................................................................... 23

*Daibo v. Kirsch,*
   316 N.J. Super. 580 (App. Div. 1999) ........................................................... 29

*Dawson v. Bunker Hill Plaza Assocs.,*
   289 N.J. Super. 309 (App. Div. 1996) ........................................................... 23

*Depolink Court Reporting & Litigation Support Services v. Rochman,*
   430 N.J. Super. 325 (App. Div. 2013) ........................................................... 15

*Graves v. Church & Dwight Co.,*
   115 N.J. 256 (1989) ....................................................................................... 25

*Howard v. Univ. of Med. & Dentistry of New Jersey,*
   172 N.J. 537 (2002) ........................................................................... 10, 27, 28

*Hrymoc v. Ethicon, Inc.,*
   467 N.J.Super. 42 (2021) ............................................................................... 13

*Johnson v. Comodo Group, Inc.,*
   2018 WL 10638474 (D. N.J. August 29, 2018) ............................................ 22

*Kaufman v. i-Stat Corp.,*
   165 N.J. 94 (2000) ................................................................................... 13, 16

*Kremer v. A Woman's Place,*
   2009 WL 905064 (3d Cir. 2009) ................................................................... 21

*Ledley v. William Penn Life Ins. Co.,*
   138 N.J. 627 (1995) ....................................................................................... 29

*Lynch v. New Jersey Educ. Ass'n,*
   161 N.J. 152 (1999) ....................................................................................... 17

*Lynch v. Scheininger,*
   162 N.J. 209 (2000) ....................................................................................... 23

*McTernan v. City of York,*
  577 F.3d 521 (3d Cir. 2009) ................................................................... 21, 24

*Niemiera by Niemiera v. Schneider,*
  114 N.J. 550 (1989) ...................................................................................... 13

*Perez v. Wyeth Laboratories. Inc.,*
  161 N.J. 1 (1999) ........................................................................................... 13

*Rabinowitz v. Reyman,*
  2010 WL 2867909 (N.J. Super. Ct. July 23, 2010) ...................................... 28

*Roember v Conlan,*
  52 N.J.L. 53 (1889) ....................................................................................... 17

*Snyder v. American Association of Blood Banks,*
  144 N.J. 269 (1996) ................................................................................ passim

*Spinosa v. Weinstein,*
  168 A.D.2d 32 (N.Y. App. Div. 1991) ........................................................ 28

*State v. Sullivan,*
  24 N.J. 18 (1957) ........................................................................................... 17

*Steinberg v. Sahara Sam's Oasis, LLC,*
  226 N.J. 344 (2016) ...................................................................................... 23

*Teubert v. SRA International, Inc.,*
  192 F.Supp.3d 569 (D. N.J. 2016) ............................................................... 21

*U.S. v. Care Alternatives,*
  952 F.3d 89 (3d Cir. 2020) ........................................................................... 16

*U.S. v. Philip Morris USA Inc.,*
  449 F.Supp.2d 1 (D.D.C. 2006) ..................................................................... 2

*Vispiano v. Ashland Chemical Co.,*
  107 N.J. 416 [1987] ....................................................................................... 25

**Statutes**

*N.J.S.A.* 2A:14-1 .............................................................................................. 25

**Other Authorities**

*Restatement (Second) of Torts* § 539(1)(a) (1977) ......................................... 17

## PRELIMINARY STATEMENT

With great power comes great responsibility. Defendant American Academy of Pediatrics, Inc. ("AAP") wants to influence pediatric health policy but does not want to be held responsible when its policy efforts harm the very children to whom the AAP purports to be dedicated. But that is not right; it also is not the law.

To insulate itself from responsibility, the AAP pretends that this is a medical malpractice claim, thereby availing itself of arguments that are inapplicable in this context. Meanwhile, the AAP ignores what it knows this case to be: an action for fraud arising out of the Lavines' indirect reliance on the policy statements of a leading professional trade association.

Given the (mis)focus of the AAP's motion, it is critical to be clear about what this case is *not*: **This is not a medical malpractice case.** The Lavines do not contend that the AAP is responsible for botching the circumcision of plaintiff Shingo Lavine ("Shingo"). Indeed, the AAP—a trade organization—does not perform circumcisions and thus cannot do so negligently. Rather, the AAP is liable because its fraudulent guidelines caused Shingo's doctor, Jeffrey L. Chait, to recommend and perform a medically unnecessary procedure that ultimately caused Shingo physical and psychological injuries independent of those caused by Dr. Chait's malpractice.

This case also is not a referendum on circumcision. The Lavines recognize that there are many reasons why parents may decide to circumcise their child. This case is not about those decisions. Rather, it is about a medically unnecessary surgery performed on an infant whose parents had no cultural, religious, or other reason to agree to that surgery—a procedure that would not have been performed but for the AAP's self-serving recommendation of routine circumcision.

Having established what the case is *not*, we move on to what it *is*: a fraud case brought against a medical trade association for issuing a report that was intended to, and did, induce its

members to recommend and perform unnecessary surgeries, knowing that recommendation was based on false or incomplete "evidence". The New Jersey Supreme Court has recognized that where, as here, a medical trade association invites reliance on its pronouncements, the association assumes a duty to patients injured because of that reliance.[1]

Until the 1980's, the AAP's guidance on circumcision was roughly in line with that of the rest of the medical world, acknowledging that there was no medical justification for the routine circumcision of newborns. Nevertheless, the practice persisted. However, in the late 1980's, in response to litigation filed against several physicians who performed circumcisions—lawsuits that threatened to curtail the practice—the AAP formed the "Task Force on Circumcision".

The Lavines allege that the mission of that Task Force was not to determine what was best for infants' health, but rather to justify the practice of routine neonatal circumcision. One critical fact, among many, supports this conclusion: the AAP's appointment of Dr. Edgar Schoen as chairman of the Task Force. As the AAP knew or should have known, Dr. Schoen manifested an open zealotry for circumcision and the profits to be derived therefrom. So passionately pro-circumcision was Dr. Schoen that a year before he was appointed to chair the Task Force, he published a vulgar poem entitled, "The Ode to the Circumcised Male". Ex. A.[2]

Dr. Schoen's stated desire (and ultimately that of the AAP Task Force he oversaw) was to "stem the anticircumcision tide." _Id_. And so in 1989, the AAP published the "Report of the Task

---

[1] Sadly, this is not the first time an industry group has put its thumb on the scientific scale, placing the financial interests of its constituents ahead of the public welfare. _See, e.g., U.S. v. Philip Morris USA Inc.,_ 449 F.Supp.2d 1 (D.D.C. 2006) (tobacco industry trade associations falsely denied, distorted and minimized the significant adverse health consequences of smoking for decades).

[2] Unless otherwise indicated, citations to exhibits ("Ex. __") or paragraphs ("¶ __") are to the exhibits and paragraphs of Plaintiffs' amended Complaint.

