**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SHINGO LAVINE,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **AMERICAN ACADEMY OF PEDIATRICS INC.,** *et al.*, <br><br> Defendants. | Civil Action No. 21-17099 (ZNQ) (JBD) <br><br> **OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendant American Academy of Pediatrics Inc. ("Defendant" or "AAP"). ("Motion", ECF No. 14.) Defendant filed a Moving Brief in support of its Motion. ("Moving Br.", ECF No. 14.) Plaintiffs Shingo Lavine, Adam Lavine, and Aiko Lavine ("Plaintiffs") filed an Opposition to Defendant's Motion ("Opp'n", at 15) to which Defendant replied ("Reply", ECF No. 19.)

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT Defendant's Motion to Dismiss without prejudice.

**I.   BACKGROUND AND PROCEDURAL HISTORY**

The instant action was initiated on February 4, 2021 in the Superior Court of New Jersey. Plaintiffs voluntarily dismissed former Defendant Princeton Medical Group, P.A. on September 7,

1

2021.  American Academy of Pediatrics Inc., the only remaining defendant, thereafter timely removed the instant matter to the Court on September 17, 2021 pursuant to 28 U.S.C. § 1441 because Princeton's dismissal created diversity jurisdiction.  (ECF No. 1.)  Plaintiffs subsequently filed an Amended Complaint on November 29, 2021.  ("Am. Compl.", ECF No. 13.)

The Amended Complaint alleges fraudulent behavior on behalf of Defendant surrounding Plaintiff Shingo Lavine's circumcision shortly after his birth.  (*See generally*, Am. Compl.)  Specifically, Plaintiffs allege that Defendant is a professional organization of and for physicians specializing in pediatrics that claims to lead the field of pediatric medicine in setting standards of practice and recommendations for practice.  (*Id.* ¶¶ 15–16.)  "One of the issues falling into the [defendant's] bailiwick is circumcision, which became entrenched in the American psyche during the early part of the 20th century, untethered from any religious rite from which the practice derived."  (*Id.* ¶ 17.)  In 1971, Defendant explicitly acknowledged—via one of its many publications—that circumcision is not medically necessary.  (*Id.* ¶ 18.)  Defendant's position remained unchanged for over a decade.  (*Id.* ¶ 20.)

In 1984, however, a lawsuit filed against Defendant by a mother on behalf of her son alleged that circumcision constituted common law battery, willful cruelty, unjustifiable infliction of pain, and child abuse, among other torts despite her consent that her son be circumcised as "her consent was invalid because it related to a medically unnecessary procedure."  (*Id.* ¶ 21.)  Although that suit was unsuccessful, it changed the landscape of pediatric medicine with respect to circumcisions.  (*Id.* ¶ 22.)  In May 1985, pediatrician Thomas Wiswell published an article suggesting that circumcision might reduce the number of urinary tract infections in boys, and "other physicians latched onto Dr. Wiswell's conclusions."  (*Id.* ¶ 24.)  Defendant later hired an outspoken advocate of the circumcision movement as a chairman to its Task Force on

Circumcision. (*Id.* ¶¶ 25–26.) Soon thereafter, Defendant adopted similar views on circumcision and published in its own pediatrics journal that "newborn circumcision is a rapid and generally safe procedure when performed by an experienced operator" (the "1989 Report[1]"). (*Id.* ¶ 27.) The article further noted that "when circumcision is being considered, the benefits and risks should be explained to the parents and informed consent obtained." (*Id.*)

Plaintiff Shingo Lavine was born to Adam and Aiko Lavine in December 1997 at Princeton Medical Center in Plainsboro, Mercer County, New Jersey. (*Id.* ¶ 32.) On or about December 18, 1997, Dr. Jeffrey Chait, the obstetrician that delivered Shingo, circumcised him. (*Id.* ¶ 33.) Aiko was born in Japan, a non-circumcising society. (*Id.* ¶ 34.) "After Shingo's birth and before the circumcision, Aiko was incapacitated and, due to a difficult 36-hour labor and a Caesarean section, on medication." (*Id.*) "Notwithstanding the lack of exigency, Dr. Chait did not wait to ask Aiko for her permission to have her son circumcised, and consequently, she did not give permission for the surgery." (*Id.* ¶ 35.) Instead, Dr. Chait obtained Adam's verbal consent to circumcise Shingo after informing him of Defendant's circumcision report that indicated circumcision reduces the incidence of urinary tract infections and penile cancer. (*Id.* ¶ 36.) In reliance upon these representations, Adam agreed to have Shingo circumcised. (*Id.* ¶ 37.) Adam and Aiko were never informed that circumcision is painful, may involve complications, and that some men who were circumcised at birth resent it having been performed without their consent. (*Id.* ¶ 38.) After the circumcision, Dr. Chait asked Adam and Aiko to monitor the healing process. (*Id.* ¶ 39.) After about one month, Adam and Aiko observed that Shingo's penis had not healed and looked abnormal to them. (*Id.*) On January 21, 1998, Adam and Aiko brought Shingo to Dr. Barone for

