**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **SHINGO LAVINE**, *et al.*, | |
| Plaintiffs, | Civil Action No. 21-17099 (ZNQ) (JBD) |
| v. | **OPINION** |
| **AMERICAN ACADEMY OF PEDIATRICS INC.**, | |
| Defendant. | |

**QURAISHI, District Judge**

    **THIS MATTER** comes before the Court upon a Motion to Dismiss ("Motion") filed by Defendant American Academy of Pediatrics Inc. ("Defendant" or "AAP").   (ECF No. 50.) Defendant filed a brief in support of its Motion.  ("Moving Br.", ECF No. 50.)  Plaintiffs Shingo Lavine ("Shingo"), Adam Lavine ("Adam"), and Aiko Lavine ("Aiko") (collectively, "Plaintiffs") filed an Opposition to the Motion.  ("Opp'n Br.", ECF No. 51.)  Defendants filed a Reply.  ("Reply Br.", ECF No. 52.)

    The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.[1] For the reasons set forth below, the Court will GRANT Defendant's Motion to Dismiss.

---

[1] Hereinafter, all references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure.

I.    **BACKGROUND AND PROCEDURAL HISTORY**[2]

The factual background of this dispute is explained in the Court's Opinion dated May 12, 2023 (the "May 2023 Opinion"), which the Court incorporates by reference. *Lavine v. Am. Acad. of Pediatrics Inc.*, Civ. No. 21-17099, 2023 WL 3431212 (D.N.J. May 12, 2023). An abbreviated background and the relevant procedural history are summarized as follows.

This action arises out of alleged fraudulent behavior by Defendant AAP surrounding Plaintiff Shingo's circumcision shortly after his birth. (*See generally* Second Am. Compl., ECF No. 43 ("SAC").) Plaintiffs' allegations relate to a report published by Defendant in 1989 (the "1989 Report") that allegedly contained false and misleading information about prophylactic circumcisions with the purpose of increasing the rate of circumcisions in the United States. (*Id.* ¶¶ 1–8.) Plaintiffs claim that Defendant defrauded and misled them because Plaintiffs "were never fully informed about the risks and downsides of circumcision." (*Id.* ¶¶ 84–85.)

Defendant removed the instant matter to this Court on September 17, 2021. (ECF No. 1.) Plaintiffs subsequently filed an Amended Complaint on November 29, 2021. ("Am. Compl.", ECF No. 13.) The Amended Complaint asserted two causes of action against Defendant: Count I, intentional fraud, and Count II, constructive or equitable fraud. (*Id.* ¶¶ 53–72.) In an Order accompanying the May 2023 Opinion, the Court dismissed Plaintiffs' Amended Complaint pursuant to a motion to dismiss filed by Defendant. (ECF No. 40.) Specifically, the Court dismissed Plaintiffs' claims without prejudice for failure to state claim for intentional fraud and equitable fraud. First, the Court concluded that Plaintiffs' fraudulent concealment claims based on omissions failed because Plaintiffs did not plausibly plead that Defendant owed them a duty under *Snyder v. American Association of Blood Banks*, 144 N.J. 269 (1996). *Lavine*, 2023 WL

---

[2] For the purpose of considering the instant Motion, the Court accepts all factual allegations in the SAC as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

3431212, at *5. Second, the Court concluded that Plaintiffs failed to adequately plead reliance with respect to their intentional fraud claim. *Id.* at *6. Finally, the Court concluded that the equitable fraud claim failed to "explicitly seek equitable relief" and that it "should be dismissed for the same reasons that the intentional fraud claim should be dismissed, minus the failure to plead Defendant's knowledge of the alleged misrepresentation." *Id.*

On June 26, 2023, Plaintiffs filed the SAC, asserting the same two causes of action of intentional and equitable fraud.[3] (ECF No. 43.)