Force on Circumcision (RE9148)" ("Guidelines"), upon which the AAP expected the medical profession and the public to rely in considering whether to recommend or agree to the circumcision of an infant. Ex. B. The Task Force issued the Guidelines to insulate the AAP's constituency from liability and to ensure that insurance companies would continue to pay for medically unnecessary circumcisions. The Guidelines gave pediatricians an authoritative document to point to when a plaintiff or third-party payer questioned the appropriateness of routine neonatal circumcision.

Unfortunately, the Task Force's guidelines included numerous materially false and misleading statements and made equally misleading omissions that bespeak the AAP's true purpose. The Guidelines thus represented an abdication of the AAP's duty to the public.

The AAP's motion to dismiss, meanwhile, is an attempt to distance itself from its own Guidelines and to avoid the legal consequences thereof. For the reasons discussed below, the AAP's motion should be denied in its entirety.

**STATEMENT OF FACTS**

**I.    Background About the AAP and Circumcision**

The AAP is an organization of physicians who specialize in pediatrics. ¶ 15. It was created in part for the purpose of leading the pediatric community in setting standards of practice and making recommendations for practice. ¶ 16. It does this by voluntarily issuing advisory reports, recommendations, and guidelines on which it expects the medical profession and the general public to rely, and on which the profession and public do in fact rely. *Id*. Additionally, the AAP exists to protect the economic welfare of its members—which it does by actively lobbying federal and state legislatures for laws beneficial to its members. ¶ 15. One of the issues on which the AAP has routinely issued policy statements is male circumcision.

Until 1989, the AAP's publicly expressed view was that elective, non-therapeutic male

circumcision is not medically necessary. ¶ 17-20. This was and is the prevailing medical view in most of the world. ¶ 17. Nevertheless, neonatal circumcision was a routine procedure in the United States in the '70s and '80s. *Id*.

In 1984, a mother named Trudie London fired a shot across the bow of that practice and sent the pediatric community into damage control mode. ¶¶ 21-22. Ms. London filed a lawsuit on behalf of her newborn son, alleging that his circumcision constituted common law battery, willful cruelty, unjustifiable infliction of pain, and child abuse, among other torts. ¶ 21. The lawsuit and its associated press coverage alarmed those in the medical profession who perform circumcisions as a routine and reliably lucrative part of their practice. ¶ 22-23.

The AAP's membership mobilized to justify the medically unnecessary practice. ¶¶ 24. One such AAP member was Dr. Edgar J. Schoen—pediatric endocrinologist, personal friend of the defendant in the *London* case, and circumcision superfan. ¶ 25.

## II.   Dr. Schoen's "Ode to the Circumcised Male"

In 1987, the American Medical Association ("AMA") published a letter to the editor from Dr. Schoen in the *American Journal of Diseases of Children*. Ex. A. Dr. Schoen's letter included a poem entitled "Ode to the Circumcised Male." In his letter, Dr. Schoen acknowledged that medical evidence—and the published views of several respected medical organizations—ran counter to the practice of routine neonatal circumcision:

> Before the mid-1970s, the American standard of care included neonatal circumcision…. More recently, evidence has suggested that adequate hygiene is all that is needed and that circumcision is an unnecessary and traumatic procedure. In 1983, the American Academy of Pediatrics and the American College of Obstetrics and Gynecology jointly agreed that routine circumcision is not necessary…." (*Id.*)

Yet the "Ode" itself offers no medical justification for the practice; rather, it is glibly critical of the decision not to circumcise—for reasons unrelated to the health and wellbeing of infants. Dr.

Schoen's reasons for promoting routine neonatal circumcision are aesthetic (heralding the day when the uncircumcised penis will "rise up in style"), cultural ("if you've been circ'ed or are Moslem or Jewish, you're outside the mode; you are old-ish not new-ish"), and economic ("third-party payers are increasingly refusing to pay for the procedure"). *Id*.

## III.   The AAP Task Force on Circumcision

Despite—or perhaps because of—his patently inappropriate poem and decidedly unorthodox views, the AAP appointed the doctrinaire Dr. Schoen as chairman of the Task Force on Circumcision. ¶ 26. The Task Force issued a report, which the AAP published in its journal, *Pediatrics*, in August 1989. ¶ 27. The Guidelines were a reflection of Dr. Schoen's "Ode": a paean to routine neonatal circumcision, dismissive of the contrary evidence, and driven by fear of the "anticircumcision tide." As such, the Guidelines contained numerous misrepresentations and omissions meant to portray circumcision in a more positive light. Among the material omissions in the Guidelines are the following (*see* ¶ 27):

(1)   The Guidelines conclude that "newborn circumcision is a rapid and generally safe procedure *when performed by an experienced operator*," but fail to disclose that many of the physicians, medical students, and nurses who perform circumcisions are neither well-trained nor experienced in the procedure.

(2)   The Guidelines claim a complication rate of 0.2-0.6% based on concededly inconclusive data, when some studies (none of which are mentioned) fix the complication rates as high as 13%.

(3)   The Guidelines misrepresent the rate of severe complications, which is as high as 2-4%.

(4)   The Guidelines make no mention of complications that occur later in childhood or during adulthood, including painful erections, scrotal webbing, hypersensitivity of the glans, and unsatisfactory cosmetic appearance.

(5)   The Guidelines falsely state that there is "no evidence that meatitis leads to stenosis of the urethral meatus," when in fact meatal stenosis occurs in 5-30% of boys following circumcision.

5

(6)   The Guidelines do not mention the salutary functions of the foreskin, including the protection of the glans, or head, of the penis.

(7)   The Guidelines do not mention the feelings of anger, regret, and guilt among some parents who allow their children to be circumcised for no medical or cultural reason.

(8)   The AAP does not disclose the financial interest of its members in performing routine neonatal circumcision.

(9)   The AAP does not disclose the gross bias of the Task Force's chairman in favor of circumcision.

(10)   The Guidelines give the false impression that neonatal circumcision is a routine practice outside the United States.

(11)   The Guidelines ignore the controversy in the American medical community around circumcision.

(12)   The Guidelines fail to mention that non-therapeutic circumcision is inconsistent with the American Medical Association's Code of Medical Ethics.

(13)   The Guidelines understate the pain endured by infants who undergo circumcision.

(14)   The Guidelines fail to disclose the documented incidences of psychological harm and trauma experienced among adult males circumcised at birth.

(15)   The Guidelines cite methodologically flawed studies to support the AAP's claim that circumcision may reduce the rate of urinary tract infections in male infants.

(16)   The Guidelines reference cancer statistics in a misleading manner to falsely suggest that neonatal circumcision is an effective and worthwhile prophylaxis against cancer.

## IV.   Shingo's Circumcision

When Shingo Lavine was born in 1997, the Guidelines were still the AAP's last word on circumcision. ¶ 31. Almost immediately after the birth, Dr. Chait—the obstetrician who delivered Shingo—solicited Adam's verbal consent to have Shingo circumcised. ¶ 36. Dr. Chait informed him that the AAP had issued guidelines about circumcision showing that circumcision reduces the incidence of urinary tract infections and penile cancer, among other maladies. *Id.* In conformity with the 1989 Guidelines, Dr. Chait portrayed circumcision as a minor, safe, harmless, and

medically beneficial procedure, as well as a routine and normal part of childbirth. *Id.* In reliance upon those representations, Adam agreed to have Shingo circumcised. ¶ 37.