---

[1] Without explanation and in spite of the document's actual title—"Report of the Task Force on Circumcision (RE9148)"—the Complaint refers to the AAP's Report as the "1989 Guidelines." (Am. Compl. ¶ 27.) At other points, the Complaint refers to the same document as "the 1989 Policy Statement" (¶¶ 66, 67) and the "AAP's 1989 Policy Statement" (¶ 68). For the purposes of this Opinion, the Court refers to it as the "1989 Report."

examination wherein Dr. Barone diagnosed Shingo as suffering from phimosis and a buried penis. (*Id.* ¶ 41.) Dr. Barone recommended a second circumcision and presented it as if it too was routine. (*Id.*) Thereafter, Dr. Barone performed the surgery on Shingo. (*Id.*)

In the ensuing years, Shingo would undergo routine annual physicals, which, until recently, were performed by Shingo's pediatricians and, upon turning 18, by Shingo's internist. (*Id.* ¶ 43.) Despite performing genital examinations as part of his checkups, the doctors never raised any problems with—or irregularities presenting on—his penis. (*Id.*) When Shingo reached adolescence, he began to experience urological issues which included increased pubic hair growth bearing skin down to the circumcision scar line which created irritations, as well as glans hypersensitivity that was sufficiently disruptive that it often woke him in the middle of the night. (*Id.* ¶ 44.) When he became sexually active, he noticed that his erection caused him great discomfort. (*Id.*) As a result, Shingo conducted his own research on his symptoms that led him to believe that his circumcision may be the cause of his problems. (*Id.* ¶ 45.)

On or about June 15, 2020, Shingo became involved with Foregen, a medical organization devoted to regenerating foreskin. (*Id.* ¶ 46.) The foreskin restoration process "requires the patient to attach weights to the penis for an uncomfortable 3-4 hours per day, for 5-10 years. (*Id.*) Shingo has spent more than 700 hours over the course of almost 1,000 sessions as part of the process to partially 'restore' foreskin." (*Id.* ¶ 47.) On July 29, 2020, Shingo began psychotherapy to cope with the severe emotional distress stemming from his circumcision. (*Id.* ¶ 48.) In August 2020, Adam reached out "to Dr. Gabriella Avellino, a top urologist at Brown University" to discuss Shingo's problems. (*Id.* ¶ 49.) Dr. Avellino, however, dismissed his concerns and instead informed Adam of the purported benefits of circumcision. (*Id.*) Professor Peter Adler, on the other hand, informed Plaintiffs that circumcision is not recommended in other countries whereas

4

it is encouraged in the United States. (*Id.* ¶ 50.) As a result, Adam and Aiko felt defrauded by Defendant because they were not fully informed of all the risks associated with circumcision. (*Id.* ¶¶ 51–52.) Plaintiffs subsequently submitted the two-count Complaint alleging Intentional Fraud (Count I) and Constructive or Equitable Fraud (Count II).

## II. JURISDICTION

Defendant removed this action pursuant to 28 U.S.C. § 1441 from the New Jersey Superior Court. Given the diversity of the parties and the amount in controversy, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

## III. LEGAL STANDARD

### A. Rule 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

5

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. (quotations and brackets omitted).

B. <u>Rule 9(b)</u>

Federal Rule of Civil Procedure 9 requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Rule

9(b)'s particularity requirement requires a plaintiff to allege 'all of the essential factual background that would accompany the first paragraph of any newspaper story-that is, the who, what, when, where, and how of the events at issue.'" *Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019) (quoting *United States v. Omnicare, Inc.*, 903 F.3d 78, 92 (3d Cir. 2018)). Rule 9(b)'s particularity requirement applies to New Jersey common law fraud claims in diversity cases. *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994); *District 1199P Health and Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 532 (D.N.J. 2011).