## II.   **LEGAL STANDARD**

### A.   **RULE 12(b)(6)**

Federal Rule of Civil Procedure 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the

---

[3] The Court also notes that after Defendant filed its Reply Brief, Plaintiff filed an informal request to strike an argument "made for the first time on reply" that Defendant is not a trade association. (ECF No. 53.) The Court agrees with Defendant that Defendant did not put forth "a new argument or defense, but rather a response to an argument that [Plaintiffs] raised in their opposition." (ECF No. 56 at 1.) Accordingly, the Court denies Plaintiffs' informal request to strike Defendant's argument. *See Bayer AG v. Schein Pharm., Inc.*, 129 F. Supp. 2d 705, 716–17 (D.N.J. 2001).

defendant unlawfully harmed me. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 663). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**B.     RULE 9(b)**

Federal Rule of Civil Procedure 9 requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Rule 9(b)'s particularity requirement requires a plaintiff to allege 'all of the essential factual background that would accompany the first paragraph of any newspaper story-that is, the who, what, when, where, and how of the events at issue.'" *Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019) (quoting *United States v. Omnicare, Inc.*, 903 F.3d 78, 92 (3d Cir. 2018)). Rule 9(b)'s particularity requirement applies to New Jersey common law fraud claims in diversity cases. *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994); *District 1199P Health and Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 532 (D.N.J. 2011).

### III.    DISCUSSION[4]

#### A.    COUNT I – INTENTIONAL FRAUD

Plaintiffs' intentional fraud claim is based on both alleged omissions and misrepresentations in the 1989 Report. (SAC ¶ 90.) The Court first addresses Plaintiffs' claims based on the omissions from the 1989 Report; then it will address the fraudulent misrepresentation claims.

#### 1.    Fraudulent Concealment

To properly plead fraudulent concealment, *i.e.*, omissions of the type alleged in this case, a plaintiff must allege five elements: "(1) a duty on behalf of the defendant to disclose to the plaintiff a material fact; (2) the failure to disclose that fact; (3) an intention to defraud or deceive the plaintiff; (4) action taken by the plaintiff in justifiable reliance on the concealment; and (5) damages as a result of the defendant's concealment." *In re Johnson & Johnson Talcum Powder Marketing, Sales Practices, and Products Liability Litigation*, 553 F. Supp. 3d 211, 231 (D.N.J. 2021) ("*Talc*") (interior quotation marks omitted); *Argabright v. Rheem Manufacturing Company*, 258 F. Supp. 3d 470, 488–89 (D.N.J. 2017); *see also Lightening Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). Though Defendant argues that Plaintiffs fail to plausibly allege several elements of a fraudulent concealment claim, the Court's analysis on this claim begins and ends on the first element: whether Defendant had a duty to disclose the facts identified in the SAC.

In its May 2023 Opinion, the Court found that Plaintiffs failed to allege that Defendant "exert[ed] anywhere near the control that the [defendant] exercised over its industry in *Snyder*" and that the Amended Complaint failed to plead "the high level of 'governance' that justified the *Snyder* court's finding of a duty to the plaintiffs in that case." *Id.* Thus, the Court concluded that

---

[4] The Court incorporates its discussion from its May 2023 Opinion here by reference.

Plaintiffs failed to plausibly allege that Defendant owed them a duty. *Lavine*, 2023 WL 3431212, at \*5. In an attempt to remedy these defects in the SAC, Plaintiffs have alleged additional facts to support their position that Defendant "fits well within the *Snyder* [c]ourt's analysis of trade association liability." (Opp'n Br. at 8.) For example, Plaintiffs claim that the "United States government relies on the AAP to help develop, promote, and implement government health standards," that government agencies "leverage the AAP's influence over pediatricians in support of public health initiatives," and that "most physicians and medical organizations are wary of having or following policies that contradict AAP guidelines because such policies or practices would fall below what would be considered the appropriate standard of care." (SAC ¶¶ 23, 24, 26.)

Here, Plaintiffs again exclusively rely on *Snyder* for their duty theory. (Opp'n Br. at 9–16.) Rather than explain how the factual allegations in the SAC cure Plaintiffs' prior defects as identified by the Court, Plaintiffs instead argue that whether Defendant exercises a high level of "governance" is neither "a determining factor" nor "a factor at all" in determining duty under *Snyder*. (*Id.* at 9.) Plaintiffs argue that the *Snyder* court considered four factors to determine whether the defendant American Association of Blood Banks ("AABB") owed a duty to blood transfusion patients: (1) the foreseeability of injury to others; (2) the nature of the risk posed; (3) the public's reliance on the defendant; and (4) the impact the imposition of a duty of care has on the public. (*Id.* (citing *Snyder*, 144 N.J. at 292).) Plaintiffs claim that the *Snyder* court merely considered AABB's role in the relevant industry as "one of many circumstances" in connection with its analysis of just one factor, public policy. (*Id.* at 10.)