After the circumcision, Dr. Chait expressed concern about the procedure and, subsequently, Shingo underwent a "second circumcision" to correct Dr. Chait's negligently performed circumcision. ¶¶ 39-41. The doctor who performed the second surgery told the Lavines that "Shingo should do very well with the circumcision," and they believed him. ¶ 41.

When Shingo reached adolescence, he began to experience urological issues. ¶ 44. Indeed, Shingo began to experience many of the negative effects of circumcision that the AAP had excluded from the Guidelines, including impaired sexual functioning, hypersensitivity of the glans, and emotional distress. ¶ 44. However, due to circumcision's prevalence in the United States, Shingo had no reason to suspect that his issues were related to the circumcision performed upon him as an infant. ¶ 44. Significantly, none of Shingo's treating physicians ever suggested such a connection. ¶ 43.

## V.    The Lavines Discover the Fraud

As an adult, Shingo decided to research his symptoms on his own. ¶ 45. Eventually, Shingo's research led him to accounts of other men experiencing similar issues, and the common denominator: circumcision. ¶ 45. Concerned about the apparent connection between his penile issues and his circumcision, Shingo made an appointment with Dr. Gabriella Avellino, a top urologist at Brown University. ¶ 49. Dr. Avellino dismissed Shingo's concerns and went so far as to extol the purported benefits of circumcision (using deeply flawed studies). ¶ 49.

Had Shingo not been introduced to Professor Peter Adler at the University of Massachusetts, Shingo and his parents might have continued believing Shingo's issues were unrelated to his circumcision. ¶ 50. Professor Adler is a legal scholar who has focused much of his

academic energy on circumcision. *Id.* Professor Adler—who understood the medical landscape in a way the Lavines, as laypeople, could not—explained to the Lavines how the AAP had misrepresented or excluded critical facts from its 1989 Guidelines. In so doing, Professor Adler revealed the fraud that had been perpetrated by the AAP.

Not long after, on February 4, 2021, the Lavines commenced this lawsuit against the AAP and Princeton Medical Group, P.A. in New Jersey Superior Court. On September 7, 2021, the Lavines voluntarily dismissed Princeton, creating diversity jurisdiction, and the AAP removed the case to this Court.

## ARGUMENT

The "elephant in the room" is the New Jersey Supreme Court's decision in *Snyder v. American Association of Blood Banks*, 144 N.J. 269 (1996), which held that a medical trade association bears responsibility to members of the public who are damaged as an indirect result of positions taken by that trade association. When the AAP first moved to dismiss the Lavine's complaint (and while this action was pending before the New Jersey Superior Court) the Lavines filed an opposition brief explicitly stating their reliance on *Snyder* and explaining why that decision is dispositive here. *See* ECF Doc. No. 1-3 at pp. 105-107 of 122. Since then, the AAP has filed two motions to dismiss in this Court (one directed at the original complaint, post-removal, and the current one, directed at the amended Complaint). Neither of those motions even mentions *Snyder*. Instead, the AAP persists in pretending that this is a medical malpractice case and asks the Court to apply a nonexistent "test" from the inapposite decision of a foreign jurisdiction.

*Snyder* lays out precisely why the AAP can and should be held liable to the Lavines for fraud under these circumstances. It (a) explains how a medical trade association like the AAP assumes a duty to its members' patients when it stakes out a policy position; (b) rejects the

argument that medical "opinions" are inconclusive, focusing instead on the foreseeability that such "opinions", if relied upon, could lead to injury; (c) notes the importance of the trade association's financial interest in determining liability; and (d) concludes that "fairness and policy" demand that unregulated medical professional associations be held responsible to patients for their policy statements. The AAP, of course, challenges none of this.

Moreover, the Lavines have adequately pleaded all the elements of common-law fraud—with the requisite specificity—including (a) nearly twenty specific misrepresentations and omissions of fact from the 1989 Guidelines, (b) facts (including the AAP's own admissions) demonstrating that the AAP knew the Guidelines contained false and misleading statements and material omissions, (c) facts (including the AAP's own admission) showing that the AAP intended for the Lavines and other parents of newborns to rely on the Guidelines, (d) that the Lavines indirectly and reasonably relied on the Guidelines in agreeing to the circumcision, and (e) that the circumcision caused injury to the Lavines.

The AAP does not meaningfully dispute that the Lavines have met the pleading standard. Instead:

- The AAP mischaracterizes the misstatements and omissions of fact identified in the Complaint as "mere opinion". They are not.  In any event, medical opinions may form the basis for a fraud claim.

- The AAP argues that it cannot be held liable for omissions. Not all the alleged misstatements are omissions but, here, even the AAP's omissions are actionable: the AAP assumed a duty of candor when it chose to make a public policy statement.

- The AAP's suggestion that the Lavines do not allege the AAP's knowledge or intent is belied by the very text of the pleading itself.

- The AAP concedes that the Lavines are proceeding on a theory of indirect reliance but contends that the Lavines' allegation that they relied on the Guidelines is inadmissible hearsay. *First,* it isn't; *second*, admissibility is not a consideration on a Rule 12(b)(6) motion to dismiss.

- The AAP claims it is immunized by "disclaimers" in the Guidelines, but those "disclaimers" are neither logically nor legally exculpatory.

- The AAP claims that Dr. Chait's negligence in botching the circumcision is a superseding cause that breaks the chain of causation, but the AAP has it backwards: Dr. Chait would never have performed the surgery in the first place if the AAP had not issued the false and misleading Guidelines.

- Similarly, the "learned intermediary" doctrine on which the AAP relies, were it applicable here, would compel the conclusion that the AAP is liable to the Lavines.

The AAP's remaining arguments are equally ineffectual:

- The Lavines' claims are not barred by the two-year statute of limitations for medical malpractice because this is not a malpractice case.

- The Lavines' claims are not barred by the six-year statute of limitations for fraud because the Lavines did not discover the AAP's fraud until last year, and the AAP's motion itself concedes that Shingo's fraud claims are not time-barred.

- The AAP is not immunized from suit because the Guidelines are not actually called "guidelines"—semantics aside, the Guidelines are precisely the sort of public policy statement that the *Snyder* court found actionable.

- The AAP is not immunized from suit because it was the publisher of the Guidelines; the AAP was not *only* the publisher—it convened the Task Force, appointed the Task Force's Chair, and endorsed the Task Force's report.

- Finally, the AAP's reliance on the New Jersey Supreme Court's decision in *Howard v. Univ. of Med. & Dentistry of New Jersey*, 172 N.J. 537, 548 (2002) deserves special mention because (a) it is wholly inapposite and (b) the two-part test the AAP ascribes to *Howard* was not applied in *Howard*, nor was it even New Jersey law.