## IV. DISCUSSION

Counts I and II of the Complaint both allege Defendant committed fraud. (Am. Compl. ¶¶ 61, 71.) Specifically, Plaintiffs allege that the 1989 Report, constituted fraud because it misrepresented the risks associated with the surgery. (*Id.* ¶¶ 54–58.) Plaintiffs further allege that Defendant's wrongful acts constitute intentional and equitable fraud. (*Id.* ¶¶ 61, 71.) Adam and Aiko "were never fully informed about the risks and downsides of circumcision. Had they not been so fundamentally misled, they would never have consented to the procedure . . ." (*Id.* ¶ 52.)

In its Motion, Defendant argues that Plaintiffs may not assert a fraud claim based on lack of informed consent because "New Jersey courts have repeatedly found that plaintiffs may not assert a fraud claim based on a lack of informed consent resulting from misrepresentations that occur pre-surgery." (Moving Br. at 11.) Rather, "informed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to evaluate knowledgeably the options available and the risks attendant upon each before subjecting that patient to a course of treatment." (Moving Br. at 12) (quoting *Howard v. Univ. of Med. & Dentistry of New Jersey*, 172 N.J. 537, 548 (2002) (stating that an informed-consent plaintiff must "prove that a reasonably prudent patient in the plaintiff's position would have declined to undergo

7

the treatment if informed of the risks that the defendant failed to disclose")); *see also Matthies v. Mastromonaco*, 160 N.J. 26, 33 (1999) (a "physician has a duty to disclose information that will enable a patient 'to consider and weigh knowledgeably the options available and the risk attendant to each.'"). In *Howard*, the New Jersey Supreme Court held that a fraud claim based on a neurosurgeon's alleged misrepresentation of his experience and credentials was unavailable to a patient who was rendered a quadriplegic from unsuccessful back surgery performed by that physician; however, the plaintiff could pursue a claim for lack of informed consent. *Howard*, 172 N.J. at 537. The Court recognized that a patient currently has three avenues of relief against a doctor; namely, (1) deviation from the standard of care (medical malpractice); (2) lack of informed consent; and (3) battery. *Id.* at 545 (citing *Colucci v. Oppenheim*, 326 N.J. Super. 166, 180 (App.Div.1999), *certif. denied*, 163 N.J. 395 (2000)).

> The Court in *Howard* further noted that they:
>
>> are not convinced that our common law should be extended to allow a novel fraud or deceit-based cause of action in this doctor-patient context that regularly would admit of the possibility of punitive damages, and that would circumvent the requirements for proof of both causation and damages imposed in a traditional informed consent setting. We are especially reluctant to do so when plaintiff's damages from this alleged 'fraud' arise exclusively from the doctor-patient relationship involving plaintiff's corpectomy procedure. (citing *Spinosa v. Weinstein*, 571 N.Y.S.2d 747, 753 (N.Y. App. Div. 1991) (holding that concealment or failure to disclose doctor's own malpractice does not give rise to claim of fraud or deceit independent of medical malpractice, and noting that intentional tort of fraud actionable "only when the alleged fraud occurs separately from and subsequent to the malpractice . . . and then only where the fraud claim gives rise to damages separate and distinct from those flowing from the malpractice")).

*Howard*, 172 N.J. at 553–54.

Plaintiffs object to Defendant's attempt to apply *Howard* to their case because they view their claims as distinct from the claims for malpractice pled in *Howard*. According to Plaintiffs,

8

their claims arise instead from the "completely different doctrine" of "trade association liability." (Opp. Br. at 28.) They argue that the New Jersey Supreme Court's decision in *Snyder v. American Association of Blood Banks*, 144 N.J. 269 (1996) provides the relevant authority.

The Court agrees that *Howard* is limited by its own terms to the doctor-patient context. It is therefore inapposite to this matter because Plaintiffs' claims are directed against AAP rather than Shingo's physicians. In *Snyder*, the New Jersey Supreme Court concluded under very specific facts that although the American Association of Blood Banks does not have a direct relationship with blood recipients, it nevertheless "owes a duty of care to ordinary persons receiving blood or blood products from its members." 144 N.J. at 305. Here, even under the expanded scope of liability recognized in *Snyder*, the Court finds that the Amended Complaint fails to state plausible claims for either intentional fraud or equitable fraud for the reasons set forth below.

### A.  INTENTIONAL FRAUD (COUNT I)

The Amended Complaint's claim for intentional fraud alleges that the 1989 Report includes a combination of misrepresentations and omissions. (Am. Compl ¶ 57.) The specific allegations are set forth in a bulleted list of fourteen defects. (Am. Compl. ¶ 27.) Insofar as the substantial majority of the purported defects—twelve of the fourteen—allege omissions from the 1989 Report, the Court addresses these first. (See *id*.)