Plaintiffs attempt to minimize the weight the court in *Snyder* gave to AABB's control and influence over its industry in its duty analysis. However, Plaintiffs constrain the court's analysis

in *Snyder* too narrowly.  In *Snyder*, the court did not set forth a rigid, four-part test to determine whether a trade association owes a duty of care.  Instead, the court analyzed the four factors Plaintiffs identify among various other considerations that are "important, although not dispositive" to determine whether a duty exists.[5]  *Snyder*, 144 N.J. at 292.

Indeed, contrary to Plaintiffs' position, the considerable control and influence of AABB within the blood-banking industry was essential to the court's analysis.  First, the court began its discussion by stating that "[c]rucial to the assessment of the AABB's alleged duty of care is its role in the blood-banking industry."  *Snyder*, 144 N.J. at 275.  The court then engaged in a detailed review of the significant roles and purposes of the AABB and noted that AABB had "substantial power over the operation of blood banks."  *Id.* at 277–80.  Next, the Court considered the AABB's "considerable influence" over "the practices and procedures of its member banks," its role "in setting blood-banking policy," and how the "AABB wrote the rules and set the standards for voluntary blood banks."  *Id.* at 293.  The court emphasized that the AABB invited others— including patients—to rely on its recommended procedures and that the AABB itself "sought and cultivated" a responsibility "for the safety of blood and blood products."  *Id.*  In other words, the court explained how the AABB has a "unique degree of authority."  *DeLong v. Am. Home Furnishings All.*, 464 F. Supp. 3d 727, 731 (E.D. Pa. 2020).

Finally, the court also found that a "relevant" consideration "to the determination of the AABB's duty of care is its role in the governmental regulation of the blood-banking industry." *Snyder*, 144 N.J. at 296.  The court underscored that the "AABB was more than a trade association. It was the governing body of a significantly self-regulated industry."  *Id.*  For example, the court highlighted that the AABB was more than an advisory body; it instead "exercised control of its

---

[5] Plaintiffs themselves admit that the four factors are "broad" and "non-exclusive" factors the *Snyder* court considered. (Opp'n Br. at 9.)

member banks" including accrediting and inspecting the member banks. *Id.* at 297. As such, Plaintiffs' attempts to constrain *Snyder* to a four-factor analysis are unavailing given the court's reliance upon AABB's considerable influence within its industry to find that AABB owed a duty to the general public. *See Talc*, 553 F. Supp. 3d at 231 ("The degree of control similarly played a substantial role in the *Snyder* . . . decision[].").

Here, notwithstanding Plaintiffs' interpretation of *Snyder*, there is nothing in the SAC that leads the Court to reach a different conclusion from before as to Plaintiffs' fraudulent concealment claim. Plaintiffs' updated factual allegations regarding Defendant's control and influence are still insufficient to establish that it owed Plaintiffs a duty. The allegations in the SAC do not plausibly allege that Defendant has "considerable influence" over its industry the same way the AABB had in *Snyder*. Even accepting as true that Defendant "set[s] the current standard of care in pediatrics" or that the U.S. government "relies on the AAP to help develop, promote, and implement government health standards," such facts are not sufficient to support a claim that Defendant owed a duty to Plaintiffs or the public. (SAC ¶¶ 23–24.) The allegations might reinforce Defendant's prominence in its industry. But just because an organization like Defendant, which publishes information about pediatric practice, might have influence over pediatricians or the pediatrics profession, it does not necessarily follow that its influence results in a duty owed. Unlike the situation in *Snyder*, there are no allegations here to suggest that the AAP invites the general public to rely on its published materials, including the 1989 Report. (*See generally id.*). To the contrary, the 1989 Report, which is the sole AAP publication at issue here, directs medical providers to explain the benefits and risks of circumcision to patients' parents when the procedure is considered, as well as to obtain informed consent; clearly, the audience of the 1989 Report is

neither parents, patients, nor the general public. (SAC Ex. B at 390.)[6] Moreover, Plaintiffs rely on a graph of circumcision rates to argue that the AAP enjoyed overarching influence over the pediatric profession. However, as Defendant points out, correlation does not equal causation and, in any event, the graph does not show any clear increase in circumcisions solely because of the 1989 Report's publication.[7]