## I.    The New Jersey Supreme Court's Decision in *Snyder* Establishing Trade Association Liability is Dispositive

In 1996, the New Jersey Supreme Court held that a medical trade association bears responsibility to members of the public who are damaged as an indirect result of positions taken by that trade association. *Snyder v. American Association of Blood Banks*, 144 N.J. 269 (1996). The trade association sued in *Snyder* was the American Association of Blood Banks ("AABB").

10

The AABB had no connection with the plaintiff in that case, who had contracted HIV from a blood transfusion, or with the donor of the transfused blood. *Id.* at 291. Nevertheless, the Court found that the AABB was liable to the plaintiff for his injuries. *Id.* at 272-73.

Like the AAP, the AABB was recognized as a thought leader in its industry. *Id.* at 277-78. At the time the plaintiff received the transfusion, it was the AABB's position that CDC data regarding the transmissibility of AIDS through blood transfusions was "inconclusive." *Id.* at 287. Thus, while conceding that "there are laboratory and clinical findings that are present in nearly all AIDS patients," the AABB "[did] not advise routine implementation of any laboratory screening program for AIDS by blood banks at [that] time." *Id.* at 287-288.

Notwithstanding the AABB's lack of any direct connection to the plaintiff, and without any apparent regard for whether the blood bank's failure to test the blood was in direct reliance on the AABB's policy statement, the Court found that "the imposition of liability on the AABB is both fair and reasonable." *Id.* at 307. The parallels between *Snyder* and this case are inescapable and, when the analysis performed in *Snyder* is applied to the facts of this case, the inexorable conclusion is that the Complaint states a valid cause of action against the AAP.

The *Snyder* court considered several factors in determining whether to hold the AABB liable, including (a) the relationship between the parties, (b) the nature and foreseeability of injury, (c) the interests of the defendant, and (d) the impact on the public of the imposition of a duty of care. 144 N.J. at 292. Each of these factors weighs in favor of finding the AAP liable to the Lavines.

### A.   The AAP Affirmatively Assumed Responsibility for the Health and Well-Being of its Constituents' Patients

As noted above, the AABB's lack of any immediate or direct connection with the plaintiff in *Snyder* was not a bar to liability. *See* 144 N.J. at 292 ("The absence of a…special relationship [between the plaintiff and defendant] is not dispositive."). Likewise, the lack of any direct

connection between the AAP and the Lavines is not fatal to the Lavines' claim.

The *Snyder* court found that the AABB had assumed a duty to patients because it had invited their reliance. 144 N.J. at 293 ("By words and conduct, the AABB invited blood banks, hospitals, and patients to rely on the AABB's recommended procedures."). Likewise, the AAP, by its words and conduct, invited other medical associations, physicians, and patients to rely upon the AAP's reports, recommendations, and guidelines. ¶¶ 2, 16. Thus, like the AABB, the AAP sought and cultivated responsibility for the health and well-being of its constituents' patients. ¶ 2. *Compare Snyder*, 144 N.J. at 293 ("Society has not thrust on the AABB its responsibility for the safety of blood and blood products. The AABB has sought and cultivated that responsibility."). And, like the AABB, the AAP should be held liable for its abdication of that responsibility.

The Court's reasoning in *Snyder* echoes three well-established New Jersey common-law doctrines: the principle that one who voluntarily speaks must speak the full truth; the doctrine of indirect reliance, and the "learned intermediary" doctrine.

### 1.    Assumed Duty to Inform

The Court's finding in *Snyder* that the AABB owed a duty to inform is grounded in the doctrine of *aliud est celare; aliud tacere* ("to conceal is one thing; to be silent another"). "Although a party may keep absolute silence and violate no rule of law or equity, yet if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to discover the whole truth." *Berman v. Gurwicz*, 189 N.J. Super. 89, 93 (Ch. Div. 1981) (quoting *Pomeroy, Equity Jurisprudence*, (5 ed. 1941), § 901a). By taking a position on the advisability of laboratory testing, the AABB assumed a duty to give a full and honest account of the science behind it. Likewise, by taking a position on the advisability of routine neonatal circumcision, the AAP assumed a duty to give a full and honest account of the science behind it.

12

### 2.      Indirect Reliance

Although the general rule (on which the AAP relies) is that there must be actual receipt and consideration of any misstatement, a plaintiff may state a claim for fraud where the defendant communicated the false statement to a third party with the intention that the victim hear and rely on it and that third party conveyed the misrepresentation to the plaintiff. *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 108 (2000). In this regard, the indirect reliance doctrine (which is discussed further below) dovetails nicely with the lessons in *Snyder* and further cements the AAP's liability in this case.

### 3.      Learned Intermediary

The learned intermediary doctrine arises in products liability cases involving manufacturers of drugs or medical devices. That doctrine recognizes "the physician's responsibility to pass on to the parties the information that enables the patient to use the product safely." *Niemiera by Niemiera v. Schneider*, 114 N.J. 550, 559 (1989); *Perez v. Wyeth Laboratories, Inc.,* 161 N.J. 1, 10 (1999). Thus, the drug or device manufacturer generally has a duty to warn the prescribing physician— rather than the patient—of the risks of using the drug. *Hrymoc v. Ethicon, Inc.*, 467 N.J.Super. 42, 85 (2021). The patient nevertheless may sue the manufacturer directly. *See, e.g., Perez, Niemiera, Hrymoc*. Thus, the learned intermediary doctrine, while not directly applicable here, further undermines the AAP's attempts to avoid liability.

### B.      The Risk that the AAP's Guidelines Would Cause Severe Harm was Foreseeable

The *Snyder* court found that, because reputable medical sources had expressed the belief that the AIDS virus could be transmitted by blood and blood products, "the AABB should have foreseen that a blood transfusion could transmit AIDS." 144 N.J. at 294. Here, the AAP knew that reputable medical sources had expressed the belief that neonatal circumcision could result in

serious injury to the patient and his family. *See* ¶¶ 17-20; MTD at 26. Indeed, one of those reputable medical sources was *the AAP itself*, which—until the *London* case—had acknowledged the lack of valid medical indications for routine neonatal circumcision. ¶¶ 18-20. Because the AAP was aware of reliable evidence that routine neonatal circumcision could cause severe harm (evidence it intentionally downplayed or outright excluded from its Guidelines), it obviously could and should have foreseen that harm.

The AAP's suggestion that the Guidelines are mere "medical opinions" or "statements as to future or contingent events" about which reasonable minds could differ does not alter the analysis. *See, e.g.*, MTD at 22-26. The *Snyder* court held that "the foreseeability, not the conclusiveness, of harm" is what matters. 144 N.J. at 294; *see also id.* at 306 (Even where an issue is "fraught with uncertainty, debate, trial and error, and even failure…[a]t some point in the process…participants should recognize that they have enough information to act responsibly and that the failure to act would be irresponsible.").

Having previously issued its own publications stating the risks of circumcision (*see* ¶¶ 19-20), the AAP cannot now claim that those risks were not reasonably foreseeable.