To properly plead fraudulent concealment, *i.e.*, omissions of the type alleged in this case, a plaintiff must allege five elements: "(1) a duty on behalf of the defendant to disclose to the plaintiff a material fact; (2) the failure to disclose that fact; (3) an intention to defraud or deceive the plaintiff; (4) action taken by the plaintiff in justifiable reliance on the concealment; and (5) damages as a result of the defendant's concealment." *In re Johnson & Johnson Talcum Powder Marketing, Sales Practices, and Products Liability Litigation*, 553 F. Supp. 3d 211, 231 (D.N.J.

9

2021) ("*Talc*") (interior quotation marks omitted); *Argabright v. Rheem Manufacturing Company*, 258 F. Supp. 3d 470, 488–89 (D.N.J. 2017); *see also Lightening Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993).

Thus, Plaintiffs in this case are first obligated to plausibly plead that the AAP had a duty to disclose to them the facts that they identify in the Amended Complaint. For this duty, Plaintiffs rely upon *Snyder*. Plaintiffs argue and allege that, like the defendant in *Snyder*, the AAP invited reliance by other medical associations, doctors, and patients by its words and conduct. (Opp'n Br. at 11–12; *see, e.g.,* Am. Compl. ¶¶ 54–56, 64–67.) But *Snyder* has its limits, and it is not so easily met. This Court in *Talc* succinctly circumscribed the scope of *Snyder*.

> There, a blood transfusion recipient who contracted Acquired Immune Deficiency Syndrome ("AIDS") after receiving blood contaminated with Human Immunodeficiency Virus ("HIV"), asserted a negligence claim against the American Association of Blood Banks ("AABB"), a voluntary trade association of blood banks. *Id.* at 273, 676 A.2d 1036. The AABB developed and recommended standards for the practice of blood banking, engaged in lobbying activities and, notably, inspected and accredited its member institutions. *Id.* at 277, 676 A.2d 1036. The New Jersey Supreme Court held that the AABB owed the public a duty of care based on the "considerable influence" it exerted "over the practices and procedures over its member banks" and the foreseeable risk that blood transfusions could spread the AIDS virus. *Id.* at 293–94, 676 A.2d 1036. Further, the *Snyder* Court found that the AABB was "not a mere advisory body," as it instructed "its member banks how to screen, obtain, and distribute blood," and the United States Department of Health required blood banks to meet the AABB standards for the bank to be licensed. *Id.* at 297, 676 A.2d 1036. Based on the AABB's governance over blood banks, the *Snyder* Court found that "the imposition of liability on [it] is both fair and reasonable." *Id.* at 307, 676 A.2d 1036. Conversely, in *Meyers v. Donatucci*, a New Jersey trial court determined that a pool safety trade association "owe[d] no duty to the general public who may use products manufactured and/or installed by its members" where the trade association promulgated only voluntary minimum standards for installation and maintenance of swimming pools. 220 N.J. Super. 73, 81–82, 531 A.2d 398 (Law Div. 1987). Notably, in *Meyers*, the court determined that the trade association had little control over its

10

>    members and had no way of enforcing its safety standards. *See id.*
>    at 82–83. *Meyers*, decided before *Snyder*, has not been disturbed
>    since the issuance of the *Snyder* decision.

*Talc*, 553 F. Supp. 3d at 227–228. Here, the AAP is not alleged to exert anywhere near the control that the AABB exercised over its industry in *Snyder*. The AAP does not inspect or accredit medical institutions or physicians, nor is it the source of government standards for licensure. The Amended Complaint therefore does not plead the high level of "governance" that justified the *Snyder* Court's finding of a duty to the plaintiffs in that case. At best, the AAP is akin to the trade association defendants in *Myers* that offered voluntary guidance. Under the circumstances, the Court therefore finds that Plaintiffs have not plausibly pled that AAP owed them a duty. Accordingly, Plaintiffs' claims premised on fraudulent concealment must fail.

The remaining two purported defects in the 1989 Report identified in the Amended Complaint are characterized as affirmative misrepresentations. To plead common-law fraud by misrepresentation, a plaintiff must allege: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular N. Am.*, 184 N.J. 161, 172–173 (2005); *Perry v. Gold & Laine, P.C.*, 371 F. Supp. 2d 622, 627 (D.N.J. 2005).