In sum, for the various reasons set forth herein, the Court does not find that the SAC alleges the requisite control or influence over its industry to pose a duty on the AAP under the court's analysis in *Snyder*, nor does it sufficiently allege how the AAP invites individuals like Plaintiffs to rely on its materials. As this Court previously stated, "*Snyder* has its limits, and it is not so easily met." *Lavine*, 2023 WL 3431212, at *5. Notably, Plaintiffs fail to cite any authority finding an existence of duty under *Snyder*'s narrow holding. *See, e.g., DeLong*, 464 F. Supp. 3d at 731 ("Indeed, the AABB's unique authority likely explains why Plaintiff can offer only a single decision where *Snyder* was followed directly."). Accordingly, the Court concludes that Plaintiffs' intentional fraud claim based on omissions must fail.

### 2.    Fraudulent Misrepresentations

Next, the Court addresses Plaintiffs' fraudulent misrepresentation claims. Plaintiffs allege that the 1989 Report contains three affirmative misrepresentations: (1) the false statement that "[t]here is no evidence that meatitis leads to stenosis of the urethral meatus"; (2) the misleading suggestion that "the generally accepted incidence of postoperative complications was 'low, approximately 0.2% to 0.6%'"; and (3) the false statement that "[c]ircumcision is a safe surgical

---

[6] The Court may consider the 1989 Report in deciding the instant Motion because it is expressly relied upon in, and attached as an exhibit to, the SAC. (*See generally* SAC Ex. B); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).
[7] Additionally, in stark contrast to *Snyder*, which focused on the AABB's status as a "trade association" that has members who pay dues, Defendant's challenge whether AAP is even a trade association at all, arguing that it is a nonprofit organization comprised of voluntary members who are pediatric physicians. (Reply Br. at 2.)

procedure if performed carefully by a trained, experienced operator using strict aseptic technique."
(SAC ¶¶ 45, 46, 49.)  To plead common-law fraud by misrepresentation, a plaintiff must allege:
"(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by
the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance
thereon by the other person; and (5) resulting damages." *Banco Popular N. Am. v. Gandi*, 184
N.J. 161, 172–73 (2005); *Perry v. Gold & Laine, P.C.*, 371 F. Supp. 2d 622, 627 (D.N.J. 2005).

As set forth in the May 2023 Opinion, the Court concluded that Plaintiffs did not plausibly
allege their affirmative misrepresentation claims for two reasons. First, Plaintiffs failed to identify
any "relevant sources" that "articulate how Defendant could have known its representations in the
1989 Report were false." *Lavine*, 2023 WL 3431212, at \*6. Second, Plaintiffs failed to plead their
own reliance because they did not allege that any affirmative misrepresentations "were actually
presented to and considered by Shingo." *Id.*  In an attempt to remedy these defects, the SAC
identifies various sources, with publication dates, seeking to "establish that the AAP knew the
omitted facts when it issued the 1989 [R]eport."  (SAC ¶¶ 43–45; Opp'n Br. at 7.)  Plaintiffs also
"concede they have not alleged direct reliance on a specific affirmative misrepresentation in the
1989 [R]eport" and that they instead proceed on a theory of indirect reliance.  (Opp'n Br. at 8.)

Despite Plaintiffs' attempts to remedy the defects in the SAC, Plaintiffs nevertheless fail
to state a fraudulent misrepresentation claim for several reasons.

### a)      Reliance

The third and fourth elements of a fraudulent misrepresentation claim involve reliance,
albeit in different contexts.  The third element considers whether a defendant intended that the
plaintiff relies on the misrepresentation; the fourth element considers whether the plaintiff actually
relied on the misrepresentation.   Given the overlap between these two elements, the Court
discusses them together.