## C.    The AAP's Members have a Substantial Financial Interest in the Promotion of Routine Neonatal Circumcision

Like the AABB, notwithstanding the "altruistic overtones" of its mission statement, the AAP "represents its interests and those of its members." 144 N.J. at 297; *see also* ¶15. And the AAP's members have a substantial financial interest in the routine performance of neonatal circumcision—an interest that was at risk at the time the AAP promulgated the Guidelines. *See, e.g.*, ¶¶ 21-23; *see also* Ex. A ("Third-party payers are increasingly refusing to pay for the procedure."). That risk was the motivation behind the grossly and intentionally misleading Guidelines. ¶¶ 24-30.

*Snyder* teaches that a professional medical organization that puts its members' financial interests ahead of their patients' welfare can be held liable for the consequences of those inverted priorities. 144 N.J. at 296. The AAP's paramount responsibility was to protect the health and safety of its members' patients; recognition of that responsibility should have led the AAP to consider more carefully the risks to infant males from non-medically indicated neonatal circumcision. *Id.* Having failed to do so, the AAP cannot now escape liability.

### D.      If the AAP Cannot be Sued, the AAP Cannot be Held Accountable

Ultimately, the Supreme Court's decision to hold the AABB liable to members of the public was grounded in principles of "fairness and policy." 144 N.J. at 292. As a private organization, the AAP (like the AABB) is not answerable to any regulatory body; nor are its practices governed by any specific rules or statutes. If the AAP were not liable to patients injured by its failure to prioritize their health and safety over the economic interests of its members, then the AAP—an organization with considerable influence over public health policy—would be accountable to no-one but its own membership. As demonstrated by the facts of this case, when that membership is led by misguided zealots like Dr. Schoen, children suffer. Thus, fairness and policy demand that the AAP be held accountable to the Lavines for the fraudulent Guidelines that led to Shingo's severe injuries.

## II.     The Lavines have Adequately Pleaded the Elements of Fraud

In order to prevail on a common law fraud claim under New Jersey law, a plaintiff must show that the defendant (1) made a representation or omission of a material fact, (2) with knowledge of its falsity, (3) intending that the misrepresentation be relied upon, (4) which resulted in reasonable reliance, (5) with the plaintiff suffering damages. *Depolink Court Reporting & Litigation Support Services v. Rochman*, 430 N.J. Super. 325, 336 (App. Div. 2013). Here, the Lavines have successfully pleaded all five elements of fraud. Therefore, the AAP's motion must

be denied in its entirety.

### A.      The Lavines have Identified with Particularity the Allegedly Fraudulent Representations and Omissions

The Complaint identifies well over a dozen material misrepresentations and omissions by the AAP in the Guidelines. *See* ¶ 27, Ex. B. Faced with these allegations, the AAP puts forward two flawed arguments. *First*, the AAP argues that the Guidelines' endorsement of circumcision is a non-actionable statement of "mere opinion,"—ignoring the fact that its *opinion* purported to be based on medical *facts* which were fraudulently misrepresented. *Second*, the AAP argues that its omissions cannot be the basis for a fraud claim because it did not owe the Lavines a duty to disclose—but, as *Snyder* (trade association liability), *Berman* (*aliud est celare; aliud tacere),* and *Kaufman* (indirect reliance) teach us, that is not the law in New Jersey.

### 1.      The Guidelines are not "Mere Opinions"

The AAP contends that it cannot be held liable for the misstatements in the Guidelines because the Guidelines merely describe the AAP's "medical opinion on the safety of circumcision." MTD at 9; *see also id.* at 21-23. But "the common-law definition of fraud permits a finding that subjective opinions may be considered false and that medical opinions can be false and are not shielded from scrutiny." *U.S. v. Care Alternatives*, 952 F.3d 89, 100 (3d Cir. 2020).

A medical "opinion" is still based on facts, and the Lavines have identified at least sixteen indisputably factual misstatements and omissions that bear directly on the AAP's recommendation in the Guidelines. Thus, to the extent the AAP's Guidelines constitute "mere opinion," that "opinion" remains actionable because the AAP misrepresented its factual basis:

> A statement of opinion as to facts not disclosed and not otherwise known to the recipient may, if it is reasonable to do so, be interpreted by him as an implied statement (a) that the facts known to the maker are not incompatible with his opinion; or (b) that he knows facts sufficient to justify him in forming it.

*Restatement (Second) of Torts* § 539(1)(a) (1977); *see also Roember v Conlan*, 52 N.J.L. 53, 56 (1889) (Opinion may be fraudulent "if, in connection with the expression of opinion, there were false assertions of fact calculated, if true, to give a basis for the opinion.").[3]

The New Jersey Supreme Court applied this venerable common-law principle to a medical opinion in *State v. Sullivan*, 24 N.J. 18 (1957), when it affirmed the perjury conviction of a doctor. As the dissenting justices in that case acknowledged:

> A Medical opinion is a conclusion from Facts. If a physician swears to the truth of those Facts, proof by qualified observers that the facts were otherwise may well suffice to sustain perjury charge[s] with respect to the testimony as to such facts. (24 N.J. at 44.)

Thus, the AAP's argument that the Guidelines are "mere opinion" is unavailing.

### 2.    The AAP Can and Must be Held Liable Even for its Omissions

The AAP contends that the AAP cannot be held liable for its omissions because the AAP did not owe the Lavines a duty to inform. MTD at 25. First, not all the alleged misrepresentations are omissions. For example, the AAP misstated the incidence of post-operative complications, falsely stated that "there is no evidence that meatitis leads to stenosis of the urethral meatus," and purported to rely on studies it knew were faulty. ¶ 27. Second, the AAP assumed a duty to inform when it chose to speak out on the topic of routine neonatal circumcision. *See Berman*, 189 N.J. Super. at 93; *Snyder*, 144 N.J. at 292. Thus, once the AAP chose to issue a policy statement on circumcision intended to influence the conduct of physicians and patients alike, it assumed a duty to tell the whole truth. As detailed in the Complaint, it fell far short of that goal. ¶ 27.

---

[3] A similar principle applies in defamation cases. *See Lynch v. New Jersey Educ. Ass'n*, 161 N.J. 152, 167 (1999) ("[O]pinion statements do not trigger liability unless they imply false underlying objective facts.").

**B.      The AAP Knew that its Guidelines were Materially Misleading**

In an odd reversal of the pleading standard, the AAP contends that the Lavines have failed to plead this element of fraud because the Complaint does not contain a conclusory allegation that the AAP knew the Guidelines were misleading. MTD at 26 ("Plaintiffs do not directly assert that the Academy knew the alleged false representations and omissions set forth in the 1989 report were false."). *But see* ¶ 59. Regardless, the facts alleged in the Complaint establish that the AAP knew or should have known of the contrary facts it omitted from the Guidelines. For example:

(1) The AAP had published a pamphlet in 1984 that went into detail about the salutary functions of the foreskin, yet deliberately omitted any discussion of the function of the foreskin from its 1989 Guidelines. (¶ 20)

(2) The AAP has acknowledged that "the principal clinicians who perform newborn circumcisions in medical settings" lack consistent training or experience and that even the AAP lacks the ability to determine the effectiveness of that training or experience, yet the Guidelines make no mention of that critical fact in stating the AAP's conclusion that "newborn circumcision is a rapid and generally safe procedure when performed by an experienced operator." (¶ 27, n.4)