According to the Amended Complaint, the 1989 Report first "misrepresent[s] the rate of severe complications" of circumcision, "which is as high as 2–4% . . . ." (Am. Compl ¶ 27.) Second, the Amended Complaint alleges that "with respect to the most common complication following circumcision, meatal stenosis (a narrowing of the urethral opening), the 1989 [Report] falsely state[s] that '[t]here is no evidence that meatitis leads to stenosis of the urethral meatus.' In fact, meatal stenosis occurs in 5% to 20% of boys following circumcision." (*Id.*)

11

As a first issue, in each of these allegations, the Amended Complaint pleads its competing facts without source or reference. Even assuming these competing facts are true, because the relevant sources are not identified, the Amended Complaint fails to articulate how Defendant could have known its representations in the 1989 Report were false. For example, if Plaintiffs' unsourced, competing facts were published *after* the 1989 Report, Defendant could not have known its representations were untrue. It is of no help that the Amended Complaint baldly accuses the AAP of acting "recklessly in the disregard of the truth or falsity of said claims" if its Task Force "did not have knowledge of [their] falsity" is insufficient. Defendant's actual knowledge must be alleged to plausibly plead fraud. The Amended Complaint lacks this requirement.

As a second issue, Plaintiffs' own reliance as pled is likewise insufficient. The Amended Complaint alleges that Adam Lavine "relied upon Dr. Chait's reference to those AAP Guidelines in support of circumcision when he consented to the circumcision." (Am. Compl. ¶ 60.; see also ¶¶ 36–37.) It is the "well established rule of New Jersey law that actual receipt and consideration of any alleged misrepresentation—reliance—is central to a common law fraud claim." *Brown ex rel. Estate of Brown v. Philip Morris Inc.*, 228 F. Supp. 2d 506, 518 (D.N.J. 2022) (quoting *Morgan v. Makerdowne Corp.*, 201 F.R.D. 341, 347 (D.N.J. 2001)); *see also Kaufman v. i-Stat Corp.*, 165 N.J. 94 (2000) (rejecting "fraud on the market" theory as failing to satisfy the reliance element of common law fraud). As pled, Dr. Chait's purported "reference" to the 1989 Report fails to specifically allege that either of the misrepresentations cited in the Amended Complaint were actually presented to and considered by Shingo. The Court therefore finds that the Amended Complaint fails to adequately plead the reliance element of its intentional fraud claim.

For the foregoing reasons, the Court concludes that Plaintiffs' intentional fraud claim should be dismissed with prejudice for failure to plead a plausible claim.

## B. EQUITABLE FRAUD (COUNT II)

The Amended Complaint separately pleads a claim for equitable fraud. Equitable fraud and common-law fraud differ in at least two respects. First, a plaintiff pleading equitable fraud need not establish the defendant's knowledge of the falsity or intention to obtain an advantage therefrom. Second, a plaintiff asserting equitable fraud is not entitled to money damages; he may seek only equitable relief. *See Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 624–25 (1981); *Capital Investment Funding, LLC v. Lancaster Group, LLC*, Civ. No. 08-4714, 2023 WL 2728716, at *10 (D.N.J. March 30, 2023).

As a first matter, the Court finds the Amended Complaint's equitable fraud claim should be dismissed for the same reasons its intentional fraud claim should be dismissed, minus the failure to plead Defendant's knowledge of the alleged misrepresentation.[2] As a second matter, the Court notes that the Amended Complaint does not explicitly seek equitable relief.

---

[2] The Court's conclusion does not reach Defendant's arguments regarding the statute of limitations as that affirmative defense cannot appropriately be addressed at this stage in the litigation. *See Ames v. Am. Radio Relay League, Inc.*, 716 F. App'x 115, 119 (3d Cir. 2017) ("ordinarily a party may not raise affirmative defenses at the motion to dismiss stage.").

13

## V.     CONCLUSION

For the reasons stated above, the Court will GRANT Defendant's Motion to Dismiss and will DISMISS the Amended Complaint WITHOUT PREJUDICE.  Plaintiffs will be given leave to file a Second Amended Complaint, limited to an attempt to cure the defects noted in this Opinion, within 30 days.  Failure to cure the defects noted in this Opinion may lead to dismissal with prejudice.  An appropriate Order will follow.

Date: **May 12, 2023**

                                              s/ Zahid N. Quraishi
                                              **ZAHID N. QURAISHI**
                                              **UNITED STATES DISTRICT JUDGE**