Plaintiffs argue they "may state a claim for fraud [under a theory of indirect reliance] where the defendant communicated the false statements to a third party with the intention that the victim hear and rely on it and that the third party conveyed the misrepresentation to the plaintiff." (Opp'n Br. at 20 (citing *Kaufman v. i-Stat Corp.*, 165 N.J. 94 (2000)).)  Plaintiffs allege their indirect reliance theory in the SAC as follows: (1) Defendant is a "professional trade organization of and for physicians specializing in pediatrics," (SAC ¶ 21); (2) Defendant published the 1989 Report, titled "Report of the Task Force on Circumcision (RE9148), in its peer-reviewed journal titled *Pediatrics* in 1989, (*id.* ¶¶ 7, 39); (3) the 1989 Report contains information about circumcisions, (*see generally id.*); (4) years later, in 1997, Dr. Chait, the obstetrician who delivered Shingo, discussed with Adam whether to circumcise Shingo, (*id.* ¶ 66, 69);  (5) in their discussion, Dr. Chait referred to information about circumcision from the 1989 Report, (*id.* ¶¶ 69, 70, 72); and (6) Adam relied on the information from Dr. Chait and agreed to Shingo's circumcision, (*id.* ¶ 70).

Plaintiffs' indirect reliance theory, however, is not plausibly alleged in the SAC.  First, the factual allegations in the SAC regarding Plaintiffs' reliance are essentially identical to those factual allegations in the Amended Complaint, except for a few immaterial changes.[8]  (*Compare* Am. Compl. ¶¶ 5, 7, 36, 37, 39, 50, 56, 69, 67, 68, *with* SAC ¶¶ 11, 13, 69, 70, 72, 83, 89, 93, 100, 101).  Nor do Plaintiffs support their indirect reliance theory with any relevant authority.[9]  (*See generally* Opp'n Br. at 20–23.)  Second, as discussed, Plaintiffs identify three potential misrepresentations

---

[8] The Court notes that there are three minor and inconsequential changes made in the SAC that are found in ¶¶ 69, 72, and 101. In ¶ 69 of the SAC, Plaintiffs merely updated the phrase "1989 guidelines" to state "1989 report." In ¶ 72, the phrase "and let him (Dr. Chait) know if there were any problems with Shingo's penis" was modified to state that Dr. Chait "asked them to let him know if there were any problems with Shingo's penis." In ¶ 101, the phrase "here Adam Lavine's reliance on the AAP's 1989 Policy Statement" was modified to state "as Adam Lavine relied on the AAP's 1989 Report."

[9] Plaintiffs summarily cite to *McTernan v. City of York*, 577 F.3d 521,526 (3d Cir. 2009), *Kremer v. A Woman's Place*, 321 F. App'x 185 (3d Cir. 2009), and *Teubert v. SRA Int'l, Inc.*,192 F. Supp.3d 569, 578 (D.N.J. 2016).  However, these cases do not discuss indirect reliance.  Rather, Plaintiffs cite to *McTernan* for the proposition that a "factual dispute must be resolved in the Lavine's favor at the motion to dismiss stage." (Opp'n Br. at 22.)  Additionally, Plaintiffs cite to *Kremer* and *Teubert* for the proposition that Dr. Chait's statements are admissible hearsay. (*Id.*)

in the 1989 Report. The SAC generally alleges that Dr. Chait referenced the 1989 Report, which in addition to the alleged misrepresentations, contains many other statements. And though Plaintiffs claim that Dr. Chait generally referenced the 1989 Report when speaking to Adam, the SAC alleges that Dr. Chait communicated only one of the alleged misrepresentations. Specifically, that "[i]n conformity with the 1989 Report, Dr. Chait portrayed circumcision as a minor, safe, harmless, and medically beneficial procedure, as well as a routine and normal part of childbirth." (SAC ¶ 69.) At best, the SAC only alleges that Dr. Chait conveyed one misrepresentation to Plaintiffs.[10] As such, it is unclear how Plaintiffs could have cured the pleading deficiencies the Court previously identified given their factual allegations remain materially unchanged. The SAC still fails to explain how Dr. Chait's alleged references to the 1989 Report were actually presented to Adam and consequently how Adam could have relied on them.

Moreover, even under a theory of indirect reliance, a "plaintiff can state a claim for fraud based on defendant's alleged misrepresentation to a third party only if the defendant 'intend[ed] it to be communicated to and relied upon by the plaintiff.'" *Eli Lilly and Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 492 (quoting *Parker Precision Prods. Co. v. Metropolitan Life Ins. Co.*, 407 F.2d 1070, 1076 (3d Cir. 1969)). In other words, Plaintiffs must have been an intended recipient of Defendant's alleged misrepresentations within the 1989 Report.