(3) The AAP was on notice of at least two lawsuits claiming that circumcision constituted a common law battery, yet gave the false impression in the Guidelines that circumcision is an uncontroversial procedure. (¶¶ 21-23)

(4) The AAP knew that the chair of its Task Force saw himself as a crusader against the rising "anti-circumcision tide," yet failed to disclose that bias. (¶ 25-26)

(5) The AAP failed to disclose the financial interest of its members in promoting unnecessary circumcisions (a fact of which it obviously was aware) and the increasing refusal of third-party payers to cover the procedure (a fact of which Dr. Schoen was vocally aware). (¶ 23, Ex. A)

(6) The AAP knew that "optimal hygiene confers as much or nearly as much protection against penile cancer as circumcision," yet it misleadingly suggested that prophylaxis against cancer is a valid basis for routine neonatal circumcision. (¶ 27)

Moreover, to the extent the AAP—the pre-eminent pediatric organization in the country—contends that it was not aware of the many medical facts omitted from the Guidelines, in so doing

it admits to a reckless disregard for the truth.

The AAP argues that the Guidelines belie such a disregard because the report cites some studies discussing the connection between circumcision and urinary tract infections (which it relegated to footnotes). MTD at 26. But those footnotes prove the Lavines' point: the AAP was aware of contrary studies and knew the Guidelines did not fully or accurately present the prevailing medical wisdom regarding circumcision. Yet, instead of ensuring that its report was accurate and complete, the AAP cherry-picked some studies (on only one of the many issues that were misrepresented in the Guidelines) to give the report a veneer of objectivity while omitting those facts and studies that truly undermined the AAP's conclusions. ¶ 27.

### C.    The AAP Intended for Parents to Rely on the Guidelines

The Complaint alleges that the AAP "holds itself out as an organization to whom medical professionals, parents and the public alike may turn for accurate, complete, and unbiased guidance." ¶ 2. The Guidelines themselves are concerned with the decision to circumcise an infant—a decision that ultimately must be made by parents like the Lavines. Indeed, the last sentence clearly signals the AAP's intent that the contents of the Guidelines be used to explain the risks to the parents and obtain their consent. Ex. B at 625. Thus, there can be no question that the facts alleged in the Complaint establish the AAP's intent to have parents rely on the Guidelines, albeit indirectly.

Further, contrary to the AAP's contention, the Lavines also have alleged that the AAP intended to derive a benefit from its misrepresentations: the continuation of the lucrative practice of routine neonatal circumcision, which is of significant financial benefit to the AAP's members. ¶ 23. The Chair of the Task Force also had such an intense personal desire to perpetuate the practice that he authored a poetic rallying cry against the "anticircumcision tide". Ex. A.

19

The AAP argues that the Lavines have failed to plead intent because they do not allege that they "received and actually considered the medical opinions proffered in the [Guidelines]." MTD at 27. But the AAP conflates intent with reliance: what the Lavines received or relied on is immaterial to what the AAP intended. Moreover, as discussed below, even though the Lavines did not directly receive the Guidelines, the AAP is liable under a theory of indirect reliance.

**D.     The Lavines Reasonably Relied on the Guidelines**

The AAP argues that the Lavines could not have relied on the Guidelines because they never actually received them; however, it is immaterial that the Lavines never personally reviewed the Guidelines because they seek to hold the AAP liable under a theory of indirect reliance. The AAP also argues that (1) the Complaint does not support a theory of indirect reliance because the Lavines have not alleged that Dr. Chait relied upon the Guidelines and (2) neither Dr. Chait's nor the Lavines' reliance on the Guidelines would have been reasonable in light of vague "disclaimers" included in therein. Both arguments are without merit.

**1.     Dr. Chait Relied Upon, and Conveyed the Substance of, the Guidelines**

Here, the Lavines allege that Dr. Chait told them that the AAP had issued guidelines on circumcision that extolled its benefits in reducing the incidence of UTI's, penile cancer and sexually transmitted diseases. ¶ 36. Moreover, the Lavines allege that Dr. Chait did not disclose any of the pertinent facts that were omitted from the AAP's Guidelines. *Id*. And, of course, the Lavines allege that they did rely on Dr. Chait's statements. ¶ 37. Further, as discussed further below, the Lavines have alleged that they (as parents of a newborn) were the intended recipients of the Guidelines' message. Thus, the Lavines have alleged that they (indirectly) received and relied upon the substance of the Guidelines.

The AAP nevertheless contends that the Lavines failed to allege indirect reliance because

it is supposedly unclear whether the "guidelines" to which Dr. Chait referred were the same Guidelines attached to the Complaint. This argument is specious, especially at the motion to dismiss stage.

*First*, the Lavines expressly allege that "the pre-procedure picture painted by Dr. Chait [was] based explicitly upon defendant the AAP's then-current guidelines…." ¶ 39. In 1997, when Shingo was born, the Guidelines were the AAP's operative statement on circumcision. ¶ 31

*Second*, even if the Lavines had not made that explicit allegation, the only reasonable inference to be drawn from the doctor's statement that "the AAP had issued guidelines about circumcision showing that circumcision reduces the incidence of urinary tract infections and penile cancer, among other maladies," is that Dr. Chait was referring to the Guidelines—the AAP's most recent statement at that time and the only one that claimed circumcision would reduce the incidence of urinary tract infections and cancer. ¶¶ 27, 31, 36.

*Third*, even if there were other plausible interpretations of Dr. Chait's statement, this Court must draw all reasonable inferences in favor of the Lavines. *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) ([I]n deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them.") (internal quotation marks and citation omitted).

Finally, Dr. Chait's statements about circumcision are not, as the AAP contends, "inadmissible hearsay." MTD at 20. The Lavines are not offering Dr. Chait's statements for their truth—as the Lavines have established, many of those statements were not true—but rather to show that Dr. Chait conveyed to the Lavines the substance of the Guidelines and based his recommendation on those Guidelines. *See Kremer v. A Woman's Place*, 2009 WL 905064, at *188 (3d Cir. 2009); *Teubert v. SRA International, Inc.*, 192 F.Supp.3d 569, 578 (D. N.J. 2016). Thus,

the AAP's assertion that "the plaintiffs will never be able to show what Dr. Chait meant by his supposed reference" must be rejected—not only because it is wrong, but because whether the Lavines' factual allegations are supported by admissible evidence is not a proper question at the motion to dismiss stage. *See Johnson v. Comodo Group, Inc.*, 2018 WL 10638474, at *1 (D. N.J. August 29, 2018) ("At the pleading stage, plaintiff may assert statements in his Complaint that might later be considered inadmissible hearsay at a subsequent stage of the litigation.").