Here, Plaintiffs' allegations suggest otherwise. The SAC is replete with allegations that pediatricians are Defendant's intended audience. For example, quoting the AAP Constitution, Plaintiffs allege that Defendant encourages "the development of high quality pediatric educational

---

[10] Even accepting as true that Dr. Chait portrayed circumcision as such to Adam, Dr. Chait's portrayal is not consistent with the 1989 Report. For example, the 1989 Report makes the following two references to the safety of circumcisions: (1) "[c]ircumcision is a safe surgical procedure if performed carefully by a trained, experienced operator using strict aseptic technique" and (2) "[n]ewborn circumcision is a rapid and generally safe procedure when performed by an experienced operator." (SAC Ex. B at 389–90.) Notably, the 1989 Report does not refer to circumcisions as either "minor" or "harmless." (*See generally id.*)

programs *for students and health professionals at all levels of education and experience.*" (SAC ¶ 2) (emphasis added). Plaintiffs allege that Defendant has a "direct and considerable influence" over its member doctors and the pediatric profession. (*Id.* ¶¶ 8, 22, 61.) The SAC explains that Defendant is an "organization of and for physicians specializing in pediatrics" and that "doctors look to it to set the current standard of care in pediatrics." (*Id.* ¶¶ 21, 23.) Plaintiffs also allege that Defendant develops government health standards and that government agencies look to leverage Defendant's "*influence over pediatricians* in support of public health initiatives." (*Id.* ¶ 26.) Finally, Plaintiffs allege that Defendant "controls when and how pediatricians in the United States perform specific procedures—including circumcisions." (*Id.* ¶ 63.) These allegations all indicate that medical professionals, specifically pediatricians, are the proper and intended recipients of Defendant's statements, not Plaintiffs.

Even the language of the 1989 Report expressly addresses medical professionals, not individual patients: "[n]ewborn circumcision has potential medical benefits and advantages as well as disadvantages and risks. When circumcision is being considered, the benefits and risks should be explained to the parents and informed consent obtained." (SAC Ex. B at 390.) The 1989 Report is aimed at doctors who are medical professionals expected to appropriately discuss the procedure with patients. Notably, Plaintiffs point to just one allegation in their SAC to support that Plaintiffs are the intended audience: that Defendant intends "for the information contained in the 1989 [R]eport to be used by doctors in speaking to parents about the decision [of] whether to circumcise their newborn." (*Id.* ¶ 100.) This allegation attempts to create a connection between doctors and patients' parents. However, it only reinforces that the 1989 Report is actually intended to be read and reviewed by medical professionals. Based on the foregoing, Plaintiffs fail to assert that they

relied on any misrepresentations, or that Defendant even intended for Plaintiffs to rely on the 1989 Report.

> b)    *Material Representation*[11]

Notwithstanding Plaintiffs' failure to allege that Defendant intended for Adam to rely on the 1989 Report or that Adam actually relied on it, Plaintiffs' fraudulent misrepresentation claim faces a broader issue.  Defendant argues that Plaintiffs cannot, as a matter of law, assert a fraud claim because the alleged misrepresentations in the 1989 Report are nonactionable "statements of tentative scientific conclusions or opinions" and "not statements of fact."  (Moving Br. at 14.) Defendant cites to *Pacira BioSciences, Inc. v. American Society of Anesthesiologists, Inc.*, a recent Third Circuit decision that considered whether allegedly false and misleading statements made about a pain medication in a peer-reviewed academic journal can form the basis of a trade libel claim.  63 F.4th 240, 243 (3d Cir. 2023).  The court considered the content, verifiability, and context of the statements at issue and concluded that the statements were nonactionable opinions. *Pacira*, 63 F.4th at 245.

Plaintiffs largely reject the applicability of *Pacira* because Plaintiffs have alleged a fraudulent misrepresentation claim, not a trade libel claim.  (Opp'n Br. at 17.)  However, as Defendant explains, a necessary element a plaintiff must allege to state a claim for both fraud by misrepresentation and trade libel is a false statement.  For example, a claim for fraud by misrepresentation requires a plaintiff to allege "a material misrepresentation of a presently existing or past fact" and a claim for trade libel requires a plaintiff to allege "false allegations concerning