### 2.      The AAP Cannot Hide Behind "Weasel Words" in its Guidelines

The AAP also argues, incomprehensibly, that the Guidelines are "not even making a recommendation," citing a "disclaimer" which itself refers to "[t]he ***recommendations*** in this statement…." MTD at 23, quoting Ex. B at 623 (emphasis added). Looking past the internal contradictions, the gist of the AAP's argument appears to be that no one could reasonably have relied on the AAP's recommendation of routine neonatal circumcision because the Guidelines admit the possibility that circumcision might not be appropriate in every case and acknowledge that there are associated risks. MTD at 23. The Guidelines, argues the AAP, leave the decision entirely to the discretion of the pediatrician. That is disingenuous at best.

The stated premise of the Guidelines is that "new evidence" calls into question the established medical view that "there is no absolute medical indication for routine circumcision of the newborn." Ex. B at 623. Using that as a starting point, the Guidelines proceed to discuss the supposed factual basis for the Task Force's recommendations. *See, generally,* Ex. B. As alleged in the Complaint, however, that factual basis was intentionally incomplete and misleading. Thus, when the AAP claims the Guidelines "leave[] that judgment to the treating doctor," it proves too much: by issuing biased Guidelines that did not contain a complete, objective account of the pertinent medical literature, the AAP robbed treating doctors (and thus the parents of their patients)

22

of the ability to make their own reasoned medical judgments.

In any event, any purported pre-injury disclaimer of liability for conduct more serious than negligence is contrary to New Jersey public policy. *See, e.g., Steinberg v. Sahara Sam's Oasis, LLC*, 226 N.J. 344, 359 (2016) (pre-injury waiver could not immunize defendant from violation of statutory duty or gross negligence).

### E.  The AAP's Fraud Caused the Lavines' Harm

Proximate cause is "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." *Dawson v. Bunker Hill Plaza Assocs.*, 289 N.J. Super. 309, 322 (App. Div. 1996). There is no dispute that the Lavines' injuries stem from Shingo's circumcision. And, but for the fraud in the AAP's Guidelines, Adam and Aiko would never have consented to the circumcision and Shingo would not have been circumcised. ¶ 52. Thus, the Lavines have stated a prima facie case that the AAP's fraud was the proximate cause of Shingo's injuries.

The AAP argues that the Lavines have failed to plead causation because Dr. Chait's recommendation was an "intervening, superseding event that would relieve the [AAP] of any liability for the failed circumcisions…." MTD at 30. The AAP purports to support this argument by citing the Restatement on superseding cause and by invoking the learned intermediary doctrine. *Id.* at 24-25, 30-31. Both approaches fail.

### 1.  This Court Cannot Conclude that Dr. Chait's Recommendation Was a Superseding Cause at the Pleading Stage

Causation—and in particular a determination of superseding cause—is a fact-based question ordinarily left to a jury. *Lynch v. Scheininger*, 162 N.J. 209, 235 (2000). Additionally, superseding or intervening causes that are reasonably foreseeable or are normal incidents of a risk do not relieve a tortfeasor of liability. *Cruz-Mendez v. ISU/Insurance Services*, 156 N.J. 556, 575

(1999). Many of Shingo's injuries—hypersensitivity, uncomfortable erections, and emotional distress—are complications that arise from "normal" circumcisions. *See* ¶¶ 27, 44, 45, 48. Thus, the damage that Shingo suffered was a reasonably foreseeable outcome and a normal incident of risk related to circumcision. To the extent the AAP disputes that conclusion, it is free to present its case to a jury; on a motion to dismiss, however, the Court must accept the Lavines' allegations as true and draw all plausible inferences in their favor. *McTernan*, 577 F.3d at 526.

Dr. Chait's negligence did not break the chain of causation. Quite to the contrary, Dr. Chait would never have performed the botched circumcision if the AAP had not issued its fraudulent report because Adam would not have consented to the procedure in the first place.

### 2.    The Learned Intermediary Doctrine is Unavailing

The AAP inaptly invokes the learned intermediary doctrine to argue that "Dr. Chait's duty to exercise his independent medical judgment and his failure to perform a circumcision properly are intervening causes here." MTD at 24. The AAP misconstrues and misapplies that doctrine. As noted above, the learned intermediary doctrine does not relieve a pharmaceutical manufacturer of liability to the patient because its duty to warn runs to the doctor. To the contrary, a pharmaceutical manufacturer is liable *to the patient* when it (*i.e.* the manufacturer) fails to adequately warn *the doctor*. Thus, to the extent the learned intermediary doctrine has any application here, it further compels the conclusion that the AAP should be held liable for its fraud. *See* section IA3, above.

### III.   The AAP's Semantic Arguments Are Unavailing

The AAP advances two additional arguments that are semantic, pedantic, and—most importantly—unavailing: (a) the AAP seeks to avoid liability by characterizing itself as a mere "publisher" of the Guidelines—despite having also been the instigator and author of that report—and (b) the AAP seizes on the Lavines' use of the word "guidelines" to argue that Dr. Chait must

have been referring to something other than the 1989 "report"—as if that distinction were meaningful in this context. The Court should reject both arguments out of hand.

## IV.    The Lavines' Claims are not Time-Barred

The AAP concedes that Shingo's fraud claim is timely under N.J.S.A 2A:14-1, insofar as Shingo filed this lawsuit within six years of his 18th birthday,[4] but argues that Adam and Aiko's claims accrued in 1998 and thus are time-barred.[5] That argument fails because Adam and Aiko were not aware they had been defrauded until September 2020. Indeed, for 22 years, medical professionals obscured the connection between Shingo's injuries and his circumcision.

The statute of limitations for fraud is six years (N.J.S.A. 2A:14-1), but the running of the statute is tolled by the "discovery rule". "The discovery rule is a rule of equity that allows the tolling of the statute of limitations when a party is either unaware that he has sustained an injury, or although aware that an injury has occurred, he does not know that it is, or may be, attributable to the fault of another." *Graves v. Church & Dwight Co.*, 115 N.J. 256, 262 (1989).

Where the nature of the case or injury makes discovery less readily ascertainable, the tolling of the statute of limitations becomes more critical. *Vispiano v. Ashland Chemical Co.*, 107 N.J. 416, 434 [1987]. In *Vispiano*, which involved a toxic tort, the court held that the injured person was unaware of the cause of his injury and, lacking specialized medical knowledge, he could not in the exercise of reasonable diligence have discovered it. *Id* at 435. The Lavines lacked the specialized medical knowledge necessary to discover the AAP's fraud and did not find an objective

---

[4] Shingo turned 18 in December 2015; this action was commenced in New Jersey Superior Court on February 4, 2021, within the 6-year statute of limitations for fraud. *See N.J.S.A.* 2A:14-1.

[5] The AAP's contention that all the Lavines' claims are barred by the 2-year statute of limitations for medical malpractice actions is inapposite since the Lavines' claims are for fraud.

expert until September 2020.

In 1998, the Lavines had no reason to believe that the AAP Guidelines cited by Dr. Chait contained material misrepresentations and omissions. All they knew at that time was that there were some medical concerns about Shingo's penis. ¶¶40-41. The physician who performed Shingo's "second circumcision" (which was presented to the Lavines as a routine procedure) told the Lavines after performing that surgery that "Shingo should do very well…." ¶ 41. For years, that seemed to be the case.