---

[11] The Court notes that in its May 2023 Opinion, the Court concluded that Plaintiffs failed to identify any "relevant sources" that "articulate how Defendant could have known its representations in the 1989 Report were false." Lavine, 2023 WL 3431212, at *6.  To cure Plaintiffs' defect regarding Defendant's alleged knowledge about the falsity of the affirmative misrepresentations, the SAC now identifies various articles, reports, and sources, all predating 1989, that contain "many of the facts the APP intentionally omitted in the 1989 [R]eport." (SAC ¶¶ 43; Opp'n Br. at 8.) Defendant challenges the adequacy of the amendment because it argues that citing to competing studies "does not answer the question of which of the studies is correct." (Moving Br. at 22.)

plaintiff's property or product." *See Banco Popular*, 184 N.J. at 172–73 (2005); *Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1140 (3d Cir. 1977).  Though courts in our Circuit have not yet applied *Pacira* in the context of a fraudulent claim, at least one circuit court affirmed a district court's holding that non-actionable medical opinions, instead of factual assertions, could not "support a claim for fraudulent or negligent misrepresentation." *Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 702 (5th Cir. 2023).

Here, the Court agrees with Defendant that the statements made in the 1989 Report are scientific conclusions and medical opinions, not statements of fact.  The 1989 Report itself disclaims that the recommendations therein "do not indicate an exclusive course of treatment or procedure to be followed."  (SAC Ex. B at 388.)  It even warns that "[v]ariations, taking into account individual circumstances, may be appropriate."  (*Id.*)  Such disclaimers evidence that the statements are more akin to "scientific conclusions subject to revision."  *Pacira*, 63 F.4th at 247.  Also, the statements were made in a peer-reviewed journal specifically targeted to pediatricians who are "best positioned to identify opinions and 'choose to accept or reject [them] on the basis of an independent evaluation of the facts.'"  *Id.* at 248 (quoting *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985)).  As such, Plaintiffs cannot, as a matter of law, assert a fraudulent misrepresentation claim based on the nonactionable conclusions and opinions made in the 1989 Report.

Accordingly, the Court finds that Plaintiffs have failed to allege a claim for intentional fraud and the Court will dismiss Count I of the SAC.

## B.    COUNT II – EQUITABLE FRAUD

The SAC also pleads a claim for equitable fraud. (SAC ¶¶ 96–105.)  Equitable fraud and common-law fraud differ in at least two respects.  First, a plaintiff pleading equitable fraud need

not establish the defendant's knowledge of the falsity or intention to obtain an advantage therefrom. Second, a plaintiff asserting equitable fraud is not entitled to money damages; he may seek only equitable relief. *See Jewish Ctr. of Sussex Cnty. v. Whale*, 86 N.J. 619, 624–25 (1981); *Cap. Inv. Funding, LLC v. Lancaster Grp., LLC*, Civ. No. 08-4714, 2023 WL 2728716, at *10 (D.N.J. Mar. 30, 2023).

The SAC now explicitly seeks equitable relief. (SAC at 26.)[12] However, the Court will nevertheless dismiss Plaintiffs' equitable fraud claim on the same grounds it dismisses the intentional fraud claim, except for the failure to plead Defendant's knowledge of the alleged misrepresentation. Accordingly, the Court will dismiss Count II of the SAC.

## C.    FUTILITY OF AMENDMENT AND DISMISSAL WITH PREJUDICE

Finally, the Court considers whether it should dismiss the SAC with prejudice. In light of the Court's holding that Defendant does not owe Plaintiff a duty under *Snyder*, any further factual allegations or explanation seeking to establish a duty would not cure the deficiencies identified herein. Further, despite several attempts to amend its pleading, Plaintiffs have failed to cure its defects regarding several elements of its intentional and equitable fraud claims. The Court therefore finds amendment would be futile and dismisses the SAC with prejudice for failure to state a claim upon which relief may be granted. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 112–13 (3d Cir. 2002) (holding that futility of amendment is a proper reason to deny leave to amend).

---

[12] The SAC is consistently numbered until the prayer for relief beginning on page 26. For clarity, when the Court refers to Plaintiffs' prayer for relief, the Court cites to the page number of the pleading.

IV.     **CONCLUSION**

For the reasons stated above, the Court will GRANT Defendant's Motion to Dismiss.  An

appropriate Order will follow.


Date: **May 31, 2024**

ZAHID N. QURAISHI
UNITED STATES DISTRICT JUDGE

17