Although Shingo underwent yearly physical examinations, his doctors never suggested there was anything irregular about Shingo's penis. ¶ 43. When Shingo eventually began to experience urological issues in his adolescence, Shingo and his parents had no reason to connect those issues to the circumcision, and Shingo's doctors certainly did not make that connection for them. ¶ 44. Even after Shingo began to suspect that his issues stemmed from the circumcision, a top urologist at Brown University assured him—as recently as August 2020—that was not the case. ¶ 49.

The Lavines, all of whom lack medical training, reasonably relied on the medical profession for 22 years. It was not until Shingo's own investigations brought the Lavines to Professor Peter Adler in September 2020 that the curtain was pulled back. ¶ 50. Professor Adler, who has devoted himself to the study of circumcision, explained to the Lavines the various misrepresentations and omissions in the Guidelines. The Lavines could not have known they were defrauded by the AAP until they learned that the Guidelines were misleading. Thus, the Lavines' fraud claims accrued— and the statute of limitations began to run—in September 2020.

The AAP contends that the Lavines "could have discovered, through reasonable diligence, the 1989 report…." MTD at 16. The Lavines had no reason to go looking for the report until

Professor Adler told them it was fraudulent. Shingo did not begin to experience the symptoms of his injuries until his adolescence, and thereafter his physicians gave him no reason to connect those injuries to his circumcision. Some, like Dr. Avellino at Brown, actively steered him away from that connection.

Even if the Lavines had "discovered" the 1989 Guidelines earlier, they would have had no reason to question their accuracy. To the contrary, this was the authoritative document on which Dr. Chait had based his recommendation. Moreover, it would have been nearly impossible for laypeople like the Lavines to discover the *omissions* in that document. Nor is it reasonable to expect, as the AAP contends, that the Lavines (who are neither doctors nor lawyers) would or should have known about a 1980 medical publication or the *London* lawsuit, which was filed 13 years before Shingo was born, much less that they should have concluded from those two data points that the subsequent AAP Guidelines were fraudulent. MTD at 16; ¶¶ 17, 21-22. On the other hand, the AAP was aware of both when it commissioned and published the 1989 Guidelines.

Until very recently, the Lavines had no reason to mistrust the AAP. They reasonably relied on the AAP and Shingo's physicians until Professor Adler—a man who has spent much of his career studying this issue and who (unlike the AAP) has no vested financial interest—pierced the veil of credibility and arcana that protects the AAP's membership.

## V.   *Howard* **is Irrelevant**

The AAP relies on *Howard v. Univ. of Med. & Dentistry of New Jersey*, and a supposed two-part test articulated therein, to argue that no fraud claim can arise under these facts. MTD at 13. As a threshold matter, *Howard* is explicitly inapposite. "The theory of the claim [in *Howard* was] not that the misrepresentation induced plaintiff to proceed with unnecessary surgery." 172 N.J. at 556. That is, of course, precisely the claim in this case. Moreover, the "two-part test" the

AAP purports to apply is illusory.

### A.    Howard is Inapposite

*Howard* involved a claim for "lack of informed consent"—a particular species of medical malpractice that can be asserted against a doctor under New Jersey law. The question in *Howard* was narrow: "what cause of action will lie (fraud or negligence) when a plaintiff contends that a physician misrepresented his credentials and experience at the time he obtained the plaintiff's consent to surgery." 172 N.J. at 552. After examining the evolution of the tort of "lack of informed consent" from common law battery, the Court decided that a fraud claim was not necessary to cure the alleged injury arising exclusively out of the physician-patient relationship. *Id.* at 554. Those are not remotely the facts of this case; thus, *Howard* has no precedential value here. Indeed, New Jersey law does not recognize a cause of action for lack of informed consent against a non-physician. *See Rabinowitz v. Reyman*, 2010 WL 2867909, at *7 (N.J. Super. Ct. July 23, 2010). As discussed above, the Lavines' claim arises out of an entirely different doctrine: trade association liability. In other words, *Snyder*—not *Howard*—controls here.

### B.    There is no "*Howard* Test"

The AAP claims *Howard* holds that "fraud is actionable 'only when the alleged fraud occurs separately from and subsequent to the malpractice…and then only where the fraud claim gives rise to damages separate and distinct from those flowing from the malpractice.'"). MTD at 13 (purporting to quote *Howard*, 172 N.J. at 554). That language (and the supposed test it articulates) comes not from the New Jersey Supreme Court but from a New York State court fraud case arising out of a doctor's alleged failure to disclose his own prior malpractice—circumstances under which the fraud could *only* have occurred "separately from and subsequent to the malpractice." *See id.*; *Spinosa v. Weinstein*, 168 A.D.2d 32 (N.Y. App. Div. 1991). Thus, the two-part test would not have

applied here even if it had been adopted by the *Howard* court (which it wasn't) and *Howard* were relevant to the facts of this case (which it isn't).

## VI.    The Lavines have Stated a Claim for Constructive Fraud

Under New Jersey law, constructive (or equitable) fraud has the same elements as intentional fraud, except that it does not require a showing of knowledge of falsity. *Daibo v. Kirsch*, 316 N.J. Super. 580, 588 (App. Div. 1999). Thus, even an innocent misrepresentation can constitute constructive, or equitable, fraud if fairness demands it. *Ledley v. William Penn Life Ins. Co.*, 138 N.J. 627, 635 (1995). Because the Lavines have met all the elements of legal (intentional) fraud, they also have stated a claim for constructive fraud.

The AAP contends that the Lavines have failed to state a claim for constructive fraud because monetary damages are not available as relief for constructive fraud. MTD at 32, citing *Daibo v. Kirsch*, 316 N.J. Super. 580, 588 (App. Div. 1999). But *Daibo* does not hold, as the AAP suggests, that a cause of action must be dismissed as a matter of law because the plaintiff has not requested specific equitable relief. In any event, as the AAP concedes, the Lavines' prayer for relief includes a request for "[s]uch other relief as the court may deem just and equitable under the circumstances. MTD at 32. Should the Court find this insufficient to state a cause of action, the Lavines respectfully request leave to amend the Complaint to add a more specific request for equitable relief (*e.g.*, an order requiring the AAP to issue a public retraction of the Guidelines).

## CONCLUSION

For all the reasons set forth herein, the AAP's motion to dismiss should be denied in its entirety.

Dated:   New York, New York
         January 4, 2022

Respectfully submitted,

**ANDREW DELANEY,**
**ATTORNEY AT LAW, LLC**


By: ___/s/ Andrew Delaney___

         Andrew DeLaney

6 South Street, Suite 203
Morristown, New Jersey 07960
T (973) 606-6090
C (862) 812-6874
E andrewdelaney21@gmail.com
*Attorney for Plaintiffs Shingo Lavine,*
*Adam Lavine, and Aiko Lavine*


Of Counsel:

Jonathan D. Lupkin (admitted *pro hac vice*)
LUPKIN PLLC
80 Broad Street, Suite 1301
New York, New York  10004
Tel: (646) 367-2771
Fax: (646) 219-4870
Email: jlupkin@lupkinpllc.com

4882-5835-3160, v. 6